IN THE

COURT OF SPECIAL APPEALS OF MARYLAND

SEPTEMBER TERM  1985

No. 75

ALFRED A. CHESTNUT,
RANSOM L. WATKINS,
ANDREW L. STEWART, JR.,

Appellants

v.

STATE OF MARYLAND,

Appellee

APPEAL FROM THE CIRCUIT COURT FOR BALTIMORE CITY
(THE HONORABLE ROBERT M. BELL PRESIDING WITH A JURY)

APPELLANTS' BRIEF

Alan H. Murrell
Public Defender

Michael R. Braudes
Assistant Public Defender

Counsel for Appellant

INDEX

TABLE OF CONTENTS

| | Page |
|---|---|
| STATEMENT OF THE CASE | 1 |
| QUESTIONS PRESENTED | 2 |
| STATEMENT OF FACTS | 2 |
| ARGUMENT: | |

I.  The trial court erred in refusing to strike a prospective juror for cause. ... 5

II.  The trial court erred in refusing to compel the State to disclose the reports of the principal investigating officer for purposes of cross-examination. ... 9

III.  The trial court erred in permitting the State to impeach and rehabilitate its own witnesses. ... 11

IV.  The trial court erred in admitting the prior consistent statement of a State's witness. ... 14

V.  The trial court erred in denying Appellants' motions to suppress identification. ... 15

VI.  The trial court erred in denying Appellant Chestnut's motion to suppress the fruits of a search of his home. ... 17

VII.  The trial court erroneously permitted improper closing argument by the prosecutor. ... 18

VIII.  The trial court erred in excluding evidence that principal State's witness did not know Appellant Stewart prior to the homicide. ... 19

CONCLUSION ................................................... 20

## TABLE OF CITATIONS

### Cases

Baltimore City Passenger Car Co. v. Knee,
    83 Md. 77, 34 A.252 (1896) ..................... 13,14
Boone v. State, 33 Md. App. 1,
    363 A.2d 550 (1976) ............................... 13
Borza v. State, 25 Md. App. 391,
    335 A.2d 142 (1975) ............................... 13
Carr v. State, 284 Md. 455,
    397 A.2d 606 (1979) ............................. 10,11
City of Baltimore v. Zell, 279 Md. 23,
    167 A.2d 14 (1977) ............................... 12
Curry v. State, 54 Md. App. 250,
    458 A.2d 474 (1983) .............................. 19
Harris v. State, 11 Md. App. 658,
    276 A.2d 406 (1971) .............................. 13
Kanaras v. State, 54 Md. App. 568,
    460 A.2d 61 (1983) ............................. 10,11
King v. State, 18 Md. App. 266,
    306 A.2d 258 (1973) .............................. 16
King v. State, 287 Md. 530,
    414 A.2d 909 (1980) ............................... 8
Leeson v. State, 293 Md. 425,
    445 A.2d 21 (1982) ............................... 20
Leonard V. State, 290 Md. 295,
    429 A.2d 538 (1981) ............................. 9,11
Poole v. State, 228 Md. 462,
    180 A.2d 682 (1962) .............................. 19
Poole v. State, 290 Md. 114,
    428 A.2d 434 (1981) .............................. 12
Shoemaker v. State, 228 Md. 462,
    180 A.2d 682 (1962) .............................. 19
State v. Werner, ___ Md. ___,
    ___ A.2d ___ (No. 136, September
    Term, 1983, filed April 4, 1985) ........... 12,13,14
Webster and Johnson v. State, ___ Md. ___,
    ___ A.2d ___ (1984) ............................. 17

## MISCELLANEOUS

LaFave, Search and Seizure -
    A Treatise On The Fourth Amendment,
    Sec. 3.2 (1978) .................................. 18
75 Am. Jur. 2d Trial Sec. 307 (1974) .................. 19

IN THE

COURT OF SPECIAL APPEALS OF MARYLAND

---

SEPTEMBER TERM, 1985

---

No. 75

---

ALFRED A. CHESTNUT,
RANSOM L. WATKINS,
ANDREW L. STEWART, JR,

Appellants

v.

