BRAUDES



UNREPORTED
IN THE COURT OF SPECIAL APPEALS OF MARYLAND

UNREPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

September Term, 1985

No. 75

---

ALFRED A. CHESTNUT
RANSOM L. WATKINS
and
ANDREW L. STEWART, JR.

v.

STATE OF MARYLAND

---

Bloom
Bell, Rosalyn B.
Karwacki,

JJ.

---

PER CURIAM

---

FILED:   September 30, 1985

Alfred A. Chestnut, Ransom L. Watkins and Andrew L. Stewart, Jr., were convicted by a jury in the Circuit Court for Baltimore City of felony murder, robbery with a deadly weapon and use of a handgun in the commission of crimes of violence. Chestnut was sentenced to incarceration for life plus twenty years, and Watkins and Ransom received life sentences.

Chestnut, Watkins and Stewart appeal and present these questions:

"1. Did the trial court err in refusing to strike a prospective juror for cause?

"2. Did the trial court err in refusing to compel the State to disclose the reports of the principal investigating officer for purposes of cross-examination?

"3. Did the trial court err in permitting the State to impeach and rehabilitate its own witnesses?

"4. Did the trial court err in admitting the prior consistent statement of a State's witness?

"5. Did the trial court err in denying Appellants' motions to suppress identification?

"6. Did the trial court err in denying Appellant Chestnut's motion to suppress the fruits of a search of his home?

"7. Did the trial court erroneously
permit improper closing argument by the
prosecutor?

"8. Did the trial court err in
excluding evidence that a principal
State's witness did not know Appellant
Stewart prior to the homicide?

Dewitt Duckett, a fourteen year old student at Harlem
Park Junior High School, was shot and killed at school on
November 18, 1983. The victim and three of his friends, Edward
Capers, Ronald Bishop and John Caldwell, were taking a shortcut
to the cafeteria using an "off limits" hallway reserved for the
faculty.

John Caldwell testified that after he and his friends
left science class, he separated from the others and returned
to the classroom because he thought he had left his lunch
ticket there. After he found the ticket he walked back down
the hall to the "off limits" hallway to catch up with his
friends. When he got there he saw "Ron, Edward, Dewitt and
[Alfred] Chestnut, Ranson [Watkins] and [Andrew] Stewart...."
He "stopped for a while" and "ducked behind a locker
...[be]cause I figured it [sic] was some sort of trouble."
From behind the locker, he saw Watkins grab Duckett around his
neck. After that, Chestnut pointed a gun at his neck. When
Caldwell looked out from his hiding place behind the locker, he

saw Stewart trying to remove Duckett's Georgetown jacket. Once again, Caldwell ducked behind the locker. The next time he peered out he saw Chestnut shoot the victim. Caldwell further related that "after he shot him I ran...down the hall and went down the steps toward the cafeteria." He indicated, however, that while he was on the stairs, Chestnut grabbed him by the shirt and told him that if he "said anything involving the case that he would hurt me...."

Edward Capers and Ronald Bishop corroborated Caldwell's testimony. Bishop related that he saw Watkins grab Duckett and saw Chestnut aim the gun at his neck. At that point, he and Capers ran to the cafeteria for help. While they were running down the stairs they heard the gun shot. Soon after they reached the cafeteria, Duckett came into the lunchroom. According to Capers, Duckett was "holding his neck and [he] went around some tables. He got in front of us and he collapsed."

Another eye witnesss, Yvette Thomas, stated that she had just finished math class and was on her way to the cafeteria. She stopped at the gate to the "off limits" hallway because she saw Chestnut, Watkins, Stewart and Duckett. Thomas

"heard Andrew [Stewart] ask for his jacket...." Then, she saw Chestnut point a gun at Duckett's neck and shoot him.

The victim was transported by ambulance to the hospital where he was pronounced dead shortly after his arrival.

## I. COURT'S REFUSAL TO STRIKE A JUROR FOR CAUSE

During the jury selection process a prospective juror responded to questions concerning pretrial publicity of the case as follows:

"THE COURT: Three-eighty-four, Mr. Mileo?

"THE JUROR: Mileo, yes, sir.

"THE COURT: What do you know about this case?

"THE JUROR: If it's the case I am thinking it is, I heard about the boy that was killed because of the jacket. I heard it on television and read about it in the paper.

"THE COURT: When was the last time you heard or read anything about it, do you remember?

"THE JUROR: Oh, I guess it's about a good five months, maybe.

"THE COURT: Other than what you've told us today is there anything in particular that you remember?

