# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| ALFRED CHESTNUT, *et al*.<br><br>Plaintiffs,<br><br>v.<br><br>DONALD KINCAID, *et al.*,<br><br>Defendants. | Civil Action No. RDB-20-CV-02342 |

## PLAINTIFFS' OPPOSITION TO DEFENDANT
## BALTIMORE POLICE DEPARTMENT'S MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

STATEMENT OF FACTS AND LEGAL STANDARD ............................................................. 2

ARGUMENT .......................................................................................................................... 2

I.     Plaintiffs Have Properly Stated Underlying Claims Against the Officer Defendants. ....... 2

II.    BPD Is Not an Arm of the State Entitled to Eleventh Amendment Immunity. .................. 2

      A.    Maryland does not pay judgments entered against BPD. ...................................... 4

            1.    Judgments against BPD are neither paid by nor enforceable against the State. ............................................................................................... 5

            2.    BPD disregards longstanding, binding precedent. ..................................... 6

            3.    There is no logical limit to BPD's "indirect-harm theory." ....................... 8

      B.    BPD is autonomous from the State. ................................................................... 9

            1.    Applying the factors considered by the Fourth Circuit, BPD is autonomous from the State. .................................................................. 10

            2.    Examples of "state control" that apply statewide to unquestionably local agencies do not support BPD's argument. ...................................... 19

      C.    BPD serves a primarily local function. ............................................................. 21

      D.    BPD is inconsistently treated as a state or local agency under State law. ............ 24

            1.    State statutes and regulations .................................................................. 24

            2.    State court decisions ............................................................................... 25

III.   Plaintiffs Have Sufficiently Stated a *Monell* Claim Against the BPD ............................ 28

      A.    Plaintiffs have sufficiently alleged a *Monell* claim against the BPD for its failure to train, discipline, and supervise its officers. ......................................... 30

      B.    Plaintiffs have plausibly alleged a *Monell* claim against the BPD based on its condonation of its officers' unconstitutional acts. ................................................ 33

CONCLUSION ...................................................................................................................... 35

CERTIFICATE OF SERVICE ................................................................................................ 36

## TABLE OF AUTHORITIES

**Cases**

*Alderman v. Balt. City Police Dep't,*
  952 F. Supp. 256 (D. Md. 1997).................................................. 3, 4, 5, 24

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009).......................................................................... 32

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)..................................................................... 28, 30

*Blades v. Woods,*
  107 Md. App. 178 (1995) ................................................................. 25

*Bordanaro v. McLeod,*
  871 F.2d 1151 (1st Cir. 1989)........................................................... 35

*Brady v. Maryland,*
  373 U.S. 83 (1963)..................................................................... 30, 32

*Brockington v. Boykins,*
  637 F.3d 503 (4th Cir. 2011) ........................................................... 28

*Burgess v. Balt. Police Dep't,*
  No. RDB-15-0834, 2016 WL 795975 (D. Md. Mar. 1, 2016)............. 29, 34

*Burley v. Balt. Police Dep't,*
  422 F. Supp. 3d 986 (D. Md. 2019)..................................................... 3

*Cash v. Granville Cnty. Bd. of Educ.,*
  242 F.3d 219 (4th Cir. 2001) ................................................... *passim*

*Chin v. City of Baltimore,*
  241 F. Supp. 2d 546 (D. Md. 2003)..................................................... 3

*City of Baltimore v. Silver,*
  263 Md. 439 (1971) ................................................................... 12, 18

*City of St. Louis v. Praprotnik,*
  485 U.S. 112 (1988)........................................................................ 27

*Dixon v. Balt. City Police Dep't.,*
  345 F. Supp. 2d 512 (D. Md. 2003)..................................................... 4

*Drewrey v. Portsmouth City Sch. Bd.,*
  No. 2:17cv20, 2017 WL 9478504 (E.D. Va. July 10, 2017) ................ 7–8

*Estate of Bryant v. Balt. Police Dep't.,*
  Civil Action No. ELH-19-384, 2020 WL 673571 (D. Md. Feb. 10, 2020)................ 32, 33, 34

*Fish v. Mayor & City Council of Balt.,*
  No. CCB-17-1438, 2018 WL 348111 (D. Md. Jan. 10, 2018) ............... 3

*Garcia v. Montgomery County,*
  No. JFM-12-3592, 2013 WL 4539394 (D. Md. Aug. 23, 2013) ............. 29

*Grim v. Balt. Police Dep't*,
  No. ELH-18-3864, 2019 WL 5865561 (D. Md. Nov. 8, 2019) ................................. 3

*Haley v. City of Boston*,
  657 F.3d 39 (1st Cir. 2011) ................................................................................... 29

*Harter v. Vernon*,
  101 F.3d 334 (4th Cir. 1996) ........................................................................ *passim*

*Hector v. Weglein*,
  558 F. Supp. 194 (D. Md. 1982) ......................................................................... 3–4

*Hess v. Port Authority Trans-Hudson Corp.*,
  513 U.S. 30 (1994) ......................................................................................... 7, 14

*Houck v. Substitute Tr. Servs., Inc.*,
  791 F.3d 473 (4th Cir. 2015) ............................................................................... 28

*J.A. v. Miranda*,
  No. PX 16-3953, 2017 WL 3840026 (D. Md. Sept. 1, 2017) ................................ 29

*Johnson v. Balt. Police Dep't*,
  No. ELH-19-00698, 2020 WL 1169739 (D. Md. Mar. 10, 2020) ............. 3, 32, 33, 34

*Kitchen v. Upshaw*,
  286 F.3d 179 (4th Cir. 2002) ......................................................................... 14, 26

*Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*,
  440 U.S. 391 (1979) .................................................................................. 5, 8, 10

*Lane v. Anderson*,
  660 F. App'x 185 (4th Cir. 2016) .......................................................................... 5

*Lawson v. Union Cnty. Clerk of Ct.*,
  828 F.3d 239 (4th Cir. 2016) ......................................................................... 14, 19

*Lee-Thomas v. Prince George's Cnty. Pub. Schs.*,
  666 F.3d 244 (4th Cir. 2012) ............................................................................... 12

*Lewis v. Bd. of Educ. of Talbot Cty.*,
  262 F. Supp. 2d 608 (D. Md. 2003) ..................................................................... 24

*Lucero v. Early*,
  No. GLR-13-1036, 2019 WL 4673448 (D. Md. Sept. 25, 2019) .................... 3, 4, 19

*Mayor & City Council of Balt. v. Clark*,
  404 Md. 13 (2008) .............................................................................................. 11

*Mayor & City Council of Baltimore v. Clark*,
  404 Md. 13 (2008) .............................................................................................. 18

*Md. Stadium Auth. v. Ellerbe Becket Inc.*,
  407 F.3d 255 (4th Cir. 2005) ......................................................................... 10, 14

*Monell v. Dep't of Soc. Servs.*,
  436 U.S. 658 (1978) ...................................................................................... *passim*

*Munyiri v. Haduch*,
  585 F. Supp. 2d 670 (D. Md. 2008) .................................................................... 3

*Napue v. Illinois*,
  360 U.S. 264 (1959) ............................................................................................ 30

*Owen v. City of Indep.*,
  445 U.S. 622 (1980) ............................................................................................ 27

*Patterson v. Ramsey*,
  413 F. Supp. 523 (D. Md. 1976), *aff'd*, 552 F.2d 117 (4th Cir. 1977) .................... 12

*Peprah v. Williams*,
  No. CV GLR-18-990, 2019 WL 224245 (D. Md. Jan. 15, 2019) ........................... 23

*Ram Ditta By & Through Ram Ditta v. Md. Nat'l Capital Park & Planning Comm'n*,
  822 F.2d 456 (1987) ...................................................................................... *passim*

*Regents of the Univ. of Cal. v. Doe*,
  519 U.S. 425 (1997) .............................................................................................. 5

*Rockwell v. Mayor & City Council of Balt.*,
  No. RDB-13-3049, 2014 WL 949859 (D. Md. Mar. 11, 2014) ........................... 2–3

*S.C. Dep't of Disabilities & Special Needs v. Hoover Universal, Inc.*,
  535 F.3d 300 (4th Cir. 2008) ............................................................................... 4

*Skinner v. Switzer*,
  562 U.S. 521 (2011) ............................................................................................ 29

*Smith v. Smith*,
  589 F.3d 736 (4th Cir. 2009) .............................................................................. 28

*Spell v. McDaniel*,
  824 F.2d 1380 (4th Cir. 1987) ............................................................................ 33

*State v. Meade*,
  101 Md. App. 512 (1994) .................................................................................. 6, 9

*Thornton v. Balt. City Bd. of Sch. Comm'rs*,
  No. WMN-07-1555, 2007 WL 9780551 (D. Md. Nov. 13, 2007) ......................... 12

*U.S. ex rel. Oberg v. Ky. Higher Educ. Student Loan Corp.* ("*Oberg I*"),
  681 F.3d 575 (4th Cir. 2012) ......................................................................... 6, 10

*U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency* ("*Oberg II*"),
  745 F.3d 131 (4th Cir. 2014) ..................................................................... 5, 11, 21

*U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency* ("*Oberg III*"),
  804 F.3d 646 (4th Cir. 2015) ....................................................................... *passim*

*Vogt v. Bd. of Comm'rs*,
  294 F.3d 684 (5th Cir. 2002) .............................................................................. 14

*Washington v. Balt. Police Dep't*,
  457 F. Supp. 3d 520 (D. Md. 2020) ........................................................ 3, 32, 33, 34

*Wilcher v. Curley,*
 519 F. Supp. 1 (D. Md. 1980) ................................................................. 3, 4

*Wiley v. Mayor & City Council of Balt.,*
 48 F.3d 773 (4th Cir. 1995) ...................................................................... 2

*Woods v. City of Greensboro,*
 855 F.3d 639 (4th Cir. 2017) .................................................................. 29

**Statutes**

42 U.S.C. § 1983 ....................................................................... 2, 3, 23, 28

2015 Md. Laws 562 ................................................................................. 20

2015 Md. Laws 563 ................................................................................. 20

2015 Md. Laws 564 ................................................................................. 20

2016 Md. Laws 7116 ............................................................................... 20

2017 Md. Laws 4254 ............................................................................... 20

2017 Md. Laws 4255 ............................................................................... 20

2017 Md. Laws 4256 ............................................................................... 20

Acts of 1860, ch. 7 .................................................................................. 18

