IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **ALFRED CHESTNUT**, *et al.*, | * | |
| **Plaintiffs,** | * | |
| v. | * | **Civil Action No. RDB-20-2342** |
| **DONALD KINCAID**, *et al.*, | * | |
| **Defendants.** | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

This case arises out of the arrest, prosecution, and conviction of Plaintiffs Alfred Chestnut ("Chestnut"), Andrew Stewart, Jr. ("Stewart"), and Ransom Watkins ("Watkins") (collectively, "Plaintiffs") for felony murder of a 14-year-old boy named DeWitt Duckett in 1983. (ECF No. 1.) On November 25, 2019, the Circuit Court for Baltimore City granted the Plaintiffs' Motion for Writ of Actual Innocence, vacating the Plaintiffs' convictions and granting the three men immediate release.[1] (*Id.* ¶ 6.) On August 13, 2020, the Plaintiffs filed nine-count Complaint in this Court against the Baltimore Police Department,[2] as well as former homicide detectives Donald Kincaid ("Kincaid"), Josh Barrick ("Barrick"), and Bryn Joyce ("Joyce") (collectively "Individual Defendants" or "Officer Defendants"), alleging that they "spent part of their childhood and their entire adult lives in prison as a result of

---

[1] On a motion to dismiss, a court may take judicial notice of matters of public record. *See Brennan v. Deluxe Corp.*, 361 F. Supp. 3d 494, 501 (4th Cir. 2019) (citing *Phillips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)). The Plaintiffs' Motion for Writ of Actual Innocence was granted by Circuit Court Judge Charles Peters. *See* Associated Press, *After 36 years in prison, 3 Maryland men cleared in death of Baltimore teenager*, NBC News (Nov. 25, 2019 at 10:49 p.m.) https://www.nbcnews.com/news/us-news/after-36-years-prison-3-maryland-men-cleared-death-baltimore-n1091201. Upon Judge Peters' decision, the Baltimore City's State's Attorney's Office dropped all charges against each of the Plaintiffs. *Id.*

[2] Any reference to the Baltimore Police Department is to the Police Department of Baltimore City.

misconduct at the hands of detectives acting in accordance with the unconstitutional polices, practices, and customs of the Baltimore Police Department." (*Id.* ¶ 7.)  On November 20, 2020, the Individual Defendants and the Baltimore Police Department each filed Motions to Dismiss for Failure to State a Claim (ECF Nos. 21, 23), each seeking complete dismissal of all claims against them.[3]  The parties' submissions have been reviewed and no hearing is necessary.  *See* Local Rule 105.6 (D. Md. 2018).  For the reasons that follow, the Motions (ECF Nos. 21, 23) will be DENIED.

## BACKGROUND

In ruling on a motion to dismiss, this Court "accept[s] as true all well-pleaded facts in a complaint and construe[s] them in the light most favorable to the plaintiff." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (citing *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015)).

### A.  Investigation and Conviction of Chestnut, Stewart, and Watkins

On November 18, 1983, Plaintiffs Chestnut, Stewart, and Watkins, along with two other friends (minors, referred to throughout at A.D. and C.D.), visited Harlem Park Junior High School where they used to be students.  (ECF No. 1 ¶ 40.)  Around 12:45 p.m., a security officer escorted the five boys off the school grounds and watched them walk up the street away from the school.  (*Id.* ¶ 41.)  The security officer then locked the school's entrances and exits.  (*Id.*)

---

[3] Counts I-IV and VII-VIII are asserted against all three Officer Defendants.  Count V is asserted solely against Defendant Barrick.  Counts VI and IX are asserted solely against the Baltimore Police Department.

Around 1:18 p.m. that same day, Harlem Park student DeWitt Duckett was headed to lunch with three friends, minors who will be referred to as E.C., R.B., and J.C. (ECF No. 1 ¶¶ 31-32, 35.) One of the three friends, J.C., turned back to grab something that he left behind. (*Id.*) Duckett was approached from behind by an individual carrying a .22-caliber revolver who demanded Duckett give him the Georgetown University starter jacket he was wearing that day. (*Id.* ¶ 33.) Before Duckett could remove the jacket, the individual shot him once in the neck, took the jacket, and fled the school. (*Id.* ¶¶ 34-36.) J.C., who was on his way back to his friends, saw the shooter but was standing too far away to make out his face. (*Id.* ¶ 37.) Duckett was pronounced dead at the hospital two hours later. (*Id.* ¶ 38.) He was 14 years old. (*Id.* ¶ 31.) His friends, E.C., R.B., and J.C. were 14, 15, and 16, respectively. (*Id.* ¶ 44.)

Shorty after the murder, Baltimore Police Department ("BPD") Officer Christopher Rayburn arrived at the school, where he learned that Duckett's three friends had potentially witnessed the murder. (*Id.* ¶ 43.) Officer Rayburn spoke with the friends, who reported that a single individual had approached Duckett, demanded his jacket, and shot him. (*Id.* ¶ 45.) Officer Rayburn included such information in a report he wrote that day, November 18. (*Id.*)

The BPD Homicide Unit then took over the investigation of Duckett's murder. (*Id.* ¶ 47.) Defendant Kincaid was the lead investigator of the murder. (*Id.* ¶ 48.) Defendants Joyce and Barrick were members of the investigative team. (*Id.*) At the time, Barrick was also the immediate supervisor of the unit as a sergeant. (*Id.*) The Plaintiffs allege that as the supervisor, Barrick was responsible for providing leadership and reviewing all witness statements taken by the detectives. (*Id.* ¶ 49.) The Plaintiffs also generally allege that the Officer Defendants worked collaboratively throughout the investigation, sharing information with each other as it

was gathered and summarizing their progress in notes and reports that were provided to the commanding officer.  (*Id.* ¶ 50.)

The day after the murder, knowing that the Plaintiffs had been present at the school that day, the Officer Defendants questioned Chestnut and Watkins.  (*Id.* ¶¶ 51-51.)  According to the Plaintiffs, when Kincaid questioned Watkins he stated, "You have two things against you—you're black and I have a badge."  (*Id.* ¶ 53.)  The Officer Defendants also later interrogated Stewart.  (*Id.* ¶ 54.)  In those initial interrogations, each of the Plaintiffs asserted that they had nothing to do with the murder.  (*Id.* ¶ 55.)

In the four days after the murder, the Officer Defendants also questioned two of Duckett's friends who had been walking with him to lunch: R.B., who remained with Duckett the entire time, and J.C., who had turned back to grab something he left behind.  (*Id.* ¶ 56.)  The Plaintiffs allege that the Officer Defendants questioned each of the students at least three time and showed them multiple photo arrays, including arrays with pictures of the Plaintiffs, but neither of the children identified the Plaintiffs as being involved in their friend's murder.  (*Id.* ¶ 56.)  Plaintiffs assert that these interviewers were not memorialized, and any statements made by R.B. and J.C. at that time were not disclosed to the State's Attorney's Office or the defense.  (*Id.* ¶ 57.)

Around the same time of these initial interviews with the Plaintiffs and R.B. and J.C. (on or before November 22), the Plaintiffs allege that the Officer Defendants received information regarding a man, referred to here as John Doe,[4] who was seen running away from

---

[4] John Doe is believed to be Duckett's true killer, however, he passed away before any criminal charges were brought against him.  (ECF No. 1 at 7 n.1.)  As he was never charger or convicted of the crime, the Plaintiffs chose to exclude his name.

