IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ALFRED CHESTNUT, | ) | |
| ANDREW STEWART, JR, | ) | |
| and RANSOM WATKINS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:20-cv-02342-RDB |
| | ) | |
| DONALD KINCAID, et. al., | ) | |
| | ) | |
| Defendants. | ) | |

## INDIVIDUAL DEFENDANTS' ANSWER TO COMPLAINT

Defendants, Donald Kincaid, Bryn Joyce, and John Barrick, (hereinafter the "Individual Defendants"), by and through their attorneys, Nathan & Kamionski, LLP, respectfully submit their answer, affirmative defenses, and jury demand in response to Plaintiffs' Complaint. In so responding, the Individual Defendants state as follows:

## INTRODUCTION

We are innocent and have been fighting to prove that. The system has failed us because we put our faith in [it] not knowing what [it was] doing to us from the beginning. The system did not care about putting three kids in a[n] adult prison, the Maryland Penitentiary, the most dangerous prison in Maryland. I was 16 years old, afraid, sent from D.O.C. to the Pen by myself . . . [On] [m]y first day, it was in your face violence, where I saw two men fighting with knives stabbing each other 'blow for blow' . . . I was a kid around wolves and dragons. Alfred Chestnut, "Juvenile Lifer," Jessup Correctional Institute Newspaper (2019).

**ANSWER:** **Inasmuch as the non-numbered introductory paragraph of Plaintiffs' complaint requires an answer, Individual Defendants admit Alfred Chestnut, Andrew Stewart, Jr., and Ransom Watkins were incarcerated following their convictions for the**

1

**murder of Dewitt Duckett. Individual Defendants lack knowledge or information sufficient to form a belief about the remaining allegations contained in the introductory paragraph of the Complaint. Individual Defendants deny that they committed any wrongful conduct.**

1. Alfred Chestnut, Andrew Stewart, Jr., and Ransom Watkins collectively spent over a century in prison—36 years apiece, 108 years in total—for a murder they did not commit. The men entered jail as youths and emerged from prison as men in their fifties.

**ANSWER: Individual Defendants admit Alfred Chestnut, Andrew Stewart, Jr., and Ransom Watkins were incarcerated following their convictions for the murder of Dewitt Duckett. Individual Defendants lack knowledge or information sufficient to form a belief about the remaining allegations contained in paragraph 1 of the Complaint. Individual Defendants deny that they committed any wrongful conduct.**

2. On November 18, 1983, 14-year-old DeWitt Duckett was murdered at Harlem Park Junior High School. Between 1 and 2 a.m. on Thanksgiving Day in 1983, Baltimore Police Department officers, with guns drawn, stormed into Alfred's, Andrew's, and Ransom's childhood bedrooms and arrested them. They were each 16 years old.

**ANSWER: Individual Defendants admit DeWitt Duckett was murdered at Harlem Park Junior High School on November 18, 1983. Individual Defendants deny the remaining allegations contained in paragraph 2 of the Complaint.**

3. From the moment of their arrests, the teens told everyone they could—the police, friends and family, the judge presiding over the trial—that they had nothing to do with the crime. It made no difference. After a jury wrongly convicted the teenagers, the government shipped them to prisons for adult men and condemned them to spend the rest of their lives behind bars.

**ANSWER:** Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 3 of the Complaint. Individual Defendants deny that they committed any wrongful conduct.

4. While the years turned into decades, Mr. Chestnut, Mr. Stewart, and Mr. Watkins held tight to the fundamental truth of their innocence. After decades of perseverance, they uncovered suppressed police reports that identified the likely perpetrator of the murder.

**ANSWER:** Individual Defendants deny that they suppressed any police reports from Plaintiffs. Individual Defendants lack knowledge or information sufficient to form a belief about the remaining allegations contained in paragraph 4 of the Complaint.

5. Once this evidence came to light, the State's Attorney's Office for Baltimore City ("SAO"), which had prosecuted the three teenagers years earlier, launched a re-investigation that swiftly found overwhelming evidence confirming their innocence.

**ANSWER:** Individual Defendants admit that the SAO joined in Plaintiffs' Joint Petition for Writ of Actual Innocence. Individual Defendants lack knowledge or information sufficient to form a belief about the remaining allegations contained in paragraph 5 of the Complaint. Individual Defendants deny that they committed any wrongful conduct.

6. On November 25, 2019, three days before Thanksgiving Day, a judge granted the writ of actual innocence (jointly filed by Plaintiffs and the State of Maryland) and ordered their immediate release. The three childhood friends, now in their early fifties, finally walked out of the courthouse as free men. They have come to be known as the "Harlem Park Three."

**ANSWER:** Individual Defendants admit that Plaintiffs' Joint Petition for Writ of Actual Innocence was granted on November 25, 2019. Individual Defendants lack knowledge

**or information sufficient to form a belief about the allegations contained in paragraph 6 of the Complaint. Individual Defendants deny that they committed any wrongful conduct.**

7.      Mr. Chestnut, Mr. Stewart, and Mr. Watkins were not wrongfully convicted by accident. They spent part of their childhoods and their entire adult lives in prison as a result of misconduct at the hands of detectives acting in accordance with the unconstitutional policies, practices, and customs of the Baltimore Police Department ("BPD").

**ANSWER:    Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

8.      Facing internal and external pressure to quickly solve the high-profile Duckett murder, which was featured prominently on the news, BPD homicide detectives focused on the three teenagers from the start of their "investigation."

**ANSWER:    Individual Defendants deny the allegations in paragraph 8 of the Complaint.**

9.      In a rush to judgment, Homicide Detectives Donald Kincaid, John Barrick, and Bryn Joyce (the "Officer Defendants") ignored eyewitness evidence and physical evidence that contradicted their chosen narrative, including evidence pointing to a different suspect. Instead, they shaped the evidence to implicate Plaintiffs—including by coercing false testimony from young witnesses. The Officer Defendants took only six days to arrest Alfred, Andrew, and Ransom.

**ANSWER:    Individual Defendants deny the allegations in paragraph 9 of the Complaint.**

10.     Three middle schoolers were in the vicinity of the murder on November 18, 1983. Altogether, the homicide detectives questioned those three witnesses roughly a dozen times over the next four days. During these interrogations, the witnesses never identified Alfred, Andrew, or Ransom as being involved in the murder, nor selected them from multiple photo arrays.

**ANSWER:     Individual Defendants admit that three middle schoolers in the vicinity of the murder were questioned multiple times in the days following the murder, and that the witnesses did not initially identify Plaintiffs as being involved. Individual Defendants deny the remaining allegations set forth in paragraph 10 of the Complaint.**

11.     Instead of crediting this testimony, the Officer Defendants turned their attention to a 13-year-old girl who had not witnessed the murder. The detectives fabricated a narrative that pinned the crime on the innocent teens, coercing the young girl to parrot the lie that Plaintiffs committed the murder and to identify them in a photo array.

**ANSWER:     Individual Defendants deny the allegations in paragraph 11 of the Complaint.**

12.     The Officer Defendants did not stop there. Immediately after securing the false statement and identifications from the girl, the detectives brought the three other middle schoolers back to the Homicide Unit. The detectives told the students that they had witnesses proving that Alfred, Andrew, and Ransom "did it." Using threats and suggestive tactics, the Officer Defendants coerced each middle schooler to say what the detectives wanted to hear: that Alfred, Andrew, and Ransom committed the crime.

**ANSWER:     Individual Defendants deny the allegations in paragraph 12 of the Complaint.**

13.     In sum, the Officer Defendants coerced four middle schoolers into falsely implicating Alfred, Andrew, and Ransom.

**ANSWER:    Individual Defendants deny the allegations in paragraph 13 of the Complaint.**

14.     In 2019, during the SAO's independent re-investigation of the murder, the four former middle schoolers confirmed that the police had coerced and pressured them into falsely identifying Alfred, Andrew, and Ransom as being involved in the murder.

**ANSWER:    Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 14 of the Complaint. Individual Defendants deny that they committed any wrongful conduct.**

15.     But in 1983, just six days after the murder, the police got what they wanted: a "solved" case.

**ANSWER:    Individual Defendants deny the allegations in paragraph 15 of the Complaint.**

16.     To seal Plaintiffs' fate and conceal their earlier actions, the Officer Defendants coached the four middle schoolers so that their stories would match at trial; concealed their coercive conduct that had extracted the false statements; withheld witness statements that supported the teens' innocence; and deliberately failed to investigate—and later concealed—evidence identifying the likely perpetrator of the murder.

**ANSWER:    Individual Defendants deny the allegations in paragraph 16 of the Complaint.**

17.     In the face of this campaign by law enforcement to secure a conviction at all costs, the three teens stood no chance. They were wrongfully convicted at trial.

**ANSWER: Individual Defendants deny the allegations in paragraph 17 of the Complaint.**

18.     From their teenage years until their fifties, Mr. Chestnut, Mr. Stewart, and Mr. Watkins endured unimaginable pain while incarcerated: the torture of solitary confinement, physical violence at the hands of fellow inmates, and the horror of waking up each morning, separated from society and their loved ones, to face the injustice of wrongful conviction.

**ANSWER: Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 18 of the Complaint. Individual Defendants deny that they committed any wrongful conduct.**

19.     At 108 combined years of wrongful incarceration, this triple exoneration is the largest wrongful conviction case in American history.

**ANSWER: Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 19 of the Complaint. Individual Defendants deny that they committed any wrongful conduct.**

20.     This lawsuit seeks redress for the injuries Mr. Chestnut, Mr. Stewart, and Mr. Watkins sustained as the result of Defendants' abuse of power and unconstitutional misconduct.

