EXHIBIT 7

IN THE CIRCUIT COURT FOR BALTIMORE CITY MARYLAND

| | |
|---|---|
| STATE OF MARYLAND | * |
| v. | * |
| Alfred Chestnut, | * |
| Co-Defendant, | * |
| ▬▬▬▬▬ | *    CRIM NOS. 18335414-15, |
| ▬▬▬▬ | * |
| ▬▬▬▬ | * |
| ▬▬▬▬ | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## CORRECTED[1]: STATE'S NOTIFICATION OF NEWLY DISCOVERED EVIDENCE AND ENTRY

## OF NOLLE PROSEQUI

COMES NOW, Marilyn J. Mosby, State's Attorney for Baltimore City, and the State of Maryland by and through Lauren R. Lipscomb, Assistant State's Attorney, hereby notify the Court that, pursuant to a State's re-investigation into each of the above-captioned cases, the State has become aware of extensive evidence that exculpates all three co-defendants in the above-captioned cases, which evidence was not known to the jury.

WHEREFORE, at the State's request, in open court on Monday November 25, 2019, the Court granted the Joint Petition for Writ of Actual Evidence ("WAI") filed with the Court by both the Defense and the State. Further, during same hearing, in open court, the State will entered a nolle prosequi in each indictment for the reasons set forth in the attached *Conviction Integrity Unit Report* which is hereby submitted to the Court and which report details the State's investigation in support of the instant notification.

Very Truly Yours,
Marilyn J. Mosby
State's Attorney for Baltimore City

By: _____
Lauren R. Lipscomb, #499050
Chief, Conviction Integrity Unit
Baltimore City State's Attorney's Office
120 E. Baltimore Street
Baltimore, MD 21202
443-984-6000

---

[1] The State filed a substantively identical pleading on 11/25/19 with the Court. The State is informed that the original pleading is being returned to this office based on there being a clerical need for only one caption per pleading.

December 4, 2019


Respectfully submitted,

Marilyn Mosby
State's Attorney for Baltimore City

By: _____

Lauren R. Lipscomb
Chief, Conviction Integrity Unit
Office of the State's Attorney for
Baltimore City
120 E. Baltimore Street
Baltimore, MD 21202
443-984-6000
CIP@stattorney.org
*State of Maryland*

_____

Elizabeth Hilliard
Assistant Public Defender
Maryland Office of the Public Defender
Post Conviction Defenders Division
217 E. Redwood Street
Baltimore, MD 21202
(410) 209-8610
ehilliard@opd.state.md.us

Brianna Ford
Deputy Director
Innocence Project Clinic
University of Baltimore School of Law
1420 N. Charles Street
Baltimore, MD 21201
(410) 837-5388
bford@ubalt.edu

*Counsel for Alfred Chestnut*

_____

Booth Ripke
Rachel Wilson
Nathans & Biddle, LLP
120 E. Baltimore Street, Ste 1800
Baltimore, MD 21202
(410)783-0272 ext. 103
bripke@nathanslaw.com


*Counsel for Andrew Stewart*

_____

Frances Walters
Isabel Corngold[17]
Mid-Atlantic Innocence Project
GWU Law School
2000 H Street, NW
Washington, DC 20052
(202) 994-8692
fwalters@exonerate.org

Christopher Nieto
The Law Office of Christopher C. Nieto
1 N. Charles Street, Suite 1301
Baltimore, MD 21201
(443) 863-8189
cnieto@nietolawoffice.com

*Counsel for Ransom Watkins*

---

[17] Pro hac motion filed 11/22/19.

13

NK DEF 006738

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that the foregoing CORRECTED: STATE'S NOTIFICATION OF NEWLY

DISCOVERED EVIDENCE AND ENTRY OF NOLLE PROSEQUI is being filed with the Court December

4th 2019, with the original substantively identical similar pleading having been sent via electronic mail to

Counsel for Defendants on November 25th, 2019.

Lauren R. Lipscomb /#499050
Chief, Conviction Integrity Unit



**Office of the State's Attorney for Baltimore City**

**120 East Baltimore Street**

**Baltimore, MD 21202**

**Marilyn J. Mosby**

**State's Attorney for Baltimore City**

## CONVICTION INTEGRITY UNIT REPORT

By: Lauren R. Lipscomb

Chief, Conviction Integrity Unit

**November 13, 2019**

**State v. Alfred Chestnut 18335414-15**

**State v. Ransom Watkins 18335416-17**

**State v. Andrew Stewart 18335418-19**

NK DEF 006740

## I. **RECOMMENDATION**

On May 16, 2019, in a *pro se* capacity, Defendant Alfred Chestnut ("Defendant Chestnut" or "Chestnut") contacted the Conviction Integrity Program ("CIP") within the Conviction Integrity Unit on behalf of himself and his co-defendants, Ransom Watkins ("Defendant Watkins" or "Watkins") and Andrew Stewart ("Defendant Stewart" or "Stewart"). Chestnut wrote seeking a review of their collective cases. Subsequent CIP investigation would reveal that the incident referenced in Chestnut's application involved the murder of 14 year old Dewitt Duckett ("Victim") which occurred at approximately 1:15pm on November 18, 1983, at Harlem Park Junior High School ("HPJHS") in Baltimore City.

As a result of the below-detailed CIP investigation[1], there exists credible support that: 1) Defendants Chestnut, Watkins, and Stewart were not present in HPJHS when the murder occurred; 2) the student identifications of the three Defendants, which were the basis for the State's case, are now nullified; and 3) the Defendants were not afforded access to a fair trial as a result of: a) minimal compliance with discovery obligations relating to disclosure of exculpating material as required by *Brady v. Maryland,* 373, U.S. 83 (1963) ("Brady"); b) apparent concealment of exculpatory evidence, c) suggestive pre-trial identification procedures; and d) coercive trial preparation of the State's witnesses. Detailed support for the aforementioned conclusions are to follow in the instant report.

Pursuant to the American Bar Association Guidelines relating to the special duties of a prosecutor, as set forth in Section 8.3: *Responses to New or Newly-Discovered Evidence or Law,* our investigation has uncovered the existence of credible and material information that has negated and nullified the inculpating evidence presented at trial to such an extent that the only reasonable conclusion is that Chestnut, Watkins, and Stewart were wrongfully convicted. Therefore, it is my recommendation that we move the Court to grant a joint writ of actual innocence petition and dismiss each charge in each of the above-captioned cases.

---

[1] *All personal identifying and sensitive information have been omitted in this informative report filed with the Court in support of the State's entry of a nol pros.*

NK DEF 006741

## II. **STATEMENT OF FACTS AND BACKGROUND**

On November 18, 1983, at approximately 1:10pm, the Victim finished his science class at HPJHS.  He left class with 2 friends, juvenile student #1 ("Student #1") and juvenile student #2 ("Student #2).  A third friend, juvenile student #3 ("Student #3"), started out with the group; however, Student #3 forgot an item, so he returned to the classroom.  Meanwhile, Students #1, #2 and the Victim took a short cut to the cafeteria by heading down an off limits hallway[1] ("C/D Hallway[2]") in the school.  While in the C/D Hallway, the Victim was approached from behind by a suspect ("Shooter") wielding a .22 caliber handgun.  The Shooter demanded the Victim's Georgetown "NBA" jacket ("NBA Jacket[3]").  Students #1 and #2 took off running[4].  The Victim tried to get his NBA jacket off; though, a struggle ensued with the Shooter over its removal.  During the struggle, the Shooter shot the Victim in the neck, then ran down the C/D Hallway.  In spite of having been shot, the Victim was able to make it down to the 1st floor and into the cafeteria.  Once in the cafeteria, the Victim headed toward the unit principal.  The unit principal helped the Victim down the hallway to the HPJHS administrative suite.  Once there, the Victim collapsed.  Medics and Baltimore Police Department ('BPD") responded.  The Victim was conscious, however he was unable to speak.  He was taken to Shock Trauma and died approximately two hours later.

In the hours following the murder, BPD learned that Students #1, #2 and #3 were potential witnesses.  Also in the hours following the murder, BPD was informed by HPJHS teachers that several former students were in HPJHS without permission around the time of the murder: Defendant Chestnut, Defendant Watkins, Defendant Stewart, juvenile Individual A ("Individual A"), and juvenile Individual B ("Individual B").  The day after the murder, on November 19, 1983, BPD developed Defendants Chestnut,

---

[1] This hallway was technically off limits for students.
[2] In 1983, as it is today, HPJHS includes more than one school.  In 1983, different areas within the school were identified by letters and units; namely, A Unit, B Unit, C Unit and D Unit.
[3] These types of starter jackets were extremely popular during this time period.  They were referred to colloquially as NBA jackets, regardless of whether the team was in fact an NBA team.

3

NK DEF 006742

Watkins and Stewart as suspects. BPD showed two groups of Polaroid pictures to Students #2 and #3. The first group ("Group #1") was shown twice to Students #2 and #3: 11/21/83 and 11/22/83[5]. Group #1 contained Defendants Chestnut, Watkins, and Stewart – neither Student #2 nor #3 made an identification.

On November 23, 1983, BPD was notified that another student, Student #4 ("Student #4"), may have witnessed the incident. Student #4 was shown picture Group #1 and picked out Defendants Chestnut, Watkins, Stewart. While Student #4 signed a statement prepared by police, Student #4 did not read what was written[6]. Following Student #4's identification, on Wednesday November 23, 1983, BPD patrol picked up Students #1, #2, and #3[7] and took them to Homicide. Each were shown picture Group #1 and each picked out Defendants Chestnut, Watkins and Stewart.

