

**Mayer Engelsberg &lt;mengelsberg@nklawllp.com&gt;**

# New Yorker Magazine fact-checking inquiry

**Werner, Hélène** &lt;helene_werner@newyorker.com&gt;  Thu, Oct 14, 2021 at 7:12 PM
To: info@nklawllp.com, snathan@nklawllp.com, akamionski@nklawllp.com, mengelsberg@nklawllp.com, melliker@nklawllp.com

Hello again,

Since I have not heard from you today, and we are soon coming up against a deadline, I am taking the liberty of sending you a memo with all of the information in Jennifer's article that concerns your three clients in this case. If you would review the material and send me a response by the end of the day on Monday, October 18th, that would be great. We would of course like to consider your input. In the meantime, I am available to answer any questions you may have about the material or the process. I look forward to hearing from you.

Best,
Hélène

> On Thu, Oct 14, 2021 at 12:10 PM Werner, Hélène &lt;helene_werner@newyorker.com&gt; wrote:
>
>> Hello,
>>
>> I'm a fact-checker at The New Yorker Magazine and am working with Jennifer Gonnerman on a story she is writing about the Harlem Park case in Baltimore. We will be publishing it soon. There is information in the article about former Detective Bryn Joyce, former Sergeant John Barrick, and former Detective Donald Kincaid, with particular focus on the actions of Mr. Kincaid. I would like to be in touch with someone on your team who can both confirm the information we have for factual accuracy and also provide comment on several points we make in the article. I hope to hear from you soon, so that we may set up a phone call or arrange for you to have the relevant information in writing in time for our deadline. Our deadline for incorporating a response from you is EOD Monday, October 18th.
>>
>> I look forward to hearing from you.

Hélène Werner

--
Hélène Werner
The New Yorker
212.286.6963

--
Hélène Werner
The New Yorker
212.286.6963

📄 **New Yorker checking memo - Nathan & Kamionski.docx**
19K

*The following list of details largely outlines a chronology of events in the investigation of the murder of DeWitt Duckett. The information focusses on the actions of members of the Baltimore Police Department at the time—Donald Kincaid in particular. Mr. Kincaid is named in the piece, but Bryn Joyce and John Barrick are not.*

*Please confirm or correct:*

1. Donald Kincaid was a veteran detective in the Baltimore Police Department when he was assigned to investigate the murder of DeWitt Duckett on November 18, 1983.

2. On November 19, 1983, Det. Kincaid located Ransom Watkins and Alfred Chestnut.

3. The police told the boys that they wanted to question them. The boys agreed.

4. Chestnut was wearing a Georgetown Starter jacket at the time, which he and Watkins insisted belonged to Chestnut.

5. The boys insisted they had nothing to do with the murder.

6. The police took Polaroids of both boys.

7. Soon after this, the police picked up Andrew Stewart and took his picture too.

8. On November 21, 1983, Det. Kincaid went to Ronald Bishop's house.

9. On that day, he laid out eleven Polaroids on a table in the front room of Bishop's house and asked Bishop, whose mother was also present, if he could identify anyone who had been involved in the shooting of Duckett.

10. Bishop recognized Chestnut, Watkins, and Stewart because they had all gone to the same elementary school. But, he did not identify any of them as having been perpetrators of the crime.

11. Det. Kincaid returned to Bishop's house on November 22, 1983.

12. Just after midnight on November 23, 1983, Det. Kincaid returned to Bishop's house again.

13. Bishop was asleep when Det. Kincaid arrived.

14. Upon being woken up, Bishop was shown a photo array by Det. Kincaid, and it again included Chestnut, Watkins, and Stewart.

15. Bishop, again, did not pick out any of the boys as being perpetrators of the crime.

16. On the afternoon of November 23, 1983, Det. Kincaid went to Harlem Park Junior High School and questioned Yvette Thomas, a 13-year-old ninth-grader at the school.

17. Police had been told by school security that Thomas might be a "possible witness" to the crime.

18. Det. Kincaid was joined by another detective (William Lansey) and a sergeant (John Barrick).

19. Thomas was interviewed in a large conference room next to the principal's office.

20. During the interview, Det. Kincaid showed Thomas a photo array that included Chestnut, Watkins, and Stewart.

21. At the trial, Det. Kincaid testified during the May 1984 trial of Stewart, Watkins, and Chestnut that Thomas had pointed out all three boys in the array on November 23rd.

22. Thomas also testified to this fact at the trial.

23. On the evening of November 23rd, a police officer came to Bishop's house and took him to police headquarters, without notifying his parents.

24. In the waiting area at the homicide office, two male classmates of Bishop's—Eddie Capers and John Caldwell—were also present.

25. The parents of these boys were not present at the police station while their children were being questioned.

26. According to Lauren Lipscomb, former head of the Conviction Integrity Unit of the State's Attorney's Office, who led the reinvestigation of the case in 2019, Eddie Capers's mother had come to police headquarters at one point during the investigation searching for her son. Capers could hear his mother from the interrogation room demanding that he be let out of the room.