STATE OF MARYLAND,

Appellee

---

APPEAL FROM THE CIRCUIT COURT FOR BALTIMORE CITY

(THE HONORABLE ROBERT M. BELL PRESIDING WITH A JURY)

---

APPELLANTS' BRIEF

---

## STATEMENT OF THE CASE

Alfred A. Chestnut, Ransom L. Watkins, and Andrew
L. Stewart, Jr. (Appellants) were charged by indictment with
murder, robbery with a deadly weapon and handgun offenses.
On May 1-28, 1984, Appellants were tried by the Circuit

Court for Baltimore City, the honorable Robert M. Bell pre-
siding with a jury. Appellants were convicted of felony-
murder, robbery with a deadly weapon, and various handgun
offenses. On July 20, 1984, Appellant Chestnut was sen-
tenced to incarceration for a period of life plus 20 years,
and Appellants Watkins and Stewart to incarceration for
life. This appeal was timely noted.

## QUESTIONS PRESENTED

1. Did the trial court err in refusing to strike a
prospective juror for cause?

2. Did the trial court err in refusing to compel
the State to disclose the reports of the principal investi-
gating officer for purposes of cross-examination?

3. Did the trial court err in permitting the State
to impeach and rehabilitate its own witnesses?

4. Did the trial court err in admitting the prior
consistent statement of a State's witness?

5. Did the trial court err in denying Appellants'
motions to suppress identification?

6. Did the trial court err in denying Appellant
Chestnut's motion to suppress the fruits of a search of his
home?

7. Did the trial court erroneously permit improper
closing argument by the prosecutor?

8. Did the trial court err in excluding evidence
that a principal State's witness did not know Appellant
Stewart prior to the homicide?

## STATEMENT OF FACTS

At approximately 1:15-1:30 P.M. on November 18,
1983, DeWitt Duckett was shot and killed while attending
classes at the Harlem Park Junior High School. The shooting

2

occurred during a robbery of Duckett's Georgetown University basketball jacket. At issue was the identity of the persons responsible.

The State's principal witnesses were four students at the school, Yvette Thomas, Edward Capers, John Caldwell, and Ron Bishop. Thomas testified that after a class ending at 1:10 P.M., she walked from a classroom toward the school cafeteria. (5/17/84,120.) Approaching an "off-limits" hallway reserved for faculty use, she observed Appellants accosting Duckett. Appellants Stewart and Watkins asked Duckett for his jacket. (Id., 132.) After these words were spoken, Appellant Chestnut placed a gun to Duckett's neck and pulled the trigger. (Id., 137.)      dence was adduced that Duckett died approximately an hour later, and that when he was next seen after the shooting he was no longer wearing his Georgetown jacket.

Thomas' credibility was impeached on the basis of prior inconsistent statements, a striking inability to recollect details, and an assertion, unsupported by any other witness, that a fourth perpetrator and a second gun were involved in the case.

Edward Capers testified that during the course of the robbery Appellant Watkins grabbed Duckett around the neck, Appellant Stewart pulled at his jacket, and Appellant Chestnut pointed a gun at his neck. (5/21/84, 25.) As Capers ran off, he heard a shot fired.

3

On cross-examination, Capers was impeached based upon his admittedly false statement to the police made on the day of the shooting. (Id., 75-77.) That statement was exculpatory to Appellants. Capers explained that he made the false statement because of fear of reprisals by Appellants.

On redirect examination, over objection and following a bench conference, Capers was permitted to testify that on December 1, 1983, he testified before the Baltimore City Grand Jury that Appellants were, in fact, involved. (Id., 90.)

John Caldwell's testimony regarding the roles of the Appellants was essentially the same as that of Capers. (Id., 107-110.) In this case, the State sought to adduce evidence of a prior inconsistent statement exculpatory to Appellants. (Id., 113.) Defense counsel objected on the basis of improper impeachment and rehabilitation. After a bench conference, the objection was overruled. (Id., 115.) The prosecutor proceeded to elicit Caldwell's testimony that on the day of the shooting, the witness had deliberately lied to the police because he was afraid of Appellants. In addition, between November 18 and November 22 Caldwell was shown photographs on three occasions, and did not select photos of Appellants. It was not until November 23, after a "stern" lecture from Detective Donald Kincaid to the effect that the police knew that he knew who was actually involved, that the witness provided the same information that he had

4

testified to on the witness stand.  Over further objection,
the State was permitted to rehabilitate Caldwell on this
basis. (Id., 120-123.)