"THE JUROR: Well, I just remember I was thinking about the boy himself and silly thing over a jacket and I kind of formed an opinion myself about the boy, they found the jacket in his house.

"THE COURT: Would you be able, if you were chosen to be a member of this jury, to listen to the evidence in this case, keep an open mind and reach a decision only after the evidence is in, the attorneys have argued their respectful [sic] positions and you've been instructed by me?

"THE JUROR: I guess I could but I know I did -- I made an opinion on my own, you know, when I heard on television. But, I don't know. I'll say I could, yes.

"THE COURT: I'm not putting pressure on you. I just want to know if you could do it.

"THE JUROR: I imagine after I heard all the facts, I imagine I could.

"THE COURT: You say you imagine you could?

"THE JUROR: Well, and my mind would -- maybe my mind would swing the other way and I would say yes.

"THE COURT: I want to make sure that you've got it right. If you were chosen as a member of this jury could you keep an open mind as to the guilt or innocence of these three individuals?

"THE JUROR: Open mind, yes, I could.

"THE COURT: All right. Not reach any conclusions in this case until all of the evidence is in and you've been instructed and the attorneys have argued their case to you?

"THE JUROR: I think I could.

"THE COURT: Any questions?

\* \* \* \* \* \* \* \*

"MR. DIAMOND: You say you would try to keep an open mind if you were swayed the other way. What did you mean by that?

"THE JUROR: I didn't say that right. That I know was, heard the case clear. I mean, I kind of wanted an opinion of my own, how I felt about it.

"MR. DIAMOND: What was the opinion that you came to?

"THE JUROR: That what he said there was -- would be -- the evidence -- he might be guilty of it.

It's been a long time, you know, since I heard it.

"MR. DIAMOND: Well, do you think that opinion would cloud your thinking at all since you already have something about the case?

"THE JUROR: No, I don't think it would." (emphasis supplied).

Appellants assert that the court erred in denying their motion to strike this juror for cause. They claim that "[i]t is patently obvious that Mr. Mileo was not an objective juror. As a result of a great deal of pretrial publicity, he had already formed an opinion as to the guilt of at least one of the defendants."

In ascertaining if a juror should be excused for cause, the court must determine whether the "person holds a particular belief or prejudice that would affect his ability or disposition to consider the evidence fairly and impartially and reach a just conclusion." King v. State, 287 Md. 530, 515 (1980). If the juror has been exposed to pretrial publicity, the question then becomes whether he can "lay aside his impression or opinion and render a verdict based on the evidence presented in court." Simms v. State, 49 Md. App. 515, 520 (1981), quoting Irvin v. Dowd, 366 U.S. 717, 723 (1961). Exposure to pretrial publicity, by itself, is not an adequate basis for disqualification of a prospective juror. Id.

In this case, the court questioned Mr. Mileo at length
concerning what effect, if any, the pretrial publicity he heard
would have upon his ability to render an impartial verdict.
Appellants refer us to selected parts of this colloquy claiming
they show that this juror had already formed an opinion as to
their guilt. Despite his comments, the juror indicated that he
would keep an open mind based on the evidence presented. Thus,
we hold that the court correctly applied the law in denying
appellants' motion to strike for cause.

Subsequent to the jury selection, appellants requested
a mistrial claiming the court had refused to strike juror
Mileo. While appellants asserted that they could not strike
him because they had used all of their sixty peremptory
challenges, they did not allege that they had done so prior to
the seating of this juror.

The refusal to grant a mistrial is within the sound
discretion of the trial court, and the ruling will not be
disturbed in the absence of an abuse of discretion. <u>Wilhelm v.
State</u>, 272 Md. 404, 429 (1974). The trial court should only
declare a mistrial where there is "manifest necessity."
<u>Cornish v. State</u>, 272 Md. 312, 317 (1974). No such situation
was presented here.

## II. PRODUCTION OF THE DETECTIVE'S REPORTS

Detective Donald Kincaid of the Baltimore City Police Department testified for the State concerning the homicide investigation which resulted in the arrest of appellants. At the conclusion of the State's examination of this witness, appellants requested production of all of the detective's written notes or reports prepared pursuant to the investigation. The court denied the motion.

Appellants maintain that the detective's investigative notes or reports constitute a "written statement of a witness" under Leonard v. State, 46 Md. App. 631 (1980), affm'd, 290 Md. 295 (1981) and Carr v. State, 284 Md. 455 (1979). Additionally, they argue that the "statements of a police officer are no exception" to the Leonard rule, citing Kanaras v. State, 54 Md. App. 568, cert. denied, 297 Md. 109 (1983).