Acts of 2018, ch. 777 .............................................................................. 20

Balt. City Code art. 1, § 21-3 .................................................................. 24

Balt. City Code art. 19, § 13-4 ................................................................ 24

Balt. City Code art. 19, § 14-4 ................................................................ 24

Balt. City Code art. 19, § 25-1 ................................................................ 24

Balt. City Code art. 19, § 34-8 ................................................................ 24

Balt. City Code art. 19, § 42-1 ................................................................ 24

Balt. City Code art. 19, § 42-2 ................................................................ 24

Balt. City Code art. 19, § 43A-2 .............................................................. 24

Balt. City Code art. 19, § 43B-5 .............................................................. 24

Balt. City Code art. 19, § 6-3 .................................................................. 24

Charter of Balt. City art. VI, § 13 ........................................................... 13

Maryland Code of Public Local Laws, art. 4, § 16-3 .......................... 22, 25

Maryland Code of Public Local Laws, art. 4, § 16-10 ......................... 15, 16

Maryland Code of Public Local Laws, art. 4, § 16-13 ............................ 14

Maryland Code of Public Local Laws, art. 4, § 16-14 ............................ 15

Maryland Code of Public Local Laws, art. 4, § 16-16B ........................... 23

Maryland Code of Public Local Laws, art. 4, § 16-20...................................................... 13

Maryland Code of Public Local Laws, art. 4, § 16-4........................................................ 14

Maryland Code of Public Local Laws, art. 10, § 68 ....................................................... 23

Maryland Code of Public Local Laws, art. 14, § 232 ..................................................... 23

Md. Code Ann., Alcoholic Beverages § 12-202 ............................................................. 12

Md. Code Ann., Crim. Proc. § 13-501 ............................................................................ 25

Md. Code Ann., Crim. Proc. § 2-102 ........................................................................ 23, 25

Md. Code Ann., Crim. Proc. § 2-103 ........................................................................ 23, 25

Md. Code Ann., Crim. Proc. § 2-105 .............................................................................. 23

Md. Code Ann., Cts. & Jud. Proc. § 5-301 ..................................................................... 24

Md. Code Ann., Educ. § 3-108 ....................................................................................... 12

Md. Code Ann., Educ. § 3-108.1 ..................................................................................... 12

Md. Code Ann., General Provisions § 5-801 ................................................................... 25

Md. Code Ann., Pub. Safety § 3-101 ............................................................................... 19

Md. Code Ann., Pub. Safety § 3-201 ............................................................................... 19

Md. Code Ann., State Gov't § 12-101 ......................................................................... 6, 25

**Other Authorities**

*About the Department*, Balt. Police Dep't, baltimorepolice.org/about-department
(last visited December 18, 2020) ............................................................................ 22, 27

*Fiscal 2020 Agency Detail – Volume II: Board of Estimates Recommendations* 257–59,
https://bbmr.baltimorecity.gov/sites/default/files/Agency_Detail_Vol2_FINAL_2019-
05-02.pdf........................................................................................................... 8, 13, 23

*Fiscal 2020 Summary of the Adopted Budget*
https://bbmr.baltimorecity.gov/sites/default/files/Final%20SOTA%20FY20-
compressed%20web.pdf 25 ................................................................................. 5, 8, 13

Kevin Rector, *Baltimore Police Commissioner Kevin Davis Fired by Mayor Pugh, Citing
Rising Crime*, Balt. Sun (Jan. 19, 2018), https://www.baltimoresun.com/
maryland/baltimore-city/bs-md-ci-davis-replaced-20180119-story.html.......................... 10–11

Mem. of Understanding between The Baltimore City Police Department and the Baltimore
City Lodge No. 3, Fraternal Order of Police, Inc., Unit 1 – Police Officers, Police
Agents, and Flight Officers, Fiscal Years 2019-2021 ................................................. 5, 15, 18

Myriam E. Giles, *In Defense of Making Government Pay: The Deterrent Effect of
Constitutional Tort Remedies*, 35 Ga. L. Rev. 845 (2001) ....................................... 27

Yvonne Wenger, *Baltimore Mayor Rawlings-Blake Fires Police Commissioner Anthony
W. Batts*, Balt. Sun (Jul. 10, 2015), https://www.baltimoresun.com/maryland/baltimore-
city/bs-md-ci-batts-fired-20150708-story.html ........................................................ 11

# INTRODUCTION

Plaintiffs Alfred Chestnut, Andrew Stewart, Jr., and Ransom Watkins each spent 36 years (approximately two-thirds) of their formidable lives in prison for a murder they did not commit. Regrettably, the story of these men, known as the "Harlem Park Three," is all too common in Baltimore. For decades, the Baltimore Police Department ("BPD") has maintained customs, policies, and practices of promoting, facilitating, and condoning the improper use of unlawful tactics in its Homicide Unit (and the BPD in general), resulting in the wrongful imprisonment of Baltimore's citizens. Moreover, history shows that the BPD failed to adequately supervise, discipline, and train its detectives and officers, instead permitting rampant misconduct within its ranks. Mr. Chestnut's, Mr. Stewart's, and Mr. Watkins' wrongful convictions were borne out of these systemic failures, which resulted in Homicide Detectives Donald Kincaid, John Barrick, and Bryn Joyce (the "Officer Defendants") violating their constitutional and due process rights and the deprivation of their life, liberty, and freedom for almost four decades.

Now, the BPD moves to dismiss, recycling arguments it has made—and repeatedly lost— in this Court, based on the faulty premise that it is immune from liability and that Plaintiffs have failed to sufficiently plead allegations supporting their *Monell* claims.[1] *See generally* ECF No. 23; *see also* ECF No. 23-1 ("BPD Mem."). To the contrary, as this Court has consistently found, the BPD is not an arm of the state and is, therefore, not entitled to Eleventh Amendment immunity. A finding to the contrary would endorse an egregious attempt by the BPD to insulate itself from liability for conduct to which it not only turned a blind eye, but formally sanctioned at the highest levels. Moreover, the BPD ignores the governing pleading standard and fails to recognize that Plaintiffs have adequately alleged specific facts to support their claim that the

---

[1] *See generally Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

Officer Defendants' actions were the result of policies ratified by the BPD's widespread and persistent pattern and practice of promoting, facilitating, and condoning improper, illegal, and unconstitutional investigative misconduct. For the reasons set forth below, the BPD's Motion to Dismiss should be denied.

## STATEMENT OF FACTS AND LEGAL STANDARD

Plaintiffs hereby adopt and incorporate by reference the Statement of Facts and Legal Standard, as well as all relevant arguments, set forth in their Opposition to the Officer Defendants' Motion to Dismiss, ECF No. 29.

## ARGUMENT

**I.    Plaintiffs Have Properly Stated Underlying Claims Against the Officer Defendants.**

BPD first argues that Plaintiffs' *Monell* claim must be dismissed because there is no underlying constitutional violation. This argument easily fails. As set forth in their Opposition to the Officer Defendants' Motion to Dismiss and incorporated herein, because Plaintiffs have properly stated underlying violations pursuant to 42 U.S.C. § 1983 against the Officer Defendants, Plaintiffs have established the necessary predicate claims to allege a *Monell* claim against the BPD. *See generally* ECF No. 29.

**II.    BPD Is Not an Arm of the State Entitled to Eleventh Amendment Immunity.**

The Fourth Circuit has assumed without deciding that BPD can be sued in federal court. *Wiley v. Mayor & City Council of Balt.*, 48 F.3d 773, 776 (4th Cir. 1995). BPD acknowledges that "recent decisions" have denied BPD Eleventh Amendment immunity, BPD Mem. 5–6, but BPD neglects to mention that trial courts in the District of Maryland have repeatedly ruled for 40 years that BPD is not entitled to Eleventh Amendment immunity. *See Rockwell v. Mayor & City Council of Balt.*, No. RDB-13-3049, 2014 WL 949859, at *11 (D. Md. Mar. 11, 2014) (collecting cases) ("As the weight of authority from this Court indicates, the Baltimore Police

Department is not a state agency for Eleventh Amendment purposes and, therefore, can be held liable under § 1983."); *see also, e.g.*, *Washington v. Balt. Police Dep't*, 457 F. Supp. 3d 520, 532–33 (D. Md. 2020); *Johnson v. Balt. Police Dep't*, No. ELH-19-00698, 2020 WL 1169739, at *24–29 (D. Md. Mar. 10, 2020); *Burley v. Balt. Police Dep't*, 422 F. Supp. 3d 986, 1021–1026 (D. Md. 2019); *Grim v. Balt. Police Dep't*, No. ELH-18-3864, 2019 WL 5865561, at *15 (D. Md. Nov. 8, 2019); *Lucero v. Early*, No. GLR-13-1036, 2019 WL 4673448, at *5 (D. Md. Sept. 25, 2019); *Fish v. Mayor & City Council of Balt.*, No. CCB-17-1438, 2018 WL 348111, at *3 (D. Md. Jan. 10, 2018); *Munyiri v. Haduch*, 585 F. Supp. 2d 670, 676 (D. Md. 2008); *Chin v. City of Balt.*, 241 F. Supp. 2d 546, 548 (D. Md. 2003); *Alderman v. Balt. City Police Dep't*, 952 F. Supp. 256, 258 (D. Md. 1997); *Hector v. Weglein*, 558 F. Supp. 194, 197–99 (D. Md. 1982); *Wilcher v. Curley*, 519 F. Supp. 1, 3–5 (D. Md. 1980).

Instead, BPD suggests that all these decisions should be disregarded because, according to the BPD, the courts failed to conduct the proper analysis. BPD Mem. 6 n.1.[2] Not so—multiple trial courts have applied the Fourth Circuit's four-factor test and concluded that BPD is not an arm of the state. *See, e.g.*, *Johnson*, 2020 WL 1169739, at *24–29; *Burley*, 422 F. Supp. 3d at 1021–1026; *Lucero*, 2019 WL 4673448, at *5; *Alderman*, 952 F. Supp. at 258;[3] *cf. Hector*, 558

---

[2] BPD is, in part, the engine of its own grievance that the district court cases supposedly "have rarely conducted the full analysis articulated by the Fourth Circuit." BPD Mem. 6 n.1. In its briefing before trial courts in recent cases, BPD has failed to even mention the Fourth Circuit's arm-of-the-state test, let alone analyze the pertinent factors. *See* Reply to Pls.' Resp. in Opp'n to the Baltimore Police Department & Dean Palmere's Mot. to Dismiss at 11–12, *Burley v. Balt. City Police Dep't*, No. 1:18-cv-01743-SAG (D. Md. Mar. 22, 2019), ECF No. 40; Reply to Pl.'s Resp. in Opp'n to Baltimore Police Department's Mot. to Dismiss at 8–10, *Parks v. Balt. City Police Dep't*, No. 1:18-cv-03092-TDC (D. Md. Apr. 8, 2019), ECF No. 64.