Harlem park and throwing down a gun on the day of Duckett's murder. (*Id.* ¶ 58.) The Plaintiffs also allege that the Officer Defendants learned that that same man was wearing a Georgetown jacket on the night of the murder. (*Id.*)

On November 23, 1983, the Officer Defendants interviewed another minor student at Harlem Park, Y.T. (*Id.* ¶ 60.) The thirteen-year-old girl allegedly told the Officer Defendants that she had not seen the shooting of Duckett and did not know who was involved. (*Id.* ¶ 61.) Plaintiffs allege that Defendants Kincaid and Barrick coerced and intimidated this girl into adopting "their false version of events." (*Id.* ¶ 62.) Specifically, the Plaintiffs allege that they pressured Y.T. into making up details during the interrogation such as that she saw two guns and heard two shots. (*Id.* ¶ 63.) The Plaintiffs also allege that the Defendants knew these details to be false because Y.T. could not have seen the murder from where she was standing at the time of the shot. (*Id.* ¶ 64.) Kincaid and Barrick allegedly wrote out a false statement that implicated the Plaintiffs and coerced Y.T. into signing the document. (*Id.* ¶ 66.) Kincaid and Barrick also allegedly coerced her into identifying photos of the Plaintiffs. (*Id.* ¶ 67.) No notes or reports related to this interview have been produced. (*Id.* ¶ 68.)

That same day, Officer Defendants interviewed another student, F.H., who was with Y.T. at the time of the murder. (*Id.* ¶ 69.) The Plaintiffs allege that the Officer Defendants concealed evidence of this interview, including information regarding where F.H. and Y.T. were standing at the time of the murder and that F.H. did not identify the Plaintiffs in a photo array. (*Id.* ¶ 69.) Again, no notes or report for this interview have been produced. (*Id.*)

After these interviews with Y.T. and F.H., the Officer Defendants decided to re-interview Duckett's friends, this time picking up all three students, E.C, R.B., and J.C. and

bringing them to meet with the Homicide Unit.  (*Id.* ¶ 70.)  On November 23, 1983, the Officer Defendants allegedly threatened and intimidated the students, accusing them of lying about what they knew about Duckett's murder and supplying them with the Officers' own version of the facts.  (*Id.* ¶ 71.)  The Plaintiffs allege that the Officer Defendants used suggestive tactics with photo arrays and encouraged the witnesses to select photos of the Plaintiffs, while discouraging them from selecting photos of other individuals.  (*Id.*)  Specifically, Plaintiffs allege that Kincaid and Joyce suggested and/or fabricated a false statement for E.C., telling him that they knew from the statements of Y.T. that the Plaintiffs had committed the crime.  (*Id.* ¶ 72.)  Under "intense pressure," E.C. ultimately stated that the Plaintiffs killed Duckett and selected them in a photo array.  (*Id.*)  Kincaid and another detective then physically threatened R.B., told him that another witness had already identified the Plaintiffs, and coerced him into falsely stating the Plaintiffs had committed the crime and identifying the three teens in a photo array.  (*Id.* ¶ 73.)  Finally, Kincaid and another detective also coerced J.C., getting him to state that the Plaintiffs murdered Duckett and to select the individuals from a photo array.  (*Id.* ¶ 74.)  Again, no notes or records from these November 23 interrogations have been produced.  (*Id.* ¶ 75.)

Overall, the Plaintiffs allege that the Officer Defendants had reason to know that the statements of Y.T. and Duckett's three friends, E.C., R.B., and J.C., were false.  (*Id.* ¶ 76.) According to the Plaintiffs, the students' statements contradicted their prior statements in which they reported that they saw one individual approach the victim and that the Plaintiffs were not involved.  (*Id.*)  Additionally, Chestnut, who the Officer Defendants claimed to be the shooter, did not match description the reporting officer collected on the day of the murder:

witnesses told the officer that the shooter was between 5'5" and 5'6" and Chestnut is 5'11". (*Id.* ¶ 76, 88.)  There was no physical evidence implicating the three Plaintiffs in the shooting— no fingerprints, DNA, or other physical proof of any kind which suggested the Plaintiffs were involved in the murder.  (*Id.* ¶ 76.)  There were simply the allegedly false statements of the youth witnesses.  Meanwhile, the Officer defendants had information from other sources related to the potential involvement of John Doe.  (*Id.* ¶ 76.)

Solely on the basis of the allegedly fabricated witness statements and identifications, the Officer Defendants obtained arrest warrants for a search of Chestnut's home, as well as for the arrests of Chestnut, Stewart, and Watkins.  (*Id.* ¶ 78.)  According to the Plaintiffs, the applications for those warrants did not contain any information regarding John Doe, disclosures that the four student witnesses had previously failed to identify the Plaintiffs as being involved in the crime, nor that the Officers coerced the witnesses into providing their statements.  (*Id.* ¶ 80.)  Between 1:00 a.m. and 2:00 am. on November 24, 1983, Kincaid and Joyce arrested the three Plaintiffs, and each were transported to the Western District and held overnight.  (*Id.* ¶¶ 81-82.)

While BPD officers were searching Chestnut's bedroom, the officers seized a Georgetown starter jacket like the one Duckett was wearing at the time of the murder.  (*Id.* ¶ 83.)  According to the Plaintiffs, Chestnut's mother showed the officers a receipt for the jacket and asserted that she had purchased it for Chestnut sometime earlier.  (*Id.*)  A lab report dated November 29, 1983 noted that the BPD's Chemistry Section had examined the jacket and found that it exhibited no signs of damage and no blood, hairs, or fibers were found on the item.  (*Id.* ¶ 84.)  The Plaintiffs allege that "[d]espite this exonerating physical evidence, the

Officer Defendants presented the Baltimore City State's Attorney with false and incomplete information to secure indictments. (*Id.* ¶ 85.) The State's Attorney's Office charged the three Plaintiffs as adults with first-degree murder, armed robbery, and illegal use of a weapon. (*Id.* ¶ 86.)

The Plaintiffs allege that the Officer Defendants intimidated and coached the minor witnesses, E.C., R.B., J.C., and Y.T. to testify at trial. (*Id.* ¶ 87.) The "fabricated" theory of the murder was that Watkins held down Duckett, Stewart pulled at Duckett's jacket, and Chestnut fired the gun. (*Id.* ¶ 88.) This version of events was completely contradictory to the four youth witnesses' earlier statements given immediately following the murder in which they asserted that a single individual approached and shot Duckett. Yet all four witnesses eventually corroborated the Officers' theory of the case involving multiple perpetrators. (*Id.* ¶¶ 89-91.) The Plaintiffs point to this striking change in testimony among all four witnesses as evidence of the Officers' coercion. The Plaintiffs also allege that the Officer Defendants attempted to coerce C.D., who had been with the three Plaintiffs at Harlem Park the day of the murder, into making a false statement implicating the three individuals. (*Id.* ¶ 92.) The Plaintiffs state that C.D. was brought in for questioning and the Officer Defendants tried to get him to sign a statement, but he refused. (*Id.*)

Meanwhile, the Officer Defendants allegedly failed to investigate the substance of the four minor witnesses' initial statements regarding the existence of a single shooter, as well as calls from at least two individuals who allegedly reported to the police that John Doe was the true shooter. (*Id.* ¶¶ 91, 94.) John Doe was reportedly 5'7" and not only had he been seen throwing a gun and running from the school, as mentioned above, but the callers reported

that he had been bragging in public on the night of the murder that he had shot Duckett and wearing the stolen Georgetown jacket. (*Id.* ¶ 95.)  According to the Plaintiffs, notes related to John Doe were not produced to Plaintiffs' defense counsel before or during the trial. (*Id.* ¶ 99.)