**ANSWER: Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants and specifically deny committing any wrongful conduct. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

## JURISDICTION AND VENUE

21.     This action is brought under 42 U.S.C. § 1983.

**ANSWER: The allegations in paragraph 21 of the Complaint set forth legal conclusions and questions of law to which no response is required. Individual Defendants deny that they committed any wrongful conduct.**

22. This Court has both federal question and supplemental jurisdiction under 28 U.S.C. §§ 1331 and 1367.

**ANSWER: The allegations in paragraph 22 of the Complaint set forth legal conclusions and questions of law to which no response is required. Individual Defendants deny that they committed any wrongful conduct.**

23. Venue is proper under 28 U.S.C. § 1391(b)(2) because the events leading to this Complaint occurred in this judicial district.

**ANSWER: The allegations in paragraph 23 of the Complaint set forth legal conclusions and questions of law to which no response is required. Individual Defendants deny that they committed any wrongful conduct.**

24. On April 9, 2020, undersigned counsel sent the Acting City Solicitor for Baltimore City notice of Plaintiffs' claims per the Maryland Local Government Tort Claims Act.

**ANSWER: Upon information and belief, Individual Defendants admit the allegations contained in paragraph 24 of the Complaint.**

25. The City of Baltimore did not respond.

**ANSWER: Upon information and belief, Individual Defendants deny the allegations contained in paragraph 25 of the Complaint.**

26. On April 9, 2020, undersigned counsel sent the Treasurer of the State of Maryland notice of Plaintiffs' claims.

**ANSWER:** Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 26 of the Complaint.

27.     The State denied Plaintiffs' claims by letter dated April 24, 2020.

**ANSWER:** Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 27 of the Complaint.

<u>**PARTIES**</u>

28.     Plaintiffs Alfred Chestnut, Andrew Stewart, Jr., and Ransom Watkins were born in Baltimore. At all times relevant to this Complaint, they were citizens and residents of the State of Maryland. Mr. Chestnut and Mr. Watkins are currently residents of Maryland, while Mr. Stewart is currently a resident of South Carolina. On November 24, 1983, they were each wrongfully arrested and incarcerated pending trial. On May 28, 1984, they were wrongfully convicted of murder, armed robbery, and illegal use of a weapon. As a result, Mr. Chestnut, Mr. Stewart, and Mr. Watkins each spent 36 years and one day in prison until their joint exoneration.

**ANSWER:** Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 28 of the Complaint. Individual Defendants deny that they committed any wrongful conduct.

29.     At all times relevant to this Complaint, the Officer Defendants were employees of the BPD, acting under color of state law and within the scope of their employment under the statutes, ordinances, regulations, policies, customs, and usage of the BPD. Plaintiffs sue the Officer Defendants in their individual capacities.

**ANSWER:** Individual Defendants admit that they were employees of the Baltimore Police Department at all times relevant to this Complaint. The remaining allegations in

paragraph 29 of the Complaint set forth legal conclusions and questions of law to which no response is required. **Individual Defendants deny that they committed any wrongful conduct.**

30.     Defendant Baltimore Police Department employed each of the Officer Defendants at all times relevant to this suit. BPD is a "person" within the meaning of 42 U.S.C. § 1983.

**ANSWER:   Defendants admit that they were employed by the Baltimore Police Department. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department. The remaining allegations in paragraph 30 of the Complaint set forth legal conclusions and questions of law to which no response is required.**

## FACTUAL BACKGROUND

A.      **Fourteen-Year Old DeWitt Duckett is fatally shot by John Doe.**

**ANSWER:   Inasmuch as the non-numbered topic sentence requires an answer, Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained within. Individual Defendants deny that they committed any wrongful conduct.**

31.     In the fall of 1983, DeWitt Duckett was a 14-year-old ninth grader attending Harlem Park Junior High School.

**ANSWER:   Upon information and belief, Individual Defendants admit the allegations contained in paragraph 31 of the Complaint.**

32.     On November 18, 1983, DeWitt was headed to lunch with three friends, E.C., R.B., and J.C. The four boys were taking a shortcut to the cafeteria through an off-limits hallway after leaving science class. One of the students, J.C., turned back to retrieve an item he had left behind.

**ANSWER: Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 32 of the Complaint.**

33. Before J.C. returned, DeWitt was approached from behind by John Doe. Doe, carrying a .22-caliber revolver, demanded DeWitt's Georgetown University Starter jacket.

**ANSWER: Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 33 of the Complaint.**

34. As DeWitt struggled to take off his jacket, Doe shot a single bullet into his neck.

**ANSWER: Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 34 of the Complaint.**

35. The shooting took place at about 1:15 p.m.

**ANSWER: Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 35 of the Complaint.**

36. Upon shooting DeWitt, Doe fled the school, carrying DeWitt's jacket.

**ANSWER: Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 36 of the Complaint.**

37. J.C. was on his way back to his friends when the shooting occurred. J.C. was standing at such a distance that he could not make out the face of the shooter.

**ANSWER: Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 37 of the Complaint.**

38. DeWitt was pronounced dead at the hospital two hours later.

**ANSWER: Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 38 of the Complaint.**

39.     Alfred, Andrew, and Ransom had nothing to do with the murder of DeWitt Duckett, whom they knew from the neighborhood and considered a friend.

**ANSWER:   Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 39 of the Complaint. Individual Defendants deny that they committed any wrongful conduct.**

40.     Alfred, Andrew, and Ransom, along with their friends A.D. and C.D., were former students of the junior high school. On November 18, 1983, the five boys visited the school but were told to leave the school and did so.

**ANSWER:   Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 40 of the Complaint. Individual Defendants deny that they committed any wrongful conduct.**

41.     The five boys left and went outside to the basketball court. A school security officer, who knew the former students, came over and spoke with them. Around 12:45 p.m., the security officer escorted the five boys off school grounds, watched them walk up North Gilmor Street, and locked the school's entrances and exits.

**ANSWER:   Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 41 of the Complaint. Individual Defendants deny that they committed any wrongful conduct.**

42.     At the time of the murder, the teens were not at Harlem Park Junior High School.

**ANSWER:   Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 42 of the Complaint. Individual Defendants deny that they committed any wrongful conduct.**

**B.      On the day of the shooting, no witnesses link Alfred Chestnut, Andrew Stewart, or Ransom Watkins to the murder.**

**ANSWER:** Inasmuch as the non-numbered topic sentence requires an answer, Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained within. Individual Defendants deny that they committed any wrongful conduct.

43. BPD Officer Christopher Rayburn of the Western District responded to the crime scene soon after the murder and learned of the three potential witnesses—the boys who had left science class with DeWitt—R.B., J.C., and E.C.

**ANSWER:** Upon information and belief, Individual Defendants admit the allegations contained in paragraph 43 of the Complaint.

44. R.B., J.C., and E.C. were 14, 15, and 16 years old, respectively, at the relevant times.

**ANSWER:** Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 44 of the Complaint.

45. Shortly after the murder, Officer Rayburn spoke with the three boys, who said that a single person had approached DeWitt and demanded his Georgetown Starter jacket. Officer Rayburn completed a report on the day of the murder (November 18) that reflected this information.

**ANSWER:** Upon information and belief, Individual Defendants deny the allegations in paragraph 45 of the Complaint.

46. The Harlem Park murder and its investigation generated significant news coverage. The morning after the murder, the first ever to occur in a Baltimore public school, The Baltimore Sun ran a front page story entitled, "City student shot, killed at school."

**ANSWER: Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 46 of the Complaint.**

47. The BPD's Homicide Unit investigated DeWitt Duckett's death.

**ANSWER: Individual Defendants admit that individuals assigned to BPD's Homicide Unit investigated DeWitt Duckett's death and deny the remaining allegations in paragraph 47 of the Complaint.**

48. Then-Detective Kincaid was the lead investigator of the murder, then-Detective Joyce was a member of the investigative team, and then-Detective Sergeant Barrick was a member of the investigative team as well as its immediate supervisor as a sergeant.

**ANSWER: Individual Defendants admit that Detective Kincaid was a primary investigator of the murder at issue in this case. Individual Defendants admit that Detective Sergeant Barrick was a sergeant. In light of the length of time that passed since the investigation underlying this Complaint, the present unavailability of contemporaneous records from which Individual Defendants may use to refresh their recollection, and the conclusory terminology utilized in the Complaint, Individual Defendants lack knowledge or information sufficient to form a belief about the remaining allegations contained in paragraph 48 of the Complaint. Individual Defendants deny that they committed any wrongful conduct.**

49. As the direct supervisor for the investigation, Det. Sgt. Barrick had responsibility to provide leadership and to review all witness statements taken by detectives.

**ANSWER: In light of the length of time that passed since the investigation underlying this Complaint, the present unavailability of contemporaneous records from which Individual Defendants may use to refresh their recollection, and the conclusory**

terminology utilized in the Complaint, Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 49 of the Complaint. Individual Defendants deny that they committed any wrongful conduct.

50. The Officer Defendants worked collaboratively during the investigation and shared information with one another as it was gathered. They also summarized their progress in investigative notes and reports that were provided to, among others, their Commanding Officer.

**ANSWER: In light of the length of time that passed since the investigation underlying this Complaint, the present unavailability of contemporaneous records from which Individual Defendants may use to refresh their recollection, and the conclusory terminology utilized in the Complaint, Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 50 of the Complaint. Individual Defendants deny that they committed any wrongful conduct.**

**C. "You have two things against you—you're black and I have a badge."**

**ANSWER: Inasmuch as the non-numbered topic sentence requires an answer, Individual Defendants deny the allegations contained within.**

51. Under pressure to close the case as quickly as possible, the Officer Defendants focused on Alfred, Andrew, and Ransom from the start of their investigation, apparently based on the three having been at the school before the murder.

**ANSWER: Individual Defendants deny the allegations in paragraph 51 of the Complaint.**

52. The day after the murder, the Officer Defendants questioned Alfred and Ransom.

**ANSWER:** Individual Defendants admit that Alfred and Ransom were interviewed the day after the murder. Individual Defendants deny that paragraph 52 of the Complaint accurately portrays the participants and nature of the questioning.