At approximately 1:00am on November 24[8], 1983, Defendants Chestnut, Watkins and Stewart were arrested for the murder. A search and seizure warrant ("SSW") was executed at Defendant Chestnut's house. In Defendant Chestnut's closet, police recovered a Georgetown NBA jacket[9].

On May 16, 2019, Defendant Chestnut submitted a CIP application requesting that CIU review all three cases based on Chestnut's contention that he, Watkins and Stewart are factually innocent. Upon receipt of the application, the transcripts standing alone were reviewed – same reflected in Court identifications from Students #1-#4 that, on their face, contained no apparent concerns.

---

[4] Student #3 returned to the C/D Hallway and found this incident unfolding, so he remained behind the lockers.
[5] Both of the 11/21/83 and 11/22/83 photo showings were in the presence of a parent or guardian. As will be detailed later, these negative arrays were not disclosed to the Defense pre-trial.
[6] While a copy of this document was not located, Witness #4 testified to same. BPD also testified there were no notes taken of this interview.
[7] According to trial testimony and present day statements made by Students #1, #2 and #3, their parents/guardians were not present nor alerted to this interview until the interviews were completed.
[8] In 1983, November 24 was Thanksgiving Day.
[9] According to transcripts, Defendant Chestnut's mother, during the arrest, showed police the receipt for the Georgetown jacket found in her son's closet. It is unclear why this document was discounted.

4

NK DEF 006743

However, in June 2019, Chestnut sent supporting application documents to the CIP which included the BPD investigative reports ("Lotus Notes[10]") that he received pursuant to his MPIA request with the Office of the Maryland Attorney General ("OAG") in June 2018[11]. The Lotus Notes reflect that: 1) there were several students who identified the Shooter to be Michael Willis[12]; 2) Student #4's photo identification was the sole foundation leading to the Defendants; and 3) there was an unexplained investigatory jump from one suspect to three suspects[13] - all of which appear to have been unknown to the Defense in 1983/1984 based on the review of the trial transcripts. As a result, these cases were escalated into a re-investigation.

During the CIP investigation, prior to interviewing the Defendants, we contacted our grant partners, the Mid-Atlantic Innocence Project ("MAIP"). We informed of our investigation and our belief that the Defendants needed representation. As such, MAIP agreed to represent the Defendants.

## III. <u>SUMMARY OF EVIDENCE PRODUCED AT TRIAL</u>

A. Pre-Trial Motions

1. Discovery Violation Motions. The Defense made several motions to dismiss based on discovery violations, concealment of evidence, and prosecutorial misconduct. There were discovery violation accusations raised several times throughout the trial process. All were denied.

---

[10] This group of investigative reports were a critical development. Present day, they would be the investigatory police progress reports that provide how the investigation develops and how the police got from A to B to C.

[11] At the close of the State's case, the Defense noted on the record that they had not been permitted to review any of the Lotus Notes. Same Lotus Notes and police reports were placed into an envelope and sealed for forwarding to the OAG. (T. 5/24/84 p.9). In 2018, responding to the MPIA from Defendant Chestnut, these documents were released.

[12] The Office of the Chief Medical Examiner confirmed that Michael Willis died on 10/27/2002.

[13] The first responding officer took a report from Students #1, #2, and #3 who described there being 1 Shooter and 2 possible UNK associates of the Shooter who were several feet away and were not observed participating in the incident.

NK DEF 006744

2. Motion to Suppress Pre-trial Identifications.  Students #1, #2, #3, and #4 each testified.  Each identified Chestnut as the Shooter, Watkins as holding the Victim by the neck and Stewart as trying to get Victim's jacket removed.

B. Openings

1. State's Opening.  To follow were the main points.  Defendants Chestnut, Watkins and Stewart were trespassing at HPJHS.  They were kicked out, then returned to the school and committed the robbery/murder.  Three friends of the Victim identified Defendant Chestnut as the Shooter, Defendant Watkins as holding the Victim, and Defendant Stewart as pulling the Victim's NBA Jacket off.  BPD executed a SSW at Chestnut's house and recovered the NBA Jacket.

2. Defense's Opening. All three defense attorneys gave an opening statement. The main points were: 1) the State won't meet its burden; 2) the jacket is not incriminating; and 3) the State's witnesses are inconsistent and lying.  Defense Watkins also asserted that this may not be a homicide due to school personnel administering CPR[14] which caused the Victim to bleed out.

C. State's Case

The main contested issue at trial was the identity of those involved.  The main testimony that convicted the Defendants at trial came from: Students #1, #2, #3, and #4 and the primary homicide detective.  While four teachers and a security officer were all called at trial and placed the 3 Defendants on site at HPJHS before 1:00 pm, there is no dispute that the Defendants were present at the

---

[14] This theory was not developed during the rest of the trial.

NK DEF 006745

school before 1:00 pm[15].  Lastly, evidence was presented that, on November 24, 1983, during Defendant Chestnut's arrest, a SSW was executed and a Georgetown NBA jacket was recovered from inside of Chestnut's closet.

1.  Teacher Testimony -- Summary

    a.  Teacher #1 (D Unit).  Teacher #1 saw Defendants Chestnut, Watkins, and Stewart[16] at approximately 12:30pm-12:40pm.

    b.  Teacher #2 (D Unit).  Teacher #2 saw Defendant Chestnut, Watkins, and three unknown boys *about* 30 minutes[17] before the shooting ~12:45pm.

    c.  Security Officer ("Security Officer").  The Security Officer saw Defendants Chestnut, Watkins and Stewart at the basketball court -- Harlem Avenue side of the school--at 12:45pm.  He testified that he told the Defendants to leave and watched them walk off the property and up Gilmor Avenue.  The Security Officer then returned inside HPJHS and locked the doors[18].  He further testified that by approximately 12:55pm, he was back in the building and, at 1:20pm, he was on the 1st floor when he saw the Victim being carried by the unit principal.  He saw a GSW on the Victim's neck and blood.  On cross, as medics were pulling up to the school, the Security Officer said he saw Michael Willis outside the school/courtyard area[19].

---

[15] Since there is no dispute that the 3 Defendants were there and the observations of each teacher were made prior to 1:00pm, this area of the case was not investigated beyond a document review.
[16] Defendant Stewart was not personally known to this teacher, however she/he identified him by face.
[17] There were many attempts to narrow this down.  At one point, Teacher #2 advised that 30 min ahead of the shooting would put it at 1pm/1:10pm, which was apparently incorrect as the murder occurred at 1:15pm.
[18] T.  5/16/84 p. 136
[19] T.  5/16/84 p. 125

NK DEF 006746

    d.   Teacher #3 (D Unit).  Teacher #3 testified that they were teaching science to the Victim, Students #1, #2, and #3 from 12:20pm-1:10pm, before the shooting.  They testified that their class was dismissed at 1:10pm for lunch.

    e.   Teacher #4 (D Unit).  Teacher #4 testified that Chestnut and Watkins were in a group with unknown others who came into their classroom. Teacher #4 saw this group during their class which was taught between 12:20pm-1:10pm.  Teacher #4 further testified to contacting BPD later the same evening to report having seen the Defendants and their group in the hallway.  Teacher #4 testified that the Defendants' group was silly and acting immaturely, but they were non-threatening.

2.   Student Witness Testimony - Summary

    a.   Student #4.  Student #4 testified to the following information.  Student #4 identified Defendant Chestnut as the Shooter, Defendant Watkins as the Victim holder, and Defendant Stewart as the NBA Jacket taker.

    b.   Student #1.  Student #1 testified to the following information.  Student #1 knows the three Defendants.  On 11/18/83, one hour after the murder, Student #1 made a statement to BPD saying that their group, including the Victim, was walking down the hall when the Shooter ran up behind the Victim.  The Shooter was described as unknown to them, slim and wearing a gray hoody.  Student #1 told BPD that, while there were two other people down the hallway, only the Shooter came up.

    Student #1 further testified that, on 11/23/83, Student #1 was taken to Homicide for an interview and that BPD was "mad" saying that "they know [Student #1] knew who did it because other people saw what

8

NK DEF 006747

happened.  Student #1 was shown picture Group #1 and identified the 3 Defendants.  Student #1 identified all 3 Defendants in Court saying the statement given to BPD on 11/18/83 was not true and that the11/23/83 interview at BPD was true.

c.  Student #3.  Student #3 testified to the following information.  On 11/18/83, one hour following the murder, Student #3 told BPD they had never seen the Shooter before.  Student #3 testified that on 11/21/83, BPD showed them picture Group #1 - no identification.

During the evening of 11/22/83, BPD came to Student #3's house, guardians present, showing a second set of pictures ("Group #2).  He picked out one picture [Michael Willis][20] but said Willis did not have anything to do with the killing.  Later the same night, on 11/22/83, BPD returned to Student #3's house and showed him picture Group #1 again.  Student #3 made no identification.

On 11/23/83, Student #3 was interviewed at Homicide, without guardians, and identified all 3 Defendants in picture Group #1.  Also, Student #3 told BPD that Chestnut threatened them when running down the hall. Saying if Student #3 said anything "involving the case", they would get hurt.

Student #3 identified all 3 Defendants in Court saying Defendant Chestnut was the Shooter, Defendant Watkins held the Victim, and Defendant Stewart pulled the Victim's NBA Jacket.

d.  Student #2.  Student #2 testified to the following information.  On 11/18/83, Student #2 gave a statement to BPD following the murder

---

[20] This was not disclosed to Defense in discovery.

NK DEF 006748

saying the Shooter was wearing a gray hoody, light pants and was about 16 years old.  There was only one suspect.