27. Bishop was seated at a desk in a small room at the homicide office. Photos were spread out in front of him.

28. Bishop was questioned by Det. Kincaid and Det. Lansey during this session.

29. According to Bishop, Det. Kincaid conducted the photo array differently at the station on November 23rd than he had at Bishop's home in the preceding days.

30. According to Bishop, at the station, he would point to photos one by one, and Det. Kincaid would comment on each one.

31. According to Bishop, when they reached the photo of Chestnut, Det. Kincaid noted that Chestnut was the one who had had the gun.

32. Bishop took this comment to mean that Det. Kincaid wanted him to say that Chestnut had shot Duckett.

33. At police headquarters on November 23rd, Bishop, Caldwell, and Capers picked out Chestnut, Watkins, and Stewart in the photo array.

34. On the morning of November 24, 1983, around 1:00AM, Det. Kincaid and a group of other police officers went to Chestnut's house.

35. Lights were shone in his face, the officers' guns were drawn, and he was pulled from his bed.

36. Police took Chestnut's Georgetown Starter jacket from his closet.

37. Chestnut was taken outside and put in the back of a paddy wagon.

38. The police then went to Ransom Watkins's house.

39. Watkins was also sleeping.

40. Guns were pointed in his face and he was told he was under arrest for murder.

41. Andrew Stewart was not at his home, but at a friend's.

42. Police found him at the friend's house and forcibly placed him into the paddy wagon as well.

43. The three boys were locked in a holding cell together at the police station.

44. In one of the investigatory reports co-written by Det. Kincaid, summarizing various leads in the case, Michael Willis's name appears frequently.

45. According to the report, a young woman told police that she had heard that Willis had had a gun, and threw it down, before running away with some other boys.

46. According to the same report, a male caller told police that he had heard that Willis killed Duckett and that Willis took the Georgetown jacket and wore it to the skating rink at Shake & Bake the night of Duckett's murder.

47. Yvette Thomas later recanted her testimony during a reinvestigation of the case by the Conviction Integrity Unit of the State's Attorney's Office in 2019.

48. Thomas said that she had attended so many meetings before the trial in May 1984 that she couldn't keep track of everyone she was speaking with and about.

49. In addition to Thomas, Ronald Bishop, John Caldwell, and Eddie Capers, all of whom testified at the trial, also recanted.

50. In August 2020, Chestnut, Watkins, and Stewart filed a lawsuit in federal court against the Baltimore Police Department, former Det. Kincaid, former Det. Bryn Joyce, and former Sgt. John Barrick.

51. All three officers are now retired.

52. The case is expected to move to trial.

*Please provide comment:*

53. According to an exchange between the defense counsel and the judge during the trial of Watkins, Chestnut, and Stewart in 1984, Ronald Bishop gave a written statement to police on November 18, 1983 in which he said there was only one assailant. This contradicted the testimony he gave at the trial, in which he said that Watkins, Stewart, and Chestnut were the perpetrators. When asked at the trial to explain this discrepancy, Bishop said he had been scared. Would you like to COMMENT on why Bishop's original statement attesting to only one assailant appears to have been discounted in the police's subsequent investigation?

54. Can you provide COMMENT on why Bishop, John Caldwell, and Eddie Capers were questioned at police headquarters on November 23, 1983 without their parents being notified or being present while their children were being questioned?

55. During the interview at the police station on November 23rd, Bishop noted that Det. Kincaid was angry, frustrated, and accusatory—a different attitude than the one he had had when he questioned Bishop in his own home in the preceding days. According to Bishop, Det. Kincaid was standing a few inches away from him during the interrogation. Can you provide COMMENT on the nature of Det. Kincaid's actions in this instance?

56. According to Bishop, Det. Kincaid and the other detective interrogating him at the police station on November 23rd acted as if Bishop were withholding important information from them. According to Bishop, they made it clear to him that if he refused to cooperate, he could be charged with the crime of being an accessory to murder. Can you provide COMMENT on the police's actions in this matter?

57. Can you COMMENT on why police did not follow up on information regarding Michael Willis's potential involvement in the crime? This lead was outlined in a contemporaneous police investigatory report co-written by Det. Kincaid, but was not pursued at the time.

58. According to a prison record cited in the report the State's Attorney's Office released in 2019, Watkins said that the "arresting detective" (i.e. Det. Kincaid) told him: "You have two things against you: You're Black, and I have a badge." Would you like to COMMENT on this remark?

59. Lauren Lipscomb concluded that all four student-witnesses for the prosecution had been coerced and coached. Would you like to COMMENT on the actions of Donald Kincaid, Bryn Joyce, and John Barrick in this regard?

60. Lawyers for Chestnut, Watkins, and Stewart claim that their clients were wrongfully convicted as a result of misconduct by detectives and due to the "customs" of the Baltimore Police Department. Would you like to COMMENT on this claim?