The situation with regard to Ron Bishop was virtu-
ally identical.  He too testified in Court that all three
Appellants were responsible for the robbery and murder.
(5/22/83, 40-42.)  Over objection, the court permitted the
prosecutor to elicit the witness's deliberately false state-
ment to police on the day of the shooting.  (Id., 46-47),
and that the lie was motivated by fear of Appellants. (Id.,
51.)  Over further objection, the State was permitted to
rehabilitate the witness through a prior consistent state-
ment made on November 23, when the witness identified Appel-
lants as the actual perpetrators. (Id., 52.)

Two defense witnesses testified that approximately
one hour before the shooting two persons who were not any of
the Appellants unsuccessfully attempted to rob DeWitt
Duckett of his jacket.

Additional facts will be supplied as they relate to
the respective issues.

## ARGUMENT

### I.  THE TRIAL COURT ERRED IN REFUSING TO STRIKE A PROSPECTIVE JUROR FOR CAUSE.

During the jury selection process, prospective
juror Mileo responded to questioning as follows:

THE JUROR:  Three-eighty-four.

THE COURT:  Three-eighty-four, Mr. Mileo?

5

THE JUROR:   Mileo, yes, sir.

THE COURT:   What do you know about this case?

THE JUROR:   If it's the case I am thinking it is, I heard about the boy that was killed because of the jacket. I heard it on television and read about it in the paper.

THE COURT:   When was the last time you heard or read anything about it, do you remember?

THE JUROR:   Oh, I guess it's about a good five months, maybe.

THE COURT:   Other than what you've told us today is there anything in particular that you remember?

THE JUROR:   Well, I just remember I was thinking about the boy himself and silly thing over a jacket and I kind of formed an opinion myself about the boy, they found the jacket in his house.

THE COURT:   Would you be able, if you were chosen to be a member of this jury, to listen to the evidence in this case, keep an open mind and reach a decision only after the evidence is in, the attorneys have argued their respectful [sic] positions and you've been instructed by me?

THE JUROR:   I guess I could but I know I did -- I made an opinion on my own, you know, when I heard on television. But, I don't know. I'll say I could, yes.

THE COURT:   I'm not putting pressure on you. I just want to know if you could do it.

THE JUROR:   I imagine after I heard all the facts, I imagine I could.

THE COURT:   You say you imagine you could?

THE JUROR:   Well, and my mind would -- maybe my mind would swing the other way and I would say yes.

THE COURT: I want to make sure that you've got it right. If you were chosen as a member of this jury could you keep an open mind as to the guilt or innocence of these three individuals?

THE JUROR: Open mind, yes, I could.

THE COURT: All right. Not reach any conclusions in this case until all of the evidence is in and you've been instructed and the attorneys have argued their case to you?

THE JUROR: I think I could.

THE COURT: Any questions?

MR. CREMIN: No, sir.

THE COURT: Questions?

MR. DIAMOND: You say you would try to keep an open mind if you were swayed the other way. What did you mean by that?

THE JUROR: I didn't say that ight. What I meant was, heard the case first. I mean, I kind of made up an opinion of my own, how I felt about it.

MR. DIAMOND: What was the opinion that you came to?

THE JUROR: That what he said there was -- would be -- the evidence -- he might be guilty of it.
It's been a long time, you know, since I heard it.

MR. DIAMOND: Well, do you think that opinion would cloud your thinking at all since you already know something about the case?

THE JUROR: No, I don't think it would.

MR. DIAMOND: I have no other questions.

MR. SHOUP: Nothing.

THE COURT:   You may stand up someplace around here, please.   Thank you.   (5/14, 93-95, emphasis added.)

Defense counsel moved to strike the juror for cause, and the motion was denied.