We disagree. In Carr v. State, supra, the court held that due process requires that the State produce its witness' prior signed statement so that the defense has the opportunity to confront directly the State's witness with any prior inconsistent statement. In Leonard v. State, supra, Judge

Wilner, writing for this Court, further explained that where a witness "has given a prior statement bearing on a material issue in the case...it is incumbent upon the court...to permit counsel to inspect the statement and determine for himself whether it is or is not usable for cross-examination." Id. at 637 and 639. Finally, in Kanaras v. State, supra, we held that "[p]olice reports may or may not provide 'statements' under Carr and Leonard." Id. at 580. In that case, we further observed that "Carr and Leonard are not the proper vehicles" for obtaining "broad investigatory evidence that was otherwise undiscoverable." Id. at 579.

Here, appellants sought production of the detective's notes or reports to demonstrate that there may have been other suspects in the case at various points during the investigation. As appellants themselves explain, "[i]t is clear that the defense attorneys could have had a field day with this report, attacking the Police Department's investigation into the possible participation of [other potential suspects] and substantially diluting the focus upon Appellants."

The defense's purpose in requesting production of these materials was to conduct a "fishing expedition," and resultant smoke screen rather than to impeach the witnesses' credibility. We hold that the court did not err in denying the motion.

### III. STATE'S EXAMINATION OF ITS WITNESS

John Caldwell and Ronald Bishop each testified for the State, and identified appellants as the perpetrators of the crime. They further averred that on the day the victim was shot they gave statements to the police but did not identify the individuals involved because they were frightened. They stated that on November 21, three days after the occurrence, the police showed them photographs of possible suspects but they did not identify the individuals who committed the crime. Two days later, they were again shown suspects' photographs by the police. This time, they identified appellants as the ones who robbed and shot the victim.

Appellants contend that the court erred in permitting this examination for three reasons: (1) the State violated "the voucher rule" by impeaching its witnesses; (2) the State

was permitted to rehabilitate its witnesses even though appellants had not attacked their credibility; and (3) the State did not establish the requisite foundation for admission of the witnesses' prior consistent statements.

In Maryland, a party may not impeach its own witnesses in the absence of surprise, hostility or deceit. Poole v. State, 290 Md. 114, 118 (1981). An extrajudicial identification made by a witness, however, may be offered in evidence for impeachment or as substantive evidence of an identification, having probative value. Bedford v. State, 293 Md. 172, 176 (1982). Since a party can offer an extrajudicial identification as substantive evidence, it would follow that a party may also offer the witnesses' previous failure to identify the accused for substantive purposes.

The record reveals that appellee offered this evidence to show the witnesses' fear of reprisal and to minimize a weakness in their case, not to impeach. Furthermore, appellants reliance on Werner v. State, 302 Md. 550 (1985) as being "directly analogous to the present case" is misplaced. In Werner, the Court held that evidence of certain other crimes of which the defendant had been convicted was inadmissible on direct examination for impeachment. Here, the evidence was

neither offered to attack credibility nor to rehabilitate -- it was offered for substantive purposes.

Finally, appellant's arguments concerning the lack of proper foundation to admit the "prior consistent statements" is specious. In this case, the witnesses prior identifications of appellants were offered for their probative value. <u>Bedford v. State</u>, <u>supra</u>. They were not introduced as prior consistent statements for the purpose of rehabilitation. <u>Boone v. State</u>, 33 Md. App. 4, 6 (1976).

We hold there was no error.

## IV. PRIOR CONSISTENT STATEMENT

On direct examination, Edward Capers related that he saw appellants accost and shoot the victim. He was impeached on cross-examination based upon his statement to the police the day of the occurrence.

On re-direct examination, the State sought to rehabilitate the witness by eliciting his subsequent testimony before the grand jury. Appellant Watkins' counsel objected. At a bench conference, appellants' counsel explained the basis of their objections as follows:

"THE COURT: Mr. Cremin?

"MR. CREMIN: Your Honor, obviously on State's redirect there was absolutely no cross-examination of this witness with respect to Grand Jury testimony.

"THE COURT: That's true.

"MR. CREMIN: Therefore, it's beyond the scope.

* * * * * * * * * * * *

"THE COURT: Any comments from you, Mr. Suser?

"MR. SUSER: No.

"MR. DIAMOND: No.

"THE COURT: I'm going to overrule it."

Appellants assert that the court erred in permitting this examination because the witness's testimony before the grand jury did not meet "the requirements for a prior consistent statement...."