[3] *Alderman*, which was decided before the Fourth Circuit clarified that the lawsuit's effect on the state treasury was not dispositive, nevertheless did not give that factor "dispositive weight," as BPD claims. *See* BPD Mem. 6 n.1. The *Alderman* Court, although it thought the impact on the treasury was the "primary" factor, 952 F. Supp. at 258, analyzed all four factors and, "[a]fter considering the subsidiary factors," concluded that BPD was not a state entity. *Id.* at 259. BPD

F. Supp. at 197–99 (pre-dating the development of the Fourth Circuit's framework, but closely analyzing the relationship between BPD and Baltimore City and concluding BPD does not have Eleventh Amendment immunity); *Wilcher*, 519 F. Supp. at 3–5 (finding same). By contrast, BPD does not identify a single decision employing the full Fourth Circuit analysis and holding that BPD is a state agency.[4]

As demonstrated below, application of this Circuit's four-factor test confirms what courts in this District have long acknowledged: BPD is not an arm of the State and, therefore, is not entitled to Eleventh Amendment immunity.

### A. Maryland does not pay judgments entered against BPD.

The first factor of the arm-of-the-state test asks "whether any judgment against the entity as defendant will be paid by the State." *S.C. Dep't of Disabilities & Special Needs v. Hoover Universal, Inc.*, 535 F.3d 300, 303 (4th Cir. 2008). A review of binding precedent reveals that the answer is "no"—judgments against BPD are neither paid by nor enforceable against the State of Maryland. Yet BPD blatantly disregards Supreme Court and Fourth Circuit authorities. In doing so, it advances an "indirect-harm theory" that has no logical limit and would cloak any entity that receives federal funding with Eleventh Amendment immunity. Longstanding law requires otherwise.

---

offers no substantive rebuttal to *Alderman*'s reasoning, nor to that reached in similar cases. As one recent trial court explained, "[b]esides the Fourth Circuit noting that the first factor is no longer the most important one, BPD gives the Court no reason to depart from *Alderman* and the Court finds none." *Lucero*, 2019 WL 4673448, at *5.

[4] *Dixon v. Baltimore City Police Department*, the only authority BPD cites holding that it is a state agency, BPD Mem. 6 n.1, is a *pro se* prisoner case in which the Court found in a conclusory holding that BPD was a "state agency" after the plaintiff failed to respond to the motion for summary judgment. 345 F. Supp. 2d 512, 513 (D. Md. 2003).

**1.      Judgments against BPD are neither paid by nor enforceable against the State.**

An "entity's 'potential legal liability' is key" and "of considerable importance" in determining whether it enjoys Eleventh Amendment immunity. *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency* ("*Oberg II*"), 745 F.3d 131, 137 & n.4 (4th Cir. 2014) (quoting *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 430–31 (1997)); *accord Lane v. Anderson*, 660 F. App'x 185, 195 (4th Cir. 2016). Thus, this Circuit considers "whether state law 'provides that obligations of the entity shall *not* be binding on the State.'" *Id.* at 137 (alterations omitted) (quoting *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 402 (1979)). The Court looks "to whether 'State law indicates that a judgment against the entity can be enforced against the State.'" *Id.* (alterations omitted) (quoting *Cash v. Granville Cnty. Bd. of Educ.*, 242 F.3d 219, 224 (4th Cir. 2001)).

Here, the State will not pay a judgment against BPD—Baltimore City will. BPD concedes so in its Memorandum in Support of its Motion to Dismiss. BPD Mem. 7 ("[A] check written to satisfy a judgment against BPD would likely come directly from the City of Baltimore's account . . . ."). This is not an aberration: the City has historically paid judgments and settlements against BPD officers, s*ee, e.g.*, *Alderman*, 952 F. Supp. at 258, a practice it maintains to this day, *see* Memorandum of Understanding Between The Baltimore City Police Department and the Baltimore City Lodge No. 3, Fraternal Order of Police, Inc., Unit 1 – Police Officers, Police Agents, and Flight Officers, Fiscal Years 2019–2021 ("MOU"), art. 15 (stating that Baltimore City will indemnify officers for torts committed within the scope of employment); *Fiscal 2020 Summary of the Adopted Budget* ("*Fiscal 2020 Summary*") 25, https://bbmr.baltimorecity.gov/sites/default/files/Final%20SOTA%20FY20-compressed%20web.pdf ("In Fiscal Year 2020, the City is allocating additional funds to the

5

Police's Civil Rights budget in order to hedge the City's risk as the Gun[] Trace Task Force (GTTF) cases continue to be filed in court.").

While Baltimore City's responsibility for judgments against BPD supports BPD's local character, even more important to the Eleventh Amendment analysis is the fact that the *State* is *not* required to pay. *See U.S. ex rel. Oberg v. Ky. Higher Educ. Student Loan Corp.* ("*Oberg I*"), 681 F.3d 575, 580 (4th Cir. 2012) (explaining the question is "whether any judgment against the entity as defendant will be paid by the State"). Because the Maryland Tort Claims Act ("MTCA") does not waive Maryland's sovereign immunity in state courts to suits challenging the actions of BPD or its officers, *see* Md. Code Ann., State Gov't § 12-101 (providing BPD officers are not within the definition of "State personnel"), the State cannot be forced to pay judgments against BPD, *see State v. Meade*, 101 Md. App. 512, 524 (1994), *superseded by statute on other grounds*. BPD has not identified any "State law indicat[ing] that a judgment against [BPD] can be enforced against the State." *Cash*, 242 F.3d at 224. Thus, a faithful application of the first factor of the arm-of-the-state test confirms that the State is not liable for judgments against BPD. This factor therefore resolves in Plaintiffs' favor.

### 2.   *BPD disregards longstanding, binding precedent.*

BPD seeks to avoid this inescapable conclusion by asking the Court to dispense with the well-settled understanding of the law in favor of a radical reinterpretation that would eviscerate the distinction between state and local government—or indeed, taken to its logical conclusion, between state and federal government. BPD asserts that, because Maryland appropriates some funding to BPD and Baltimore City generally, "[a] [j]udgment [a]gainst BPD [w]ill [i]ndirectly [h]arm the State Treasury." BPD Mem. 7–8. BPD fails to identify *any* support for this method of determining the effect on the state treasury, *see id.*, and there is none. In fact, BPD does not cite a single court decision in its discussion of the first factor. *See id.*

6

The Supreme Court foreclosed BPD's theory more than 25 years ago. In *Hess v. Port Authority Trans-Hudson Corporation*, 513 U.S. 30 (1994), the Court rejected an indistinguishable version of BPD's indirect-harm argument. There, the defendant argued that any judgment against it would reduce available funds for public projects that New York and New Jersey might otherwise finance, and such judgments therefore would "produce[] an effect equivalent to the impact of a judgment directly against the State." *Id.* at 50. The Court found that "[t]his reasoning misses the mark," identifying the pertinent question as: "[I]s the State in fact obligated to bear and pay the resulting indebtedness of the enterprise?" *Id.* at 51.

The Fourth Circuit rejected a similar argument in *Cash*. Just as BPD posits that a judgment against it could lead the State legislature to consider "allocating more dollars from the State's treasury" to Baltimore City to offset the judgments, BPD Mem. 8, the defendant in *Cash* argued that a judgment against it "might prospectively" alter appropriations "from the state's general fund" to the county, 242 F.3d at 225. In dismissing this argument, the Fourth Circuit explained that the "speculative, indirect, and ancillary impact on the State treasury that a judgment against the School Board in this case would have does not give rise to Eleventh Amendment protection." *Id.*; *see also Drewrey v. Portsmouth City Sch. Bd.*, No. 2:17cv20, 2017 WL 9478504, at *5 (E.D. Va. July 10, 2017), *report and recommendation adopted*, 264 F. Supp. 3d 724 (E.D. Va. 2017) (explaining that "[a]ny argument which contends that, because state funds may be lumped into a pool from which a school board pays a particular judgment, it is the State which pays the judgment is not credible" and noting, "[a]t best, that argument forwards a

technicality which is too attenuated and indirect to be considered payment from the State's treasury" (citations omitted)).[5]

### 3.    There is no logical limit to BPD's "indirect-harm theory."

Not only is BPD's indirect-harm theory contrary to precedent, it has no logical limit. By BPD's reasoning, a court looking at the impact on the state treasury would find that this factor favors Eleventh Amendment immunity for *any* entity that accepts state funding. That would include nearly all counties and municipalities in the country, which are definitionally local entities that do not have state sovereign immunity. *Lake Country Estates*, 440 U.S. at 401. A local entity's acceptance of state funding does not make that entity an arm of the state any more than Maryland's acceptance of funding from the United States Treasury means that it is part of the federal government. BPD's proposed reformulation of the first factor is unworkable for the additional reason that it would force courts to trace the ever-changing transfer of state funds to local governments in annual budgets and to make political predictions about whether judgments against local entities would somehow be offset by the state in future legislative cycles.

BPD's desired standard is not the law. Because any judgment against BPD would neither be paid by nor enforceable against the State of Maryland, the first factor decisively counsels against a finding of immunity.

---

[5] BPD's discussion of issues such as public-school funding in Maryland and "the current Covid-19 pandemic and resulting financial shortfalls facing Baltimore City and other municipalities," *see* BPD Mem. 7–8, reflects the attenuated nature of its argument and does not alter the legal analysis. Even if the Court were to consider that some of Baltimore City's funding comes from the State, the City is responsible to pay its own judgments. The City is self-insured and pays judgments out of its Self-Insurance Fund, itself funded by the General Fund, the vast majority of which is funded by the City alone. *See Fiscal 2020 Agency Detail – Volume II: Board of Estimates Recommendations* 257–59, https://bbmr.baltimorecity.gov/sites/default/files/Agency_Detail_Vol2_FINAL_2019-05-02.pdf ("*Fiscal 2020 Detail*"); *Fiscal 2020 Summary*, *supra*, at 31 (state contributes approximately 5% of the $1.9 billion General Fund).