The Plaintiffs allege that they were convicted on a case built entirely on the statements of the four youth witnesses. (*Id.* ¶ 104.) The Circuit Court for Baltimore City sentenced Chestnut, Stewart, and Watkins to life in prison on the murder conviction and 20 years on the other charges. (*Id.* ¶ 111; *see also* Case Nos. 18335414-18335417.)  The Maryland Court of Special Appeals upheld their convictions on direct appeal, but the Plaintiffs continued to challenge their convictions in various post-convictions proceedings. (*Id.* ¶¶ 113-14.)  More than thirty years later, Chestnut received documents in response to a public records request and discovered police reports (including investigative notes regarding John Doe), which had allegedly not been disclosed to defense counsel before trial. (*Id.* ¶ 116.)  Chestnut then wrote to the Baltimore City's State's Attorney's Office, asking that his case and those of Stewart and Watkins be re-investigated. (*Id.* ¶ 117.)  That office ultimately joined Chestnut, Stewart, and Watkins in filing a Joint Petition for Writ of Actual Innocence and argued in support of the Petition in front of Judge Peters of the Circuit Court for Baltimore City. (*Id.* ¶ 118.)[5]  On November 25, 2019, the Circuit Court for Baltimore City held a hearing, granting the petition and vacating the convictions of the Plaintiffs after 36 years of imprisonment. (*Id.* ¶ 119.)  The State dismissed all charges against them. (*Id.* ¶ 120.)

---

[5] *See also* Tim Prudente, *Judge exonerates three men in 1983 'Georgetown jacket' school killing,* Baltimore Sun (Nov. 25, 2019 at 7:34 p.m.) https://www.baltimoresun.com/news/crime/bs-md-ci-cr-exonerations-in-georgetown-jacket-killing-20191125-5ea5smhvpzenfpyqkismdgla74-story.html.

**B. Allegations of Misconduct at the Baltimore Police Department**

The Plaintiffs allege that the misconduct that led to their wrongful convictions "was part of a longstanding pattern and practice within the Baltimore Police Department ("BPD") of unconstitutional conduct in the course of homicide investigations. (*Id.* ¶ 122.) They assert that "[a]t the time of Plaintiffs' wrongful convictions and throughout their incarcerations, the practices described in this Complaint were sufficiently widespread within the BPD to assume the quality of a 'custom or usage' of which the BPD had actual or constructive knowledge." (*Id.*) This allegedly unconstitutional conduct involved "using coercive techniques in interviews and interrogations; fabricating inculpatory evidence; withholding exculpatory and impeachment evidence from prosecutors, defense attorneys, and judges; and, in bad faith, failing to conduct investigations in order to shield earlier wrongful acts in the course of homicide investigations." (*Id.* ¶ 123.) In turning a blind eye to this conduct the BPD allegedly "condoned, facilitated, and encouraged these practices." (*Id.* ¶ 124.)

Plaintiffs allege that "[d]espite actual or constructive knowledge that its officers required more training" in different areas such as "the disclosure of evidence, interactions with witnesses (including minors), and the conduct of investigations in homicide cases (including the need to follow leads that contradicted detectives' prevailing theory of the case), the BPD failed to provide adequate training on these topics." (*Id.* ¶ 125.) The Complaint details numerous deficient investigations of the Homicide Unit dating back to 1968 and continued throughout and after the period when the Officer Defendants were working on the Plaintiffs' case. (*Id.* ¶¶ 126-144.) The allegations include instances of fabrication of evidence through coercion and threats and the suppression of exculpatory and impeachment evidence

in numerous investigations which resulted in wrongful convictions.  (*Id.*)  For example, the Complaint includes allegations that Defendant Kincaid was involved in another investigation in which he suppressed the results of two photo arrays shown to an important witness who had not identified the wrongfully convicted individual; suppressed witness statements that excluded the individual as the murderer; and failed to include material information in an affidavit used to secure a search warrant for search of the individual's car.  (*Id.* ¶ 127.)  Plaintiffs allege that the BPD and its supervising officials, including Defendant Barrick, did not act to remedy these and other abuses described in the Complaint.  (*Id.* ¶ 148.)

### C.  Procedural Background

On August 13, 2020, the Plaintiffs filed this nine-count Complaint against Defendants Kincaid, Joyce, Barrick, and the Baltimore Police Department ("BPD").  The Complaint makes several claims against all three Officer Defendants under 42 U.S.C. § 1983 including malicious prosecution in violation of the Fourth and Fourteenth Amendments (Count I); violation of due process for fabrication of evidence in violation of the Fourteenth Amendment (Count II); violation of due process for failure to adequately investigate and disclose exculpatory and impeachment evidence in violation of the Fourteenth Amendment (Count III); and failure to intervene (Count IV).  The Complaint also alleges supervisor liability against Defendant Barrick under § 1982 (Count V).  The Complaint contains claims for malicious prosecution (Count VII) and intentional infliction of emotional distress under Maryland law (Count VIII) against all three Officer Defendants.  With respect to the Baltimore Police Department, the Complaint alleges a *Monell* claim pursuant to the Fourteenth Amendement (Count VI).  The final count of the Complaint seeks indemnification from the BPD (Count

IX).

On November 20, 2020, the individual Officer Defendants as well as the BPD filed Motions to Dismiss for Failure to State a Claim (ECF Nos. 21, 23).  The Officer Defendants make challenges to the Complaint generally, alleging that the Plaintiffs failed to meet requirements of the relevant pleading standard by utilizing group pleading and initials of minor witnesses throughout the Complaint.  The Officer Defendants also note objections to each of the seven counts applicable to the individually named Defendants.  The BPD's motion argues that because the Plaintiffs fail to state a claim against the Officer Defendants, their claims against the BPD also fail.  They further assert that the BPD is entitled to sovereign immunity, and even if it is not entitled to such protection, the Plaintiffs' claims as alleged fail to state a claim for relief.

## STANDARDS OF REVIEW

### A.  Rule 12(b)(6)

Rule 8(a)(2) of the Federal Rules of Civil Procedure provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted.  The purpose of Rule 12(b)(6) is "to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

The United States Supreme Court's opinions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), "require that complaints in civil actions

be alleged with greater specificity than previously was required." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted).  In *Twombly*, the Supreme Court articulated "[t]wo working principles" that courts must employ when ruling on Rule 12(b)(6) motions to dismiss. *Iqbal*, 556 U.S. at 678.  First, while a court must accept as true all factual allegations contained in the complaint, legal conclusions drawn from those facts are not afforded such deference. *Id.* (stating that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *see also Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) ("Although we are constrained to take the facts in the light most favorable to the plaintiff, we need not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." (internal quotation marks omitted)). Second, a complaint must be dismissed if it does not allege "a plausible claim for relief." *Iqbal*, 556 U.S. at 679.

### B.  Rule 12(b)(1)

The Baltimore Police Department asserts a facial challenge to this Court's subject matter jurisdiction, arguing that the allegations of the complaint establish their immunity to suit under the Eleventh Amendment to the United States Constitution.  *See Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018) (holding that sovereign immunity deprives the court of subject matter jurisdiction).  A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction challenges a court's authority to hear the matter brought by a complaint.  *See Davis v. Thompson*, 367 F. Supp. 2d 792, 799 (D. Md. 2005).  A challenge to jurisdiction under Rule 12(b)(1) may proceed either as a facial challenge, asserting that the allegations in the complaint are insufficient to establish

subject matter jurisdiction, or a factual challenge, asserting "that the jurisdictional allegations of the complaint [are] not true." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted). The Defendants in this case clearly present a facial challenge and accordingly "must show that [the] complaint fails to allege facts upon which subject matter can be predicated." *Amador v. Mnuchin*, 476 F. Supp. 3d 125, 139 (D. Md. Aug. 5, 2020) (quoting *Hutton v. Nat'l Bd. of Exam'rs Inc.*, 892 F.3d 613, 620-21 (4th Cir. 2018)).

### C. Section 1983

In Counts I though VI of the Complaint, the Plaintiffs allege violations of both the Fourth and Fourteenth Amendments to the United States Constitution, pursuant to 42 U.S.C. § 1983. Under Section 1983, a plaintiff may file suit against any person, who acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See* 42 U.S.C. § 1983. To state a claim under Section 1983, a plaintiff must allege that: (1) a right conferred by the Constitution or the laws of the United States was violated and (2) the alleged violation was committed by a person acting under the color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988).