53. When Defendant Kincaid questioned Ransom, the detective said, "You have two things against you—you're black and I have a badge."

**ANSWER:** Individual Defendants deny the allegations in paragraph 53 of the Complaint.

54. The Officer Defendants later interrogated Andrew.

**ANSWER:** Individual Defendants admit that Andrew was interviewed at some point after the murder. Individual Defendants deny that paragraph 54 of the Complaint accurately portrays the participants and nature of the questioning.

55. Alfred, Andrew, and Ransom all independently told the police the truth: they had nothing to do with the shooting.

**ANSWER:** Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 55 of the Complaint. Individual Defendants deny that they committed any wrongful conduct.

56. In the four days after the murder, November 19–22, the Officer Defendants questioned witnesses R.B. and J.C. at least three times each and showed them multiple photo arrays, including arrays with pictures of Alfred, Andrew, and Ransom. R.B. and J.C. did not identify the teens as having been involved in the murder.

**ANSWER:** In light of the use of collective identifiers and pseudonyms, Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 56 of the Complaint. Individual Defendants further deny that

paragraph 56 of the Complaint accurately portrays the participants in the interviews and nature of the photo arrays.

i. **November 23, 1983: Interrogation of 13-Year-Old Y.T.**

**ANSWER: Inasmuch as the non-numbered topic sentence requires an answer, Individual Defendants admit that Y.T. was questioned on or about November 23, 1983. Individual Defendants deny that they committed any wrongful conduct.**

57. On information and belief, the Officer Defendants failed to memorialize R.B.'s and J.B.'s oral statements during the November 19–22 interviews and did not disclose them to the prosecution or the defense because they contradicted the Officer Defendants' narrative of the case.

**ANSWER: Individual Defendants deny the allegations in paragraph 57 of the Complaint.**

58. On or before November 22, the Officer Defendants had received reports that John Doe was at Harlem Park Junior High School on the day of the murder, that Doe was seen throwing a gun down while running away from the school, and that Doe killed DeWitt and wore DeWitt's Georgetown jacket on the night of the murder.

**ANSWER: Individual Defendants admit to receiving anonymous, second hand, and third hand tips regarding John Doe. Individual Defendants deny that they committed any wrongful conduct.**

D. **The Officer Defendants coerce four youths to falsely implicate and testify against Alfred, Andrew, and Ransom.**

**ANSWER: Inasmuch as the non-numbered topic sentence requires an answer, Individual Defendants deny the allegations contained within.**

17

59.     The questioning of E.C., R.B., and J.C. through November 22 did not provide the Officer Defendants with a legitimate basis to arrest and seek the prosecution of the innocent teens. No physical evidence linked Alfred, Andrew, or Ransom to the murder.

**ANSWER:     The allegations in paragraph 59 of the Complaint set forth legal conclusions and questions of law to which no response is required. Individual Defendants admit that no physical evidence linking Alfred, Andrew, or Ransom to the murder was known prior to November 22, 1983. Individual Defendants lack knowledge or information sufficient to form a belief about the remaining allegations contained in paragraph 59 of the Complaint. Individual Defendants deny that they committed any wrongful conduct.**

60.     On November 23, the Officer Defendants interviewed Y.T, a 13-year-old student at Harlem Park Junior High School.

**ANSWER:     In light of the use of collective identifiers and pseudonyms, Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 60 of the Complaint. Individual Defendants further deny that paragraph 60 of the Complaint accurately portrays the participants in the interview.**

61.     Y.T. had not seen the shooting of DeWitt, nor did she know who was involved.

**ANSWER:     Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 61 of the Complaint. Individual Defendants deny that they committed any wrongful conduct.**

62.     Detectives Kincaid and Barrick coerced and intimidated the vulnerable 13-year-old girl into adopting their false version of the events.

**ANSWER:     Individual Defendants deny the allegations in paragraph 62 of the Complaint.**

63. Detectives Kincaid and Barrick pressured Y.T. into making up details during the interrogation. She claimed, for example, that she saw two guns and heard two shots.

**ANSWER: Individual Defendants deny the allegations in paragraph 63 of the Complaint.**

64. Given these known-to-be-false details and where she was standing at the time of the murder, the Officer Defendants knew or had reason to know that Y.T. had not witnessed the murder and could not make a truthful, accurate, or reliable eyewitness identification of anyone involved.

**ANSWER: Individual Defendants deny the allegations in paragraph 64 of the Complaint.**

**ii. November 23, 1983: Interrogations of E.C., R.B., and J.C.**

**ANSWER: Inasmuch as the non-numbered topic sentence requires an answer, Individual Defendants admit that E.C., R.B., and J.C. were questioned on or about November 23, 1983. Individual Defendants deny that they committed any wrongful conduct.**

65. Dets. Kincaid and Barrick told or suggested to Y.T. that Alfred, Andrew, and Ransom had committed the murder of DeWitt, and they fed her details implicating the innocent teens, including that all three teens actively participated in the murder.

**ANSWER: Individual Defendants deny the allegations in paragraph 65 of the Complaint.**

66. On information and belief, Defendants Kincaid and Barrick wrote out a false statement that implicated the innocent teens and, through coercion, obtained 13-year-old Y.T.'s signature.

**ANSWER: Individual Defendants deny the allegations in paragraph 66 of the Complaint.**

67.     Defendants Kincaid and Barrick also coerced Y.T. into identifying photos of Alfred, Andrew, and Ransom.

**ANSWER: Individual Defendants deny the allegations in paragraph 67 of the Complaint.**

68.     On information and belief, Dets. Kincaid and Barrick did not take notes of their interview with Y.T. nor did they write a report describing that interview.

**ANSWER: Individual Defendants deny the allegations in paragraph 68 of the Complaint.**

69.     The Officer Defendants interviewed another student, F.H., who was with Y.T. at the time of the murder and thus did not witness the crime. On information and belief, the Officer Defendants concealed the evidence of F.H.'s whereabouts at the time of the murder, which would have undermined the credibility of Y.T.'s false account of the murder at trial and helped to exculpate Plaintiffs. On information and belief, the Officer Defendants also concealed evidence that F.H. did not identify Alfred, Andrew, and Ransom from a photo array and/or failed to memorialize their interview with F.H.

**ANSWER: Individual Defendants deny the allegations in paragraph 69 of the Complaint.**

70.     Upon coercing the false written and oral statements from 13-year-old Y.T., the Officer Defendants sent patrol cars to pick up E.C, R.B., and J.C and bring them to the Homicide Unit.

**ANSWER: Individual Defendants deny the allegations in paragraph 70 of the Complaint.**

71. The Officer Defendants threatened and intimidated the young boys, accused them of lying about the murder of their friend during the prior meetings, and supplied them the police's version of the facts. The Officer Defendants also used suggestive tactics during the photo arrays, including encouraging witnesses to select photos of Alfred, Andrew, and Ransom, and discouraging them from selecting photos of other individuals.

**ANSWER: Individual Defendants deny the allegations in paragraph 71 of the Complaint.**

72. Dets. Kincaid and Joyce coerced, suggested, and/or fabricated a false statement and identifications from 16-year-old E.C. They ignored E.C.'s prior statements and told E.C. that they knew Alfred, Andrew, and Ransom had committed the crime, referring to Y.T.'s coerced statement and identifications. Under intense pressure from the interrogating Defendants, E.C. falsely stated that Alfred, Andrew, and Ransom committed the crime and selected them in the photo array.

**ANSWER: Individual Defendants deny the allegations in paragraph 72 of the Complaint.**

73. Det. Kincaid (and another detective) coerced, suggested, and/or fabricated a false statement and identifications from 14-year-old R.B. The detectives physically threatened R.B., told him that witnesses had identified Alfred, Andrew, and Ransom, and coerced R.B. into falsely stating the teens had committed the crime and selecting them in a photo array.

**ANSWER: Individual Defendants deny the allegations in paragraph 73 of the Complaint.**

21

74.     Det. Kincaid (and another detective) coerced, suggested, and/or fabricated a false statement and identifications from 15-year-old J.C. The detectives ignored J.C.'s statements that he did not see who committed the crime, and then coerced J.C. into falsely stating that Alfred, Andrew, and Ransom committed the crime and selecting the three teens in a photo array.

**ANSWER:    Individual Defendants deny the allegations in paragraph 74 of the Complaint.**

75.     On information and belief, in order to cover up their misconduct, the Officer Defendants did not take notes of, or videotape or audio record, their November 23 interrogations of the four children nor did they write a report describing those interrogations.

**ANSWER:    Individual Defendants deny the allegations in paragraph 75 of the Complaint.**

76.     The Officer Defendants knew or had reason to know that the students' November 23 statements and identifications were false for many reasons, including that the coerced statements contradicted the students' prior statements about one suspect approaching the victim; the student-witnesses' prior statements did not implicate Plaintiffs as having been involved in the killing; the innocent teens did not match the description of the suspect from the day of the murder; no physical or other evidence implicated the teens in the shooting; and significant evidence implicated Doe.

**ANSWER:    Individual Defendants deny the allegations in paragraph 76 of the Complaint.**

77.     The Officer Defendants conspired with one another to conceal their coercion, suggestion, and fabrication of the statements and identifications. The Officer Defendants never disclosed to the prosecution or Plaintiffs' defense counsel (before, during, or after trial) that they

had coerced and fabricated witness statements and identifications. The Officer Defendants failed to disclose, among other things, their physical threats, suggestive photo array tactics, and pre-statement and pre-identification statements to the four middle schoolers, including the Officer Defendants' statements that other witnesses had identified the three teens as the perpetrators. Plaintiffs' defense counsel were thus deprived of key material to impeach the credibility of the student witnesses at trial as well as to impeach the Officer Defendants' account of their investigation, including Det. Kincaid's testimony at trial.