On 11/19/83, BPD went to Student #2's house and showed Student #2 picture Group #1 which contained all 3 Defendants.  No identification was made.  On 11/22/83, BPD showed Student #2 picture Group #2. Student #2 identified the picture of Michael Willis, but said that Michael Willis was not involved in the crime[21].  On 11/22/83, after midnight, BPD returned to Student #2's house and showed them picture Group #1 again.  There was no identification made. On 11/23/83, BPD patrol picked Student #2 up along with the other boys and took them down to Homicide[22].  Student #2 identified all 3 Defendants in photos. In Court, Student #2 identified all 3 Defendants.

3.   Detective Donald Kincaid Testimony

Detective Kincaid testified during pre-trial motions, the State's case in chief and he was called by the Defense.  Detective Kincaid provided largely the same information as the students relating to the photo identification procedures, arrest, and SSW. He confirmed that he had not taken notes during the interviews.

4.   Assistant Medical Examiner Korell – Summary

According to AME Korell, due to the nature of the Victim's GSW (shot in the neck, bullet went through Victim's finger/left hand), blood loss would have begun immediately.  The blood stains on the floor[23] would be consistent with blood loss from the wounds the Victim sustained.

---

[21] The Defense elicited this identification of Michael Willis during cross examination.
[22] Student #2's parents were not present nor notified.
[23] Tech John French took pictures and testified to blood stains found on the floor of the C/D Hallway.

NK DEF 006749

5. SSW Executed at Chestnut's House – Summary

On 11/24/83, 1:05AM, Defendant Chestnut was arrested. A search was conducted and a Georgetown jacket was recovered from Chestnut's bedroom closet.

D. Summary of Defense Case

1. Detective Kincaid. He testified as follows. He visited HPJHS approximately 5-6 times. The view from the hallway that intersects A/B and C/D contains a grate[24]. One could see through the grate, though the view is not clear.

2. Defense Student #1. He testified that he was with the Victim in science class. He stated that before science class, he saw two unknown boys ---neither being the Defendants --- attempting to rob the Victim of his jacket.

3. Defense Student #2. He testified that he was in science class with Victim, et al. He walked out at the same time as Student #3. The Defendants did not run by them and Student #3 never mentioned having just seen the murder.

4. Defense Student #3. He was with the Victim in science class. Before science class, he saw two unknown boys arguing with the Victim. In science class, the Victim told him that the two unknown boys from the hallway had tried to take his jacket. The two unknown persons were not the Defendants. He further stated that the Defendants are all known to him.

5. Defendant Chestnut's mother. She testified that she bought Chestnut the Georgetown jacket and another NBA jacket from Cavalier's Men's Shop about 3 weeks before the murder. She had a receipt which she showed the

---

[24] Both in 1984 and now, Student #4 says he/she was behind this grate – both in 1984 and now. It should be noted the subsequent investigation reveals it would have been impossible to view the murder from this position.

NK DEF 006750

Detective when her son was arrested.  The day after Chestnut's arrest, she sent her other son to the store for an authentication letter, which was provided.[25]

6.  Witness JS.  Witness JS testified as follows.  He was an employee at Cavalier Men's Shop and confirmed selling two NBA starter jackets on 11/3/83.  He authenticated Chestnut's receipt and authentication letter.

7.  Witness GP.  Witness GP was an OPD investigator.  He testified that he attempted to interview Students #1 and #3 on 3/8/84.  Student #3 told him that BPD showed him pictures and that the Defendants were not who he saw the day of the shooting. Student #1 said his statement is the same as Student #3's and Detective Kincaid instructed them not to speak.

E.  State Rebuttal

Teacher #3.  Teacher #3 was called and testified that Defense Student #2 was absent on 11/18/83, according to the attendance roster.

F.  Closings (5/28/84)

1.  State's Opening Close. The trial prosecutor highlighted: 1) there were three teachers who saw the defendants trespassing in the school before the murder; 2) there were 4 eyewitnesses who identified Chestnut as the Shooter, Watkins as holding the Victim and Stewart as pulling the jacket; 3) any inconsistencies in the States' witnesses stories were caused by them being afraid; and 4) seven different people[26] are putting the three Defendants in this.

2.  Stewart Closing.  The highlights were as follows: 1) the Defendants did not commit the murder; 2) the teachers put the Defendants at HPJHS between

---

[25] In a Baltimore Sun article written on November 26, 1983, following the bail review, Sarah Chestnut told reporters in front of Western District that she had a receipt for the jacket.

NK DEF 006751

12:30-12:50pm, yet there is no denial they were there; 3) no one testified that the Defendants would be able to materialize back in the school after security locked the doors[27]; 4) Student #4 could provide no details about the incident and could not have seen the incident[28]; 5) there is an alternative suspect, Michael Willis[29]; and 6) Chestnut owned the recovered jacket.

3.   Watkins Closing.  The highlight was that the witnesses were inconsistent.

4.   Chestnut Closing.  The highlights were:  1) the jacket in evidence is Chestnut's not the Victim's; 2) the Defendants weren't at HPJHS; 3) the Defendants were at HPJHS, but not involved; and 4) lack of motive.

5.   State's Closing Close.  The highlights were: 1) the Defendants had time to return to the school after being kicked out; 2) Witness #4 saw everything through the grate; 3) there were no other suspects[30]; 4) Michael Willis was not a suspect; 5) Watkins having a scar should have been brought out by Defense[31]; and 6) NBA jackets were expensive and a hot item – they could be sold, so this jacket may have been taken for a friend, but the Defendants had to get rid of it.

The transcript reflects that the end of the Defense case, closing instructions and closings occurred on May 28, 1984, which was Memorial Day.

---

[26] The number of witnesses was emphasized heavily.

[27] This is accurate.  There was no evidence elicited explaining how the Defendants could have regained entry into the school after security locked the doors.  There was also no evidence presented that contradicted that security, indeed, did lock the doors upon his reentry into the school.  It should be noted, however, that anyone *already in* the school would still have been able to leave.

[28] This is also accurate.  Student #4 was unable to answer any questions that took them beyond 3-4 facts.  Further, there is no dispute that Student #4 was in another hallway behind a grate.  We have located Student #4's position within the school.  In the light most favorable to the testimony provided, it would have been impossible to see the incident from Student #4's position.

[29] This was not explored in great detail during closing.

[30] This was categorically incorrect.  The Lotus Notes reflect leads indicating that Michael Willis was the Shooter.  This information was known to the prosecutor as the transcript reflects same Lotus Notes were enclosed in an envelope.

13

NK DEF 006752

Closings concluded at 6:20pm. Defense Counsel asked the Court to advise the jury whether they would get dinner and whether they would be sequestered to a hotel. Both requests were denied. The record does not reflect what ultimately came of the dinner request.

Jury deliberations began at 6:29pm. At 9:10pm, the jury sent out a question about the verdict sheet. At 9:29pm, the jury rendered their verdict on the record. Each Defendant was convicted of felony murder and HGCOV. A PSI was ordered in each case.

G. Disposition

1. Chestnut. The attorney had a scheduling conflict, so Chestnut's disposition went ahead of Stewart's and Watkin's.

   a. Motion for New Trial. This motion was done in writing and supplemented on the record. The supplemental argument raised the seating of Juror #9 as being improper.[32]
   b. Sentencing. Chestnut has mitigation.
   c. Allocution. None.

2. Watkins.

   a. Motion for New Trial. The Defense argued mainly: 1) the prosecutor intentionally sat Juror #9; 2) there existed substantial Brady violations, exculpatory evidence was withheld; 3) the prosecutor came close to commenting on Defendant not testifying during closings.

---

[31] This led to an objection, motion for mistrial, and stern admonishment from the Court. Ultimately, the mistrial was denied because the prosecutor stopped just short of commenting on the Defendant having not testified.

14

NK DEF 006753

       i.   State response.  The prosecutor argued mainly: 1) Juror #9 said he could be fair, Defense should have used their strikes; 2) the State turned over witness statements before they testified; 3) other contentions were harmless; and 4) the Defense opened the door during its close by talking about Defendant's scar.

   b.  Sentencing.  Watkins had mitigation.

   c.  Allocution.  Watkins stated he was wrong for being in the school when he was not supposed to be; however, he insisted, "didn't none of us do this crime[33]."

3.  Stewart.

   a.  Motion for New Trial.  Defense incorporated arguments of co-counsel and submitted.

   b.  Sentencing.  Stewart had mitigation.

   c.  Allocution.  Defendant denied involvement stating, "[BPD/ASA] didn't get the person who did it, we know we didn't do it."[34]

## IV. CIP INVESTIGATION OVERVIEW

*Standard of Review*

The following standard guides the CIU review of this case.  Has the newly reviewed or discovered evidence negated or mitigated the inculpating evidence known prior to trial and/or presented at trial to such an extent that it would suggest affirmatively that the Defendants are factually innocent of the crime.  Here, the exculpating evidence discovered during our re-investigation suggest that the Defendants are each factually

---

[32] Before trial, Juror #9 stated that he saw BPD recover the jacket on TV.  He advised that the Defendant whose house the jacket was found in was guilty.
[33] T. 7.10.84 p. 28
[34] T. 7.10.84 p. 29

15

NK DEF 006754

innocent. Further, there is compelling evidence to suggest that, at best, the police investigation failed to adequately explore angles that deviated away from the Defendants and there appears to have been minimal prosecutorial vetting of the police investigation. At worst, it is possible that there was purposeful suppression of evidence that would derail a conviction against Defendants Chestnut, Watkins and Stewart. What is evidenced throughout the transcript is that the trial prosecutor downplayed the significance of exculpating evidence and repeatedly appears to mislead the Court about both the existence of an alternative suspect and same exculpating evidence. What can also be inferred from the transcript was that the prosecutor had access to the Lotus Notes which indicate that BPD received multiple leads suggesting that Michael Willis was the Shooter.