The following day, after Mr. Mileo was actually seated on the jury, counsel renewed their motions to strike and moved for a mistrial. (5/15/84, 30-36.)  During the lengthy argument, counsel asserted that they had exercised all of their peremptory challenges, were not "satisfied with the jury," and in no way waived their objection.  The motions were denied. (Id., 36.)

Appellants assert that the court's ruling was obvious error.   In King v. State, 287 Md. 530, 535, 414 A.2d 909 (1980), the Court of Appeals wrote:

> In determining whether a juror should be excused for cause, the general question is whether a person holds a particular belief or prejudice that would affect his ability or disposition to consider the evidence fairly and impartially and reach a just conclusion.

It is patently obvious that Mr. Mileo was not an objective juror.  As a result of a great deal of pretrial publicity, he had already formed an opinion as to the guilt of at least one of the defendants.  To the extent that his mind was "open," it was open for the purpose of having the defense prove that his preconception was in error.  Plainly, the burden of proof in this case as to at least one juror was borne by the defense and not by the State.

8

The law is clear that a prospective juror's answers to voir dire questions must clearly dispel the possibility of bias:

> [A] juror should be excluded unless the court is clearly satisfied of his fairness and freedom from prejudice, and it is the duty of the court to resolve all doubts on this question against the juror. According-ing to some decisions all doubts as to a juror's competency should be resolved, in a criminal case, in favor of [the] ac-cused.  50 C.J.S. Juries sec. 277 at 1062 (1947).  (Emphasis added.)

In the instant case, there was no doubt to dispel. The juror was biased in favor of the State, and his presence on the jury assured a fundamentally unfair trial.

> II.   THE TRIAL COURT ERRED IN REFUS-
> ING TO COMPEL THE STATE TO DIS-
> CLOSE THE REPORTS OF THE
> PRINCIPAL INVESTIGATING OFFICER
> FOR PURPOSES OF CROSS-EXAMINA-
> TION.

At trial, the defense requested that the State turn over any notes or reports prepared by Detective Kincaid for use on cross-examination.  Cited as authority was Leonard v. State, 290 Md. 295, 429 A.2d 538 (1981). (5/23/84, 69.)  The request was denied. (Id., 71.)  The court then ordered the relevant documents collected for purposes of appellate re-view, and they appear in the record as Appellant Watkins' Exhibit No. 5.[1]

-----------------
[1] All Appellants expressly joined in the request.

Appellants assert that the ruling of the court was clear error. Under <u>Leonard</u> and its predecessor <u>Carr v. State</u>, 284 Md. 455, 397 A.2d 606 (1979), it is now clear that upon request, the statement of a prosecution witness must be turned over to the defense prior to cross-examination. The statements of a police officer are no exception. In <u>Kanaras v. State</u>, 54 Md. App. 568, 573-80, 460 A.2d 61 (1983), this Court was faced with an identical request for production of the notes of a principal investigating officer. It wrote, at 579, that "ordinarily, we might agree with Appellant ...." It found that any error in this regard was harmless, because the officer's testimony was consistent with the defendant's theory of defense.[2]

In the present case, by contrast, the detective's testimony was totally damaging to the defense. Moreover, the reports would have offered valid points for cross-examination. For example, Kincaid's report of November 18, 1983, flatly states that a single suspect was involved, indicating that he believed the initial versions of the witnesses which were later recanted. The report (at Page 3) further listed Arnold Dow and Curtis Dow as having been seen in the area immediately prior to the shooting; these two names were listed in the same category as those of Appellants.

------------------

[2] Whitehead v. State, 54 Md. App. 428, 458 A.2d 905 (1983), was cited by the Kanaras Court. The prosecutor's reliance upon Whitehead below was therefore obviously misplaced.

10

The report of November 23, 1983, provides even more grounds for cross-examination. That report lists several new potential suspects: Craig Cox, Jimmie Watkins, Walter Jones, Kenneth Johnson, Brian Goodwyn, Michael Washington, Irroll Glascoe, Melvin Griffith, and Raymond Ashe, Jr. It is clear that the defense attorneys could have had a field day with this report, attacking the Police Department's investigation into the possible participation of those people and substantially diluting the focus upon Appellants.