A general objection serves to preserve all grounds for appellate review which may exist. von Lusch v. State, 279 Md. 255, 263 (1977). If, however, the objector states specific grounds for his objection "he normally is deemed to have waived any objection to the evidence on a ground not stated." Id.

In this case, appellants specifically indicated that
they objected to the admission of this evidence because it
exceeded the scope of cross-examination. They did not properly
preserve the issue they now raise for our review. Rule 1085.

## V. MOTION TO SUPPRESS IDENTIFICATION

At a hearing to suppress out of court identifications
of appellants, Detective Kincaid testified that John Caldwell
and Ronald Bishop had been shown photographic arrays on four
separate occasions between November 21 and November 23, 1983.
He related that at different times on November 21, each of the
witnesses was shown an array of eleven color photographs which
contained photographs of all three appellants. Neither one
identified any of them as the perpetrators of the crime. The
next day, Caldwell and Bishop were shown a totally new array of
six black and white photographs as a result of new information
developed by the police. Neither one identified anyone from
that array. Later that night, a third array was shown to the
witnesses, and again there was no positive response.

On November 23, Caldwell and Bishop were taken to
police headquarters. Kincaid indicated that at that time, he

told Caldwell "we had developed some additional information and through this information from witnesses...we know now that he knew who was involved and responsible for the murder of Duckett." He also told them that "[w]e are not going to play around any longer." Both independently identified all three appellants as the perpetrators of the crime.

Appellants claim that the court erred in denying their motion to suppress the pre-trial and in-court identification of these witnesses because the police used impermissibly suggestive identification procedures. Specifically, they argue that "the repetition of the three photographs of persons familar to the witnesses, in conjunction with the potentially coercive impact of Detective Kincaid's admonition, rendered the procedure impermissibly suggestive." In support of their argument they rely on King v. State, 18 Md. App. 266 (1973). They concede that "the witnesses in the instant case were not subjected to a 'barrage' of like photos such as occurred in King," but assert that "Detective Kincaid's admonition made up the slack."

In _Bonner v. State_, 43 Md. App. 518 (1979), this Court adopted the standard, established by the Supreme Court in _Neil v. Biggers_, 409 U.S. 188 (1972), for determining the admissibility of an out of court identification:

> "Reliability, not suggestiveness, is the linchpin in the determination of admissibility. If in the totality of the circumstances, the out of court identification possesses indicia of reliability, the identification is admissible even if suggestive."

_Bonner_, 43 Md. App. at 521.

The court must consider several factors in ascertaining the likelihood of misidentification, including "the opportunity of the witness to view the criminal at the time of the crime; the witness' degree of attention; the accuracy of the witness' prior description of the criminal; the level of certainty demonstrated by the witness at the confrontation; and the length of time between the crime and the confrontation." _Id_. In the instant case, Caldwell and Bishop witnessed the crime and knew or were previously familiar with appellants from the neighborhood.

We hold that the reliability of the out of court identification outweighs any suggestiveness in the identification procedures utilized by the police. The court did not err in denying appellants' motions to suppress.

## VI. MOTION TO SUPPRESS FRUITS OF THE SEARCH

Prior to trial, appellant Chestnut moved to suppress the Georgetown basketball jacket seized from his home at the time of his arrest. He argued that the affidavit supporting the application for a search warrant of his home "does not contain facts giving rise to probable cause." The court denied the motion.

Appellants now assert that the court erred in denying the motion to suppress because "there was simply no basis for a reasonable belief that a Georgetown jacket would be found in the Chestnut home."

In determining whether a search warrant is based upon probable cause, a reviewing court must examine the totality of the circumstances under which it was issued. Potts v. State, 300 Md. 567, 571 (1984). Moreover, in conducting this review, the issuing magistrate's probable cause determination is given

deference. <u>Id</u>. "[S]o long as the magistrate had a 'substantial basis for...conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more" <u>Id</u>., quoting <u>Illinois v. Gates</u>, 462 U.S. 213, 236 (1983).

In denying appellant's motion, the court stated:

"I think that we deal with facts and logical and reasonable inferences deducible from the facts and when one looks at the totality of the circumstances as I am required to do, I believe that a magistrate faced with this affidavit, having read it, would be justified in executing a search and seizure warrant.

"The other thing is there is a preference for a warrant and a good deal of weight is given when there is a warrant submitted to that independent magistrate for their review prior to there being a search of the premises.

"When one looks at the facts as set forth in the warrant, it is clear to me that there is a basis for an arrest warrant. When one looks at the age of the individual whose home will be searched and the nature of the items sought, it seems very clear that a logical inference to be deducible from the facts will be that those items will be located or in all probability will be located in the home."