**B.    BPD is autonomous from the State.**

A fair-minded reading of state and local law makes clear that the Police Commissioner, and to a lesser extent Baltimore City, control BPD—not the State. The State itself has long acknowledged this reality. Testifying on the 1989 amendments to the MTCA that foreclosed coverage of BPD, the State Treasurer's Office expressed its view that BPD was a "local government" agency, employing "local policemen" that the State did not control and for whom the State should not be financially responsible. *See Meade*, 101 Md. App. at 523–24. To this day, the State disclaims responsibility for BPD, stating in routine correspondence from the Treasurer's Office that the "Baltimore Police Department is a local government entity, and its police officers are local government actors," such that "there would not be a good faith basis to sue the State of Maryland for any conduct attributed to the Baltimore police officers." *See* Letter from R. Garvey to A. Freeman (July 30, 2018), *Johnson v. Balt. City Police Dep't*, No. 1:19-cv-00698-ELH (D. Md. June 28, 2019), ECF No. 29-1.

BPD's argument that it is closely regulated by the State relies on selective excerpts from the public local law and a spin that wildly overstates the State's involvement in BPD affairs. It proves too little by failing to show the indicia of state control required by the Fourth Circuit. It proves too much by failing to differentiate BPD from other entities "which, though created by the state, operate independently and do not share the state's immunity." *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency* ("*Oberg III*"), 804 F.3d 646, 651 (4th Cir. 2015). An examination of the Fourth Circuit's factors concerning autonomy reveals that BPD is a local, not a state, agency.

### 1.    *Applying the factors considered by the Fourth Circuit, BPD is autonomous from the State.*

When evaluating a state's control over a defendant, the Court discourages "a free-wheeling inquiry into the 'autonomy' of the state entity in question" and instead focuses on a few specific factors. *Md. Stadium Auth. v. Ellerbe Becket Inc.*, 407 F.3d 255, 261 n.10 (4th Cir. 2005). The factors are: "who appoints the entity's directors or officers, who funds the entity, and whether the State retains a veto over the entity's actions," as well as "whether an entity has the ability to contract, sue and be sued, and purchase and sell property, and whether it is represented in legal matters by the state attorney general." *Oberg III*, 804 F.3d at 668 (citations omitted); *see, e.g.*, *Md. Stadium Auth.*, 407 F.3d at 261 & n.10; *Ram Ditta By & Through Ram Ditta v. Md. Nat'l Capital Park & Planning Comm'n*, 822 F.2d 456, 458–59 (1987). An entity's powers may be set forth in state law, but if that law delegates control to a local government or vests the entity with control of itself, it is not a state agency. *See Oberg I*, 681 F.3d at 580 (citation omitted) (the Court "draw[s] the line between a State-created entity functioning independently of the State from a State-created entity functioning as an arm of the State or its alter ego"). Regarding the matters emphasized by the Fourth Circuit or others, BPD need not be completely autonomous from the State in order to be considered a local entity: an entity may lack sovereign immunity even though it "exercise[s] a 'slice of state power.'" *Cash*, 242 F.3d at 222 (quoting *Lake Country Estates*, 440 U.S. at 401). Accordingly, it is entitled to immunity only if it is "simply a tool of the state." *Oberg III*, 804 F.3d at 673 (citation omitted). Each of the factors on which the Fourth Circuit focuses—and which BPD ignores—points to BPD's autonomy from the State.

Baltimore City appoints and removes the BPD Commissioner at will and fills temporary vacancies, PLL art. 4, § 16-5(a)(1), (e)–(f), powers it has exercised freely over the last decade to shift BPD's direction, *see* Kevin Rector, *Baltimore Police Commissioner Kevin Davis Fired by*

10

*Mayor Pugh, Citing Rising Crime*, Balt. Sun (Jan. 19, 2018),

https://www.baltimoresun.com/maryland/baltimore-city/bs-md-ci-davis-replaced-20180119-

story.html; Yvonne Wenger, *Baltimore Mayor Rawlings-Blake Fires Police Commissioner*

*Anthony W. Batts*, Balt. Sun (July 10, 2015), https://www.baltimoresun.com/maryland/baltimore-

city/bs-md-ci-batts-fired-20150708-story.html. BPD understates the Mayor's authority in this

process, relying on case law that pre-dates the BPD's current structure. *See* BPD Mem. 8–9

(citing *Mayor & City Council of Balt. v. Clark*, 404 Md. 13, 26–28 (2008) (recounting, at that

time, that the Mayor could not remove the Commissioner at will)). The qualifications of the

BPD's Commissioner are largely left to the Mayor's discretion, with the State requiring only that

the person be a U.S. citizen over the age of 30 with more than five years of administrative

experience, PLL art. 4, § 16-5(a)—traits the City would likely require of any candidate,

regardless.

   BPD is mistaken in downplaying the importance of the Mayor's appointment and

removal power to the arm-of-the-state analysis. *See* BPD Mem. 8–9. The Fourth Circuit has long

recognized this as a key factor in evaluating Eleventh Amendment immunity. *See, e.g.*, *Oberg II*,

745 F.3d at 144 ("[S]tate authority to appoint all of an entity's decisionmakers remains powerful

evidence of state control."); *Ram Ditta*, 822 F.2d at 458 ("The state appoints no members, nor

does it exercise any degree of control over the counties' appointment or removal of Commission

members."). BPD tries to evade this precedent by pointing to the Baltimore City Board of Liquor

License Commissioners ("Liquor License Board") and the Baltimore City Board of School

Commissioners ("School Board"), both of which, BPD claims, are appointed by the Mayor and

both of which are nevertheless state agencies. BPD Mem. 9 & nn.2–3. These contentions are

wrong.

The State Senate must advise and consent to the members of the Liquor License Board, Md. Code Ann., Alcoholic Beverages § 12-202(a)(2), and Plaintiffs have located no authority, and BPD has cited none, determining that the Board has Eleventh Amendment immunity. The State retains the ability to remove members of the School Board, and the Mayor may remove them only for cause. Md. Code Ann., Educ. § 3-108.1(j). Regardless, this District has ruled that the School Board is a local agency not entitled to federal sovereign immunity. *Thornton v. Balt. City Bd. of Sch. Comm'rs*, No. WMN-07-1555, 2007 WL 9780551, at *2 (D. Md. Nov. 13, 2007); *Patterson v. Ramsey*, 413 F. Supp. 523, 530 (D. Md. 1976), *aff'd*, 552 F.2d 117 (4th Cir. 1977). BPD cites no case holding otherwise and no reason this Court should not follow suit with regard to BPD, over whose leadership the State has even less control.[6]

BPD's funding stream also weighs against its claim to Eleventh Amendment immunity.[7] The law prescribes no role for the State in BPD's budgeting. Instead, Baltimore City funds BPD,

---

[6] BPD relies on *Lee-Thomas v. Prince George's County Public Schools*, 666 F.3d 244, 249 n.5 (4th Cir. 2012), *see also* BPD Mem. 9 n.3, but the Prince George's County School Board's sovereign immunity was not contested in that case. In any event, unlike the Baltimore City School Board, and unlike BPD, the Prince George's County School Board is appointed by the Governor. Md. Code Ann., Educ. § 3-108; *see Thornton*, 2007 WL 9780551, at *4 ("Baltimore City is treated differently in the Maryland Code than the Boards of Education of Maryland's counties . . . [t]hus, decisions addressing the sovereign immunity of other boards of education are not necessarily determinative.").

[7] BPD selectively quotes a sentence fragment from *City of Baltimore v. Silver*, 263 Md. 439, 451 (1971), unrelated to Eleventh Amendment immunity for the proposition that City funding "in no way provides the City with control over BPD." BPD Mem. 9. BPD further mischaracterizes *Silver*, claiming that City funding of BPD "could not be construed as a method of indirect control over the police department by the City." *Id.* A complete reading of this quote reveals that at the time of the decision, "control of [BPD was] vested in the State with immediate supervision and direction of the department under a police commissioner who [was] appointed by the Governor." *Id.* at 450. Indeed, as the full sentence from which BPD selectively quotes explains: "Certainly, although [City funding] in itself could not be construed as a method of indirect control over the police department by the City, nonetheless one would be overly naive not to think that such a situation would provide the occasion for the flow and exchange of communications, accommodations and co-operative action between the City and the police commissioner." *Id.* at 451. The notion that *Silver* supports BPD's argument that City funding "in no way provides the City with control over

and BPD goes through the same budgeting process used to fund other City agencies. PLL art. 4,

§ 16-8(a). BPD "is not dependent on state money for its survival," which is "critical evidence" of

its autonomy. *Oberg III*, 804 F.3d at 669 (alteration and citation omitted); *see Ram Ditta*, 822

F.2d at 458–59 ("The budgetary process applicable to state agencies is expressly inapplicable to

the Commission."). The City determines the number of BPD employees and their compensation.

PLL art. 4, § 16-8(b)–(c). Relatedly, the City bargains with the Commissioner and police union

in accordance with municipal law. Charter of Balt. City art. VI, § 13; PLL art. 4, § 16-8A(a).

Labor disputes that cannot be resolved go to an arbitration board appointed by the Mayor and

police union. The State has no say. PLL art. 4, § 16-8A(b)(3). The Commissioner controls the

funds that come into BPD's hands and must report on such funds "in detail to the Mayor and

City Council annually." *Id.* § 16-20. If BPD cannot pay its employees out of its own funds, the

City must make up the difference; there is no provision for the State to do so. *Id*. Baltimore

City's budget for BPD anticipates that the City's funding decisions will have "service impacts";

provides "performance measures" analyzing BPD's progress towards City and BPD goals; and

sets priorities for BPD going forward. *Fiscal 2020 Detail*, *supra*, at 329–78.

  State appropriations are not so "inextricably intertwine[d]" with BPD's budget as to

render it a state entity. *See* BPD Mem. 9. Any state mandates are still funded by the City and

negligible compared to the overall size and complexity of the budget. The City has budgeted

$536,376,477 for BPD for 2020, in addition to $2,194,751 to cover police legal affairs and

$675,121 for police-community relations. *Fiscal 2020 Summary*, *supra*, at 114, 129, 135. The

State contributes about 4% of these funds. *See Fiscal 2020 Detail*, *supra*, at 331. That is

---

BPD" is dubious given BPD's modern structure and the context of Eleventh Amendment
immunity.

insufficient to establish any relevant state budgetary control over BPD. *See Hess*, 513 U.S. at 37–38 (holding states' "modest" appropriation does not weigh in favor of immunity when "the States in no way undertake to cover the bulk of the Authority's operating and capital expenses"); *Lawson v. Union Cnty. Clerk of Ct.*, 828 F.3d 239, 251 n.4 (4th Cir. 2016), *as amended* (July 8, 2016) (holding state supplementation of official's salary does not make him a state official); *Kitchen v. Upshaw*, 286 F.3d 179, 185 (4th Cir. 2002) (similar).

With regard to the State's veto power, while the State can direct BPD policy if it chooses, BPD is not "*truly subject* to sufficient state control to render it a part of the state." *Oberg III*, 804 F.3d at 669. The Court looks not only to the state's legal power to exercise significant control, but whether, in reality, it does so. *See id.* at 673 n.22. Under Fourth Circuit precedent, an entity is "truly subject" to state control when it must seek state approval before acting, particularly when it cannot contract, buy and sell property, or control its finances independently. In *Maryland Stadium Authority*, for example, the Fourth Circuit held that the University System of Maryland was an alter ego of the State because it could not purchase and sell property, enter into significant contracts, spend excess revenue, or issue revenue bonds without prior state approval. 407 F.3d at 264. In *Oberg III*, the Court found significant that the defendant conducted day-to-day operations without state oversight. 804 F.3d at 669; *see also id.* at 671 (citing *Vogt v. Bd. of Comm'rs*, 294 F.3d 684, 694–95 (5th Cir. 2002)).

State law is clear: The Commissioner controls the "affairs and operations of the department." PLL art. 4, § 16-4. BPD need not and does not seek the State's permission for any particular undertaking, no matter how significant.[8] Indeed, BPD has not cited a single instance in

---

[8] The exception that proves the rule is that the Attorney General must approve reimbursements to officers for the costs of legal defense. PLL art. 4, § 16-13. These funds come from the City. *See*

14

which the State vetoed its independent policy decision. The BPD Commissioner "makes the policy decisions for the direction of the agency, and tasks [BPD's] executives and managers with implementing those decisions and directions on a day-to-day basis." *Oberg III*, 804 F.3d at 669. The Commissioner has the independent authority to, among other things, issue binding regulations, establish BPD's organizational structure, define responsibilities within BPD, "regulate attendance, conduct, training, discipline and procedure for all members of the Department," "make and execute contracts," and acquire property. PLL art. 4, § 16-7.[9] BPD is exempt from the State Administrative Procedure Act, *id.* § 16-14, and the State Personnel Management System, *id.* § 16-10(f). *See Ram Ditta*, 822 F.2d at 458 (finding significant that "[i]nstead of participating in the state civil service system, the Commission has its own merit system for evaluating its employees' performance").

BPD focuses on State law that does not require BPD to seek the State's prior approval to act, does not substantially undermine the Commissioner's autonomy and ultimate policymaking responsibility, and mostly either delegates power to the Commissioner or directs the Commissioner to collaborate with the City. The State requirements to which BPD points—for example, "how BPD is to be organized, led, funded, staffed, trained, disciplined, and authorized," BPD Mem. 10—are purely ministerial and nowhere near so detailed as BPD implies. For hiring, firing, and promotion decisions, the State simply tells BPD to establish an exam process and select the candidates who perform best on the exam, without giving any guidance as to the qualifications BPD should value, what should be tested, what kinds of tests or

---

*supra* Part II.B.1 (describing City budget for police legal affairs); MOU, art. 15 (prescribing that City provides BPD officers' legal defense).

[9] The Commissioner must obtain the Civil Service Commission of Baltimore's consent to establish the civil service ranks for civilian employees. PLL art. 4, § 16-7(6).

how many should be administered, or how the results should be evaluated. PLL art. 4, § 16-10. Beyond requiring compliance with the Law Enforcement Officers' Bill of Rights ("LEOBR"), *see infra* Part II.B.2, the State delegates power to the Commissioner to adopt "rules, regulations, or orders" to govern disciplinary proceedings, to compel the production of documents and witnesses, and to impose any lawful punishment. PLL art. 4, § 16-11. Similarly, the State delegates operation of the grievance procedure and personnel board to the Commissioner and BPD, and the Commissioner and personnel board may alter any of the State's procedural regulations for the grievance process. *Id.* § 16-12.[10] The State's control over redistricting is limited to instructing the Commissioner to consider certain data, without prescribing how the data should be used. *Id.* § 16-55. In this, as in many other areas, the State instructs BPD to work with the City. *Id.* "[S]tatutory restrictions [that] operate predominantly at the administrative edges rather than the discretionary heart of [BPD's] authority" and "do not intrude on [BPD's] exercise of its substantive discretion" or its "substantive decisions governing the focus and direction of the company and its day-to-day operations" do not give rise to Eleventh Amendment immunity. *Oberg III*, 804 F.3d at 672–73.

BPD's power to undertake substantial policy changes and legal obligations without interference from the State is illustrated by the Consent Decree into which it and the City—but not the State—entered with the United States Department of Justice. Consent Decree ¶ 1, *United States v. Police Dep't of Balt. City*, No. JKB-17-00099 (D. Md. Jan. 12, 2017), ECF No. 2-2, https://www.justice.gov/opa/file/925056/download ("Consent Decree"). An entity's significant undertaking "in the absence of express statutory authority . . . and without any involvement of"

---

[10] The members of the personnel board are either elected by BPD officers or appointed by the Commissioner, not the State. PLL art. 4, § 16-12(d).

or "direction from" the state is "powerful evidence" of its autonomy. *Oberg III*, 804 F.3d at 670. Without the State's input, BPD committed to a drastic overhaul of its policies, training, and culture. BPD obliged itself to reorient toward community policing, Consent Decree ¶ 15, and made specific commitments to the new training, data collection and evaluation, and policies it will implement to do so, *see, e.g.*, *id.* ¶¶ 16–18, 31–37, 67–68, 124–127, 141, 166–68. BPD agreed to create entirely new programs dealing with matters at the heart of its mission and operations, including regarding stops, searches, arrests, documentation, data collection, and supervisory review and discipline. *E.g.*, *id.* ¶¶ 38–59, 60–66, 69–85, 88, 90–94, 100, 106–07, 112–13, 121–22, 177–78, 375–77. It committed to coordinating with other jurisdictions and agencies without going through the State. *Id.* ¶¶ 263, 393. Most recently, BPD arranged an independent investigation to determine the root of the Gun Trace Task Force's unlawful activity. Motion to Approve Investigation of Gun Trace Task Force Scandal, *United States v. Police Dep't. of Balt. City*, No. JKB-17-00099 (D. Md. Jan. 12, 2017), ECF No. 251.

The Consent Decree recognized Baltimore City, not the State, as BPD's partner in this transformation. The City, along with BPD, agreed to forgo the practices that led to DOJ finding that BPD had a pattern and practice of constitutional violations. Consent Decree ¶ 8. The City committed to improving community relations with BPD, including by working with BPD on implementing policies to better hold BPD officers accountable for misconduct. *Id.* ¶¶ 19, 329, 390, 396–97, 401, 412. The City is to participate in BPD's recruitment plan. *Id.* ¶ 420(e). The Consent Decree instructs BPD to cooperate with the City to fund the Decree's mandates. *Id.* ¶¶ 292, 314, 429–30, 500. The State has no role in monitoring BPD under the Consent Decree. Instead, BPD, the City, and DOJ jointly select a monitor, and the City pays. *Id.* ¶¶ 443, 448. The monitor must communicate only with the parties to the Consent Decree, not the

17

State, *id.* ¶ 454, and the new policies BPD implements pursuant to the Consent Decree are subject to review only by the monitor and DOJ, *id.* ¶¶ 283–87.[11]

Additionally, Baltimore City provides legal counsel in any civil case in which a plaintiff alleges that a BPD officer is liable for acts within the scope of his or her employment, MOU, art. 15, including the case at bar.

BPD also fails to recognize the significant devolution of State control over BPD to the City and BPD itself since 1860. In 1860, the Maryland General Assembly placed BPD under the control of four commissioners appointed by the State, established their terms and salaries, set forth BPD's organizational structure, established the salaries and term limits of BPD officers, and required Baltimore City to raise any funds BPD demanded. Acts of 1860, ch. 7. Today, Baltimore City appoints the sole BPD Commissioner; Baltimore City determines how long the Commissioner will serve and at what pay; Baltimore City bargains with BPD to set officer salaries and establish BPD's budget; and BPD determines its own organizational structure. All of the state cases on which BPD relies pre-date BPD's modern structure and Baltimore City's absolute authority over the appointment and dismissal of the BPD Commissioner. *See* BPD Mem. 8–9; *Mayor & City Council of Balt. v. Clark*, 404 Md. 13, 28 (2008) (recounting, at that time, that the Mayor could not remove the Commissioner at will); *Silver*, 263 Md. at 450 (recounting, at that time, that the police commissioner was appointed by the governor). They are of little use to the Court in answering questions about BPD's status today.

---

[11] The Consent Decree further recognizes that only the City and BPD play a significant role in BPD's operations by covering the City and BPD in its conflict-of-interest provisions, but not the State, Consent Decree ¶¶ 477–79, and instructing the monitor not to "replace or assume the role and duties of the City or BPD, or any duties of any City or BPD employee," *id.* ¶ 445.

Lacking a foundation in the Fourth Circuit's Eleventh Amendment precedent, BPD largely relies on state cases that address whether Baltimore City exercises sufficient control over BPD to be vicariously liable for torts committed by BPD officers, some cases dating back to the early twentieth century. *See* BPD Mem. 8–9. Cases that "present[] no Eleventh Amendment issue" and/or predate "the evolution of Eleventh Amendment jurisprudence" are of little use in resolving Eleventh Amendment questions. *Lawson*, 828 F.3d at 279–80 (Davis, J., dissenting on other grounds). The question is not whether Baltimore City controls BPD; the question is whether the State does. *E.g.*, *Cash*, 242 F.3d at 224 (citation omitted) (describing the "factors formed largely to determine the relationship between the State and the entity in question"); *see also, e.g.*, *Lawson*, 828 F.3d at 251 ("Gault must demonstrate that the Union County Clerk's Office is an arm of the state, and not an independent subdivision of the state."). As one judge explained, "whether there are sufficient connections between BPD and the City to preclude a claim of sovereign immunity by BPD . . . is a different question from whether the City controls BPD to establish *Monell* liability." *Lucero*, 2019 WL 4673448, at *4 (citation omitted).

BPD's independence is clear from the text of the law and the actions it takes. It is not a tool of the State and does not have Eleventh Amendment immunity.

### 2. *Examples of "state control" that apply statewide to unquestionably local agencies do not support BPD's argument.*

The other examples of state control BPD proffers, BPD Mem. 10–11, do not differentiate BPD from other entities that are unquestionably local. LEOBR and state training requirements apply to essentially all police personnel in the state. *See* Md. Code Ann., Pub. Safety § 3-101(e)(1) (defining "Law enforcement officer" for purposes of LEOBR); *id.* § 3-201(f)(1) (defining "Police officer" for purposes of the Maryland Police Training and Standards Commission). The fact that BPD follows generally applicable state law does not rob it of its local

19

character. *See Oberg III*, 804 F.3d at 656 (acknowledging that the local agency, like all "Commonwealth agencies," had to follow the opinions of the Attorney General and submit certain contracts for state review).

Similarly, BPD's understanding of how funding weighs in the autonomy analysis would favor immunity for *all* local entities. BPD says that "the budgets of State and local entities," not just BPD, "in Maryland" are "inextricably intertwine[d]." BPD Mem. 9. BPD does not contend that all of these local entities are actually arms of the State.

Nor does the State regulate BPD uniquely. As it does with BPD, the State from time to time passes laws targeted at specific law enforcement agencies. For example, the State has required the Baltimore County police department to establish a behavioral health unit, 2015 Md. Laws 562–64; authorized police officers in Charles County to collectively bargain with the county, 2016 Md. Laws 7116; required the Montgomery County police department to report to the state on its use of school bus monitoring cameras, 2017 Md. Laws 4254–56; and prohibited the Prince George's County police department from using towing agencies not selected via an open procurement process, Acts of 2018, ch. 777, http://mgaleg.maryland.gov/2018RS/chapters_noln/Ch_777_hb0238E.pdf.

Considered in the full context of state law, BPD's argument boils down to the unremarkable position that the State is the ultimate progenitor and source of authority over all government agencies in Maryland, local or otherwise. That is true, but it does not establish that BPD shares the State's sovereign immunity, when the State chooses to delegate its power to local entities and does not use what power remains. This factor weighs in favor of finding that BPD is a not an arm of the State.

C.      **BPD serves a primarily local function.**

As the police force for Baltimore City, BPD's authority is local. Indeed, BPD concedes

that its "primary responsibility is 'the lives and safety of all persons within the City of

Baltimore.'" BPD Mem. 11 (quoting PLL art. 4, § 16-2(a)). Yet, BPD argues that its

involvement in enforcing state criminal law and its interest in criminal justice more broadly

weigh in favor of finding that it is an arm of the State. Once again, by BPD's logic, every local

law enforcement agency in Maryland would be entitled to Eleventh Amendment immunity.

BPD's attenuated argument reveals that nothing about the scope of BPD's authority renders it an

arm of the State, as opposed to a municipal police department.

"[W]hether the entity is involved with statewide as opposed to local or other non-state

concerns" depends on the scope of the entity's authority, including how the entity functions and

its jurisdictional or territorial limits. *Oberg II*, 745 F.3d at 140 n.5 (citation omitted); *see also*

*Harter v. Vernon*, 101 F.3d 334, 342 (4th Cir. 1996) (explaining that, notwithstanding the fact

that it enforces state laws, North Carolina Sheriff's Office is a local entity); *Ram Ditta*, 822 F.3d

at 459 (holding Maryland-National Capital Park and Planning Commission is a local entity in

part because it lacks involvement in "operating or developing areas beyond the borders" of two

Maryland counties); *Cash*, 242 F.3d at 226 (providing the fact that the entity's jurisdiction is

limited to one county "clearly points to local concerns").

As its name portends, BPD is a police force tasked with "safeguard[ing] the lives and

safety of all persons within the City of Baltimore" and "protect[ing] property therein." PLL art.

4, § 16-2(a). It has the responsibility "within the boundaries of said City" to, among other things,

prevent crime and to enforce state laws and laws of the Mayor and City Council of Baltimore. *Id.*

BPD holds itself out as a local agency: on its website, it notes that its "jurisdiction covers

Maryland's largest city, with a population of 614,000." *About the Department*, Balt. Police Dep't, baltimorepolice.org/about-department (last visited Dec. 18, 2020).

The set of comprehensive reforms to which BPD agreed as part of the Consent Decree was the product of input "from the diverse communities that make up the City of Baltimore." Consent Decree ¶ 6. In a process that was focused on BPD's reorientation to community policing and developing "a strong partnership between the police department and the communities that it serves," *id.*, DOJ, the City, and BPD made no attempt to address BPD's practices regarding or relations with communities outside of the City. Over and over, the Consent Decree defines the community of concern to BPD as the City of Baltimore. *Id.* ¶¶ 10–11, 13(b), 16(g), 19(g), 20, 23, 33, 93(k), 94, 104, 336, 397, 411, 416, 420, 442, 444(d), 456, 459, 461(i), 493.

That BPD's jurisdiction may in some circumstances extend outside Baltimore City limits does not enlarge the scope of its concerns from local to statewide. BPD selectively, and misleadingly, quotes the law regarding its jurisdictional authority to imply that it can operate unconditionally anywhere in the state. BPD Mem. 11–12. In fact, BPD's cross-jurisdictional authority is restricted to areas "owned, controlled, operated, or leased by the Mayor and City Council of Baltimore, or any agency, commission, or department thereof." PLL art. 4, § 16-2(b). BPD's authority to arrest individuals in any part of the State is similarly restricted to those who have committed crimes within Baltimore City limits, or in those areas outside the City "owned, controlled, operated, or leased by the Mayor and City Council of Baltimore." *Id.* § 16-3(a). BPD does not have authority to operate everywhere in Maryland that Baltimore City has a vaguely defined "interest," *see* BPD Mem. 12, and the limited circumstances in which BPD could exercise extra-territorial authority are designed to inure to the benefit of Baltimore City residents, *see Ram Ditta*, 822 F.2d at 459.

22

BPD is hardly unique in its ability to enforce state laws and act outside of its territorial limits. All police officers in Maryland "may make arrests, conduct investigations, and otherwise enforce the laws of the State throughout the State without limitations as to jurisdiction" under certain circumstances. Md. Code Ann., Crim. Proc. § 2-102(b)(1); *see also id.* § 2-103(b). Other municipalities may grant extraterritorial authority to their police officers in local law. Md. Code Ann., Crim. Proc. § 2-105(b); *see also, e.g.*, PLL art. 10, § 68(a) (permitting law enforcement officers in Dorchester County to arrest statewide "any person charged with the commission of a crime in the City of Cambridge"). These other municipalities can also provide that their officers may enforce state law. PLL art. 14, § 232 (allowing Howard County police officers to "arrest all offenders against the laws of the State"). That, in and of itself, does not provide BPD with Eleventh Amendment immunity. *Cf. Peprah v. Williams*, No. CV GLR-18-990, 2019 WL 224245, at \*5 (D. Md. Jan. 15, 2019) (citations omitted) ("Under *Monell*, a municipality, such as Howard County, is subject to suit under § 1983.").

In its effort to characterize itself as a state agency, BPD argues that it delegated certain activities of local concern, "like parking tickets, directing traffic, and building code violations" to Baltimore City employees, allowing it to focus on "weighty" state criminal law matters affecting every Maryland citizen. BPD Mem. 11 n.4. Not only has BPD failed to demonstrate that it has, in fact, delegated such activities, or that it retains no oversight over City employees performing such activities, BPD has misrepresented the law. The public local law provides that BPD "shall continue to enforce the laws regulating parking and [is] not relieved of any duty by this section." PLL art. 4, § 16-16B(4). BPD also ignores the fact that funds for local traffic enforcement, crowd control, and special events management come out of its budget. *Fiscal 2020 Detail*, *supra*, at 357–60. BPD further ignores the host of City ordinances requiring it to deal with quintessentially

local police matters, such as loitering, Balt. City Code art. 19, § 25-1(b), neighborhood

nuisances, *id.* §§ 6-3, 43A-2, 43B-5, youth drinking and curfew violations, *id.* §§ 13-4, 14-4, 34-

8, press identification cards, *id.* §§ 42-1, 42-2, and Neighborhood Block Watch Sign

applications, *id.* art. 1, § 21-3.

BPD's enforcement of State criminal law does not affect every Maryland citizen by

virtue of the fact that Baltimore is Maryland's biggest city or because the laws were passed by

the Maryland General Assembly. If the size of the city and the impact of city concerns on the

state mattered to the Eleventh Amendment analysis, large cities themselves would be state

entities. BPD's authority is akin to that of other police departments in Maryland and is

"unquestionably local." *Alderman*, 952 F. Supp. at 258. This factor weighs against BPD's

Eleventh Amendment immunity.

### D.    BPD is inconsistently treated as a state or local agency under State law.

BPD relies on a single provision of the public local law declaring it a state agency and

state precedent holding that it has sovereign immunity in *state* court to argue that its legal status

under Maryland law entitles it to Eleventh Amendment immunity. BPD Mem. 12. In overstating

that the fourth factor "could not be any more clearly in [its] favor," *id.*, BPD ignores other

statutory authority and Maryland precedent that treat it as a local agency. To determine "how the

entity is treated as a matter of state law," courts look to state statutes, regulations, and state court

decisions. *Harter*, 101 F.3d at 342 (alteration and citation omitted).

#### 1.    *State statutes and regulations*

The Local Government Tort Claims Act ("LGTCA") defines BPD as a local government.

*See* Md. Code Ann., Cts. & Jud. Proc. § 5-301(d)(21); *cf. Lewis v. Bd. of Educ. of Talbot Cnty.*,

262 F. Supp. 2d 608, 614 (D. Md. 2003) (relying on the LGTCA's definition of "local

government" to find that county school boards are state agencies). BPD officers are excluded

from the MTCA's definition of "state personnel." Md. Code Ann., State Gov't § 12-101. The

State routinely relies on the LGTCA to disclaim responsibility for BPD. *See* Letter from R.

Garvey to A. Freeman (July 30, 2018), *Johnson v. Balt. City Police Dep't*, No. 1:19-cv-00698-

ELH (D. Md. June 28, 2019), ECF No. 29-1. Elsewhere in the Maryland Code, BPD is expressly

treated as an agent of Baltimore City. *See* Md. Code Ann., General Provisions § 5-801(c)

(defining BPD officers as local officials subject to Baltimore City, not state, ethics laws); Md.

Code Ann., Crim. Proc. § 13-501 (describing the City as BPD's "governing body" in a law

relating to the forfeiture of property used in connection with human trafficking).[12]

### 2. *State court decisions*

State court decisions ruling on the issue are relevant to the analysis under factor four, but

not determinative. *See Harter*, 101 F.3d at 337, 342. "A state court's view of the status of a state

political entity is, of course, an important factor for a federal court to consider in determining

whether that entity is entitled to Eleventh Amendment immunity." *Ram Ditta*, 822 F.2d at 459–

60. The Maryland Court of Special Appeals has held that BPD is not entitled to Eleventh

Amendment immunity. *See Blades v. Woods*, 107 Md. App. 178, 182 (1995).

Considering BPD's treatment as a local entity in various state statutes, and at least one

Maryland appellate decision holding that BPD is not a state agency for federal immunity

---

[12] Relying on PLL art. 4, § 16-3(b), which provides that BPD officers share the same immunities and defenses as may be made available to "sheriffs, constables, police, and peace officers" in civil or criminal suits arising from acts performed in the course of their duties, BPD analogizes its officers to Maryland State Troopers and posits the "strange" outcome that would result if each agency and its officers were entitled to different sets of legal immunities. BPD Mem. 12–13. But whether BPD and the Maryland State Police are similarly situated for purposes of Eleventh Amendment immunity is a question of federal, not state, law, and therefore depends on far more than state law immunities. *Harter*, 101 F.3d at 342. That is the point of the arm-of-the-state analysis. Nor does BPD find it "strange" that other local law enforcement agencies may have different immunities than the Maryland State Troopers, although they also work together. *See* Md. Code Ann., Crim. Proc. §§ 2-102(b)(1), 2-103(b).

purposes, this factor tilts in favor of finding that BPD is not immune from suit under the

Eleventh Amendment.

BPD falls woefully short of its burden to demonstrate that it is an arm of the State. As the

foregoing analysis demonstrates, three of the four factors of the Eleventh Amendment immunity

analysis strongly favor finding that BPD is not a state agency, with the fourth factor militating in

favor of the same. As the Fourth Circuit held in *Ram Ditta*, where "[t]hree of the four factors we

consider, *i.e.*, the state treasury's responsibility for any judgment, the Commission's autonomy

from the state and the nature of the Commission's functions, all weigh heavily against eleventh

amendment immunity," even where an entity is a state agency under state law, Eleventh

Amendment immunity should be denied. 822 F.2d at 460. In recent years, the Fourth Circuit has

made clear that courts should not give "preeminence to any single factor." *Owens v. Balt. City*

*State's Atty's Off.*, 767 F.3d 379, 395 n.5 (4th Cir. 2014); *see also Oberg II*, 745 F.3d at 137.

Balancing the four factors equally, BPD is not a state agency and therefore not entitled to

Eleventh Amendment immunity.

BPD's attempt to convince the Court that the outcome would be different if more weight

were given to concerns about the State's "sovereign dignity" misunderstands the law. BPD Mem.

13–14. This Circuit's arm-of-the-state analysis already takes appropriate account of whether

subjecting an entity to suit in federal court will impair the sovereign dignity of the state: that is

what analysis of the last three factors is intended to determine. *Kitchen*, 286 F.3d at 184; *Cash*,

242 F.3d at 225; *Harter*, 101 F.3d at 340; *see also Oberg III*, 804 F.3d at 677 (finding state's

sovereign dignity was not impaired by rejecting defendant's immunity in light of defendant's

"intended and actual independence from the Commonwealth"). As it has regarding this argument

in the past, the Court should reject BPD's attempt to elevate the state's dignity as "a separate, free-floating factor." *Harter*, 101 F.3d at 340.

***

This Court should reject an attempt by the eighth largest municipal police department in the United States to shield itself from all oversight of its compliance with federal civil rights law. *See About the Department*, Balt. Police Dep't, baltimorepolice.org/about-department (last visited Dec. 18, 2020). *Monell* liability is "intended not only to provide compensation to victims of past abuses, but to serve as a deterrent against future constitutional deprivations, as well." *Owen v. City of Indep.*, 445 U.S. 622, 651 (1980). The public nature of a lawsuit, the discovery and litigation process, and the imposition of liability can have a behavior-modifying effect due to the information and fault-fixing functions that encourage policymakers to take remedial actions. Myriam E. Giles, *In Defense of Making Government Pay: The Deterrent Effect of Constitutional Tort Remedies*, 35 Ga. L. Rev. 845, 860–62 (2001); *see also id*. at 863.

*Monell* litigation is a powerful tool in righting past wrongs, preventing future harm, and preserving human liberty and human rights. *See Monell*, 436 U.S. at 684. Recognizing the importance of holding local governments accountable for their federal civil rights obligations, the Supreme Court has warned against "egregious attempts by local governments to insulate themselves from liability." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). To find for BPD would leave Mr. Chestnut, Mr. Stewart, Mr. Watkins, and other similarly situated persons with no protection against BPD's persistently unconstitutional policies and practices. Fortunately, there is no principled reason to cloak BPD in Eleventh Amendment immunity, and BPD's motion to dismiss should be denied.

**III.    Plaintiffs Have Sufficiently Stated a *Monell* Claim Against the BPD.**

The BPD alternatively argues that Plaintiffs' *Monell* claim should be dismissed on the ground that the allegations in the Complaint are insufficient to support *Monell* liability under two theories: (1) that the BPD failed to train, discipline, and supervise its officers; and (2) that the BPD condoned its officers' unconstitutional acts. This argument ignores the proper standard of review governing a motion to dismiss and instead attempts to impose a heightened pleading standard on Plaintiffs. Viewing the allegations in the light most favorable to Plaintiffs and drawing all reasonable factual inferences in Plaintiffs' favor, their Complaint is more than sufficient to allege that the BPD maintained policies, practices, or customs of misconduct in homicide investigations under both theories.

On a motion to dismiss, "dismissal is inappropriate unless, accepting as true the well-pleaded facts in the complaint and viewing them in the light most favorable to the plaintiff, the plaintiff is unable to 'state a claim to relief that is plausible on its face.'" *Brockington v. Boykins*, 637 F.3d 503, 505–06 (4th Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Smith v. Smith*, 589 F.3d 736, 738 (4th Cir. 2009) (reversing dismissal of § 1983 claim). Plausibility "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" supporting a plaintiff's allegations: "[O]f course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (citation omitted).

Thus, "[t]o survive a motion to dismiss, a plaintiff need not demonstrate that her right to relief is probable or that alternative explanations are less likely; rather, she must merely advance her claim 'across the line from conceivable to plausible.'" *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015) (quoting *Twombly*, 550 U.S. at 570). In other words, "[t]he

28

question . . . is 'not whether [the defendant] will ultimately prevail . . . but whether [the] complaint was sufficient to cross the federal court's threshold.'" *Woods v. City of Greensboro*, 855 F.3d 639, 652–53 (4th Cir. 2017) (quoting *Skinner v. Switzer*, 562 U.S. 521, 529–30 (2011)). *Monell* allegations "need not be particularly detailed, and the chance of success need not be particularly high." *Owens*, 767 F.3d at 403. "Although prevailing on the merits of a *Monell* claim is difficult, simply alleging such a claim is, by definition, easier." *Id.* In *Owens*, for example, the Fourth Circuit held the plaintiff sufficiently pled an unconstitutional custom or practice when he alleged a number of "[r]eported and unreported cases" in which BPD officers suppressed exculpatory evidence in criminal prosecutions and in which there had been a number of successful suppression motions. *Id.* The Court held that, even though the plaintiff did not identify specific cases, "assertions as to 'reported and unreported cases' and numerous 'successful motions' are factual allegations, the veracity of which could plausibly support a *Monell* claim." *Id.*; *accord Burgess v. Balt. Police Dep't*, No. RDB-15-0834, 2016 WL 795975, at *12 (D. Md. Mar. 1, 2016).[13]

Plaintiffs' Complaint alleges that the BPD has maintained a longstanding pattern and practice of unconstitutional conduct in homicide investigations, including using coercion in interviews and interrogations to obtain false confessions from minors, suppressing exculpatory

---

[13] *See also Owens*, 767 F.3d at 403–04 (discussing *Haley v. City of Boston*, 657 F.3d 39, 53 (1st Cir. 2011), in which the First Circuit found sufficient the plaintiff's allegations of a "volume of cases" involving suppression of evidence, even where those other cases were not specifically identified); *J.A. v. Miranda*, No. PX 16-3953, 2017 WL 3840026, at *8 (D. Md. Sept. 1, 2017) (holding that the plaintiffs' "averment of other similar constitutional violations, is sufficient for the claim against the County to survive at this stage"); *Garcia v. Montgomery County*, No. JFM-12-3592, 2013 WL 4539394, at *5 (D. Md. Aug. 23, 2013) ("At this stage, it is enough that Mr. Garcia has alleged that Montgomery County was aware of ongoing constitutional violations by MCPD officers and that the county's failure to supervise and discipline its officers allowed a pattern and/or practice of unconstitutional actions to develop.").

and impeachment evidence, and failing to conduct adequate investigations in bad faith to hide

officers' misconduct. *See* Compl. ¶ 123. Not only does Plaintiffs' Complaint describe this very

conduct in connection with Plaintiffs' criminal prosecution, but the Complaint also identifies

*thirteen* other homicide investigations in which BPD officers fabricated or withheld evidence and

conducted inadequate investigations, similar to that of Plaintiffs. *See* Compl. ¶¶ 126–143

(describing the cases of Wendell Griffin, Walter Lomax, Michael Austin, Gary Washington,

James Owens, Anthony Coleman, Jerome Johnson, Clarence Shipley, Sabein Burgess, Antoine

Pettiford, Rodney Addison, Malcolm Bryant, and Tyrone Jones). As explained below, the

Complaint contains more than enough factual allegations "to raise a reasonable expectation that

discovery will reveal" even more evidence supporting Plaintiffs' claims under both theories of

liability the BPD challenges. *See Twombly*, 550 U.S. at 556.

> ### A. Plaintiffs have sufficiently alleged a *Monell* claim against the BPD for its failure to train, discipline, and supervise its officers.

Plaintiffs' Complaint plausibly alleges that the BPD's failure to train, discipline, and

supervise its officers directly led to the constitutional violations by the Officer Defendants in this

case. For example, it describes the BPD's failure during the relevant time period to train its

officers on the disclosure of evidence and compliance with their obligations under *Napue v.

Illinois*, 360 U.S. 264 (1959), and *Brady v. Maryland*, 373 U.S. 83 (1963), despite the obvious

necessity of such training. *See* Compl. ¶ 146. The Complaint highlights more than a dozen

instances where BPD officers committed *Brady* violations or falsified evidence and describes

several deficiencies of BPD's Homicide Unit that were documented in an official Department

report. Compl. ¶¶ 126–144.

For instance, in the Michael Austin case, BPD homicide detectives, like here, failed to

disclose to prosecutors that an eyewitness refused to identify Mr. Austin as being involved in the

murder on multiple occasions, leading the trial prosecutor to later say, "[H]ad I known then what I know now, I would have never prosecuted the case." Compl. ¶ 131. The Complaint specifically recounts that, in the Coleman post-conviction case, Detective Sydnor testified that that "BPD Homicide Detectives used their discretion to decide which documents to share with State prosecutors," Compl. ¶ 134; that he had witnesses adopt his notes of their conversations as their statements; and that he did not document all of his conversations with witnesses, Compl. ¶ 135, allegations that are consistent with the ones in this case. The BPD does not engage with the allegations concerning the Tabeling Report, which found, among other things, that BPD homicide detectives kept case folders in an "abysmal condition" and that homicide detectives lacked appropriate processes and protocols for recording information gathered in the course of their investigations. Compl. ¶ 144. These allegations cite specific and widespread deficiencies in BPD homicide detectives' understanding of their constitutional obligations and in BPD's official protocols, which support the reasonable inference that such deficiencies were paralleled in BPD's training.

The BPD's failure to properly train, supervise, and discipline its officers is evident in Defendant Kincaid's misconduct in a case just two years before the prosecution of the Harlem Park Three. Compl. ¶¶ 126–127. Defendant Kincaid, the lead detective in the Duckett murder investigation, omitted material information from a search warrant affidavit, and coerced a key witness into falsely testifying during the murder investigation of James Wise, for which Wendell Griffin was wrongfully convicted. Compl. ¶¶ 126–127. Allegations that Detective Kincaid engaged in the exact same misconduct at issue here in a murder investigation just two years

31

before this case gives rise to the reasonable inference that BPD failed to properly train, supervise, and discipline its homicide detectives.[14]

The BPD challenges the sufficiency of only Plaintiffs' failure to train theory on the ground that Plaintiffs have not pointed to any specific deficiencies in BPD's training program. BPD Mem. 16. Not only have Plaintiffs identified specific deficiencies, but this Court has repeatedly rejected BPD's argument. In *Estate of Bryant v. Baltimore Police Department*, No. ELH-19-384, 2020 WL 673571, at *39 (D. Md. Feb. 10, 2020), this Court concluded that the plaintiff's allegations that the BPD failed to train its officers on their *Brady* obligations, coupled with the plaintiff's description of eight instances in which individuals were wrongfully convicted as a result of *Brady* violations, sufficiently stated a *Monell* claim under a failure to train theory. And in *Johnson v. Baltimore Police Department*, 2020 WL 1169739, at *33, this Court, again, found that the plaintiff's identification of a specific deficiency within BPD's training—its failure to train officers on the obligation to disclose *Brady* material—and multiple examples of that training defect stated a *Monell* claim. So, too, in *Washington v. Baltimore Police Department*, did this Court find that the plaintiff's failure-to-train *Monell* claim survived because the complaint specifically alleged that BPD's *Brady* training was inadequate and supplemented this allegation "with specific examples, both before and after [plaintiffs'] wrongful convictions, demonstrating the results of that failure to train." 457 F. Supp. 3d at 533.

Plaintiffs' allegations of the same, plus a description of *thirteen* other instances where BPD homicide detectives—including Detective Kincaid—engaged in *Brady* violations or fabricated evidence, must also give rise to a valid *Monell* claim. This Court should follow the

---

[14] The Court should adopt the common-sense inference that had BPD officers been appropriately trained not to commit constitutional violations, they would have followed their training. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

approach of *Estate of Bryant*, *Johnson*, and *Washington* and soundly reject the BPD's attempt to "foist an unreasonable pleading standard upon plaintiff[s'] *Monell* claim." *Johnson*, 2020 WL 1169739, at \*33.

**B.     Plaintiffs have plausibly alleged a *Monell* claim against the BPD based on its condonation of its officers' unconstitutional acts.**

Finally, Plaintiffs have adequately pled a *Monell* claim based on the BPD's condonation of its officers' unconstitutional acts by setting forth facts describing the BPD's "fail[ure] to put a stop to or correct a widespread pattern of unconstitutional conduct." *Owens*, 767 F.3d at 402 (citation omitted). In order to make out a *Monell* claim for condonation of unconstitutional conduct, a plaintiff must "point to a 'persistent and widespread practice of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" *Id.* at 402 (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1391 (4th Cir. 1987)). "Both knowledge and indifference can be inferred from the 'extent' of employees' misconduct." *Id.* at 402–03 (quoting *Spell*, 824 F.3d at 1391).

As noted above, Plaintiffs' Complaint describes thirteen other homicide investigations involving misconduct on the part of BPD officers in which officers fabricated evidence, failed to turn over exculpatory evidence, and/or failed to investigate in an effort to shield their misconduct. Compl. ¶¶ 126–143. Plaintiffs have alleged that in cases as early as 1968, through Plaintiffs' case and after, the BPD has had "actual or constructive knowledge of the pattern of misconduct in the homicide unit" and "did not act to remedy the abuses . . . thereby perpetuat[ing] the unlawful practices and ensur[ing] that no action would be taken to prevent or remedy Mr. Chestnut's, Mr. Stewart's, and Mr. Watkins' injuries." Compl. ¶¶ 126–148.

33

The BPD takes issue with these examples, arguing that they span more than 30 years, several post-date Plaintiffs' case, and only one has any temporal proximity to when the events at issue occurred. *See* BPD Mem. 18. The BPD disregards recent cases from this Court allowing *Monell* claims to proceed with fewer examples and acknowledging that "the timing of the . . . cases is beside the point." *Estate of Bryant*, 2020 WL 673571, at \*42. Indeed, thirteen cases over three decades are not "isolated mistakes" but rather, "paint[] a compelling picture of a police department that turned a blind eye to the conduct of its officers in murder investigations, suppressing exculpatory evidence." *Id.*; *see also Washington*, 457 F. Supp. 3d at 536 (recognizing a *Monell* claim under a condonation theory where plaintiff alleged four specific examples of similar misconduct over an 8-year period); *Johnson*, 2020 WL 1169739, at \*33 (recognizing a *Monell* claim under a condonation theory where plaintiff alleged twelve specific examples of similar misconduct over a 34-year period); *Burgess*, 2016 WL 795975, at \*2 (recognizing a *Monell* claim under a condonation theory where plaintiff alleged three specific examples of similar misconduct over 14-year period). The BPD also ignores that the Fourth Circuit recognized a *Monell* claim for condonation of unconstitutional conduct where the plaintiff did not cite a single case in addition to his own in which BPD officers engaged in misconduct. *Owens*, 767 F.3d at 403.

The fact that some of the cases occurred subsequent to Plaintiffs' case is inconsequential. Plaintiffs highlight them not to demonstrate the pervasive nature of the "widespread practice among BPD officers of conducting unconstitutional investigations such that the BPD had actual or constructive knowledge of this misconduct." *Estate of Bryant*, 2020 WL 673571, at \*42; *accord Johnson*, 2020 WL 1169739, at \*36. Moreover, "[p]ost-event evidence can shed some

34

light on what policies existed in the city on the date of an alleged deprivation of constitutional right." *Bordanaro v. McLeod*, 871 F.2d 1151, 1167 (1st Cir. 1989).

The extent of misconduct by BPD officers over the years in the criminal prosecutions of Wendell Griffin, Walter Lomax, Michael Austin, Gary Washington, James Owens, Anthony Coleman, Jerome Johnson, Clarence Shipley, Sabein Burgess, Antoine Pettiford, Rodney Addison, Malcolm Bryant, and Tyrone Jones, and the BPD's failure to take action to punish the wrongdoers or prevent future wrongdoing, illustrates the BPD's condonation of constitutional abuses. Plaintiffs have adequately outlined the BPD's pervasive pattern and practice at this early stage of the litigation, and their *Monell* claim should proceed to discovery.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant BPD's Motion to Dismiss.

Respectfully submitted,

_____/s/_____

Kobie A. Flowers (Bar No. 16511)
kflowers@browngold.com
Andrew D. Freeman (Bar No. 03867)
adf@browngold.com
Neel K. Lalchandani (Bar No. 20291)
nlalchandani@browngold.com
Chelsea J. Crawford (Bar No. 19155)
ccrawford@browngold.com
Anthony J. May (Bar No. 20301)
amay@browngold.com
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 1700
Baltimore, Maryland 21201
Tel: (410) 962-1030
Fax: (410) 385-0869


_____/s/_____

Larry A. Nathans (Bar No. 03023)
nathans@nathanslaw.com
Booth M. Ripke (Bar No. 25764)
bripke@nathanslaw.com

Nathans & Biddle LLP
120 E. Baltimore Street, Suite 1800
Baltimore, Maryland 21201
Tel: (410) 783-0272
Fax: (410) 783-0518

*Attorneys for Plaintiffs Alfred Chestnut,
Andrew Stewart, Jr., and Ransom Watkins*

Dated: December 18, 2020

## CERTIFICATE OF SERVICE

I, the undersigned attorney, hereby certify that I have caused true and correct copies of

the above and foregoing to be served on all counsel of record via to the Court's CM/ECF system,

in accordance with the rules of electronic filing of documents, on this 18th day of December,

2020.

/s/ Kobie A. Flowers
Kobie A. Flowers