### ANALYSIS

The Plaintiffs' case follows a series of cases filed in this Court in which wrongfully convicted individuals have sought to recover against the Baltimore Police Department and individual detectives or officers involved in the investigations and prosecutions against them. *See, e.g.*, *McPherson v. Baltimore Police Dep't*, -- F. Supp. 3d --, 2020 WL 6063479 (D. Md. Oct. 14, 2020); *Washington v. Baltimore Police Dep't*, 457 F. Supp. 3d 520 (D. Md. 2020); *Johnson v. Baltimore*

*Police Dep't*, No. ELH-19-00698, 2020 WL 1169739 (D. Md. Mar. 10, 2020); *Estate of Bryant v. Baltimore Police Dep't*, 2020 WL 673571 (D. Md. Feb. 10, 2020); *Burgess v. Baltimore Police Dep't*, No. RDB-15-0834, 2016 WL 795975 (D. Md. Mar. 1, 2016).  This Court has referenced these cases in addressing the Defendants' Motions to Dismiss.

## I.    Claims against Officer Defendants

In support of their Motion to Dismiss (ECF No. 21), the Officer Defendants make general objections to the Plaintiffs' Complaint, alleging that they have failed to meet the 12(b)(6) pleading standard due to their use of group pleading and acronyms throughout the Complaint.  These objections are without merit.

First, with respect to group pleading, the Officer Defendants specifically claim that the "Plaintiffs failed to properly identify Individual Defendants in their pleading" by "inappropriately" grouping "various Defendants together without differentiation or explanation as to what each person did or did not do, how they were involved in the purported action giving rise to civil liability, or what they are being thrust into this suit to defend against." (ECF No. 22 at 4.)  As this Court noted in *Burgess*, "[t]he plausibility requirement of *Iqbal* and *Twombly* does not permit a plaintiff's 'listing everyone that could have been involved for every specific act that allegedly occurred[.]'"  2016 795975, at *10 (citing *Proctor v. Metro. Money Store Corp.*, 579 F. Supp. 2d 724, 744 (D. Md. 2008)).  However, as this Court continued, *Iqbal* and *Twombly* do not demand "that a plaintiff possess full and complete knowledge of the defendant's alleged actions.  Rather, a plaintiff need only submit facts sufficient to plead a plausible claim for relief."  *Id.*  Accordingly, this Court held that at such an "early stage in the litigation," the plaintiff's allegations regarding actions taken by a group of officer defendants

were sufficient to meet the 12(b)(6) standard.  *Id.*  The Court examined the complaint and noted that "[w]here [the plaintiff] allege[d] direct knowledge of the specific officers involves, he use[d] only those names.  When he [did] not have this knowledge, he allege[d] a definite subgroup of Defendants—the Officer Defendants—committed the alleged acts."  *Id.*  Given that some of the plaintiff's allegations were specific, the Court found that the plaintiff's use of the term "Officer Defendants" instead of specific names was "hardly an attempt to shift the burden from Plaintiff to the Officer Defendants regarding what they did and did not do," and instead held that the burden remained on the plaintiff to plead a plausible claim for relief, "and then prove that claim through information obtained during discovery."  *Id.*

The same can be said of the case at hand.  The Complaint alleges that Detective Kincaid "was the lead investigator of the murder," and that Detectives Joyce and Barrick were members "of the investigative team."  (ECF No. 1 ¶ 48.)  The Complaint also alleges that Barrick was the supervisor of the team as a sergeant, and that the officers "worked collaboratively during the investigation and shared information with one another as it was gathered."  (*Id.* ¶ 49.)  The Complaint specifically alleges that Detectives Kincaid and Barrick coerced and intimidated witness Y.T. into adopting their version of events and identifying photos of the Plaintiffs.  (*Id.* ¶¶ 62-63, 66-67.)  The Complaint also specifically alleges that Kincaid and Joyce interviewed and coerced witness E.C.  (*Id.* ¶ 72.)  Detective Kincaid is also specifically alleged to have been involved in other specific incidents of questioning and interrogation.  (*Id.* ¶¶ 53, 73-74.)  Other allegations in the Complaint refer to all three Officer Defendants.

Essentially, the Plaintiffs have made specific allegations where they have specific

knowledge of the actions of the three individually named Defendants. The Complaint also alleges that the detectives "were each intimately involved in the investigation [of the crime], and wrongly decided that [the plaintiffs] were involved in the murder." *See Johnson*, 2020 WL 1169739, at *21. As this Court has noted, "it is the purpose of discovery to establish the presence or absence of facts with which the plaintiff intends to prove his claim." *Burgess*, 2016 WL 795975, at *10. The burden will remain on the Plaintiffs to ultimately prove their claims through information obtained during discovery, and the use of group pleading at this stage in the litigation is sufficient to meet the requirements under *Iqbal* and *Twombly*.

With respect to the use of initials, the Officer Defendants claim that the Plaintiffs' use of initials to identify the four minor witnesses renders their Complaint "vague" and therefore does not provide the Defendants with fair notice of the factual basis of the claims as required by law. (ECF No. 22 at 3-6.) Yet, as the Plaintiffs note, exhibits attached to the Officer Defendants' own motion reveal the names of the individuals identified by their initials. (ECF No. 22-4 at 2-3.) As the Fourth Circuit explained in *Wright v. North Carolina*, "while the complaint 'must contain sufficient facts to state a claim that is plausible on its face,' it nevertheless 'need only give the defendant fair notice of what the claim is and the grounds upon which it rests.'" 78 F.3d 256, 263 (citing *E.I. du Pont Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)). The Plaintiffs' use of initials and group pleading does not prohibit the Plaintiffs' Complaint from providing notice of the claims against them.

### A. Malicious Prosecution (Count I)

In Count I of the Complaint, the Plaintiffs allege that all three Officer Defendants are liable under Section 1983 for malicious prosecution in violation of their rights under the

Fourth and Fourteenth Amendments to the U.S. Constitution.  (ECF No. 1 ¶¶ 159-63.)  A malicious prosecution claim of this nature "requires a showing that a defendant '(1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in the plaintiff's favor.'"  *Burgess v. Baltimore Police Dep't*, 300 F. Supp. 3d 696, 708 (D. Md. 2018) (quoting *Humbert v. Mayor & City Council of Baltimore City*, 866 F.3d 546, 555 (4th Cir. 2017)).  As the Fourth Circuit explained in *Humbert*:

> "'[P]robable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed . . . an offense." *Cahaly v. Larosa*, 796 F.3d 399, 407 (4th Cir. 1998) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)).  Probable cause is "an objective standard of probability that reasonable and prudent persons apply in everyday life," *United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998), and determined by a "totality-of-the-circumstances" approach, *Illinois v. Gates*, 462 U.S. 213, 230 (1983). "While probable cause requires more than bare suspicion, it requires less than that evidence necessary to convict." *Gray*, 137 F.3d at 769 (internal quotation marks omitted).

*Humbert*, 866 F.3d at 555-56.  The Officer Defendants contend that there was probable cause for the arrests of Chestnut, Stewart, and Watkins because four witnesses had identified them and given statements asserting they were involved in Duckett's murder (ECF No. 22 at 10 (citing ECF No. 1 ¶¶ 71-74)); the three boys were at Harlem Park Junior High the day of the murder (*id.* (citing ECF No. 1 ¶ 40)); and inside Chestnut's house, arresting officers found a Georgetown starter jacket like the one the victim was wearing at the time of the murder (*id.* (citing ECF No. 1 ¶ 83)).  However, these facts, when considered in their context, may not support a finding of probable cause.

For example, the fact that a Georgetown jacket was found at Chestnut's house cannot have supported the Officers' probable cause to arrest the three Plaintiffs because the jacket

was found *during* the arrest.  (ECF No. 1 ¶ 83.)  With respect to the witness statements identifying and implicating the Plaintiffs in the murder, it is important to note that central to the Plaintiffs' Complaint are allegations that the Officer Defendants coerced and intimidated these four student witnesses to adopt the Officers' own false narrative of the crime.  (ECF No. 1 ¶¶ 59-74, 87-92, 105, 107.)  At this stage in the litigation, this Court must accept the Plaintiffs' allegations as true, viewing the Complaint in the light most favorable to the Plaintiffs.  *See Twombly*, 550 U.S. at 555.  If the Officer Defendants truly coerced the four witnesses into identifying the Plaintiffs and falsely stating they were involved in the crime, it is hard to see how such statements could have provided the Officer Defendants with probable cause to make the arrests.  *See McPherson*, 2020 WL 6063479, at *8 ("[T]aking as true Plaintiffs' assertions that [the defendants] knew that the arrests were unsupported by probable cause because each of [the] identifications were false, Plaintiffs plausibly pled a malicious prosecution claim.")  Allegations of a knowing falsification of evidence, resulting in absence of probable cause, can also constitute actual malice.  *Id.* (citing *DiPino v. Davis*, 354 Md. 18, 729 A.2d 354, 374 (1999) (inferring malice from lack of probable cause); *Butler v. Windsor*, Civil No. PWG-13-883, 2014 WL 2584468, at *11 (D. Md. June 9, 2014) ("[B]ecause the jury could find a lack of probable cause, it could also infer malice.")).

Finally, with respect to the Plaintiffs' presence at Harlem Park on the day of the crime, the Plaintiffs contend that such fact, under the totality of the circumstances is not alone sufficient to support a finding of probable cause.  (ECF No. 29 at 15 (citing *Robinson v. Miller*, 802 F. App'x 741, 748 (4th Cir. 2020) ("Presence at a crime scene or accompanying someone who engages in criminal activity, however, does not by itself establish probable cause of

involvement in the criminal offense.").)  This Court notes that the Officer Defendants do not argue that the fact the three boys were present at the school the day of the murder alone is sufficient to establish probable cause.  Further, just because presence at the scene of a crime alone is not *sufficient*, does not mean it is not *relevant*.  As the Fourth Circuit has made clear, presence is a legitimate factor to consider in determining the existence of probable cause. *United States v. Colzie*, 817 F.2d 103 (Table) (4th Cir. 1987) (citing Ringle, 2 *Searches & Seizures*, Arrest and Confessions, § 23.3(a) (1986) ("presence combined with other factors may provide probable cause"); *United States v. Di Re*, 332 U.S. 581, 593-94 (noting that mere presence is "forceful enough in some circumstances" to support probable cause, but holding defendant's presence in car where counterfeit ration coupons were transferred was not enough in light of facts of the case).

Nevertheless the Plaintiffs in this case allege numerous facts that were allegedly within the knowledge of the Officer Defendants at the time of the arrest which may outweigh the strength of any evidence implicating the Plaintiffs in the murder.  For example, the Plaintiffs allege that three of the four witnesses originally told the Officer Defendants that they saw a single individual fleeing the scene of the crime. (ECF No. 1 ¶ 45.)  They also allegedly knew that one of the witnesses could not have actually viewed the murder from where she was standing at the time of the shooting.  (ECF No. 1 ¶¶ 63-64.)  The Plaintiffs allege that the Officer Defendants knew that the Plaintiffs had left the school prior to the shooting.  (ECF No. 1 ¶¶ 41-42.)  Finally, the Complaint alleges that on or before November 22, the Officer Defendants had received reports that John Doe was at the school on the day of the murder,

was seen throwing away a gun while running from the school, and that he had been wearing the jacket stolen from the victim on the night of the murder.  (ECF No. 1 ¶ 58.)

At this stage in the proceedings, this Court makes no finding as to whether the Officer Defendants had probable cause to arrest the Plaintiffs.  All the Plaintiffs are required to do at this point to assert a plausible claim for relief.  Given the facts alleged in the Complaint, the Plaintiffs have met the minimal standard to survive a motion to dismiss on their claim for malicious prosecution.

### B.  Fabrication of Evidence (Count II)

In Count II of the Complaint, the Plaintiffs allege, again under Section 1983, a violation of due process under the Fourteenth Amendment to the Constitution for the Officer Defendants' alleged fabrication of evidence.  (ECF No. 1 ¶¶ 164-67.)  To state a claim under Section 1983 based on fabrication of evidence, a plaintiff must allege that the defendant fabricated evidence and that the fabrication resulted in a deprivation of the plaintiff's liberty. *Washington v. Wilmore*, 407 F.3d 274, 282 (4th Cir. 2005 (citing *Zahrey v. Coffey*, 221 F.3d 342, 349 (2d Cir. 2000)).  In this case, the Plaintiffs specifically allege that the Officer Defendants coerced and threatened numerous witnesses into falsely identifying the Plaintiffs and making statements implicating the Plaintiffs in the murder.  (ECF No. 1 ¶¶ 13, 62-67, 71-74, 76-77.)

The Fourth Circuit has recognized a due process claim for fabrication of evidence on the basis of coercing a witness into providing false testimony.  *See Gilliam v. Sealey*, 932 F.3d 216, 240 (4th Cir. 2019), *cert. denied* 140 S. Ct. 2641 (2020).  In support of their allegations, the Plaintiffs note numerous inconsistencies between the witnesses' original statements and the final statements used by the Officer Defendants in their arrest warrant and at trial.  For

example, they allege that shortly after the murder, the Officers spoke with three of the four youth witnesses, who told them that a single person had approached the victim and demanded his jacket.  (ECF No. 1 ¶ 45.)  They further allege that in the four days following the murder, the Officer Defendants questioned two of those same witnesses at least three times and showed them multiple photo arrays, but those witnesses never identified the teens as having been involved in the murder.  (ECF No. 1 ¶ 56.)  Additionally, the Plaintiffs allege that one of the four youth witnesses could not have even seen the murder—a fact of which the Defendants were allegedly aware.  (ECF No. 1 ¶ 64.)  The Plaintiffs also note the total lack of other evidence implicating them: for example, there was no physical evidence that linked them to the crime, and none of the Plaintiffs matched a known description of the suspect.  (ECF No. 1 ¶ 76.)

In *McPherson*, the plaintiffs alleged fabrication of evidence where a witness identified the plaintiffs from a photo lineup after she allegedly stated to the officer-defendant that she had not seen the shooters.  2020 WL 6063479, at *7.  This Court found that such an allegation was sufficient at the motion to dismiss stage of the proceedings.  *Id.*  Similarly, in *Estate of Bryant*, the plaintiff alleged that an officer used "'direct and indirect suggestion' to produce a composite sketch that resembled" the wrongly convicted plaintiff.  2020 WL 673571, at *24.  Again, this Court found such allegations were sufficient to state a claim for relief at the motion to dismiss stage of the proceedings.  This Court is satisfied that the Plaintiffs in this case, at this stage in the litigation, have stated a plausible claim for relief based on fabrication of evidence.

### C. Failure to Adequately Investigate and Disclose Exculpatory and Impeachment Evidence (Count III)

In Count III of the Complaint, the Plaintiffs allege another violation of due process under the Fourteenth Amendment via Section 1983, asserting that the Officer Defendants failed to adequately investigate and disclose exculpatory and impeachment evidence. (ECF No. 1 ¶¶ 168-71.) This claim is based on alleged violation of the principles laid down by the Court in the landmark case, *Brady v. Maryland*, which generally requires the prosecution to turn over to the defendant all evidence that might exonerate him or her. 373 U.S. 83 (1963). To state a claim that a police officer violated *Brady*, a plaintiff must allege "(1) the evidence at issue was favorable to him; (2) the Officers suppressed the evidence in bad faith; and (3) prejudice ensued." *Owens v. Baltimore City State's Attorney's Office*, 767 F.3d 379, 396-97 (4th Cir. 2014).

In this case, the Plaintiffs allege that the Officer Defendants "did not disclose" original witness statements from two of the minor witnesses, R.B. and J.C., "to the prosecution or the defense because they contradicted the Officer Defendants' narrative of the case." (ECF No. 1 ¶¶ 56-57.) The Plaintiffs also allege that the Officer Defendants "concealed the evidence of F.H.'s whereabouts at the time of the murder." (*Id.* ¶ 69.) The Plaintiffs generally assert that the Officer Defendants did not disclose the fact that several witness statements were coerced and fabricated. (*Id.* ¶¶ 77, 86.) They argue that this suppression was in bad faith as evidenced by their allegations that the Officer Defendants "fabricated and failed to disclose statements from multiple witnesses, physically threatened a witness, and purposefully failed to interview key witnesses." (ECF No. 29 at 23-24 (citing ECF No. 1 ¶¶ 69, 73, 77, 86, 95-96).)

Evidence of contradictory and coerced statements is the kind of evidence that courts have found to be favorable to a witness under the *Brady* standard. For example, in *Johnson*, Judge Hollander held that discovery of a report related to a witness statement made just hours

23

after the murder which contradicted her later statements and testimony at trial was "great enough to undermine the confidence in the outcome of [the plaintiff]'s case."  2020 WL 1169739, at * 23 (citing *Gilliam*, 932 F.3d at 238).  As Judge Hollander explained, the report "was material because [the witness] knew Mr. Johnson and thus she certainly could have provided his name or a description if she had actually seen him.  Yet, when she spoke to police just hours after the murder, she did not mention Mr. Johnson."  *Id.*  The Court held that the lack of any reference to Mr. Johnson (the plaintiff), "tends to exculpate Mr. Johnson."  *Id.*

Judge Hollander also noted that the plaintiff's claims sufficiently alleged bad faith: "Moreover, bad faith can be inferred when police officers fabricate evidence and fail to disclose especially pertinent exculpatory evidence."  *Id.* at *24 (citing *Gilliam*, 932 F.3d at 239-40).  Judge Hollander summarized:

> According to plaintiff, [the defendants] suppressed [two reports], and handwritten interview notes. [ ] Further, plaintiff alleges that the detectives repeatedly pressured [the witness] into identifying Mr. Johnson.  [ ] The Complaint also alleges that the detectives intentionally failed to interview witnesses that would have exculpated Mr. Johnson . . . . These allegations suffice to support the inference that the detectives acted in bad faith."  *Id.* at *24 (citing *Gilliam*, 932 F.3d at 239-40 (defendant's alleged failure to disclose statements from eye witnesses was adequate to show bad faith).

*Id.*  Judge Hollander held that the plaintiff's allegations could survive a motion to dismiss.  *Id.*

Similarly, in *Ying Li v. City of New York*, the court held that the plaintiff had sufficiently pled a *Brady* violation where:

> The Amended Complaint state[d] that "the Officer Defendants failed to . . . disclose evidence inconsistent with plaintiff's guilt, did not document or inform the district attorney's office of exculpatory evidence, [and] falsely reported facts in reports and search warrant affidavits." [ ]  Plaintiff also alleges that Defendants "maliciously concealed material exculpatory evidence" [ ], and that prejudice ensued because it resulted in her arrest [ ].

246 F. Supp. 3d 578, 627 (E.D.N.Y. 2017).

The factual allegations of the Plaintiffs in this case are similar to those in *Johnson* and *Ying Li*, and this Court is satisfied that at this stage, the Plaintiffs have alleged a plausible claim for relief.  Further, in *McPherosn*, Judge Gallagher of this Court noted that the defendants' arguments raised "significant factual issues about whether certain evidence was or was not disclosed, whether the allegedly undisclosed evidence was material, whether the officers suppressed it in bad faith, and whether defense counsel should have uncovered the evidence in the exercise of reasonable diligence," but that "despite the defendants' intent to contest almost every element of the *Brady* claim," such arguments presented "factual disputes not suited for resolution at the motion to dismiss stage."  2020 WL 6063479, at *7.  In this case, the Officer Defendants' arguments related to whether some police reports were disclosed to defense counsel at trial similarly raise factual issues which this Court will not resolve at this stage.

### D. Failure to Intervene (Count IV)

Count IV of the Complaint alleges failure to intervene against all three Officer Defendants, again under Section 1983.  (ECF No. 1 ¶¶ 172-75.)  This cause of action has been recognized by the Fourth Circuit, and it is "'premised on a law officer's duty to uphold the law and protect the public from illegal acts, regardless of who commits them.'"  *See Stevenson v. City of Seat Pleasant*, 743 F.3d 411, 416-17 (4th Cir. 2014) (quoting *Randall v. Prince George's Cty.*, 302 F.3d 188, 203 (4th Cir. 2002)).  As the Fourth Circuit explained in *Randall*, "such a duty attaches when an officer observes or has reason to know that 'a constitutional violation [is being] committed' by other officers and possesses 'a realistic opportunity to intervene to prevent the

harm from occurring.'"  302 F.3d at 203-04 (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)).  Failure to intervene claims are "by nature, concomitant with a plaintiff's other [Section] 1983 claims."  *Johnson*, 2020 WL 1169739, at *15 (citing *Hinkle v. City of Clarksburg*, 81 F.3d 416, 420 (4th Cir. 1996)).  To allege a claim for failure to intervene, a plaintiff must assert that an officer was (1) "confronted with a fellow officer's illegal act," (2) "possesse[d] the power to prevent it," and (3) "cho[se] not to act."  *Burley v. Baltimore Police Dep't*, 422 F. Supp. 3d 986, 1030 (D. Md. 2019) (quoting *Brooks v. Johnson*, 924 F.3d 104, 110 (4th Cir. 2019) (internal citation omitted)).

The Officer Defendants argue in their Motion to Dismiss that the Plaintiffs' claim for failure to intervene fails to state a claim because the Plaintiffs have also failed to state a claim for malicious prosecution, fabrication of evidence, and failure to disclose or investigate exculpatory evidence.  (ECF No. 22 at 16.)  However, as explained above, the Plaintiffs have not failed to state a claim on those other counts.  Further, the Plaintiffs have generally alleged that Kincaid, Barrick, and Joyce were all members of the investigative team and shared information with one another as it was gathered.  (ECF No. 1 ¶¶ 48-50.)  Their Complaint also includes numerous allegations that all or at least two of the Defendants were present for interviews of the youth witnesses which allegedly involved physical threats and coercion.  (*Id.* ¶¶ 60-75.)  In *McPherson*, the plaintiffs' claim for failure to intervene survived the defendants' motion to dismiss where "there [were] sufficient factual allegations regarding their presence at the time Plaintiffs' constitutional rights were violated."  2020 WL 6063479, at *8 (citing *Burley*, 422 F. Supp. 3d at 1030).  In that case, Judge Gallagher held that even where one of the two defendant officers was not alleged to have been personally engaged in violating the Plaintiffs'

26

rights, "he would have had the opportunity to intervene to prevent the other officer's unconstitutional acts," and, therefore, a claim against him survived a motion to dismiss. *Id.* At this time, the Plaintiffs have stated a plausible claim for failure to intervene, as they have alleged that the Officer Defendants were present for or aware of the alleged wrongdoing of the other members of the investigative team.

### E. Supervisory Liability (Count V)

In Count V, the Plaintiffs allege Defendant Sergeant Barrick is liable under Section 1983 as the supervisor of the murder investigation. (ECF No. 1 ¶¶ 176-81.) "The principle is firmly entrenched that supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) (citing, *inter alia*, *Slakan v. Porter*, 737 F.2d 368 (4th Cir. 1984), *cert. denied*, 470 U.S. 1035 (1985)). To state a claim for supervisory liability under Section 1983, a plaintiff must allege:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to the knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Id.* at 799 (4th Cir. 1994) (citations omitted); *see also Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014). To be held liable as a supervisor, the supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference." *Jones v. City of Chicago*, 856 F.2d 985, 992-92 (7th Cir. 1988) (citations omitted).

In this case, the Plaintiffs allege that Sergeant Barrick was the immediate supervisor of the Homicide Unit and that as the direct supervisor, he "had the responsibility to provide leadership and to review all witness statements taken by detectives."  (ECF No. 1 ¶¶ 48-49.) The Complaint not only alleges that he held this supervisory role, but also that Sergeant Barrick was directly involved in the allegedly unlawful investigation.  For example, the Plaintiffs allege that both Barrick and Kincaid "coerced and intimidated" Y.T. into adopting their "false version of events;" "pressured Y.T. into making up details during the interrogation;" "told or to suggested to Y.T." that the Plaintiffs committed Duckett's murder; "wrote out of a false statement that implicated the innocent teens and, through coercion, obtained 13-year-old Y.T.'s signature;" and "coerced Y.T. into identifying photos" of the Plaintiffs.  (*Id.* ¶¶ 62-68.) Accepting these allegations as true, Defendant Sergeant Barrick's alleged direct involvement in the alleged wrongdoing of the Homicide Unit states a plausible claim for relief in Count V of the Complaint.

### F.  Malicious Prosecution under Maryland Law (Count VII)

Count VII of the Complaint alleges liability of all three Officer Defendants under Maryland law for malicious prosecution.  (ECF No. 1 ¶¶ 189-96.)  Similar to claims under federal law, a malicious prosecution claim under Maryland law requires "that the defendant instituted or continued a criminal proceeding; the proceeding was resolved in favor of the accused; there was no probable cause for the proceeding; and the defendant acted with malice, or for the primary purpose other than that of bringing an offender to justice." *Burley*, 422 F. Supp. 3d at 1035 (citing *Okwa v. Harper*, 757 A.2d 118, 130 (Md. 2000)).  For the same reasons detailed above with respect to the Plaintiffs' claim for malicious prosecution under Section

1983, the Plaintiffs have also stated a plausible claim for malicious prosecution under Maryland law.

### G.  Intentional Infliction of Emotional Distress (Count VIII)

In Count VIII of the Complaint, the Plaintiffs allege that all three Officer Defendants are liable for intentional infliction of emotional distress ("IIED") under Maryland law.  (ECF No. 1 ¶¶ 197-99.)  To plead IIED under Maryland law, "a plaintiff must allege: (1) that the conduct in question was intentional or reckless; (2) that the conduct was extreme and outrageous; (3) that there was a causal connection between the conduct and the emotional distress; and (4) that the emotional distress was severe." *McPherson*, 2020 WL 6063479, at *10 (citing *Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977)).  As this Court noted in *Arsham v. Mayor & City Council of Baltimore*, "[t]he tort of IIED 'is to be used sparingly and only for opprobrious behavior that includes truly outrageous conduct . . . of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind.'"  85 F. Supp. 3d 841, 849 (D. Md. 2015) (quoting *Kentucky Fried Chicken Nat'l Mgmt. Co. v. Weathersby*, 607 A.2d 8 (Md. 1992)).  However, the Plaintiffs in this case may "plausibly meet that very rigorous standard." *McPherson*, 2020 WL 6063479, at *11.  In *McPherson*, Judge Gallagher noted that the defendants' positions as law enforcement officers "enhance[d] the alleged extreme and outrageous character of their conduct, which 'may arise from [their] abuse of a position, or relating with another person, which gives him actual or apparent authority over him, or power to affect his interests." *Id.* (quoting *Harris v. Jones*, 281 Md. 560, 380 A.2d 611, 615-16 (Md. 1977)).  She also noted that the Restatement (Second) of Torts has recognized that, "'[i]n particular police officers . . . have been held liable for extreme abuse of their position.'" *Id.* (citing Restatement

(Second) of Torts § 46, cmt. e (Am. Law Inst. 1975)).  Judge Gallagher held that the defendants in *McPherson* "[were] alleged to have used their authority as officers to falsify evidence of Plaintiffs' participation in a homicide, resulting in decades of wrongful imprisonment and the attendant emotional distress." *Id.*  She continued, "while Plaintiffs will have a high bar to clear as the litigation proceeds, this Court will decline to dismiss Plaintiffs' intentional infliction claim." *Id.*  Given the facts alleged in this case, this Court will do the same.

## II.     Claims Against the Baltimore Police Department

### A.   *Monell* Claim (Count VI)

In *Monell v. Department of Social Services*, the U.S. Supreme Court determined that local governmental bodies may be liable under Section 1983 based on the unconstitutional conduct of individual defendants if those defendants were executing an official policy or custom of the local government when they violated a plaintiff's rights.  436 U.S. 658, 690 (1978).  To plead a claim for *Monell* liability, a plaintiff must allege that (1) "the municipality had an unconstitutional policy or custom;" and (2) "the unconstitutional policy or custom caused a violation of the plaintiff's constitutional rights." *Johnson*, 2020 WL 1169739, at *30 (citing *Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997); *Kirby v. City of Elizabeth City*, 388 F.3d 440, 451 (4th Cir. 2004), *cert. denied*, 547 U.S. 1187 (2006); *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003)).

In Count VI of the Complaint, the Plaintiffs assert that under *Monell* the BPD is liable under Section 1983 because the actions of the Officer Defendants were taken pursuant to the BPD's illegal policies and practices which included the failure to adequately train police officers in the Homicide Unit on their obligations regarding disclosure of exculpatory and

impeachment evidence; fabrication of evidence; interrogations, including of minors; and proper investigation. (ECF No. 1 ¶¶ 182-188.) The Complaint also alleges failure to supervise officers in the homicide unit and a general failure to supervise and discipline police officers. (*Id.*) The Plaintiffs assert that these policies and practices were so widespread within the BPD as to constitute a "custom or usage" of which BPD policymakers and supervisors had actual or constructive knowledge. (*Id.* ¶ 184.)

The BPD moves to dismiss Count VI pursuant to both Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. With respect to Rule 12(b)(1), the BPD contends that it is immune from suit in federal court pursuant to the Eleventh Amendment, and therefore, this Court lacks jurisdiction over the Plaintiffs' claims. (ECF No. 23-1 at 5-14.) This Court has had numerous opportunities to address the question of whether the BPD is entitled to sovereign immunity. *See, e.g.*, *McPherson*, 2020 WL 6063479, at *12; *Johnson v. Baltimore Police Dep't*, 452 F. Supp. 3d 283, 299 (D. Md. 2020); *Johnson*, 2020 WL 1169739, at *27; *Burley*, 422 F. Supp. 3d at 1023-26; *Lucero v. Early*, No. GLR-13-1036, 2019 WL 4673448, at *3-5 (D. Md. Sept. 25, 2019). In all such cases, this Court has determined that BPD is not entitled to such protection from suit. *Id.*

As Judge Hollander explained in *Johnson*, states and state agencies enjoy immunity from suit brought in federal court, but "political subdivisions of the state, such as municipalities and counties" are not protected by the doctrine. 2020 WL 1169739, at *26 (citing *Ram Ditta v. Md. Nat. Capital Park & Planning Comm'n*, 822 F.2d 456, 457 (4th Cir. 1987) (internal citation omitted)). Numerous factors weigh in favor of the BPD being considered a political subdivision of the state, rather than a state agency: the BPD is immunized by the Mayor and

City Council of Baltimore; the BPD is expressly included in the list of local government entities covered by Maryland's Local Government Torts Claims Act; the BPD Commissioner is selected by the Mayor; the City of Baltimore maintains the BPD's pension and retirement benefits; the City also provides substantial funding to the BPD, including the salaries of the BPD Commissioner and BPD Officers; and the City expressly permits the BPD Commissioner to use the funding that the BPD receives from the City to defend officers in lawsuits. *Id.* at *26-*27. Additionally, the BPD's authority "is not state-wide but rather limited to the City limits" and is therefore "distinctly local." *Id.* at *27. Although the Maryland Court of Appeals has at times recognized the BPD as a state agency, an overall balancing of factors continues to weigh in favor of a finding that the BPD is not entitled to sovereign immunity. *Id.* at *28 (citing *Mayor & City Council of Baltimore*, 541 A.2d 1122, 1138 (Md. 2008) (internal citation omitted); *Clea v. Mayor & City of Baltimore*, 541 A.2d 1303, 1306-07 (Md. 1988)).

Just as Judge Gallagher stated in *McPherson*, the rationales of this Court is in its various decisions finding the BPD is not immunized from suit under the Eleventh Amendment are "persuasive." 2020 WL 6063479, at *12. This Court hereby adopts those rationales and concludes that the BPD is not entitled to sovereign immunity from Plaintiffs' Section 1983 claims at this stage in the litigation. "[S]hould the Fourth Circuit issue an opinion in those cases to the contrary, this Court will entertain a motion for reconsideration on this issue." *Johnson*, 452 F. Supp. 3d at 299.

The BPD also moves for dismissal of Count VI arguing that the Plaintiffs have failed to state a plausible claim for relief under Rule 12(b)(6). As noted above, to state a claim for relief under *Monell*, a plaintiff must allege violation of constitutional rights caused by adherence

to a policy or custom of the municipality.  A plaintiff may allege the existence of a policy or

custom in a variety of ways:

> (1) through an express policy, such as a written ordinance or regulation; (2)
> through the decisions of a person with final policymaking authority; (3) through
> an omission, such as a failure to properly train officers, that "manifest [s]
> deliberate indifference to the rights of citizens"; or (4) through a practice that is
> so "persistent and widespread" as to constitute a "custom or usage with the
> force of law."

*Lytle*, 326 F. 3d at 471 (citing *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)).  The Plaintiffs

in this case rely on the latter of those four theories of liability.

When a plaintiff asserts a claim based on inadequate training, the "complaint should

contain facts revealing: (1) the nature of the training; (2) that the training was a 'deliberate or

conscious' choice by the municipality, and (3) that the officer's conduct resulting from said

training." *Lewis v. Simms*, AW-11-2171, 2012 WL 254042, at *3 (D. Md. Jan. 26, 2012) (quoting

*Drewry v. Stevenson*, WDQ-09-2340, 2010 WL 93268, at *4 (D. Md. Jan. 6, 2010), *aff'd*, 583 F.

App'x 180 (4th Cir. 2014)).  Just as in *Johnson*, the Plaintiffs' Complaint in this case identifies a

specific deficiency with BPD's training, namely "BPD failed to provide adequate training on

topics" including "disclosure of evidence, interactions with witnesses (including minors), and

the conduct of investigations in homicide cases (including the need to follow leads that

contradicted detectives' prevailing theory of the case)."  (ECF No. 1 ¶ 125.)  And again, just

as in *Johnson*, the Complaint illustrates the specific training defect, by providing extensive

factual allegations regarding other cases in which individuals were wrongfully convicted of

murder after the BPD fabricated evidence, suppressed exculpatory evidence, and engaged in

bad-faith investigations.  (ECF No. 1 ¶¶ 122-47.)  Those allegations include assertions that

Defendant Kincaid suppressed two photo arrays shown to an important witnesses, who had

not identified another wrongfully convicted individual; suppressed witness statements which excluded the individual from the murder; and failed to include material information in an affidavit for a search warrant for the individual's car. (*Id.* ¶ 127.)  Detective Kincaid also allegedly coerced a key witness in that case by threatening her with a perjury prosecution and possible loss of her children if she did not "cooperate" with him.  (*Id.*)  Such "factual allegations regarding the BPD's liability go well beyond a generic restatement of the elements of a *Monell* claim and are sufficient to provide the BPD with fair notice of the grounds for which [it] has been sued." *Johnson*, 2020 WL 1169739, at *33.

When a plaintiff asserts a claim based on a theory of condonation under *Monell*, a plaintiff must "point to a 'persistent and widespread practice of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual and constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" *Owens*, 767 F.3d at 402 (quoting *Spell v. McDonald*, 824 F.2d 1380, 1391 (4th Cir. 1987)).  "Both knowledge and indifference can be inferred from the 'extent' of employees' misconduct." *Id.* at 402-03 (quoting *Spell*, 824 F.3d at 1391).  In *Owens*, the Fourth Circuit reversed the district court's motion to dismiss a *Monell* claim against the BPD, noting that allegations that BPD officers withheld exculpatory information "on multiple occasions could establish a 'persistent and widespread' pattern or practice, the hallmark of an impermissible custom." *Id.* at 403 (citing *Spell*, 824 F.2d at 1368.  In this case, the Plaintiffs have alleged numerous examples of instances in which BPD officers engaged in misconduct in murder investigations, including fabricating evidence or suppressing exculpatory and impeachment evidence.  The conduct

34

alleged in this case is similar to the improper conduct of BPD officers in these numerous detailed investigations which also resulted in wrongful convictions.

The BPD argues that these allegations do not support the Plaintiffs' *Monell* claim based on condemnation as there are no facts alleging that when the Plaintiffs were investigated and convicted in 1983 and 1984 the BPD or its leadership was aware of the allegedly improper practices of its officers.  (ECF No. 23-1 at 17.)  However, just as Judge Hollander held in *Johnson*, such an argument is not persuasive.  As in that case, "the Complaint paints a disturbing picture of a police department that turned a blind eye to the suppression of exculpatory evidence by its officers in murder investigations."  2020 WL 1169739, at *36 (citing *Burgess*, 2016 WL 795975, at *12).  Further, the fact that some of the examples of misconduct occurred after the Plaintiffs' convictions "is beside the point."  *Id.* (citing *Bordanaro v. McLeod*, 871 F.2d 1151, 1167 (1st Cir. 1989) ("Post-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right."); *Huthnance v. District of Columbia*, 793 F. Supp. 2d 183, 210 (D.D.C. 2011) (same), *aff'd*, 722 F.3d 371 (D.C. Cir. 2013)).  Essentially, the Plaintiffs in this case are alleging that since 1968 the BPD has been engaged in widespread misconduct, and this is sufficient at this stage in the litigation to state a plausible claim that the BPD had actual or constructive knowledge of such misconduct at the time of the Plaintiffs' arrests and convictions.

### B.  Indemnification (Count IX)

The final count of the Plaintiffs' Complaint asserts a claim for indemnification against the BPD and states that the BPD should be ordered to indemnify the Officer Defendants for any judgment entered against them in this matter.  The Local Government Tort Claims Act

provides that a "local government shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government."  Md. Code Ann., Cts. & Jud. Proc. § 5-303(b)(1).  The Act specifically notes that the BPD is such a "local government."  *Id.* § 5-301(d)(21).  This Act also specifically provides that a local government cannot assert sovereign immunity as a defense against claims for indemnification.  *Id.* § 5-303(b)(2).  Given that the Plaintiffs in this case have alleged numerous claims against the Officer Defendants and a *Monell* claim against the BPD, and this Court has determined such claims will survive the Defendants' Motions to Dismiss, the Plaintiffs' claim for indemnification under Count IX must also survive.  *See McPherson*, 2020 WL 6063479, at *11-12.  "[T]o facilitate an efficient resolution of this case, and to avoid 'the possibility of redundant litigation,' the Court concludes that dismissal of Plaintiffs' indemnification claim would be improper at this time."  *Id.* at *12 (citing *Bumgardner v. Taylor*, GLR-18-1438, 2019 WL 4115414, at *11 (D. Md. Aug. 29, 2019)).

## CONCLUSION

For the foregoing reasons, the Officer Defendants' Motion to Dismiss (ECF No. 21) is DENIED.  The Baltimore Police Department's Motion to Dismiss (ECF No. 23) is also DENIED.

A Separate Order follows.


Dated: April 28, 2021                                      _____/s/_____

                                                           Richard D. Bennett
                                                           United States District Judge