**ANSWER: Individual Defendants deny the allegations in paragraph 77 of the Complaint.**

**E. Alfred, Andrew, and Ransom are arrested and charged with the murder of their friend.**

**ANSWER: Inasmuch as the non-numbered topic sentence requires an answer, Individual Defendants admit that Alfred, Andrew, and Ransom were arrested and charged with murder. Individual Defendants lack knowledge or information sufficient to form a belief about the remaining allegations contained within. Individual Defendants deny that they committed any wrongful conduct.**

78. On the basis of the fabricated witness statements and identifications, the Officer Defendants sought warrants for a nighttime raid of Alfred's home and the overnight arrests of the three teens.

**ANSWER: Individual Defendants deny the allegations in paragraph 78 of the Complaint.**

79. Police officers have an obligation to disclose material information, including information harmful to their investigations, in applications for a search and/or seizure warrant so that a neutral judge can make a probable cause determination.

**ANSWER: The allegations in paragraph 79 of the Complaint set forth legal conclusions and questions of law to which no response is required. Individual Defendants deny that they committed any wrongful conduct.**

80. On information and belief, the applications and supporting affidavits, the Officer Defendants did not disclose the evidence implicating John Doe, prior negative identifications and witness statements, or their coercion of the witnesses.

**ANSWER: Individual Defendants deny the allegations in paragraph 80 of the Complaint.**

81. Between 1 and 2 a.m. on November 24, Thanksgiving Day, the BPD's "raiding party" (including Dets. Kincaid and Joyce) arrested Alfred, Andrew, and Ransom. The teens were separated from their homes and families for the next three-and-a-half decades.

**ANSWER: Individual Defendants admit that Alfred, Andrew, and Ransom were arrested between one and two a.m. on November 24, 1983. Individual Defendants lack knowledge or information sufficient to form a belief about the remaining allegations contained in paragraph 81 of the Complaint. Individual Defendants deny that they committed any wrongful conduct.**

82. As reflected in Det. Joyce's report from 3 a.m., the BPD officers transported the three children to the Western District and held them there overnight.

**ANSWER: Individual Defendants admit that Alfred, Andrew, and Ransom were transported to the Western District at some point in the early morning of November 24, 1983. Individual Defendants lack knowledge or information sufficient to form a belief about the remaining allegations contained in paragraph 82 of the Complaint. Individual Defendants deny that they committed any wrongful conduct.**

83.     While raiding Alfred's bedroom, the BPD officers seized from his closet a Georgetown Starter jacket, a popular item at the time, which his mother had bought for him weeks earlier. Alfred's mother showed the police the receipt for the jacket, but the Officer Defendants ignored it.

**ANSWER:    Individual Defendants deny the allegations in paragraph 83 of the Complaint.**

84.     In a lab report dated November 29, a forensic examiner with BPD's Chemistry Section determined that Alfred's Georgetown Starter jacket "exhibits no signs of damage. The item was examined for the presence of blood, hairs and fibers with negative results."

**ANSWER:    Individual Defendants admit the allegations in paragraph 84 of the Complaint.**

85.     Despite this exonerating physical evidence, the Officer Defendants presented the Baltimore City State's Attorney's Office with false and incomplete information to secure indictments.

**ANSWER:    Individual Defendants deny the allegations in paragraph 85 of the Complaint.**

86.     Because the SAO did not know that the Officer Defendants had, among other misconduct, fabricated Y.T.'s written statement, coerced statements and identifications from four children, and deliberately failed to investigate John Doe, prosecutors charged the three boys as adults with first-degree murder, armed robbery, and illegal use of a weapon.

**ANSWER:    Individual Defendants deny the allegations in paragraph 86 of the Complaint.**

**F.    The Officer Defendants double down on their campaign to falsely convict the innocent teens and cover up their misconduct.**

**ANSWER:** Inasmuch as the non-numbered topic sentence requires an answer, Individual Defendants deny the allegations contained within.

       i.     **The Officer Defendants intimidate and coach minor witnesses.**

**ANSWER:** Inasmuch as the non-numbered topic sentence requires an answer, Individual Defendants deny the allegations contained within.

87.    In preparation for the May 1984 trial, the Officer Defendants coached and intimidated E.C., R.B., J.C., and Y.T. to testify falsely at trial.

**ANSWER:** Individual Defendants deny the allegations in paragraph 87 of the Complaint.

88.    The Officer Defendants fabricated a theory of the murder: that while Ransom held the victim down and Andrew pulled at his Georgetown jacket, Alfred fired the gun. Contrary to the responding officer's report that the shooter's height was between 5'5" and 5'6", the Officer Defendants pegged Alfred as the shooter. Alfred was 5'11" tall.

**ANSWER:** Individual Defendants deny the allegations in paragraph 88 of the Complaint.

89.    The Officer Defendants fed these details to E.C., R.B., J.C., and Y.T. in pretrial meetings held for the purpose of coordinating the students' trial testimony. The details deviated in materials ways from the information gathered on the day of the murder and known to the Officer Defendants, including that only one individual had approached and shot the victim.

**ANSWER:** Individual Defendants deny the allegations in paragraph 89 of the Complaint.

90.    Although the detectives knew Y.T. had not seen the murder or the lead-up to it, they pressured the other students to adopt Y.T.'s fabricated statements.

**ANSWER: Individual Defendants deny the allegations in paragraph 90 of the Complaint.**

91. Many times between the murder and trial, E.C. and R.B. told the Officer Defendants that Y.T. had not witnessed the murder. The Officer Defendants ignored, suppressed, and/or failed to investigate this information.

**ANSWER: Individual Defendants deny the allegations in paragraph 91 of the Complaint.**

92. The Officer Defendants also attempted to coerce C.D., who was with Alfred, Andrew, and Ransom on the day of the murder, into making a false statement. The Officer Defendants brought C.D. in for questioning and tried to tell him what happened. The detectives tried to get C.D. to sign a statement that he did not make, but he refused to do so.

**ANSWER: Individual Defendants deny the allegations in paragraph 92 of the Complaint.**

**ii. The Officer Defendants deliberately fail to investigate the likely perpetrator or other exculpatory leads.**

**ANSWER: Inasmuch as the non-numbered topic sentence requires an answer, Individual Defendants deny the allegations contained within.**

93. In the immediate aftermath of DeWitt Duckett's death, BPD knew of approximately 18 suspects, not including Plaintiffs. Most of the credible evidence pointed towards one suspect—John Doe.

**ANSWER: Individual Defendants deny the allegations in paragraph 93 of the Complaint.**

94. The BPD's investigative notes reflect that at least two people called police to report that Doe was the shooter. Doe was 5'7"—approximately the same height as the suspect.

**ANSWER:** Individual Defendants admit that two anonymous callers reported that Doe was the shooter. Individual Defendants lack knowledge or information sufficient to form a belief about the remaining allegations contained in paragraph 94 of the Complaint. Individual Defendants deny that they committed any wrongful conduct.

95. The Officer Defendants learned of—then ignored and suppressed—evidence implicating Doe, including that he (1) was seen throwing a gun and running from the school after the shooting; (2) reportedly bragged in public on the night of the murder that he had shot DeWitt; and (3) was seen wearing DeWitt's Georgetown jacket in public, also on the night of the murder.

**ANSWER:** Individual Defendants deny the allegations in paragraph 95 of the Complaint.

96. The Officer Defendants deliberately and in bad faith failed to follow up on the leads pointing to Doe because they knew such evidence would undermine or contradict the four eyewitness identifications they had coerced and, in turn, would give rise to questions about their conduct in the interrogation.

**ANSWER:** Individual Defendants deny the allegations in paragraph 96 of the Complaint.

97. The Officer Defendants all reviewed the investigative notes implicating Doe.

**ANSWER:** Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 97 of the Complaint. Individual Defendants deny that they committed any wrongful conduct.

98. Before trial, Plaintiffs' respective defense attorneys filed formal discovery requests pursuant to established Maryland rules and court precedent, asking for copies of all police reports pertaining to the investigation of the murder.

**ANSWER: Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 98 of the Complaint. Individual Defendants deny that they committed any wrongful conduct.**

99. Police reports and their investigative notes, including those about Doe and containing other material exculpatory and impeachment evidence, were not produced to Plaintiffs' defense counsel before or during the subsequent trial.

**ANSWER: Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 99 of the Complaint. Individual Defendants deny that they committed any wrongful conduct.**

100. Without knowledge that Y.T.'s written statement, verbal statement, and identifications had been fabricated and coerced, Plaintiffs' defense counsel could not use that information to impeach Y.T. and the Officer Defendants' at trial as well to help prove Plaintiffs' innocence.

**ANSWER: Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 100 of the Complaint. Individual Defendants deny that they committed any wrongful conduct.**

101. Without knowledge that E.C.'s, R.B.'s, and J.C.'s statements and identifications had been fabricated and coerced, Plaintiffs' defense counsel could not use that information to impeach those witnesses and the Officer Defendants' at trial as well as to help prove Plaintiffs' innocence.

**ANSWER: Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 101 of the Complaint. Individual Defendants deny that they committed any wrongful conduct.**

102.    Without the investigative reports and notes regarding Doe, Plaintiffs' defense attorneys could not impeach Detective Kincaid's testimony at trial regarding the Officer Defendants' investigation of Plaintiffs and their knowledge about John Doe's suspected involvement in the murder. Plaintiffs' defense counsel were also deprived of key exculpatory information.

**ANSWER:    Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 102 of the Complaint. Individual Defendants deny that they committed any wrongful conduct.**

103.    The Officer Defendants purposefully did not interview other witnesses who would have provided evidence exculpating the innocent teens, or memorialize their interviews with other witnesses, because they wanted to shield their earlier misconduct and did not want to uncover evidence undermining their version of the crime.

**ANSWER:    Individual Defendants deny the allegations in paragraph 103 of the Complaint.**

**G.    The Officers Defendants' misconduct leads to the wrongful conviction of Alfred, Andrew, and Ransom.**

**ANSWER:    Inasmuch as the non-numbered topic sentence requires an answer, Individual Defendants deny the allegations contained within.**

104.    At the May 1984 trial, the prosecution built its case on the four child-witnesses' accounts.

**ANSWER:    Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 104 of the Complaint. Individual Defendants deny that they committed any wrongful conduct.**

105.     Under intense pressure from the Officer Defendants, E.C., R.B., J.C., and Y.T. testified falsely at trial, implicating Alfred, Andrew, and Ransom—just as the Officer Defendants had coerced and coached them to do.

**ANSWER:     Individual Defendants deny the allegations in paragraph 105 of the Complaint.**

106.     With no credible physical or documentary evidence, the case rested on their coerced witness testimony.

**ANSWER:     Individual Defendants deny the allegations in paragraph 106 of the Complaint.**

107.     Without knowledge of the Officer Defendants' misconduct and failure to disclosure critical pieces of information, including the threats and suggestive tactics they used with the four student witnesses, the fabricated written statement signed by Y.T., and the information implicating Doe, Plaintiffs' defense attorneys were left without key evidence that could be used to both undermine the credibility of the student-witnesses and Det. Kincaid as well as to prove Plaintiffs' innocence.

**ANSWER:     Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 107 of the Complaint. Individual Defendants deny that they committed any wrongful conduct.**

108.     On May 28, 1984, the jury convicted Alfred, Andrew, and Ransom of first-degree murder, armed robbery, and illegal use of a weapon.

**ANSWER:     Individual Defendants admit the allegations in paragraph 108 of the Complaint.**

109.     The court denied their motions for a new trial.

**ANSWER: Individual Defendants admit the allegations in paragraph 109 of the Complaint.**

110. Alfred, Andrew, and Ransom continued to profess their innocence. At sentencing, Andrew declared, "You still didn't get the person who did it. I'm saying we know we didn't do it, and a lot of other people know we didn't do it."

**ANSWER: Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 110 of the Complaint.**

111. The court sentenced Alfred, Andrew, and Ransom each to life in prison on the murder conviction and concurrent sentences of 20 years on the other charges.

**ANSWER: Upon information and belief, Individual Defendants admit the allegations in paragraph 111 of the Complaint.**

**H. A 36-Year Fight for Freedom.**

**ANSWER: Inasmuch as the non-numbered topic sentence requires an answer, Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained within.**

112. Mr. Chestnut, Mr. Stewart, and Mr. Watkins never wavered in protesting their innocence. From the days after the murder, continuing through trial, at sentencing, in parole hearings, and during their decades-long wrongful incarcerations, the Harlem Park Three never gave up.

**ANSWER: Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 112 of the Complaint. Individual Defendants deny that they committed any wrongful conduct.**

113. The Maryland Court of Special Appeals upheld their convictions on direct appeal.

**ANSWER: Individual Defendants admit the allegations in paragraph 113 of the Complaint.**

114. Plaintiffs repeatedly challenged their convictions in post-conviction proceedings. For decades, courts rejected these efforts.

**ANSWER: Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 114 of the Complaint.**

115. The men applied for release from the Maryland Parole Commission but were denied because they did not "accept responsibility" for the murder they had not committed.

**ANSWER: Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 115 of the Complaint. Individual Defendants deny that they committed any wrongful conduct.**

116. Eventually, after more than three decades of wrongful incarceration, Mr. Chestnut received documents in response to a public records request. In those documents, Mr. Chestnut discovered police reports (including investigative notes concerning John Doe) that had not been disclosed to the defense before trial.

**ANSWER: Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 116 of the Complaint. Individual Defendants deny that they committed any wrongful conduct.**

117. After obtaining these exculpatory documents, Mr. Chestnut wrote the Baltimore City SAO asking that his case and those of Mr. Stewart and Mr. Watkins be re-investigated based on the documents that he obtained.

**ANSWER: Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 117 of the Complaint. Individual Defendants deny that they committed any wrongful conduct.**

118. Given the overwhelming evidence of Plaintiffs' innocence, the State took the rare step of joining Mr. Chestnut, Mr. Stewart, and Mr. Watkins in filing a Joint Petition for Writ of Actual Innocence.

**ANSWER: Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 118 of the Complaint. Individual Defendants deny that they committed any wrongful conduct.**

119. On November 25, 2019, the Circuit Court for Baltimore City held a hearing, granted the petition, and vacated the convictions.

**ANSWER: Individual Defendants admit the allegations in paragraph 119 of the Complaint. Individual Defendants deny that they committed any wrongful conduct.**

120. The State then dismissed each of the counts against each man.

**ANSWER: Individual Defendants admit the allegations in paragraph 120 of the Complaint. Individual Defendants deny that they committed any wrongful conduct.**

121. That day, for the first time in 13,141 days, Alfred Chestnut, Andrew Stewart, and Ransom Watkins were free.

**ANSWER: Individual Defendants admit that Chestnut, Stewart, and Watkins were released on November 25, 2019. Individual Defendants deny that they committed any wrongful conduct.**

**I. The Officer Defendants' and BPD's Pattern and Practice of Unconstitutional Misconduct in Homicide Investigations.**

**ANSWER: Inasmuch as the non-numbered topic sentence requires an answer, Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

122.     The unconstitutional conduct that led to the wrongful convictions of Mr. Chestnut, Mr. Stewart, and Mr. Watkins was part of a longstanding pattern and practice within the BPD of unconstitutional conduct in the course of homicide investigations. At the time of Plaintiffs' wrongful convictions and throughout their incarcerations, the practices described in this Complaint were sufficiently widespread within the BPD to assume the quality of a "custom or usage" of which the BPD had actual or constructive knowledge.

**ANSWER: Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

123.     The BPD has long maintained a policy, practice, or custom of: using coercive techniques in interviews and interrogations to obtain confessions and false statements from minors and others; fabricating inculpatory evidence; withholding exculpatory and impeachment evidence from prosecutors, defense attorneys, and judges; and, in bad faith, failing to conduct investigations in order to shield earlier wrongful acts in the course of homicide investigations.

**ANSWER: Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

124.     These practices were sufficiently widespread that BPD knew or should have known that its officers engaged in such conduct. Nevertheless, it failed to take action to stop such conduct,

including refusing to investigate or discipline officers it knew or should have known had so abused their offices. By deliberately turning a blind eye, BPD condoned, facilitated, and encouraged these practices.

**ANSWER: Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

125.    Despite actual or constructive knowledge that its officers required more training on their obligations regarding the disclosure of evidence, interactions with witnesses (including minors), and the conduct of investigations in homicide cases (including the need to follow leads that contradicted detectives' prevailing theory of the case), BPD failed to provide adequate training on these topics. Its failures perpetuated the kinds of unconstitutional conduct rampant in the Duckett investigation.

**ANSWER: Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

126.    Then-Detective Kincaid, the primary investigator of the Duckett murder, engaged in similar misconduct in a case just two years before the case at issue.

**ANSWER: Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

127.    In 1981, Wendell Griffin was convicted of the murder of James Wise. As part of that investigation, Det. Kincaid engaged in substantial misconduct, including suppressing the results of two photo arrays shown to an important witness who had not identified Mr. Griffin;

suppressing witness statements that excluded Mr. Griffin as the murderer; and failing to include material information in an affidavit for a search warrant for Mr. Griffin's car. Det. Kincaid also coerced another key witness, Delores Queen, into falsely testifying by threatening her with a perjury prosecution and possible loss of her children if she did not "cooperate" with him. Det. Kincaid himself testified:

Q. What if anything did you tell Delores Queen when you first picked her up?

A. I told her I received certain information that she told she know [sic] about this homicide. And if she didn't cooperate with me, under the law and [with] the assistance of the State's Attorney's Office, I could summon her to the Grand Jury, have her put her testimony to the Grand Jury and I would come with the witnesses that gave me the information and this witness would testify. And if the Grand Jury felt she was lying, the State's Attorney's Office could bring perjury charges against her. If perjury charges were brought, she could be arrested and lose her children.

**ANSWER:** **Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants lack knowledge or information sufficient to form a belief about the alleged testimony attributed to Det. Kincaid. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

128. On information and belief, Defendants Barrick and Joyce had also previously engaged in misconduct in the course of murder investigations similar to their misconduct in the Duckett case. On information and belief, none of the detectives was ever disciplined for such conduct.

**ANSWER: Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

129. In addition to the investigation of the Duckett murder, several other cases demonstrate that BPD homicide detectives have routinely fabricated evidence, suppressed evidence, and engaged in bad-faith investigations.

**ANSWER: Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

130. In 1968, Walter Lomax was convicted of robbing a food market and fatally shooting the market's evening manager. It was later discovered that several key pieces of evidence were not disclosed to Mr. Lomax's trial attorney, including a BPD report that showed that an eyewitness identified someone else as the gunman. A separate police report contained notes from a witness interview in which the witness's description of the gunman did not match Mr. Lomax. Rather than present all evidence to the prosecutors, the BPD officers presented incomplete and fabricated reports. Mr. Lomax was granted a new trial based on these violations, and the State dismissed the charges.

**ANSWER: Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

131. In 1974, Michael Austin was convicted of shooting and killing a private security guard. BPD officers, among other violations, failed to turn over to both prosecutors and the defense a non-identification of Mr. Austin by the eyewitness with the best direct view of the murder. BPD

officers also failed to disclose that the same eyewitness again refused to identify Mr. Austin as having been one of the two perpetrators of the crime when they came back and showed the witness a second set of photographs containing at least one photo of Mr. Austin. BPD officers also failed to investigate other potential suspects and buried exculpatory evidence. The trial prosecutor later testified that, '[H]ad I known then what I know now, I would have never prosecuted the case."

**ANSWER:** **Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

132.    In 1987, Gary Washington was convicted of murder. Twenty-five years later, it was discovered that BPD officers had procured the conviction by coercing false witness testimony and fabricating two statements, including one from a thirteen-year-old. The officers also suppressed exculpatory evidence, including evidence of their own misconduct during the investigation.

**ANSWER:** **Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

133.    James Owens' February 1988 convictions for burglary and felony murder were overturned after Mr. Owens discovered that BPD detectives had fabricated inculpatory evidence from the star witness and withheld evidence of several earlier, inconsistent statements made by that witness. In 2018, Mr. Owens settled a lawsuit against the BPD and three of its detectives for $9 million.

**ANSWER:** **Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

134.     Also in 1988, Anthony Coleman was tried and convicted of first-degree murder and conspiracy to commit murder. In post-conviction proceedings, counsel for Mr. Coleman elicited testimony from the BPD detective investigating the homicide, Detective Sydnor, that BPD homicide detectives used their discretion to decide which documents to share with state prosecutors. When asked whether he forwarded copies of everything in his file to the prosecutor, Detective Sydnor responded that "It depends on what it's about. Yeah if it's pertinent to the investigation, yeah I would. If it's something between me and another detective I may not."

**ANSWER:     Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

135.     In a later exchange, Detective Sydnor answered affirmatively when asked, "isn't it fair to say that you do not always photocopy every information sheet and every set of notes that you take but, in fact, you usually concentrate on the ones that you believe are relevant to this offense?" The detective admitted that police did not copy and give to the prosecution everything in Anthony Coleman's case file—rather, the officers presented incomplete or falsified information to prosecutors. Later, during direct examination, the detective explained that "sometimes" he would have witnesses review his notes of their conversation, sign the notes, and adopt them. When witnesses gave "important" statements, he would write them down, but he did not document everything that a witness told him.

**ANSWER:     Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

136. After determining that evidence had been wrongfully withheld from Mr. Coleman's trial counsel, the Court of Special Appeals vacated the judgment denying post-conviction relief and remanded Mr. Coleman's case for further proceedings.

**ANSWER: Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 136 of the Complaint. Individual Defendants deny that they committed any wrongful conduct. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

137. In 1989, Jerome Johnson was wrongly convicted of the murder of Aaron Taylor. In that case, BPD officers concealed a police report containing a statement from the State's star witness (a 15-year-old girl)—the only person to implicate Mr. Johnson at trial—that contradicted her trial testimony. The officers also suppressed other key evidence, pressured a 15-year old witness, and fabricated police reports during their investigation. Mr. Johnson uncovered the suppressed police reports while incarcerated. In 2018, he was released after wrongfully serving 30 years in prison.

**ANSWER: Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

138. In 1991, Clarence Shipley was wrongly convicted of murder. Mr. Shipley was incarcerated until 2018, when he was exonerated on the basis of evidence that BPD officers had made a secret deal allowing their informant to plead guilty to one charge of car theft instead of seven and then withheld information about that deal from Mr. Shipley and his attorney. BPD officers also suppressed other key pieces of evidence, including police notes, police reports, and supplemental reports that pointed to the true perpetrator of the crime.

**ANSWER: Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

139. In 1995, Sabein Burgess was convicted of the shooting death of his girlfriend. BPD officers fabricated gunshot residue evidence and suppressed notes and other evidence of an alternate perpetrator. As a result of these violations, Mr. Burgess's conviction was vacated and the charges against him were dismissed. In 2017, a federal court jury found that an officer had violated his constitutional rights and awarded him $15 million. The evidence at that trial included testimony from BPD detectives that BPD policies and practices did not require the proper documentation and recording of evidence or require officers to disclose evidence to state prosecutors.

**ANSWER: Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

140. Antoine Pettiford was convicted of murder in 1995. Mr. Pettiford's post-conviction counsel discovered that BPD officers failed to disclose eyewitness statements and other exculpatory evidence. An independent investigation by The Baltimore Sun uncovered additional undisclosed evidence. Not only was this information never disclosed to Mr. Pettiford's trial counsel, it had never been disclosed to Mr. Pettiford's post-conviction counsel. At a hearing on Mr. Pettiford's motion to re-open post-conviction, Judge Ellen M. Heller found that a BPD Detective knew that he had to disclose a witness statement and that his failure to disclose to do so was "egregious." Mr. Pettiford's plea was ultimately vacated and charges against him were dismissed.

**ANSWER: Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

141. In 1998, Rodney Addison was wrongfully convicted of a 1996 murder. In October 2005, after nine years in prison, Mr. Addison was released when it was revealed that exculpatory witness statements had been withheld and the sole witness recanted her testimony at a post-conviction proceeding.

**ANSWER: Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

142. In 1999, Malcolm Bryant was convicted of a 1998 murder and assault that he did not commit. Mr. Bryant was exonerated in 2016. Mr. Bryant's post-conviction proceedings uncovered that BPD officers fabricated witness identifications and failed to disclose several key pieces of evidence exculpating Mr. Bryant and pointing to the true suspect, including undisclosed witnesses and witness statements.

**ANSWER: Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

143. In 1999, Tyrone Jones was convicted of conspiracy to commit murder in the shooting death of a 15-year-old boy. At trial, the state presented evidence that a witness identified Jones in a photo array and that Mr. Jones had a particle of gunshot residue on his hand. During the post-conviction phase of Mr. Jones' case, his counsel discovered evidence in the BPD file that the witness who identified Mr. Jones at trial had told a BPD officer that he had not seen the shooting

or the shooter. Further, internal BPD documents revealed that gunshot residue results were unreliable because of widespread contamination of police department facilities. Despite requests by his counsel for exculpatory material, the documents were disclosed only after a court ordered their production. Ultimately, Mr. Jones' conviction was vacated and the state nolle prossed the charges against him.

**ANSWER: Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

144. In addition to the instant case and cases dating from the sixties to the nineties demonstrating BPD's pattern and practice of unconstitutional conduct, Lieutenant Stephen B. Tabeling completed a report in 2000 about BPD's Homicide Unit as requested by then-BPD Commissioner Ronald L. Daniel. Lieutenant Tabeling's report found, among other things, that: there is "an apparent mutual lack of confidence and a serious divisive deficiency in teamwork" between the BPD and the SAO; BPD Homicide Detectives kept case folders in "abysmal condition—that is, when they can be located"; and homicide detectives lacked appropriate processes and protocols for recording information gathered during their investigations. On information and belief, these deficiencies dated to before and during the period when the Officer Defendants committed the misconduct in Mr. Chestnut, Mr. Stewart, and Mr. Watkins' case.

**ANSWER: Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

145. The BPD's policy, pattern, and practice of misconduct in murder investigations described above was perpetuated by the BPD's failure to train, supervise, and discipline its police

officers, even though BPD knew or should have known that further training, supervision, and discipline was necessary. Instead, BPD sanctioned and facilitated the kind of misconduct that Defendants committed against Mr. Chestnut, Mr. Stewart, and Mr. Watkins.

**ANSWER:** **Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

146.    For example, there was a failure during the relevant period to train police officers on disclosing evidence and complying with their obligations under Napue v. Illinois, 360 U.S. 264 (1959), and Brady v. Maryland, 373 U.S. 83 (1963), despite the obvious necessity of such training, as shown by the public testimony and reports from BPD officers that, as a policy or practice, the BPD tolerated the fabrication of evidence and did not require officers to turn all Brady information over to prosecutors.

**ANSWER:** **Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

147.    The BPD also failed to properly supervise and discipline its police officers. As a result, officers continued to violate suspects' rights with impunity in the manner described more fully above, as evidenced by the recent revelations of misconduct within the BPD's Gun Trace Task Force. A 2016 Report of the U.S. Department of Justice, Civil Rights Division concluded, "[t]his pattern or practice [of unconstitutional conduct] is driven by systemic deficiencies in BPD's policies, training, supervision, and accountability structures." For instance, the BPD did not take any actions to discipline Defendant Kincaid after his misconduct in the case of Wendell Griffin.

**ANSWER: Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

148.    Despite actual or constructive knowledge of the pattern of misconduct in the homicide unit, including, but not limited to, the repeated failure to disclose exculpatory and impeachment evidence to prosecutors, the defense, and on applications for warrants; the fabrication of evidence, including by improper interrogations or minors and others; and cover-ups of misconduct in the course of investigations, the BPD and its supervising officials, including Defendant Barrick, did not act to remedy the abuses described in the preceding paragraphs. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to prevent or remedy Mr. Chestnut's, Mr. Stewart's, and Mr. Watkins' injuries.

**ANSWER: Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

149.    These failures were a direct and proximate cause of the injuries suffered by Plaintiffs.

**ANSWER: Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

**J.    Mr. Chestnut's, Mr. Stewart's, and Mr. Watkins' Damages.**

**ANSWER: Inasmuch as the non-numbered topic sentence requires an answer, Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained within.**

150. Defendants' misconduct robbed Mr. Chestnut, Mr. Stewart, and Mr. Watkins of the best years of their lives. Only after decades, as men in their fifties, did they regain the freedom that had been stolen from them at age 16.

**ANSWER: Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

151. Mr. Chestnut, Mr. Stewart, and Mr. Watkins each spent more than 36 years—over two-thirds of their lives—caged in Maryland prisons.

**ANSWER: Individual Defendants admit that Chestnut, Stewart, and Watkins were incarcerated for approximately 36 years. Individual Defendants lack knowledge or information sufficient to form a belief about the remaining allegations contained in paragraph 151 of the Complaint.**

152. Incarcerated in adult prisons while still children, Plaintiffs suffered immense physical and emotional pain throughout their imprisonment.

**ANSWER: Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 152 of the complaint.**

153. The men awoke each day to the torture of being trapped inside a small cell for a murder they did not commit.

**ANSWER: Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 153 of the complaint.**

154. They encountered and experienced the violence and degradation inherent to prison life.

**ANSWER:   Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 154 of the complaint.**

155. While incarcerated in State facilities, Mr. Chestnut, Mr. Stewart, and Mr. Watkins missed meaningful life events: the ability to share holidays, birthdays, weddings, and funerals with loved ones; the opportunity to find meaningful work; the chance to care for and raise children; the opportunity to be present with friends and family in moments both mundane and profound; the occasion to transform laughter and love into cherished memories; and the fundamental freedom to lead a life of one's own choosing.

**ANSWER:   Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 155 of the complaint.**

156. Plaintiffs suffered tremendous damage, including physical injuries and severe emotional trauma, and they continue to suffer emotional trauma, all of which were caused by Defendants' misconduct.

**ANSWER:   Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

157. Plaintiffs' injuries and damages were foreseeable to Defendants at the time of their acts and omissions.

**ANSWER:   Individual Defendants deny the allegations in paragraph 157 of the Complaint.**

158.     All the acts and omissions committed by Defendants were done intentionally, unlawfully, wantonly, recklessly, negligently, and/or in bad faith.

**ANSWER:     Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

## FEDERAL CLAIMS

### Count I – 42 U.S.C. § 1983

**Malicious Prosecution (Fourth and Fourteenth Amendments) (Against Officer Defendants)**

159.     Each foregoing paragraph is incorporated as if restated fully herein.

**ANSWER:     Individual Defendants incorporate their responses to each foregoing paragraph as if fully restated herein.**

160.     In the manner described above, by their conduct and under the color of state law, the Officer Defendants caused Plaintiffs to be arrested, charged, and prosecuted for the murder of DeWitt Duckett pursuant to legal process that was unsupported by probable cause, thereby violating Plaintiffs' clearly established rights, under the Fourth and Fourteenth Amendments of the United States Constitution, to be free of unreasonable searches and seizures. No reasonable officer in 1983 or 1984 would have believed this conduct was lawful.

**ANSWER:     Individual Defendants deny the allegations in paragraph 160 of the Complaint.**

161.     The misconduct described in this Count was objectively unreasonable, and the Officer Defendants acting individually and in concert, intentionally, knowingly, and deliberately misrepresented the truth and withheld exculpatory facts from the prosecutor.

**ANSWER:     Individual Defendants deny the allegations in paragraph 161 of the Complaint.**

162.    The proceedings terminated in Plaintiffs' favor on November 25, 2019.

**ANSWER:    Individual Defendants admit the allegations in paragraph 162 of the Complaint.**

163.    As a direct and proximate result of the Officer Defendants' malicious prosecution, Plaintiffs suffered injuries, including but not limited to loss of liberty, physical injury, and emotional distress, and they continue to suffer emotional distress.

**ANSWER:    Individual Defendants deny the allegations in paragraph 163 of the Complaint.**

### Count II – 42 U.S.C. § 1983

### Violation of Due Process (Fourteenth Amendment) Fabrication of Evidence (Against Officer Defendants)

164.    Each foregoing paragraph is incorporated as if restated fully herein.

**ANSWER:    Individual Defendants incorporate their responses to each foregoing paragraph as if fully restated herein.**

165.    In the manner described above, by their conduct and under the color of state law, the Officer Defendants fabricated evidence against Plaintiffs.

**ANSWER:    Individual Defendants deny the allegations in paragraph 165 of the Complaint.**

166.    The Officer Defendants performed the above-described acts in bad faith and under color of state law, deliberately, and recklessly for Plaintiffs' clearly established constitutional rights and innocence. No reasonable officer in 1983 or 1984 would have believed this conduct was lawful.

**ANSWER:    Individual Defendants deny the allegations in paragraph 166 of the Complaint.**

167.     As a direct and proximate result of the Officers Defendants' fabrication of evidence, including fabrication of witness testimony, Plaintiffs suffered injuries, including but not limited to loss of liberty, physical injury, and emotional distress, and they continue to suffer emotional distress.

**ANSWER:     Individual Defendants deny the allegations in paragraph 167 of the Complaint.**

## Count III – 42 U.S.C. § 1983

### Violation of Due Process (Fourteenth Amendment) Failure to Adequately Investigate and Disclose Exculpatory and Impeachment Evidence (Against Officer Defendants)

168.     Each foregoing paragraph is incorporated as if restated fully herein.

**ANSWER:     Individual Defendants incorporate their responses to each foregoing paragraph as if fully restated herein.**

169.     In the manner described above, by their conduct and under color of state law, the Officer Defendants deprived Plaintiffs of their constitutional rights to be free from deprivation of liberty without due process of law. The Officer Defendants, individually, jointly, and in conspiracy with one another and others, deliberately withheld exculpatory and impeachment evidence. The Officer Defendants also in bad faith failed to adequately investigate the crime, including pursuing leads pointing to the true perpetrator, in order to shield their wrongful acts. In doing so, the Officer Defendants violated their clearly established duty to report to prosecutors all exculpatory and impeachment materials. No reasonable officer in 1983 or 1984 would have believed this conduct was lawful.

**ANSWER:     Individual Defendants deny the allegations in paragraph 169 of the Complaint.**

170.    Absent the Officer Defendants' misconduct, the prosecution of Plaintiffs could not and would not have been pursued, and they would not have been convicted. The Officer Defendants' misconduct directly led to the unjust and wrongful criminal conviction of Plaintiffs and their continuing wrongful imprisonment. The Officer Defendants thus denied them their constitutional rights to be free from deprivation of liberty without due process of law in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

**ANSWER:    Individual Defendants deny the allegations in paragraph 170 of the Complaint.**

171.    As a direct and proximate result of this violation of their constitutional rights to be free from deprivation of liberty without due process of law. Plaintiffs suffered injuries, including but not limited to the loss of liberty, physical injury, and emotional distress, and they continue to suffer emotional distress.

**ANSWER:    Individual Defendants deny the allegations in paragraph 171 of the Complaint.**

**Count IV – 42 U.S.C. § 1983**

**Failure to Intervene (Against Officer Defendants)**

172.    Each foregoing paragraph is incorporated as if restated fully herein.

**ANSWER:    Individual Defendants incorporate their responses to each foregoing paragraph as if fully restated herein.**

173.    In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, each of the Officer Defendants stood by without intervening to prevent the violation of Plaintiffs' constitutional rights, although each of the Officer Defendants had the opportunity to do so.

**ANSWER: Individual Defendants deny the allegations in paragraph 173 of the Complaint.**

174. The misconduct described in this Count was objectively unreasonable and was undertaken in bad faith, intentionally, recklessly, and with willful indifference to Plaintiffs' clearly established constitutional rights.

**ANSWER: Individual Defendants deny the allegations in paragraph 174 of the Complaint.**

175. As a direct and proximate result of the Officer Defendants' failure to intervene to prevent the violation of Plaintiffs' clearly established constitutional rights, Plaintiffs suffered injuries, including but not limited to loss of liberty, physical injury, and emotional distress, and they continue to suffer emotional distress.

**ANSWER: Individual Defendants deny the allegations in paragraph 175 of the Complaint.**

## Count V – 42 U.S.C. § 1983

### Supervisory Liability (Against Defendant Barrick)

176. Each foregoing paragraph is incorporated as if restated fully herein.

**ANSWER: Individual Defendants incorporate their responses to each foregoing paragraph as if fully restated herein.**

177. Detective Sergeant Barrick was both personally involved in the investigation of Plaintiffs (including the November 23 interview of Y.T.), and directly supervised the investigation by the investigative team, including Detectives Kincaid and Joyce.

**ANSWER: In light of the length of time that passed since the investigation underlying this Complaint, the present unavailability of contemporaneous records from**

which **Individual Defendants** may use to refresh their recollection, and the conclusory terminology utilized in the Complaint, Individual Defendants lack knowledge or information sufficient to form a belief about the allegations contained in paragraph 177 of the Complaint. Individual Defendants deny that they committed any wrongful conduct.

178.     Dets. Kincaid and Joyce acted with impunity in an environment in which they were not adequately supervised by Det. Sgt. Barrick, both in this case and as a matter of practice and custom. Det. Sgt. Barrick knew, or should have known, that Dets. Kincaid and Joyce were engaging in the unconstitutional conduct described above in the investigation of the Duckett murder. Det. Sgt. Barrick knew, or should have known, that Dets. Kincaid and Joyce and other detectives in BPD's homicide unit under his supervision had previously engaged in similar unconstitutional conduct in the course of murder investigations. Det. Sgt. Barrick had the power to discipline the officers or take other action to prevent these abuses of power but failed to do so.

**ANSWER:     Individual Defendants deny the allegations in paragraph 178 of the Complaint.**

179.     Det. Sgt. Barrick acted recklessly and intentionally to Plaintiffs' constitutional rights by failing to adequately supervise Dets. Kincaid and Joyce, thereby allowing and causing those detectives to deprive Plaintiffs of their clearly established constitutional rights, including their rights to be free from malicious prosecution and free from deprivation of liberty without due process of law.

**ANSWER:     Individual Defendants deny the allegations in paragraph 179 of the Complaint.**

180.     The reckless and deliberately indifferent conduct of Det. Sgt. Barrick violated his clearly established duty, in 1983, to supervise the detectives, and no reasonable police supervisor

in 1983 would have believed that reckless supervision in the fact of actual or constructive notice of misconduct by their subordinate officers were lawful.

**ANSWER:    Individual Defendants deny the allegations in paragraph 180 of the Complaint.**

181.    As a direct and proximate result of Defendant Barrick's acts and omissions, Plaintiffs suffered injuries, including but not limited to loss of liberty, physical injury, and severe emotional distress, and they continue to suffer emotional distress.

**ANSWER:    Individual Defendants deny the allegations in paragraph 181 of the Complaint.**

### Count VI – 42 U.S.C. § 1983

**Monell Claim (Fourteenth Amendment) (Against the Baltimore Police Department)**

182.    Each foregoing paragraph is incorporated as if restated fully herein.

**ANSWER:    Individual Defendants incorporate their responses to each foregoing paragraph as if fully restated herein. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

183.    The actions of all of the Officer Defendants were undertaken pursuant to policies that were ratified by policymakers with final policymaking authority and/or pursuant to persistent and widespread patterns of practice. These policies and practices included regularly failing to disclose exculpatory and impeachment evidence to the defense, prosecutors, and in applications for warrants; fabricating evidence; improperly interrogating witnesses, including minors; and in bad faith failing to conduct investigations in order to shield earlier wrongful acts. BPD's illegal policies and practices also included the failure to adequately train police officers in the homicide unit on their obligations regarding disclosure of exculpatory and impeachment evidence;

fabrication of evidence; interrogations, including of minors; and proper investigation; failure to supervise officers in the homicide unit; and failure to supervise and discipline police officers in the homicide unit who engaged in violations similar to those described above.

**ANSWER: Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

184. These policies and practices were so widespread within the BPD as to constitute a "custom or usage" of which BPD policymakers and supervisors had actual or constructive knowledge.

**ANSWER: Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

185. The BPD's policy, custom, and/or pattern and practice of promoting, facilitating, and condoning improper, illegal, and unconstitutional investigative actions, and its policy, custom, and/or pattern and practice of failing to adequately supervise, discipline, and train BPD detectives and officers, is reflected by the multiple acts of misconduct and illegality committed by multiple BPD detectives and officers as described above, and the testimony and reporting of BPD detectives and officers that these practices constituted the official or unofficial policies of the BPD.

**ANSWER: Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

186. BPD maintained the policies and practices described in this Count with deliberate indifference to Plaintiffs' constitutional rights.

**ANSWER:** **Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

187. The BPD is therefore liable for the misconduct committed by the Officer Defendants.

**ANSWER:** **Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

188. As a direct and proximate result of the BPD's actions, Plaintiffs' constitutional rights were violated and they suffered injuries, including but not limited to loss of liberty, physical injury, and severe emotional distress, and they continue to suffer emotional distress.

**ANSWER:** **Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

## STATE LAW CLAIMS

### Count VII

### Malicious Prosecution (Against Officer Defendants)

189. Each foregoing paragraph is incorporated as if restated fully herein.

**ANSWER:** **Individual Defendants incorporate their responses to each foregoing paragraph as if fully restated herein.**

190. The Officer Defendants accused Plaintiffs of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to the prosecutor and other officials to exert influence and to institute and continue the judicial proceedings.

**ANSWER:    Individual Defendants deny the allegations in paragraph 190 of the Complaint.**

191.    The Officer Defendants caused Plaintiffs to be improperly subjected to judicial proceedings for which there was no probable cause, resulting in injury.

**ANSWER:    Individual Defendants deny the allegations in paragraph 191 of the Complaint.**

192.    The Officer Defendants fabricated evidence and withheld exculpatory evidence that would have established Plaintiffs' innocence. The Officer Defendants knew that, as described more fully above, no true or reliable evidence implicated Plaintiffs in the murder of DeWitt Duckett.

**ANSWER:    Individual Defendants deny the allegations in paragraph 192 of the Complaint.**

193.    The Officer Defendants intentionally failed to investigate evidence that would have confirmed Plaintiffs' innocence.

**ANSWER:    Individual Defendants deny the allegations in paragraph 193 of the Complaint.**

194.    The misconduct described in this Count was undertaken intentionally, willfully, and with reckless indifference to the rights of others.

**ANSWER:    Individual Defendants deny the allegations in paragraph 194 of the Complaint.**

195.    The proceedings terminated in Plaintiffs' favor on November 25, 2019.

**ANSWER:    Individual Defendants admit the allegations in paragraph 195 of the Complaint.**

196.     As a direct and proximate result of this misconduct, Plaintiffs suffered and continue to suffer injuries as set forth above, including physical injury and emotional distress, and they continue to suffer emotional distress.

**ANSWER:     Individual Defendants deny the allegations in paragraph 196 of the Complaint.**

## Count VIII

### Intentional Infliction of Emotional Distress (Against Officer Defendants)

197.     Each foregoing paragraph is incorporated as if restated fully herein.

**ANSWER:     Individual Defendants incorporate their responses to each foregoing paragraph as if fully restated herein.**

198.     The acts and conduct of the Officer Defendants as set forth above were extreme and outrageous. The Officer Defendants' actions were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiffs, as more fully alleged above.

**ANSWER:     Individual Defendants deny the allegations in paragraph 198 of the Complaint.**

199.     As a direct and proximate result of the Officer Defendants' actions, Plaintiffs suffered and continue to suffer physical injury and severe emotional distress, and they continue to suffer emotional distress.

**ANSWER:     Individual Defendants deny the allegations in paragraph 199 of the Complaint.**

## Count IX

### Indemnification (Against the Baltimore Police Department)

200.     Each foregoing paragraph is incorporated as if restated fully herein.

**ANSWER:   Individual Defendants incorporate their responses to each foregoing paragraph as if fully restated herein. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

201.     Maryland law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable for acts or omissions within the scope of their employment activities.

**ANSWER:   The allegations in paragraph 201 of the Complaint set forth legal conclusions and questions of law to which no response is required. Individual Defendants deny that they committed any wrongful conduct. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

202.     The Officer Defendants are or were employees of the BPD who acted within the scope of their employment in committing the misconduct described in this Complaint.

**ANSWER:   Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

203.     Accordingly, the BPD should be ordered to indemnify the Officer Defendants for any judgment entered against them in this matter and to pay such judgment to the Plaintiffs.

**ANSWER:   Individual Defendants deny the allegations in this paragraph to the extent the allegations pertain to Individual Defendants. Individual Defendants make no answer with regard to the allegations directed at Defendant Baltimore Police Department.**

## <u>AFFIRMATIVE DEFENSES</u>

1.     The Complaint fails to state a claim upon which relief can be granted.

2.     The investigation, arrest, prosecution, and imprisonment of Chestnut, Stewart, and Watkins were lawful.

3.     There was probable cause to arrest Chestnut, Stewart, and Watkins and to participate in their being charged, tried, and convicted.

4.     The Individual Defendants acted in good faith and without malice.

5.     The Individual Defendants acted reasonably under the circumstances.

6.     The Individual Defendants' actions are privileged because all were performing lawful duties as a member or employee of the Baltimore Police Department and are entitled to all common law, statutory, and qualified immunities.

7.     Chestnut, Stewart, and Watkins' claims are barred, in whole or in part, by the doctrines of governmental immunity.

8.     The Individual Defendants acted within the scope of their authority and did not violate any clearly established statutory or constitutional rights. Individual Defendants are government officials who perform discretionary functions in the course of their work. At all times material to the events alleged in Plaintiffs' Complaint, a reasonable police officer, objectively viewing the facts and circumstances that confronted Individual Defendants, could have believed their actions to be lawful in light of clearly established law and the information that they possessed. Accordingly, Individual Defendants, are entitled to the defense of Qualified Immunity from suit and damages.

9.     To the extent that the claims against any Individual Defendants attempt to impose liability based upon an allegation that any gave false testimony, the Individual Defendants are absolutely immune from liability on such a basis.

10. To the extent that Chestnut, Stewart, and Watkins suffered any injuries, losses, or damages as a result of the incident alleged in the Complaint, the injuries were proximately caused by their own conduct, illegal or otherwise, the conduct of other persons or parties, including but not limited to the Office of the State's Attorney, for which the Individual Defendants are not responsible or liable.

11. Chestnut, Stewart, and Watkins' claims are barred, in whole or in part, by the doctrine of unclean hands.

12. Chestnut, Stewart, and Watkins' claims are barred, in whole or in part, by the failure to mitigate damages.

13. Chestnut, Stewart, and Watkins' claims are barred, in whole or in part, by their failure or the failure of their criminal defense attorneys to investigate their own defenses.

14. Chestnut, Stewart, and Watkins' claims for conspiracy are barred by the intracorporate conspiracy doctrine, because all alleged conspirators were employed by the same municipality.

15. Because discovery has only recently commenced, the Individual Defendants reserve the right to amend this disclosure to add additional affirmative defenses as additional information becomes known.

16. To the extent that any injuries or damages claimed by Plaintiffs against Individual Defendants were caused in whole or in part by negligent, willful and wanton, and intentional conduct of Plaintiffs, even if Individual Defendants are liable in damages, the total amount of damages to which Plaintiffs would otherwise be entitled must be reduced by application of the principles of comparative fault in proportion to the amount of the negligent, willful and wanton, and intentional conduct of Plaintiffs which was the proximate cause of their injuries.

## JURY DEMAND

Individual Defendants DONALD KINCAID, BRYN JOYCE, and JOHN BARRICK, hereby demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

DATED: May 26, 2021                    Respectfully Submitted,

*/s/ Shneur Nathan*
Shneur Nathan, Bar No. 20707
snathan@nklawllp.com
Avi Kamionski, Bar No. 20703
akamionski@nklawllp.com
Mayer Engelsberg Bar No. 21105
mengelsberg@nklawllp.com
Michael J. Elliker Bar No. 20810
melliker@nklawllp.com
NATHAN & KAMIONSKI LLP
575 S. Charles St. Ste.402
Baltimore, MD 21201
(312) 612-1955
(312) 448-6099
*Attorneys for Individual Defendants*
*Donald Kincaid, Bryn Joyce, &*
*John Barrick*

**CERTIFICATE OF SERVICE**

I, the undersigned attorney, hereby certify that I have caused true and correct copies of the above and foregoing to be served on all counsel of record via to the Court's CM/ECF system, in accordance with the rules of electronic filing of documents, on this 26th day of May, 2021.

*/s/ Shneur Nathan*
Shneur Nathan