In sum, there exists strong support that: A) Defendants Chestnut, Watkins, and Stewart were not present in HPJHS when the murder occurred which is supported by: 1) the student identifications of the three Defendants, which were the basis for the State's case, are nullified; and 2) additional witnesses corroborate the lack of Defendants' culpability; and B) the Defendants were not afforded access to a fair trial as a result of: 1) minimal compliance with discovery obligations relating to Brady material, 2) apparent concealment of exculpating evidence, 3) suggestive pre-trial identification procedures, and 4) coercive trial preparation of the State's witnesses.

## A. Defendants Chestnut, Watkins and Stewart were not present in HPJHS when the murder occurred.

*Evidence Supports that Students #1, #2, #3, and #4 were coerced and coached – all have recanted their trial testimony thereby rendering their identifications effectively nullified.*

There exists support that the *pre-arrest* identifications made by all of the Students were obtained via coercion. During the *pre-trial* period, there is evidence to support that these witnesses were extensively coached to ensure their testimony matched.

16

NK DEF 006755

Trial transcripts reveal these witnesses had a difficult time providing any details that extended beyond the few facts that they were coached to say. To follow, each witness will be analyzed. First, the discrepancies that existed during the trial period will be highlighted. Second, the present day recantations will be summarized.

    1.   Student #4 (13Y/14Y[35])

*Discrepancies*
At trial, Student #4 identified all 3 Defendants. Pre-trial, on 11/23/83, Student #4 picked out all 3 Defendants contained in picture Group #1 testifying to same subsequently.

    a.   Pre-trial Investigation. Student #4 was interviewed on 11/23/83 at HPJHS in the conference room by BPD. According to Lotus Notes, Student #4 picked the 3 Defendants out of picture Group #1. There are no records indicating what the context of the identification was[36]. However, Student #4 would later testify that his/her identifications were prompted by Detectives asking, "can you pick out the ones you saw". Student #4 would further testify that he/she did not observe the detectives taking any notes. Detective Kincaid would later testify that he took no notes during interviews. Student #4's 11/23/83 identifications were made at HPJHS ahead of identifications that would be made by Student #2, Student #3 and Student #1 later the same day[37].

    b.   Grand Jury. On 12/1/83, Student #4 testified before the grand jury and stated that she/he did not know who fired the shot.

---

[35] At the time of the murder and trial.
[36] There were no notes taken to indicate specifically what she/he was identifying the persons to have done. Nonetheless, during trial, Student #4 testified that Chestnut shot, Watkins and Stewart pulled jacket/held Victim.

NK DEF 006756

c.  Pre-Trial Motions. On 5/2/84, Student #4 testified during pre-
    trial motions. In short, he/she testified that she/he had math
    before walking to typing class with friends, Individual C
    ("Individual C") and Individual D ("Individual D"). While in
    the hallway, she/he looked down through the connector
    hallway, through the grate and saw the Defendants. He/She
    knew of the 3 Defendants, but did not 'know them know them'.
    He/She further testified that he/she was not in the C/D
    hallway[38] as he/she was on the other side of the grate. Lastly,
    he/she testified that he/she was in math class until around 1pm
    and she/he saw the Defendants before 1pm[39].

d.  State's Case in Chief. On 5/15/84, during the State's case in
    chief, Student #4 testified that he/she was in math class[40] from
    12:20pm-1:10pm. After math class, Student #4, Individual C
    and Individual D walked to their typing class in the B unit and
    put their books down. After dropping off the books, Student
    #4 looked through the grate, down the hallway and saw the
    Victim, Chestnut, Watkins and Stewart. He/she heard Stewart
    and Watkins demanding Victim's jacket. She/he testified that
    she/he saw Chestnut pull the trigger and heard the gun shot.
    On cross, Student #4 was confronted with her/his following
    prior statements:

---

[37] Student #4's identification was used as a foundation for the case.
[38] The murder occurred in the C/D Hallway.
[39] This conflicts with the time line that was accepted at trial as the murder occurred at 1:15pm. However, this sighting by Student #4 makes sense given present day information that he/she and Individual C were skipping math class and saw the boys at some point during that class period - class was from 12:20pm-1:10pm.
[40] It should be noted that the testimony of a teacher puts Student #4, Individual C and Individual D in math during that time period.

NK DEF 006757

1) 11/23/83 statement to BPD when she/he said they never saw anyone grab anyone, there were 2 guns, and he/she did not know whether Chestnut had a gun; and

2) 12/1/83 GJ testimony in which she/he said she/he saw "them" forcing Victim's jacket and heard the gunshot, but didn't know who shot him or where he was shot;

It is notable that, Student #4 was unable to provide an explanation for these conflicts. Also, to the following questions asking for details, Student #4 answered "I don't know" or "I can't remember":

- What did the 4th boy look like?
- What Chestnut was wearing?
- What was happening with the Victim?
- How long she saw the group for?
- How long the hall was?
- What the distance was between her and the boys?
- Whether the boys were far away?
- What Watkins was wearing?
- What Stewart was wearing?
- Whether BPD asked her who had a gun?
- Amount of time she spent observing the incident?
- What *anyone* she saw was wearing?
- Whether Chestnut had a gun?
- Where the Victim was in the hallway?
- Whether she saw blood?
- What the Victim's injury was?
- Her GJ testimony?

Both in 1983 and 2019, witness Student #4 said they were not in the C/D Hallway when the murder occurred. Student #4 testified that

19

she/he was on the other side of the grate. While it would have been possible to see through the grate, the murder occurred about 25 feet down the hallway and 8-10 feet around the corner to the left from Student #4's testified-to location. Present day, Student #4 says she/he, in fact, did not see the murder.

In August, the CIP team traveled to HPJHS with Student #2. Once there, Student #2 led us from the science class to where the shooting occurred[41]. Student #2 said the only people present during the murder were him/her, Student #1, Victim and the Shooter. There was only one Shooter. It was confirmed that there was a grate in the connector hallway, which is perpendicular to C/D Hallway. Student #2 is adamant Student #4 was not present in the C/D Hallway and could not have seen what was claimed.[42]

On 9/13/19, the CIP team traveled to western Maryland to interview Student #1.[43] Student #1 is adamant that Student #4 was not in the C/D Hallway and could not have seen the incident from the position she claimed to be in. Witness Student #1 describes many arguments with BPD and the trial prosecutor during which Student #1 stressed this point back in 1983-1984.

In August 2019, with the assistance of police in South Carolina, Individual C was located and provided a phone interview[44]. Individual C advised he/she was with Student #4 cutting class and neither could see the murder.

---

[41] Unbeknownst to Student #2, on 11/18/83, there were blood stains on the floor which were photographed by Tech French. The position of the blood stains testified to at trial corroborate the murder location indicated by Witness Student #2 present day in 2019.
[42] Student #2's statement will be detailed later. Inv. Ellis and Chief Lipscomb were present during all interviews.
[43] Student #1's statement will be detailed later.
[44] This interview will be detailed later.

NK DEF 006759

In September 2019, the CIP Team interviewed Student #3[45].  They advised there were only boys, no girls, in the C/D Hallway when the incident occurred.

Our belief is that Student #4 and friends were either cutting class or had snuck out of class early and did not see the murder, but observed parts of the period leading up to the incident and following the incident. As the 3 Defendants were in fact at the school, Student #4 likely did see them at some point.  Indeed, the math teacher testified to seeing the 3 Defendants in math class[46] at around 12:30pm.  She testified that Watkins walked into the back of her classroom.  She said she told Watkins to leave, then went out into the hallway finding Chestnut and Stewart there.  She told all 3 to leave and continued to the stairwell area, grabbing the unit principal who was heading up the stairwell. She directed the principal toward the direction of the 3 Defendants who had run down the C/D hallway.  She testified that she returned to her classroom to resume teaching at around 12:40pm.  It is entirely probable that Student #4 et al. left class during the commotion.

*Recantation*

Student #4 was interviewed present day by the CIP team.  They advised that, while they remembered testifying at trial, they do not remember "what was said back then".  They further do not remember being shown pictures or picking anybody out.  Student #4 provided that she/he was in school on 11/18/83.  While in school, he/she saw three boys talking to the Victim.  She/he knew one guy talking to the Victim. She/he did not hear a gunshot and did not see anybody shoot a gun.  She/he did

---

[45] Student #3's interview is detailed later.
[46] This is the math class that Student #4, Individual C and Individual D were in.

NK DEF 006760

not see the Victim in a struggle and did not see the murder.  She/he did not know the Defendants on trial[47].

Following the murder, Student #4 remembers seeing the Victim come into the cafeteria by himself.  She/he remembers that "chaos and confusion" ensued.  She/he did not know the Victim had been shot until she/he saw him in the cafeteria.  Student #4 and friends were already seated in the cafeteria when the Victim came in[48].

Student #4 knows Student #3.  Student #4 remembers seeing Student #3 seated in the cafeteria as well -- ahead of the Victim coming in.

In reflecting on the pre-trial period, Student #4 remembers attending so many meetings, she/he did not know "who was who".

2.   Student #1 (16Y[49])

*Discrepancies*

a.   Pre-Trial Investigation. On 11/18/83, Student #1 was interviewed about one hour following the homicide.  During same interview, Student #1 advised she/he did not know who the suspects were and she/he had not seen them before.  He/She indicated that there was one suspect who approached the Victim and shot him.  Student #1 further advised that he/she saw 2 others who did not approach the Victim but did appear to

---

[47] Chestnut, Watkins and Stewart were present at the school and were in the D unit classroom area until they were told to leave at around 12:45pm.  While the Chestnut group was there, there is no dispute that they were being silly and disruptive.
[48] This timing makes it impossible for Student #4 to have seen the murder as there would not have been enough time to see the murder, then be in the cafeteria in time to see the Victim come in. The shooting occurred moments before the Victim came into the cafeteria.
[49] At the time.

22

be with the Shooter.  Student #1 described the Shooter as slim
and wearing a gray hoody.

On 11/23/83, Student #1 was interviewed at BPD[50].  He/She
identified the 3 Defendants in picture Group #1.

b.  State's Case in Chief.  On 5/21/84, Student #1 testified during
the State's case in chief.  She/He identified all 3 Defendants
saying they knew each of them -- Chestnut had the gun,
Stewart pulled the NBA Jacket from the Victim and Watkins
grabbed the Victim's neck.  When asked on cross about the
inconsistency, he/she stated they lied to BPD on 11/18/83 and
there were 3 participants, not 1, no one had on a gray hoody,
and their description was a lie.  Student #1 testified that
Student #3 was not present in the hallway.

*Recantation*

   The CIP team conducted a present day interview of Student
#1.  He/She stated that did not see the face of the Shooter and did
not see the Victim get shot.  Student #1 further indicated as
follows.

   Student #1, Student #2, and the Victim left class together.
Student #1 looked back and saw 3 guys – the Shooter was right
behind Victim, two unknown persons were down the hall.  Student
#1, Student #2 and the Victim began running.  Student #1 heard the
gun shot, but thought the Shooter shot the gun to scare them.
Student #1 described school security at the time as being low:
doors were left unlocked and nobody was monitoring the hallways.

---

[50] Student #1 would later testify that BPD was "mad", saying Student #1 knew who did it.  He/She would
further testify that the statement he/she made the day of the homicide was only part true.

NK DEF 006762

Following the incident, Student #1 indicated that BPD showed them pictures. He/She said, "Student #4 claimed to see the incident, but they were in the other hallway [A/B hallway]". According to Student #1, there were gates up between the hallways, Student #4 could not have seen anything.

Student #1 advised that Student #4 made an ID of the suspects and BPD wanted Student #1 and Student #2 to make an ID also to match their story to Student #4's, but Student #1 and Student #2 refused --resulting in problems. Student #1 described ongoing pressure by BPD to make a statement that matched Student #4's. She/He felt that Student #4's statement was given more weight[51] because it matched what BPD thought happened. Student #1 could not understand "how Student #4 had a better understanding of what happened than Student #1 and Student #2 when they were standing right there" and "Student #4 was not there". Student #1 knew that Student #4 could not have seen the incident from where Student #4 claimed to be in 1984.

Student #1 indicated that "time and place" of the murder were the only things they and BPD agreed on. Student #1 described being taken out of school numerous times, being "pressured" and "coerced" into "seeing things the police's way." Student #1 stated they were "treated like criminals" when they would not change their stories. Police told them, "we need y'all". Police "told them [Student #1 and Student #2] what they saw[52]" not the other way around.

---

[51] Both Student #1 and Student #2 describe repeatedly to us that they were made to think Student #4's statement was better than theirs by BPD and ASA throughout the pendency of the case.

NK DEF 006763

Throughout the pendency of the case, he was taken to BPD many times for witness meetings. Police would come get him without his parents.

The first time when Student #1 and Student #2 were taken to Homicide (11/23/83), their parents were called after they had been interviewed. Student #1 remembers hearing his mother outside the interview area upset and demanding to know why police brought Student #1 to BPD without her permission. Student #1 heard someone say "they did not want parents to question the boys about what they saw because it was an ongoing investigation." Student #1 saw Student #4 at the station and he remembered thinking Student #4 could not have seen anything from that opposite hallway. Student #1 said the detective told Student #2 and Student #1 what Student #4 said.

Student #1 indicated that she/he missed so much school that they were failing by the end of the year. Student #1 described a continuing spiral downward following having seen his friend murdered, then the trial and then having trouble in school.[53] Student #1 states they did not see who shot the Victim nor the 2 other guys with the Shooter.

As with the other witnesses, Student #1 did not appear to realize that there was no one who categorically identified the Defendants. Each witness was being told another witness saw the incident.

---

[52] Student #1 meant that BPD supplied them with the facts to say.
[53] It should be noted that, according to other witnesses, Student #1 was a very good student before this incident. It seems there was no counseling or other intervention provided.

25

3.  Student #3 (15Y[54])

*Discrepancies*

a.  Pre-Trial Identification.  On 11/18/83, Student #3 made a
statement to BPD that he had never seen the Shooter.  Student
#3 indicated seeing two guys in addition to the Shooter.  Photo
identifications were made as follows.

1)  11/21/83 at 5pm, with parents present, Student #3 was
shown picture Group #1 containing the Defendants: no ID.
2)  11/22/83 at 5:15pm, with a guardian present, Student #3
was shown picture Group #2 containing Michael Willis: he
identified Willis as being familiar.
3)  11/22/83 late night, with parents present, Student #3 was
shown picture Group #1 a second time: no ID.

On 11/23/83, Student #3 was brought to Homicide with no
parents and shown Group #1.  Student #3 identified all 3
Defendants.

b.  Pre-Trial Motions.  On 5/4/84, Student #3 testified
during the suppression motion.[55] He identified all 3
Defendants.

c.  State's Case in Chief.  On 5/21/84, Student #3 testified during
the case in chief.  He testified as follows.  He, Student #2,
Student #1 and the Victim walked out of science class together
heading to lunch.  He saw Watkins put his arm around the
Victim's neck, Chestnut got in front of the Victim and

---

[54] At the time.

26

NK DEF 006765

displayed a gun, and Stewart removed Victim's NBA Jacket.
He saw Chestnut fire the gun, shooting the Victim.  Student #3
said Chestnut and his group ran by him.  Chestnut stopped,
grabbed his shirt and said if he said "anything involving the
case[56]" he would get hurt.

It should be noted that Student #1 nor Student #2 in 1983 (nor present day)
put Student #3 in the C/D Hallway where the incident occurred.

*Recantation*

Present day, in September 2019, Student #3 responded to the SAO and
was interviewed. Student #3 indicated he remembered being in class.  He left
class and walked down the C/D hallway, but only got about ¼ of the way because
he dropped or lost something.  He left and then came back to the hallway, but
stayed at the top, close to the classroom because he saw the Victim and Shooter
exchanging words.  Victim was wearing his NBA Jacket.  Victim was "beefing"
with one person, though Student #3 saw two other unknown person nearby.  The
Victim, his 2 friends, and the Shooter were at the other end of the hallway, close
to the end.  The gun went off and everyone froze. Once the gun went off, Student
#3 turned around and ended up in the cafeteria.  He was sitting at a table when he
heard commotion[57], girls screaming; though, he did not see the Victim come into
the cafeteria and did not see the Victim again.

Student #3 advised that from where he was in the C/D Hallway, it would
be "asinine" to say that he could see the faces down the hall.  He could see that
there were faces, but not the details.  When he was shown photos, Student #3 said
he picked out the picture that was familiar to him and the picture "resembled" the

---

[55] This was the subject of a discovery violation motion -- Defense argued that none of the picture displays
were disclosed: 11/21/83, 11/22/83x2, or 11/23/83.
[56] Student #3 used the specific word "case" T. 5/21/84 p. 111

NK DEF 006766

Shooter[58]. He did not know the Defendants. He does not remember how many times he was shown pictures. He was interviewed by himself. Student #3 remembers that all of the State's witnesses were in a room together being "coached on what to say" before the trial.

4. Student #2 (14Y[59])

*Discrepancies*

a. Pre-Trial Identification. On 11/18/83, following the murder, Student #2 gave a statement to the first responding officer. He stated that he, Student #1, Student #3 and Victim left class headed for the cafeteria. A Shooter approached the Victim. There were two unknown boys who appeared to be with the Shooter, but remained back. The Shooter produced a HG and demanded the Victim's jacket. As the Victim was trying to remove the jacket, the Shooter's gun went off. The Shooter and other two ran in an unknown direction[60]. Student #2 was shown pictures as follows:

1) 11/21/83, picture Group #1, including 3 Defendants, parent present: No ID;
2) 11/22/83, picture Group #2, including Michael Willis, parents present: Willis ID'D as someone known to Student #2; and
3) 11/22/83, picture Group #1 for a second time: No ID.

---

[57] This matches Student #4's statement – that Student #3 was sitting in the cafeteria when the Victim came in.
[58] This is picture Group #2, picture of Willis.
[59] At the time.

28

NK DEF 006767

On 11/23/83, Student #2 was taken to Homicide.  His parents were not present.  Student #2 was advised "we have witnesses proving Chestnut, Watkins, and them did it."  Student #2 identified all 3 Defendants in picture Group #1 saying Chestnut had the gun, Stewart was pulling on Victim's jacket, and Watkins grabbed the Victim[61].

b.  Grand Jury.  On 12/1/83, Student #2 testified before the grand jury[62].  To the grand jury, in response to whether he knew the identities of the 3 boys, Student #2 said, "I ain't seen three boys, I just saw the one that came up on us."[63]  Student #2 further testified that he identified "Michael" as the Shooter on 11/22/83 and the Shooter was wearing a gray hoody.

c.  Pre-trial Motions.  On 5/3/84, Student #2 testified.  He said that he left science class, was in the hallway and saw "someone" with a gun upside the Victim's head and someone said, "give me your jacket."  He knew all 3 Defendants from around.  He did not see what any of them were wearing.  He testified to seeing pictures and making no identification.[64]  Student #2 identified all 3 Defendants in Court.

---

[60] The responding officer report from 11/18/83 notes that only 1 person saw the shooting, though the other 2 heard the shot.  This is consistent with Student #2 having seen the shooting and Student #1 and Student #3 having heard it.

[61] There were no notes taken.

[62] There is no transcript of these proceedings.  However, there are direct quotes from the GJ transcripts within the trial transcripts.

[63] T. 5/22/84 p. 74

[64] The ASA objected ahead of Student #2 being asked about viewing pictures from which he/she made no identification.  The ASA advised proffered to the Court, T. 5/3/84 p. 54, "those pictures had nothing to do with the defendants or the case…they are photos of another person who may have been related to another case."  The prosecutor's voice was evidently loud, according to the transcript.  The Defense objected and argued that the prosecutor was trying to coach the witness by talking loudly, which was sustained.  This exchange caused a motion to dismiss, motion for mistrial based on Brady violations and allegations of prosecutorial misconduct.

NK DEF 006768

    d.   State's Case in Chief.  On 5/22/84, Student #2 testified during the case in chief.  He indicated he left science with Student #1, Student #3 and Victim heading toward lunch.  At some point, the 3 Defendants were behind them and the Victim was shot. Student #2 testified that Student #3 was not there.[65]

Student #2 was heavily cross examined as to inconsistencies.  Student #2 said the inconsistencies were because he was scared.

*Recantation*

Student #2 was interviewed by the CIP Team in August and September of 2019.   Student #2 stated that the entire incident and pendency of the trial was a traumatic experience.  He described a frenzied investigation wherein witnesses were coming out of the "woodwork" and he was being questioned repeatedly.  Student #2 reiterated repeatedly that he felt that Student #4's testimony trumped his.  Student #2 stated categorically that his grand jury testimony was accurate and, under intense pressure, he did not tell the truth on the stand during trial.  According to Student #2, there was no way Student #4 could have seen anything unless Student #4 was in the same hallway-- "which they were not".

During the weeks the case was in Court, Student #2 said that the prosecutor accused him of "protecting the defendants and, if he continued with his testimony, he could be charged with perjury or accessory after the fact." Student #2 stated that he knew he "had to stick to what Student #1 testified to, which was the same as Student #4's testimony."

---

[65] Student #2 had not noticed that Student #3 had run back to the classroom.

NK DEF 006769

During his interview, Student #2 repeatedly stated that he "knew the defendants did not do this." Further, Student #2 confirmed that Student #3 was not there and was not threatened.

Student #2 stated unequivocally that "there was one shooter and it was Michael Willis[66]". He did not see anyone else in the hallway; though, there may have been someone peeping around the corner down the hall[67].

Student #2 described that Michael Willis "stalked" Student #2 following the murder and during the trial. After the murder, the first day that Student #2 returned to school, Willis was in the yard and called over making a joke that if anyone tried to take his jacket, give him [Willis] a call. Willis threatened to kill Student #2. Willis was in the courtroom the day Student #2 was set to testify. Willis approached Student #2 in the hallway and said, "they are trying to say I did it."

Student #2 described that the Detective showed pictures to him and said, "we have testimony the guys who did it are in the pictures, but he [Student #2] did not see the real shooter in the pictures."[68] Student #2 said he was the one closest to the Victim when he was shot, he further stated that his grand jury testimony was correct[69].

The CIP team met Student #2 at HPJHS to do a witness walk through of the crime scene. It should be noted that the only significant change to the scene is that the connector hallway between the A/B Hallway and C/D Hallway has been closed off into a storage room.

---

[66] This in fact is supported by Student #2's own identification in picture Group #2, initial statement to BPD on 11/18/83 and his grand jury testimony.
[67] This would be Student #3. Student #3 puts himself as peeking around the corner at the end of the hallway.
[68] Student #2 was referring to picture Group #1 he was shown that contained the 3 co-defendants.

31

Student #2 indicated he has been living with guilt for 38 years and he told his parents the truth.

Based on all of the above information, there is overwhelming support that the identifications of then-juveniles Student #4, Student #1, Student #3 and Student #2 relied upon in this case are now of minimal value.

*Additional Witnesses Corroborate Lack of Defendants' Culpability*

1. Individual C

Individual C was interviewed over the phone by the CIP team.   They advised that they clearly remembered the day of the murder. He/She was with Student #4. The two were cutting class – neither saw the murder because they were not in the hallway.

Individual C's lack of observations were not known to the Defense.  In spite of the Defense arguing at different points that if Individual C was with Student #4 and Individual C did not view the incident, then that information is exculpating, Individual C was not ultimately produced and no statement was provided to Defense.

2. Individual A

Individual A was with the 3 Defendants at HPJHS before the shooting occurred. In October 2019, the CIP team interviewed Individual A.  He indicated as follows.

He, Individual B, Chestnut, Watkins and Stewart went to HPJHS together.  They were in B Unit when security kicked them out of the school, they exited on the A unit side near Harlem Avenue.  Once kicked out, they were hanging out on the basketball

---

[69] According to the trial transcript, Student #2 told the grand jury that there was only one shooter.  Further, Student #2 testified that he identified "Michael" in photos.

NK DEF 006771

court when security came upon them.  The Security Officer told the group that they needed to go.  The group left and did not return.  Individual A advised that they were not in the school at the time of the murder.  After leaving the school, they learned that the Victim had been killed.

Following the murder, the Victim's brother said on multiple occasions that Michael Willis killed his brother.

3.   Individual B

In October 2019, the CIP team interviewed Individual B via telephone.  His foremost memory of this event was "being treated badly by police".  He further provided that he was placed in a room and the police were "telling him what happened" instead of him telling what he knew.  Finally, Individual B indicated that police "tried to get him to sign a statement that he didn't make", which he refused.  As to the incident, Individual B relayed the following information.

Individuals A, B, Watkins, Chestnut and Stewart were at HPJHS the day of the murder.  Before the murder, they were escorted out of the school by security.  They were in the neighborhood when they learned the Victim had been shot.  They were not in the school at the time of the murder.

He was friends with the Victim.  He used to play with the Victim – they wrestled, etc.  Regarding the murder, he states, "everyone knows Michael Willis shot Dewitt".

4.   Individual E

This witness was named in the Lotus Notes which were not turned over to Defense.  In 1983, the Lotus Notes reflect that Individual E "said that Michael Willis killed a boy named Dewitt Duckett down at HPJHS and took the Georgetown jacket and wore the jacket to the skating rink…on Friday night [night of the murder]".  Further Lotus

33

NK DEF 006772

Notes reflect that Individual E was "at HPJHS with Michael Willis when police responded to the shooting call.  Michael Willis had a gun and threw the gun down and ran away with some other boys."

The CIP team met with Individual E at her home.  Individual E remembered the incident and confirmed seeing Michael Willis the night of the murder in the NBA Jacket at the Shake and Bake.

B.      **The Defendants were not Afforded Access to a Fair Trial**

*There was minimal compliance with discovery obligations relating to Brady material.*

The Defense went to trial having received minimal discovery[70].  On 5/2/84, the Defense proffered that they received: the SOPC, arrest warrant, SSW and offense reports.[71] Regarding to the discovery that they received, in open court, the Defense complained:

> "…since it is a homicide case and since it is a CID homicide case, almost all of the reports in the case are interdepartmental reports, all of the information regarding the investigation, how the Defendants were arrested, what evidence, what other suspects there might have been, anything, the progress of the investigation are all in these reports which we have no access to…it is the intra-departmental reports which give the gist of the entire case"[72].

Further, the Defense asserted that:

---

[70] This may be the result of the State's statutory discovery obligations being narrowly construed during that time period.

[71] It appears that only select offense reports were disclosed.  Between 5/2/84 and 5/28/84, the Defense made repeated objections and motions for mistrial based on alleged discovery violations.  In the BPD file, there exist offense reports that name additional tips and leads; however, the Defense made no mention of these tips/leads during any of their objections or motions.  This suggests that they did not have the documents.

NK DEF 006773

"…what [the Defense] is saying to the Court is that the State has done almost everything possible, I guess with regard to strategy and trial tactics, to insure that there is going to be surprise.  Not only by denying, concealing evidence, but from preventing the Defendant from at least talking to the witnesses and seeing what the testimony might be."[73]

The Defense detailed to the Court their attempts to speak with the known witnesses ahead of trial.  The Defense described that they sent letters to the known witnesses and, in response, the trial prosecutor called the Defense and informed that the witnesses would not talk.

The discovery provided the Defense falls substantially short of present day standards, not only pursuant to interpretation of relevant statutes, rules and case law, but, internally, pursuant to our SAO open file policy.  Today, in a murder case, providing such incomplete discovery would be unacceptable internally.   In the instant case, there was no investigatory information provided at any point.

### Apparent concealment of exculpating evidence

There is evidence to support the Defense's contentions of concealment of exculpatory evidence. The Defense was unaware of Lotus Notes and the additional offense reports which, in fact, raised an alternative suspect.  Additionally, a review of transcripts and interviews conducted present day reveal seeming attempts to conceal exculpating evidence.  The strongest support for this is in the failure to disclose the Lotus Notes.  At trial, the investigatory reports and related documents, Lotus Notes, that the Defense referred to as having not received, in fact, do contain the following information:

> anonymous calls identified Michael Willis as the Shooter;

---

[72] T. 5/2/84 p. 4
[73] T. 5/2/84 p. 8-9

NK DEF 006774

      · Michael Willis was seen running from the scene while discarding a HG;

      · Michael Willis was observed the night of the murder and admitted to having killed the Victim; and

      · Michael Willis was observed wearing the Victim's NBA Jacket to Shake and Bake the night of the murder.

On the record, in Court, relating to Lotus Notes, the following ensued at the close of the State's case:

> "DEFENSE: Can I do some housekeeping with respect to the case? That specifically would be, the record should reflect that the detective, Detective Kincaid, testified as a State's witness in this case. At the conclusion of direct testimony, I inquired whether or not he had prepared reports which he authored pursuant to what he had observed and what he had heard during the course of this investigation…I asked the State to produce these written reports which request was denied by the State, ultimately supported by the Court[74]. For the purposes of appellate review, the State has produced these written reports of Detective Kincaid which I have not been privy to…
>
> ASA: I gave it to the Clerk.
>
> COURT: Already sealed and in the file.
>
> DEFENSE:…the exhibit identified white envelope, bearing the logo of the Police Department of Baltimore 'police emergency only'…sealed envelope entered by [ASA], for appellate purposes only, not to be opened for any other reason…"[75]

These Lotus Notes were sealed in same envelope and forwarded to the

---

[74] Based on the trial prosecutor's proffers in the transcripts, it is highly likely that the Court was not aware of the contents of the Lotus Notes.

NK DEF 006775

OAG.   We obtained the BPD file and it did not contain these investigative Lotus Notes. There is no indication that these Lotus Notes were disclosed to the Defense at any point between the arrests of the Defendants on 11/24/83 and 6/7/18 when the Lotus Notes were sent to Chestnut in response to his MPIA request.

Given that the record is clear that the trial prosecutor had possession of these Lotus Notes, it is through that lens that an analysis of the transcripts suggests concealment of exculpating evidence.  During trial, the prosecutor repeatedly proffered that there was no evidence to suggest Willis was a suspect and that the Defense had all exculpating evidence.  This is just not the case.

The Defense did not have any of the investigative Lotus Notes nor a complete set of offense reports.  The Defense did not learn that Student #3 and Student #2 had failed to identify the Defendants, twice, until pre-trial motions.

On the stand, when witness testimony came near mentioning the negative arrays or Michael Willis, the prosecutor adamantly objected in an apparent attempt to prevent the existence of the negative arrays and Michael Willis from coming to light.  An illustrative example may be found in the following exchange which occurred during pre-trial motions:

> "ASA: the State will proffer the photographs [Kincaid] showed had absolutely nothing to do with the three Defendants.  They weren't in that group...I'm proffering, the State, as an officer of the Court, is saying that these photographs have nothing to do with the photographic identification of those three individuals[76]."

Subsequent testimony provided that the 3 Defendants were in fact in this photo Group #1 from which there was no identification made.

---

[75] T. 5/25/84 p. 8-9
[76] T. 5/3/84 p. 51-53

NK DEF 006776

Regarding photo Group #2, which included Michael Willis and which was shown to Student #2, the following transpired in Court:

> "Court: My indication is [Student #2] would not say that because apparently someone was picked out. That is the interference.
> ASA: Picked out but absolutely irrelevant to the people who committed the crime[77]."

Subsequent testimony provided that Michael Willis was in this photo Group #2 that was shown to Student #2. When pressed about the identification of Michael Willis, Student #2 and Kincaid testified that Student #2 picked out Willis, but Student #2 said Willis was not involved.

Upon the detective testifying to the negative arrays and the picking out of Michael Willis, the prosecutor moved to strike Kincaid's testimony in its entirety because it was "different". The Court denied by reminding the trial prosecutor that that is the nature of cross examination.

It is noteworthy that both Student #2 and Student #3[78] only picked out Michael Willis's picture in the photos shown to them over the course of three sessions between 11/21/83-11/22/83, but, again, according to testimony, Willis was identified only as someone Student #2 and Student #3 knew from the neighborhood.

Curiously, during the State's case in chief, when Student #2 was asked on cross about Michael Willis's picture, the following ensued:

---

[77] T. 5/3/84 p. 59
[78] Present day, as stated earlier, Student #3 states that the picture he identified "resembled" the Shooter. He contends he could not clearly make out faces from where he was.

38

NK DEF 006777

"DEF ATTY: …I'm going to ask you, are these the photographs [photo Group #2 shown to Student #2 on 11/22/83], you can lay them out any way you want, that the detective showed you on the 22nd at your house?
STUDENT #2: Yes.
DEF ATTY: Okay.  And in response to the detective's question about whether you could identify from these photographs anyone who you saw in the hallway when [Victim] was shot, who was involved in the shooting, which picture did you pick out?
Student #2: Michael[79]."[80]

Lastly, it should be noted that the 3 Defendants were known to Student #2 and Student #3 yet they were not identified by Student #2 and Student #3, even in the sense of 'known from the neighborhood' until they were interviewed on 11/23/83.

### *Suggestive pre-trial identification procedures*

A review of the transcripts and current statements evidence a pre-trial interview strategy that was suggestive.  Here, police told *each* juvenile witness that they had witnesses who had identified the suspects and who told them what happened, but there were no such witnesses.[81]

Student #2, Student #1, Student #3 were told Student #4 witnessed everything and she/he identified the suspects.  Student #4 testified that BPD told her/him that they already knew who the suspects were and they wanted her/him to pick out in photos who she/he saw at the school that day.  There were no notes taken of this interview.  Student #4 testified that BPD prepared a written statement attributed to him/her that she/he did not read before signing.  Likewise, Student #4 was told that BPD knew who did it.

---

[79] This was the picture of Michael Willis.
[80] T. 5.22.19 p. 75
[81] As an isolated tactic, this would not be concerning; however, in conjunction with all of the factors in play here, this is problematic.

NK DEF 006778

In fact, none of the Defendants are named as involved by anyone in the Lotus Notes. As to the Defendants, they were named in Lotus Notes as having been trespassing at the school that day. There are notes that Student #4 picked the Defendants out in photos, though there is no mention of why they were identified, i.e. there is no statement saying Student #4 identified Chestnut as having pulled out a gun, for example. Further, there are no further notes explaining the steps taken to get from the responding officer's report of one Shooter to the arrests of the three Defendants. This is curious as Michael Willis is the only person in the Lotus Notes as that was named categorically as being the Shooter.

By the time 11/23/83 arrives and the detective interviews Student #4/Student #2/Student #3/Student #1, there are two negative arrays of the Defendants and a positive array of Willis. According to the transcripts, Detective Kincaid "sternly[82]" interviewed Student #3, Student #1 and Student #2, telling Student #2: "we have witnesses proving that Chestnut, Watkins and them did it."[83]

### Coercive trial preparation of the State's witnesses

There appear to have been multiple, group trial preparation meetings led by the trial prosecutor. The existence of these meetings can be substantiated as they were mentioned at points in the transcript and in present day interviews. Present day, each State's witness: Student #4, Student #1, Student #3 and Student #2 - all told us they attended multiple group meetings to review and "match"[84] their testimony. During their separate 2019 interviews, Student #2 and Student #1 advise that they were pulled into multiple meetings, together, to review what they were going to say.

In 2019, Student #1 describes the meetings as "coercive". Student #1 described to us that the "only thing he and BPD could agree on was the time and place of the murder."

---

[82] Kincaid testified that he "wasn't going to play around any longer", T. 5/4/84 p. 108
[83] According to Student #2's pre-trial testimony, see T. 5.3.84 p. 148
[84] This precise word was used by Student #1 and Student #2.

NK DEF 006779

In 2019, Student #2 describes multiple meetings as well.  He described a feeling of letting the prosecutor down if he didn't match his testimony up with the rest of the group.

In 2019, Student #3 and Student #4 also advise they attended several group pre-trial meetings.

It should be noted that, aside from Student #1, none of the witnesses seem to realize that group meetings to match testimony together are problematic.

*Pre-trial Publicity and the NBA Jacket*

Juror #9.  An issue with Juror #9 is worth a mention.  Pre-trial, recovery of the Georgetown jacket from Chestnut's house was broadcast on television.  On 5/14/84, once the jury was sworn, but ahead of opening instructions, Defense raised a motion to strike the individual seated as Juror #9.  Defense argued to strike Juror #9 based on the following.

During jury selection, Juror #9[85] stated that he saw in the newspaper and on television that BPD announced recovery of the Georgetown jacket from "one of the defendant's homes".  In response to questions about whether he could be fair in light of those observations, Juror #9 responded on two occasions that he believed the boy who lived in the home where the jacket was recovered was guilty.  Defense's motion to strike this juror was denied.

Recovered NBA Jacket was Chestnut's.  The evidence does not support that the jacket recovered from Chestnut's closet was the Victim's.  On 11/24/83, when Chestnut was being arrested, his mother produced a receipt for the Georgetown jacket to Detective Kincaid.  This was not in dispute.  Media coverage of the bail review included a statement made by Ms. Chestnut to reporters that she had the

---

[85] T. 5/15/84 p. 30-31

NK DEF 006780

receipt for her son's jacket.  This was not in dispute.  At trial, an employee from Cavalier's Men's Shop authenticated the receipt.

However, what was not disclosed were observations made of Michael Willis purportedly wearing the Victim's NBA Jacket the night of the murder.

The above demonstrate that the Defendants were not afforded a fair trial based on: the failure to disclose exculpating discovery, concealment of exculpating evidence, seemingly coercive pre-trial identifications followed by unduly suggestive and coercive witness trial preparation.

## V.  **DEFENDANT'S STATEMENTS**

1. *Chestnut.  Co-Defendant Chestnut has maintained that he was not present at the murder and did not kill the Victim since the first record of his being asked about the incident, Saturday 11/19/83.*

On 11/19/83, BPD notes that Chestnut was observed with Watkins, Stewart and others in the neighborhood.  Chestnut was wearing his Georgetown jacket that day.  All 3 boys were picked up and taken to Homicide, questioned, photographed and released. There were no notes taken of this encounter.  All 3 co-defendants advise they told BPD that day they were not involved.

The evening that Chestnut was arrested, 1:05am 11/24/83, Chestnut's mother showed Detective Kincaid her receipt for Chestnut's jacket.  Records support that there is no dispute this occurred.  The authenticity of this receipt is well documented in the available records.

42

At trial, Chestnut did not testify and did not allocute.  In November 2019, the CIP team reviewed records of reports with Chestnut over the years.  We found Chestnut has maintained his denial of involvement over the years[86].

In September 2019, the CIP team traveled to DOC and interviewed Defendant Chestnut.  Chestnut indicated the following as to the day of the murder[87].

On 11/18/83, he went to HPJHS with Individuals A, B, Watkins and Stewart.  All were former students of the school and liked seeing old teachers.  The group made their way through the school speaking to teachers, etc and acting silly[88].  The group was told to leave the school and they made their way out of the school, at around 12:35pm, and ended up at the basketball court.  They were there for a few minutes when security came up and told them they needed to leave the school grounds.[89]  Chestnut advised that his group walked to the store, played video games.

At 1:00am, Thanksgiving morning he was arrested.  He heard his brother screaming, BPD guns were drawn on him.  He, Watkins, Stewart were kept at Western District overnight, then taken to city jail.  When BPD came to get him, Chestnut states that someone said, "bring the stars out".

  2.  *Watkins.  Co-Defendant Watkins has maintained that he was not present at the murder and did not kill the Victim since the first record of his being asked about the incident, Saturday 11/19/83.*

---

[86] The denial of involvement is but one circumstance that was considered.  Denial of involvement standing alone would not necessarily be of note.  However, given the totality of circumstances here, the Defendants' consistent denial of involvement bolsters the credibility of their present day assertion of factual innocence.
[87] This is a summary.
[88] Trial testimony corroborates this characterization.  Each teacher that testified to seeing the group that day testified that they were acting: silly, immaturely and non-threatening.
[89] The Security Officer testified to this and he indicated that he observed the group at 12:45pm.  He testified that he told the group to leave and watched them make their way up Gilmor Ave.  He further testified that he finished watching them leave and returned to the school around 1pm at which time he locked all of the entrances.

43

NK DEF 006782

On 11/19/83, BPD notes that Chestnut was observed with Watkins, Stewart and others in the neighborhood.  Chestnut was wearing his Georgetown jacket that day.  All 3 boys were picked up and taken to Homicide, questioned, photographed and released. There were no notes taken of this encounter.  All 3 co-defendants advise they told BPD that day they were not involved. On 11/24/83, Watkins was arrested.

Watkins did not testify at trial.  During allocution on 7/10/84, he stated the following:

"…we were wrong for going in the school which everybody knew me…we got blamed for it.  Didn't none of us do this crime. By putting us behind bars, that isn't getting this crime off the streets"[90]

Indeed, the prosecutor stated to the Court ahead of allocution: "Your honor, I will not go over again the history of why this case is an important case in Baltimore City.  I want to mention two things.  The…indicates that neither Watkins nor Stewart would even admit that they were at the school at the time of this occurrence."[91]

In November 2019, the CIP team reviewed records of reports with Watkins over the years.  We found Watkins has maintained his denial of involvement over the years.[92]

In September 2019, the CIP team traveled to DOC and interviewed Defendant Watkins.  He advised as follows.

On 11/18/83, Watkins met up with the group in the area of Calhoun/Harlem Ave. He was formerly a student at HPJHS, lived across the street and knew every teacher.  He and the group went to the school because Chestnut needed a key from his brother[93].

---

[90] T. 7.10.84 p. 28
[91] T. 7.10.84 p. 27.  It should be noted that Chestnut's transcript reflected the same.
[92] Notably, the CIP team read a record indicating the arresting detective told Watkins, "you have two things against you, you're black and I have a badge".
[93] All 3 co-defendants recall that someone needed something from someone, but they each have a different recollection of the who and the what.

NK DEF 006783

Watkins recalls talking to students and teachers as they made their way through the school. At some point, they were told to leave, so they left. They did not return to HPJHS.

11/19/83, BPD took Watkins and others to Homicide. They asked him if he knew anything about the murder – he said no. Watkins's father was not alerted to this interview. Watkins states that he kept asking Homicide to speak to his father, this request was declined.

On 11/24/83, he was arrested in the early morning. He was sleeping when 4-5 police officers appeared with guns drawn. Either Chestnut or Stewart was already in the bus when Watkins was arrested. Detectives asked if he had a Georgetown jacket, he said no, but Chestnut did as his mother bought it for him.

3. *Stewart. Co-Defendant Stewart has maintained that he was not present at the murder and did not kill the Victim since the first record of his being asked about the incident, Saturday 11/19/83.*

On 11/19/83, BPD notes that Chestnut was observed with Watkins, Stewart and others in the neighborhood. Chestnut was wearing his Georgetown jacket that day. All 3 boys were picked up and taken to Homicide, questioned, photographed and released. Stewart says they told BPD that day that they were not involved.

On 11/24/83, Stewart was arrested. He did not testify at trial. During allocution, he stated as follows:

"[Stewart] knew Victim his whole life…they played basketball together…You still didn't get the person who did it. I'm saying we know we didn't do it, and a lot of other people know we didn't do it."[94]

---

[94] T. 7.10.19 p.29

NK DEF 006784

In November 2019, the CIP team reviewed records of interactions with Stewart over the years.  Stewart has maintained he was not involved over the years.

The CIP Team interviewed Stewart at DOC.  He stated that while he and his group were at HPJHS, they were told to leave.  S/O Kelly admonished them to get an education, etc, then they left.  They headed to Chestnut's, then played video games.  They were later informed of the shooting.

## VI.   <u>**Victim Family Contact**</u>

On September 23, 2019, we spoke over the phone with the representative designated by the family.  During this conversation, the Victim's family representative was informed of the State's re-opening of this investigation.  He was further advised that a possible outcome is exoneration whereby the Defendants are released.   He advised the family accepts wherever the investigation leads, including exoneration and release.

## VII.   <u>**Recap**</u>

The events of 11/18/83 are likely as follows based on our investigation.  On 11/18/83, Chestnut, Watkins and Stewart arrived at HPJHS at some point after 12pm.  While there, they visited multiple classrooms and were generally not welcomed as they were being disruptive.  Ultimately, they were told to leave and finally did leave.  Once outside, they hung around the basketball court.  At around 12:45pm, S/O Kelly returned from lunch and found the three Defendants on the basketball court.  S/O Kelly spent about 10 minutes lecturing the Defendants on the importance of staying out of trouble and getting an education.  He then escorted the group from school grounds and watched as they headed northbound on Gilmor Avenue.  S/O Kelly went back into the school just before 1:00pm.  He secured all of the entrances at that time.

NK DEF 006785

Unbeknownst to S/O Kelly, Willis and unknown others were still in the building during that time period[95]. When Student #1, Student #2 and the Victim left science class and headed into the C/D Hallway, Willis accosted the Victim and shot him. Willis and unknown others then ran from the building. Later that evening, Willis bragged about the shooting and wore the Victim's NBA Jacket to Shake and Bake[96]. Student #2 and Student #3 identified Willis in photos.

The teachers each testified to seeing the 3 Defendants in the school ahead of the shooting – this is not in dispute. All 3 Defendants put themselves at the school ahead of the shooting – back in 1983 and now.

State's witnesses Student #1, Student #2 and Student #3 have recanted their trial testimony. Student #1 and Student #3 say they didn't see faces. Student #2 affirmatively identifies Michael Willis as the Shooter and is clear that the three Defendants did not do it.

State's witness Student #4 has recanted her testimony saying that he/she did not see the murder. Individual C corroborates this information as she/he was with Student #4 and neither saw the murder. The logistics of where Student #4 was compared to where the murder occurred also corroborate that Student #4 did not see the murder – it would have been impossible.

The reason the State's witnesses testified as they did was that they were coerced and coached. Each State's witness describes multiple group trial prep meetings in order to coordinate what they were going to say. Each State's witness was a juvenile and were interviewed at critical points without a parent or guardian, i.e. when an actual identification was alleged to have occurred. Each of the Students were told to "get with the program".

---

[95] Student #2 corroborates that he noticed Willis lurking around ahead of committing the murder.
[96] That Willis wore the jacket the night of the murder is corroborated by Individual E.

NK DEF 006786

In addition to there being no remaining reliable inculpating evidence, the Defendants were not afforded a fair trial which appears to have been designed to achieve a conviction. At no known point were the Lotus Notes shared with the Defense. These investigative notes clearly indicated persons as having named Michael Willis as the Shooter. Further, Student #2 identified Willis in photos on 11/22/83 and testified to same before the Grand Jury. In spite of this, the three Defendants were charged, convicted and sentenced. Safeguards that are in place present day[97] were either not in place or were disregarded to achieve the result obtained.

## VIII.   **CONCLUSION**

In conclusion, based on the results of the CIP investigation, it is my recommendation that we move the Court to grant a joint writ of actual innocence petition and order a new trial. It is also my recommendation that we dismiss each indictment as to Alfred Chestnut, Ransom Watkins and Andrew Stewart based on our investigation in the instant report.

---

[97] Double blind photo arrays, taped witness interviews, prosecutorial oversight of homicide case development from investigation through indictment, mandatory eyewitness corroboration are among the many safeguards that exist now to prevent such an outcome.

NK DEF 006787