Under Leonard, Carr, and Kanaras, the disclosure should have been made.[3]

### III. THE TRIAL COURT ERRED IN PERMITTING THE STATE TO IMPEACH AND REHABILITATE ITS OWN WITNESSES.

As set forth in the Statement of Facts, the trial court permitted the prosecutor, over repeated and specific objections, to impeach and rehabilitate his own witnesses, John Caldwell and Ron Bishop. Each was permitted to testify that Appellants were the perpetrators of the offense; that from November 18 through 22, 1983, they intentionally lied to the police, giving false statements and deliberately failing to select proper photographs as a result of fear of

---

[3] Alternatively, this information should have been disclosed because its content — identifications of persons other than Appellants as the perpetrators — was exculpatory in nature. Brady v. Maryland, 373 U.S. 83 (1963).

11

reprisals; and that on November 23, 1983, each gave a "correct" statement to the police, which was evidentially justified as a prior consistent statement. It is asserted that the court's allowance of this examination was incorrect for three distinct reasons.

First, the state violated the "voucher" rule by impeaching its own witnesses. "In Maryland, we continue to adhere to the rule that ordinarily a party may not impeach its own witness. Poole v. State, 290 Md. 114, 118, 428 A.2d 434 (1981)." State v. Werner, ___ Md. ___, ___ A.2d ___ (No. 136, September Term, 1983, filed April 4, 1985), slip op. at 20 n.11. A prior inconsistent statement is not substantively admissible - it comes in only to impeach. In this case, the inconsistency was particularly impeaching because it took the form of a deliberate falsehood. Obviously, the voucher rule was not adhered to.

Secondly, the State violated the rule that "a party ordinarily may not sustain the credibility of his own witness absent an attack upon credibility by the other side. City of Baltimore v. Zell, 279 Md. 23, 27, 367 A.2d 14 (1977), and authorities there cited." Werner, supra, at 15, emphasis added. Here, of course, no impeachment "by the other side" preceded the prosecutor's rehabilitative questioning.

Thirdly, even had there been proper impeachment by the opposing parties, the circumstances justifying the admission of prior consistent statements were not present. A

12

prior consistent statement is admissible to rehabilitate a
witness accused of fabricating testimony only if the extra-
judicial statement was made before the alleged motive to
fabricate arose. Balto. City Passenger Car Co. v. Knee, 83
Md. 77, 78-80, 34 A.252 (1896); Boone v. State, 33 Md. App.
1, 6, 363 A.2d 550 (1976); Borza v. State, 25 Md. App. 391,
410, 335 A.2d 142 (1975); Harris v. State, 11 Md. App. 658,
661, 276 A.2d 406 (1971). In the instant case, the asserted
motive to fabricate arose when Detective Kincaid sternly
informed the witnesses that the police knew they were with-
holding information. The "prior consistent statements," to
Kincaid and to the Grand Jury, came after this event.
Therefore, they did not rebut the allegation of fabrication,
and should not have been admitted.

State v. Werner, supra, is directly analogous to
the present case. In that prosecution for a sexual offense
against the defendant's step-daughter, the State improperly
impeached the alleged victim by eliciting the fact that she
waited five years to report the crime. Using the same
"bootstrapping" technique utilized in the instant case, the
prosecutor then rehabilitated the witness with evidence that
the defendant had committed an assault on a second step-
daughter, leading the first to report the offense. The
Court of Appeals made the same three findings that Appellant
urges upon this Court: the prosecutor improperly impeached
his own witness; he bolstered her credibility before it had

13

been attacked by the opposing party; and he adduced reha-
bilitative evidence that violated an independent evidentiary
rule.

The result in Werner should also apply here. The
convictions must be reversed.[4]

### IV. THE TRIAL COURT ERRED IN ADMIT-
### TING THE PRIOR CONSISTENT STATE-
### MENT OF A STATE'S WITNESS.

The rehabilitation of Edward Capers arose in a
different context than that of Caldwell and Bishop, but the
error is analogous. Capers was examined and cross-examined
in acceptable fashion, with the impeachment coming from the
defense. On redirect examination, over objection, Capers
testified that on December 1, 1983, he testified before the
grand jury that Appellants were guilty of the offense.
(5/21/84, 87-90.) Again, the court expressly justified the
admission of the testimony as a prior consistent statement.

As set forth in Argument II, supra, the require-
ments for a prior consistent statement were not met. The
alleged motive to fabricate arose, if at all, from Detective
Kincaid's November 23 tongue-lashing. The prior consistent
statement came a week later, when it could have no tendency
to dissipate the fabrication. As the Court of appeals wrote
at length in Knee, supra, the prior consistent statement
exception is a narrow one which must be strictly construed

-----------------
[4]As in Werner, any argument that the prior inconsistent
statements would have been utilized by defense counsel on
cross-examination in any event is sheer speculation.

14

against admission of the evidence. Where as here the evidence clearly did not meet the test, and witness credibility was the central issue, the admission of the sworn testimony, inculpatory to Appellants, was reversible error.

### V. THE TRIAL COURT ERRED IN DENYING APPELLANTS' MOTIONS TO SUPPRESS IDENTIFICATION.

Prior to trial, Appellants moved to suppress, _inter alia_, the pretrial and in-court identifications by John Caldwell and Ron Bishop on grounds of impermissibly suggestive identification procedures. The motion was denied. (5/7/84, 39.) Appellants submit that this ruling was erroneous.

Caldwell and Bishop were each shown photographs on four separate occasions between November 21 and November 23. The pattern was the same for each witness. Detective Donald Kincaid testified[5] that on November 21, he and a partner, Detective Lansey, showed the witnesses an array of 11 color photographs, which contained photographs of all three Appellants. Each witness selected none of the photos as depicting persons involved in the shooting.

The following day, a totally new array of six photographs was shown to the witnesses early in the evening. No relevant selections were made.

Very late that night, a third array was shown the witnesses. Again, no identification was made.

---
[5]The relevant testimony begins at Page 85 of the transcript of May 4, 1984.

15

The following day, November 23, the witnesses were transported to police headquarters at 601 East Fayette Street. In a "stern" manner (5/4/84, 108), Kincaid informed the witnesses that the police knew that they had relevant information, and had been withholding it. The same group of 11 photographs as had been shown two days earlier -containing the photos of the three Appellants, who were the only three persons in the group known to the witnesses - was shown again. This time, the witnesses selected photographs of the three Appellants.

It is submitted that the repetition of the three photographs of persons familiar to the witnesses, in conjunction with the potentially coercive impact of Detective Kincaid's admonition, rendered the procedure impermissibly suggestive. The law is clear that repeated showings of the same photograph renders the procedure impermissibly suggestive. King v. State, 18 Md. App. 266, 306 A.2d 258 (1973). While concededly the witnesses in the instant case were not subjected to a "barrage" of like photos such as occurred in King, Detective Kincaid's admonition made up the slack. The detective effectively told the witnesses that if they did not make an identification, they would be liars, and perhaps obstructors of justice, in the eyes of the Baltimore City Police Department. The identification they made consisted of three people with two things in common:  their photos had been shown twice, and they were familiar to the witnesses from the neighborhood.

16

In addition to suggestiveness, Appellants must demonstrate a likelihood of misidentification. Webster and Johnson v. State, ___ Md. ___, ___ A.2d ___ (1984). In the instant case, the witnesses were never asked if their identifications were based upon their recollection of the incident, as opposed to the showing of the photographs. As this Court noted in King, repeated photographic images tend to remain in a witness's mind. Taking into account all of the relevant facts and circumstances, the motions to suppress should have been granted.

## VI.   THE TRIAL COURT ERRED IN DENYING APPELLANT CHESTNUT'S MOTION TO SUPPRESS THE FRUITS OF A SEARCH OF HIS HOME.

Prior to trial, Appellant Chestnut moved to suppress the fruits of a search of his home which led to the seizure of a Georgetown basketball jacket. (5/2/84, 20-30.) Appellant argued that the affidavit supporting the issuance of the warrant permitting the search, which appears in the record as State's Motion Exhibit No. 1, does not contain facts giving rise to probable cause. That argument was correct, and the motion should have been granted.

While "probable cause" is a difficult concept to define, the cases have generally turned upon whether a reasonable person, exercising ordinary common sense, would have a reasonable basis to conclude that incriminating evidence will be found in a particular location. See generally

17

Lafave, Search and Seizure - A Treatise On The Fourth Amend-
ment, Sec. 3.2 (1978). In the present case, there was sim-
ply no basis for a reasonable belief that a Georgetown
jacket would be found in the Chestnut home.[6] While there
was evidence in the affidavit and at trial that Appellant
Chestnut was involved in the crime, the affidavit provides
no reason to believe that the jacket would be found in his
home. Accordingly, the motion to suppress should have been
granted.

### VII.   THE TRIAL COURT ERRONEOUSLY PERMITTED IMPROPER CLOSING ARGUMENT BY THE PROSECUTOR.

During the prosecutor's closing argument, the fol-
lowing occurred:

> The juries have been listening to facts,
> listening to adults and children testify,
> have been able to reach just decisions and
> convictions based on evidence - -

MR. CREMIN:  Objection.

THE COURT:  Overruled.

MR. SHOUP:  So, what you are doing right now is
nothing that is an incredible burden.
· · · ·  (5/28/83, 180.)

·   ·   ·

MR. SHOUP:  In addition to [putting pressure on
witnesses], Detective Kincaid or mem-
bers of the Baltimore City Police De-
partment were going to do something to
fabricate evidence which was sort of
what the defense said at one time.

MR. CREMIN:  Objection.

----------------
[6]The evidence at trial strongly indicated that the jacket
seized was not DeWitt Duckett's jacket.

18

THE COURT:  Overruled.  (Id., 183.)

Appellants submit that in both instances, the objections should have been sustained.  The first quoted argument, by stressing that convictions are common, everyday events, was improper because it denigrated the jury's responsibility and the State's burden of proof.  Cf. Shoemaker v. State, 228 Md. 462, 180 A.2d 682 (1962); Poole v. State, 295 Md. 167, 194-97, 453 A.2d 1218 (1987), both involving the shifting of the jurors' responsibility to another body.  The argument that convictions are just and common is quite similar to an argument that the public expects the jury to return a verdict of guilty, and such arguments are universally condemned.  75 Am. Jur. 2d Trial Sec. 226 (1974).

The prosecutor's second argument is simply a liedefense counsel did not accuse the police of fabricating evidence.  A prosecutor's obligation to be truthful in argument is clear.  Curry v. State, 54 Md. App. 250, 458 A.2d 474 (1983).  There is no doubt that such an unwarranted attack upon opposing counsel is improper.  75 Am. Jur. 2d Trial Sec. 307 (1974).  Accordingly, the second objection should have been sustained as well.

> VIII.  **THE TRIAL COURT ERRED IN EXCLUDING EVIDENCE THAT A PRINCIPAL STATE'S WITNESS DID NOT KNOW APPELLANT STEWART PRIOR TO THE HOMICIDE.**

On direct examination of John Caldwell, the

19

prosecutor elicited the fact that Caldwell had initially lied to the police because he was afraid of Appellants (5/22/84, 11.) On recross-examination, in order to both reduce the impact of this testimony and to weaken Caldwell's identification of his client, Appellant Stewart's counsel asked, "As a matter of fact, you didn't even know Andrew Stewart before this incident happened, did you?" (Id., 13-14.) The prosecutor objected, and the objection was sustained.

It is asserted that this ruling was obvious error. Caldwell's lack of prior acquaintance with Appellant Stewart was directly relevant, because it tended to support the defense position of the crucial issue of identification and the subsidiary issue of Caldwell's fear of the defendants individually. See generally Leeson v. State, 293 Md. 425, 445 A.2d 21 (1982). This exclusion of relevant evidence was reversible error.

## CONCLUSION

For the foregoing reasons, Appellants respectfully request that this Court reverse the judgment of the court below.

Respectfully submitted,

Alan H. Murrell
Public Defender

Michael R. Braudes
Assistant Public Defender

Counsel for Appellants

lv
4/22/85

20