Our review of the record demonstrates the court correctly applied the law in denying the motion to suppress.

## VII.  CLOSING ARGUMENT

During closing argument, the State made the following comments on rebuttal:

"[THE STATE]: The purpose of rebuttal is to answer the questions the defense has brought up that might create some kind of questions in your mind as to the facts. Before we delve into that, there's one thing that you must remember. What you are doing here and what you have done for the last, at least, 14 days, from the picking of the jury on May the 14th, is something that happens thousands of times in the United States every day. It's happened hundreds of thousands of times since the institution of our system of justice in the United States and the system of justice that we have brought from England with us.

"The juries have been listening to facts, listening to adults and children testify, have been able to reach just decisions and conviction based on evidence --

"MR. CREMIN: Objection.

"THE COURT: Overruled.

"[THE STATE]: So, what you are doing right now is
nothing that is an incredible burden. So, what I ask you to do
again is use your common sense and realize that you are part of
a system of justice." (emphasis added).

In addition, the prosecutor remarked:

"Now, would you say if the State put pressure or
Detective Kincaid or any other member of the Baltimore City
Police Department put pressure on a witness, would the State
have all the inconsistencies that we have f a young children
in our State? No, we provided all that information to you as
the triers of fact to determine who was telling the truth. In
addition to that, Detective Kincaid or members of the Baltimore
City Police Department were going to do something to fabricate
evidence which was sort of what the defense said at one time.

"MR. CREMIN: Objection.

"THE COURT: Overruled."

(emphasis added).

Appellants maintain that in both instances the court erred in overruling their objections to the State's comments. Specifically, they argue that the underlined portion of the first argument was improper because it stressed "that convictions are common, everyday events." They further argue that the underlined portions of the second argument are "simply a lie—defense counsel did _not_ accuse the police of fabricating evidence."

In determining whether the prosecutor's remarks unfairly created prejudice against appellants, "recognition must be given to the fact that the trial judge...is in the best position to evaluate and assess -- in the context in which the remarks are made and their relationship to other factors in the trial -- whether they were in fact prejudicial." Wilhelm v. State, 272 Md. at 429. We will not interfere with the court's ruling unless "it is clear that there has been prejudice" to appellants. Id. Moreover, a mere objection to closing argument

is insufficient to preserve the issue for appellate review.
<u>Dorsey Bros., Inc. v. Anderson</u>, 264 Md. 446, 455 (1972); <u>Feeney</u>
<u>v. Dolan</u>, 35 Md. App. 538, 553 (1977). The objecting party
must also seek remedial action through a curative instruction
or a motion for mistrial. <u>Id</u>.

Our review of the alleged prejudicial remarks - in the
overall context in which they were made and in relation to
appellants' arguments on closing - demonstrate they were not in
fact prejudicial to appellants. Additionally, the record shows
that appellants merely objected. They did not seek either a
curative instruction nor did they move for a mistrial. We
discern no error.

## VIII. RECROSS-EXAMINATION

On recross-examination of John Caldwell, appellant
Stewart's counsel asked the witness the following questions:

"Q. Let me ask you, on November 18th after this
incident happened, after you spoke to the police, did Andrew
Stewart come up to you and say or do anything to you that day?

"A. No.

"Q. Did Alfred Chestnut?

"A. No.

"Q. Did Ransom Watkins?

"A. No.

"Q. As a matter of fact, you didn't even know Andrew Stewart before this incident happened, did you?

"[THE STATE]: Objection.

"THE COURT: Sustained."


Appellants contend that "this ruling was obvious error. Caldwell's lack of prior acquaintance with Appellant Stewart was directly relevant, because it tended to support the defense position of the crucial issue of identification and the subsidiary issue of Caldwell's fear of the [appellants] individually."

The scope of cross examination is a matter which rests within the sound discretion of the court. Caldwell v. State, 276 Md. 612, 618 (1976); Shupe v. State, 238 Md. 307, 310 (1965). Furthermore, it has long been the rule in this jurisdiction that cross-examination "is restricted to the points on which the witness testified on direct examination." Caldwell v. State, supra; Plank v. Summers, 205 Md. 598, 607 (1954).

Here, Caldwell's unfamiliarity with appellant Stewart was not brought out either on direct examination or on redirect examination. We hold that the court did not improperly exercise its discretion in sustaining appellee's objection to this line of questioning. In any event, even if there was error, it was harmless beyond a reasonable doubt. <u>Dorsey v. State</u>, 276 Md. 638, 659 (1976).

JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANTS.