IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| ALFRED CHESTNUT, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD KINCAID, *et al.*,<br><br>Defendants. | Civil Action No. LKG-20-2342 |

**PLAINTIFFS' OBJECTIONS TO FEBRUARY 28, 2022,
LETTER ORDER OF MAGISTRATE JUDGE COPPERTHITE
REGARDING TOPICS FOR CORPORATE DESIGNEE DEPOSITION OF
<u>DEFENDANT BALTIMORE POLICE DEPARTMENT</u>**

Plaintiffs Alfred Chestnut, Andrew Stewart, and Ransom Watkins, by their undersigned counsel and pursuant to Federal Rule of Civil Procedure 72(a), respectfully object to the February 28, 2022, Letter Order of Magistrate Judge A. David Copperthite, ECF No. 135, (hereinafter, "Letter Order"), precluding Plaintiffs from deposing Defendant Baltimore Police Department ("BPD") on topics concerning certain BPD policies applicable to Plaintiffs' allegations against Defendants Donald Kincaid, Bryn Joyce, and John Barrick (collectively "the Officer Defendants"). Plaintiffs respectfully request that this Court set aside the Letter Order because it: (1) fails to consider and apply case law from this Court and other jurisdictions regarding the discoverability of Plaintiffs' topics in the context of bifurcation; and (2) reaches factual findings regarding undue burden that are unsupported by the record and, in doing so, disregards law regarding the obligations of a corporate deponent. The fundamental error in the reasoning of the Letter Order is that it fails to consider that evidence regarding BPD policies is likely to be relevant to Plaintiffs' claims against the Officer Defendants in addition to being

relevant to their bifurcated *Monell* claims. While Plaintiffs recognize the deference afforded to magistrate judges when resolving discovery disputes, the errors in the Letter Order will significantly impede Plaintiffs' ability to pursue their claims against the Officer Defendants and unfairly prejudice their case. Accordingly, Plaintiffs respectfully request that this Court set aside the Letter Order and direct the BPD to produce one or more designees to testify on all matters of examination for all topics provided in Plaintiffs' 30(b)(6) deposition notice.

## FACTS

### I. Plaintiffs' Convictions and Exonerations

Plaintiffs Alfred Chestnut, Andrew Stewart, and Ransom Watkins were wrongfully convicted of the 1983 murder of Dewitt Duckett, a 14-year-old student attending Harlem Park Junior High School ("HPJHS"). An assailant shot and killed Mr. Duckett at HPJHS and stole his Georgetown Starter jacket. Defendant Donald Kincaid, a detective with BPD's Homicide Unit in 1983, was the lead investigator of the murder investigation. Defendant Bryn Joyce, another detective, assisted Detective Kincaid in the investigation, and Defendant John Barrick supervised both detectives.

Just six days following the murder, on November 24, 1983, BPD officers arrested Plaintiffs, all then 16-years-old, effectively closing the murder investigation. In May 1984, Plaintiffs were tried before a jury in Baltimore City Circuit Court, convicted of the murder of Mr. Duckett, and later sentenced to life in prison. In 2019, the Conviction Integrity Unit ("CIU") of the Baltimore City State's Attorney's Office ("SAO") launched a reinvestigation of Plaintiffs' criminal case and concluded that Plaintiffs were not involved in Mr. Duckett's murder. Significantly, the CIU found that exculpatory evidence directly pointing to an alternate perpetrator was withheld from Plaintiffs' criminal defense counsel. The CIU also found that four juvenile witnesses who testified falsely against Plaintiffs and falsely identified Plaintiffs as the

perpetrators were coached extensively. The four witnesses recanted their trial testimony during the CIU's reinvestigation.

The SAO joined Plaintiffs' post-conviction counsel in filing a Petition for Writ of Actual Innocence, which the Baltimore City Circuit Court granted, resulting in Plaintiffs' release from prison on November 25, 2019—36 years after their arrest. The Plaintiffs, known today as the Harlem Park Three, have collectively served 108 years in prison—the longest total period of wrongful incarceration in United States history.

**II.     Plaintiffs' civil rights lawsuit and discovery dispute with the BPD**

On August 13, 2020, Plaintiffs filed a federal civil rights lawsuit against the Officer Defendants and BPD. *See* ECF No. 1. Plaintiffs alleged that the Officer Defendants engaged in misconduct that violated Plaintiffs' constitutional rights, giving rise to several claims pursuant to 42 U.S.C. § 1983, including malicious prosecution, fabrication of evidence, failure to disclose exculpatory evidence, and failure to adequately supervise (against Defendant Barrick only). *See generally* Pls.' Am. Compl., ECF No. 59. Plaintiffs also sued the BPD pursuant to *Monell v. Department of Social Services*, 426 U.S. 658 (1978), for its "policy, custom, and/or pattern and practice of promoting, facilitating, and condoning improper, illegal, and unconstitutional investigative actions, and its policy, custom, and/or pattern and practice of failing to adequately supervise, discipline, and train BPD detectives and officers." Pls.' Am. Compl. ¶ 192.

Both the Officer Defendants and BPD unsuccessfully moved to dismiss Plaintiffs' lawsuit, *see* ECF Nos. 21, 23; ECF Nos. 35, 36 (Mem. Op. and Order denying Defs.' Mots. to Dismiss). On June 4, 2021, BPD filed an unopposed motion to bifurcate Plaintiffs' *Monell* claim from Plaintiffs' claims against the Officer Defendants. *See* ECF No. 46. Plaintiffs agreed not to oppose bifurcation on several conditions, including that BPD would produce policy and training materials in effect at the relevant time. Specifically, the Plaintiffs and BPD agreed that

bifurcation would allow "discovery relevant to the individual defendants, including policy and training materials in effect at the relevant time," *see* Email from K. Flowers to K. Lynch at 3 (May 5, 2021), attached as Exhibit A, as those topics were critical for Plaintiffs to prosecute their claims against the Officer Defendants. On June 7, 2021, this Court granted BPD's motion. ECF No. 47.

During discovery, Plaintiffs requested BPD policies and procedures in effect from the date of Mr. Duckett's murder through the date of Plaintiffs' conviction concerning, among other things, the disclosure of evidence to prosecutors or a defendant; interviewing/interrogating witnesses, including minors; conducting eyewitness identification procedures, including photo arrays; and documenting an investigation. In response, BPD produced some of its policies in effect at the relevant time, including the Standard Operating Procedures of the Homicide Unit. *See* Def.'s Resps. to Pls.' First Req. Produc. Docs. No. 12 (July 12, 2021), attached as Exhibit B.

On October 1, 2021, Plaintiffs' counsel emailed BPD counsel a draft Notice of Corporate Designee Deposition that identified 18 topics for examination. *See* Email from C. Crawford to K. Ashe (Oct. 1, 2021), attached as Exhibit C. On October 20, counsel for BPD emailed Plaintiffs' counsel requesting a meet and confer to discuss the draft 30(b)(6) notice. *See* Email from N. Amato to C. Crawford (Oct. 20, 2021), attached as Exhibit D. On October 27, counsel for Plaintiffs and the BPD met by telephone to discuss BPD's objections. That same day, Judge Copperthite granted the Officer Defendants' request for an extension of the discovery schedule and a stay of all depositions. *See* ECF No. 76. All depositions then scheduled were canceled in light of the significant change to the case calendar. Thereafter, Plaintiffs revised the draft deposition notice to address some of BPD's concerns and emailed BPD a revised notice on January 28. *See* Notice of Corporate Designee Dep. of Balt. Police Dep't, attached as Exhibit E.

Among other changes, the revised draft notice omitted several topics that BPD initially found objectionable and narrowed the relevant time period concerning BPD's training of the Officer Defendants.

On January 31, 2022, the parties agreed to a deposition calendar with BPD's 30(b)(6) deposition tentatively scheduled on February 28. *See* Email from M. Engelsberg to C. Crawford (Jan. 31, 2022), attached as Exhibit F. Counsel for Plaintiffs and BPD met and conferred again regarding the revised 30(b)(6) deposition notice on February 7 and February 15 to further discuss BPD's concerns with some of the topics in Plaintiffs' draft notice. BPD agreed to produce a designee to testify regarding topics one through four of the revised notice. *See* Email from K. Ashe to C. Crawford (Feb. 16, 2022), attached as Exhibit G. However, BPD refused to provide any corporate testimony on Topics 5 through 15, set out below:

5. Statistics relating to BPD's homicide clearance and closure rates in the 1980s, including the policies, procedures, and methodology for calculating and reporting the same.

6. BPD policies, practices, procedures, and rules, in place from November 18, 1983, to May 28, 1984, whether formal or informal, concerning "red ball" cases, as defined above.

7. BPD policies, practices, procedures, and rules, in place from November 18, 1983, to May 28, 1984, whether formal or informal, concerning the sharing of information and/or files among BPD's police officers, agents, detectives, and any other employees, prosecutors with the SAO and/or a defendant in a criminal matter.

8. BPD policies, practices, procedures, and rules, in place from November 18, 1983, to May 28, 1984, whether formal or informal, concerning the interviewing and interrogation of witnesses, including minors.

9. BPD policies, practices, procedures, and rules, in place from November 18, 1983, to May 28, 1984, whether formal or informal, concerning the identification, investigation, and elimination of suspects.

10. BPD policies, practices, procedures, and rules, in place from November 18, 1983, to May 28, 1984, whether formal or informal, concerning the investigation of alibi witnesses.

11. BPD policies, practices, procedures, and rules, in place from November 18, 1983, to May 28, 1984, whether formal or informal, concerning seeking arrest warrants.

12. BPD policies, practices, procedures, and rules, in place from November 18, 1983, to May 28, 1984, whether formal or informal, concerning conducting eyewitness identification procedures, including photo arrays.

13. BPD policies, practices, procedures, and rules, in place from November 18, 1983, to May 28, 1984, whether formal or informal, concerning the preparation and completion of routine investigative reports, including all such reports contained in the homicide file of Dewitt Duckett, such as incident reports, supplement reports, arrest reports, laboratory reports, 24-hour reports, prosecution reports, police reports, and supplemental memoranda.

14. BPD policies, practices, procedures, and rules, in place from November 18, 1983, to May 28, 1984, whether formal or informal, concerning how to document the progress of a murder investigation

15. BPD policies, practices, procedures, and rules, in place from November 18, 1983, to May 28, 1984, whether formal or informal, concerning *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and the disclosure of exculpatory and/or impeachment evidence.

*See* Exs. E, G.

On February 23, 2022, in accordance with Judge Copperthite's Standing Order governing discovery disputes, the Plaintiffs and the BPD submitted position papers, limited to three pages, outlining their respective positions regarding the relevancy of the eleven above-listed topics and their relation to Plaintiffs' claims against the Officer Defendants. *See* ECF Nos. 131, 132.

### III. Judge Copperthite's February 28, 2022, Letter Order

In his Letter Order, Magistrate Judge Copperthite found that Topics 5 through 15 of the revised draft deposition notice were outside the scope of permissible discovery.

With respect to Topic 5, the Court concluded that "statistics and the underlying policies" concerning BPD's homicide clearance and closure rates in the 1980s were not relevant to Plaintiffs' claims against the Officer Defendants, despite Plaintiffs' argument that such statistics would demonstrate that the Officer Defendants were under immense pressure from the public and within BPD to arrest a suspect in the Duckett murder investigation. *See* ECF No. 135 at 3. The Court found that compliance with this request would pose "significant barriers" for BPD to identify "a proper Rule 30(b)(6) designee." *Id.*

The Court also rejected Plaintiffs' request to depose a designee on Topics 6 through 15 of the deposition notice, stating that Plaintiffs "impermissibly [sought] *Monell* discovery." *Id.* Specifically, the Court reasoned that the Court's bifurcation order limited Plaintiffs to discovery only against the Officer Defendants and that "Plaintiffs have not shown that the requested topics are specific to the Officer Defendants and thus distinct from *Monell*-related discovery." *Id.* at 4. The Court concluded that "the topics at issue seek policies on BPD's patterns and practices which fall squarely within the context of *Monell* discovery." *Id.*

In accordance with Federal Rule of Civil Procedure 72(a), these Objections timely follow the Court's Letter Order.

## **STANDARD OF REVIEW**

Under Rule 72(a) of the Federal Rules of Civil Procedure, a party has 14 days to "serve and file objections" to an order of a magistrate judge regarding a non-dispositive pretrial matter. Upon timely receipt of a party's objections, the district judge "must . . . modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a). "In performing this review, the court may 'receive further evidence or recommit the matter to the magistrate judge with instructions.'" *O'Malley v. Trader Joe's E., Inc.*, No. CV RDB-19-3273, 2020 WL 6118841, at *1 (D. Md. Oct. 15, 2020) (quoting 28 U.S.C. § 636).  "The 'clearly

erroneous' standard applies to factual findings, while legal conclusions will be rejected if they are 'contrary to law.'" *Stone v. Trump*, 356 F. Supp. 3d 505, 511 (D. Md. 2018), *amended on reconsideration*, 402 F. Supp. 3d 153 (D. Md. 2019) (quoting *Sky Angel U.S., LLC v. Discovery Commc'ns, LLC*, 28 F. Supp. 3d 465, 479 (D. Md. 2014)).

Under the "clearly erroneous" standard, "'the court is only required to determine whether the magistrate judge's findings are reasonable and supported by the evidence.'" *Kreuze v. VCA Animal Hosps., Inc.*, No. CV PJM 17-1169, 2017 WL 11458018, at *2 (D. Md. Dec. 21, 2017) (quoting *Int'l Ass'n of Machinists & Aerospace Workers v. Werner-Matsuda*, 300 F. Supp. 2d 479, 486 (D. Md. 2005)).

The "critical inquiry" under the "contrary to law" standard "is whether there is legal authority that supports the magistrate's conclusion." *Stone*, 356 F. Supp. 3d at 511. "An order is contrary to law when it fails to apply or misapplies relevant statutes, case law, or rules of procedure." *United Mktg. Sols., Inc. v. Fowler*, No. 1:09-CV-1392-GBL-TCB, 2011 WL 837112, at *2 (E.D. Va. Mar. 2, 2011) (citation omitted).

While decisions of magistrate judges in discovery matters are afforded "substantial deference" akin to an abuse of discretion standard, *O'Malley*, 2020 WL 6118841, at *2, "such an abuse will . . . be identified where discovery restrictions prevent a litigant from 'pursuing a [litigation] theory.'" *United States v. Ancient Coin Collectors Guild*, 899 F.3d 295, 323 (4th Cir. 2018) (quoting *Ardey v. United Parcel Serv.*, 798 F.2d 679, 682 (4th Cir. 1986)).

## ARGUMENT

I.  **The Letter Order is contrary to law under Rule 72(a).**

Among Magistrate Judge Copperthite's errors in the Letter Order are: (1) a failure to apply relevant authority from this Court regarding permissible policy-related discovery in similar

cases, and (2) a misapplication of cited authority. Both errors warrant setting aside the Court's decision and entering an order in favor of Plaintiffs.

> A. **The Letter Order fails to consider relevant law from this Court and other jurisdictions regarding Topics 6-15 of the deposition notice holding that, even if discovery relates to a *Monell* claim, it may also relate to claims against individual officer defendants.**

The Letter Order fails to consider case law cited by Plaintiffs supporting their central argument with respect to Topics 6–15: that these topics relate to Plaintiffs' claims against the Officer Defendants and are therefore discoverable, notwithstanding the fact that the topics may overlap with Plaintiffs' *Monell* claim.[1] *See* ECF No. 132 at 3. Contrary to the Magistrate Judge's conclusion, the mere fact that the requested discovery may be common to the *Monell* claim does not preclude Plaintiffs from obtaining the discovery at this juncture.

This Court's decision in *Johnson v. Baltimore Police Department* squarely addresses the circumstances in which policy-related discovery may be relevant to a wrongful conviction plaintiff's claim against a municipality and the plaintiff's claims against the individual defendants. 500 F. Supp. 3d 454 (D. Md. 2020). In *Johnson*, the plaintiff brought a lawsuit against BPD and several of its officers pursuant to 42 U.S.C. § 1983. *Id.* at 457–58. The plaintiff's claims against the officers included, as the Plaintiffs' claims do here, fabrication of evidence and the failure to disclosure exculpatory and impeachment evidence. *Compare id. with* Pls.' Am. Compl., ECF No. 59. The plaintiff also brought a claim against BPD pursuant to

---

[1] In their Position Statement, Plaintiffs argued that Topics 7–15 of the deposition notice specifically related to policies applicable to the Officer Defendants' conduct in the underlying criminal investigation. *See* ECF No. 132 at 3. For Topics 5 and 6, Plaintiffs focused their arguments on rebutting BPD's position that the topics were irrelevant, overly broad, and outside the scope of permissible discovery because BPD had not produced any documents concerning these topics. *See id.* at 2–3. In its Letter Order, the Court analyzed Topic 5 independently, but grouped discussion of Topics 6-15 under its flawed *Monell* analysis. *See* ECF No. 135 at 3. For purposes of these objections, Plaintiffs similarly group their discussion of the deposition topics.

*Monell*. *Id.* at 458. The individual officers and BPD jointly moved to bifurcate and stay discovery of the plaintiff's *Monell* claim, but the Court denied the defendants' motion, reasoning that certain discovery may be common to a plaintiff's claims against the individual officers and the municipality. *See id.* at 462 ("Whether bifurcation would serve judicial economy depends in part on the extent to which the claims against the Officers and the *Monell* claim will involve intertwined evidence.").

Specifically, Judge Hollander explained that, where a plaintiff alleges a claim that the officers suppressed exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), evidence of the municipality's policies becomes relevant to proving that the officers suppressed the exculpatory evidence in bad faith.

> Moreover, I noted that bad faith can be inferred based on gross deviations from routine police conduct. *See Mellen v. Winn*, 900 F.3d 1085, 1104 (9th Cir. 2018) (finding that because the officer defendant "had participated in hundreds of homicide investigations," a reasonable jury "could conclude that [the officer] knowingly suppressed the statements to secure a conviction"); *Jimenez v. City of Chicago*, 732 F.3d 710, 721–22 (7th Cir. 2013) (noting that errors in investigation "were so severe or persistent as to support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights"). *Therefore, for plaintiff to prove his Brady claims against the Officers, he may endeavor to obtain discovery of BPD policies at the relevant time. And, those same policies could be relevant to the Monell claim.*

*Johnson*, 500 F. Supp. 3d at 462 (emphasis added). This reasoning applies equally to cases, such as *Johnson*, in which the *Monell* claim has not been bifurcated, and those, such as here, in which it has been.

Judge Hollander's analysis is well supported by cases in other jurisdictions that establish the importance of a municipality's policies in evaluating whether officers engaged in the "bad faith" needed to prove officer defendants' unconstitutional misconduct. For example, in *Restivo v. Hessemann*, two men wrongfully convicted of a 1984 rape and murder sued several police officers involved in the murder investigation. 846 F.3d 547, 557–58 (2d Cir. 2017). One of the

allegations was that police illegally suppressed evidence of an investigative lead pointing to the involvement of individuals other than the plaintiffs. *Id.* at 562–63. At trial, the plaintiffs called a police practices expert to testify about the applicable police standards and practices for the disclosure of exculpatory evidence. *Id.* The defendant officer argued on appeal that the district court erred by allowing the expert to testify about the materiality of the exculpatory investigative lead. *Id.* at 579–80.

The Second Circuit rejected the defendant's argument, reasoning that the expert's testimony on the applicable professional standards was relevant "because it 'can give a jury a baseline to help evaluate whether a defendant's deviations from those standards were merely negligent or were so severe or persistent as to support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights.'" *Id.* at 580 (quoting *Jimenez*, 732 F.3d at 721–22); *see also Mellen*, 900 F.3d at 1102, 1104.

The Letter Order appropriately cites the *Johnson* opinion, but it ignores the reasoning of *Johnson*. *See* ECF 135 at 3. As a result, it is unclear whether the Court disagrees with Judge Hollander's analysis or has attempted to distinguish it, and if the latter, on what basis the Court made any distinction.

The fact that the court ultimately denied bifurcation in *Johnson* in no way alters its analysis regarding why bifurcation in wrongful conviction cases can be complicated and inefficient. Indeed, as explained above, the *Johnson* court stated that one reason why bifurcation was inappropriate was because policy-related evidence from the municipality can be directly relevant to proving a plaintiff's claims against officer defendants. *See Johnson*, 500 F. Supp. 3d at 462. While BPD attempts to diminish *Johnson's* holding by arguing that the court's bifurcation decision was premature at that time, the parties in *Johnson* have since completed

11

summary judgment briefing, and it is apparent from the plaintiff's opposition to the officer defendants' motion for summary judgment in that case that policy-related evidence made up a significant part of Mr. Johnson's proof against the officer defendants. *See Johnson v. Balt. Police Dep't*, Case No. ELH-19-0698, Pl.'s Resp. in Opp'n. to Defs.' Mot. Summ. J. 43–44, ECF No. 151 ("Here, there is ample evidence from which a jury could infer bad faith. . . . The Officer Defendants repeatedly deviated from BPD policies. BPD policy required that '[a]ll case activity must be documented properly.' Yet the Officer Defendants frequently failed to document their conversations with witnesses and sources . . . ." (internal citation omitted)); *id.* at 34–35 (citing BPD policy to explain that key witnesses should be interviewed as soon as possible, and thus, a defendant's claim that he failed to interview a key witness on the night of the murder contravenes policy and undermines his credibility).

Likewise, here, the deposition topics relating to BPD's policies will yield admissible evidence from which a jury may determine whether the Officer Defendants acted with the requisite heightened level of intent. In order to prevail on their § 1983 claims, Plaintiffs must prove that the Officer Defendants did more than engage in unconstitutional misconduct by mistake or negligence. Rather, Plaintiffs must prove that the Defendants committed unconstitutional misconduct by: (1) "deliberately" fabricating evidence (Count II); (2) acting in "bad faith" when they suppressed exculpatory evidence and failed to adequately investigate this case (Count III); and (3) acting with "deliberate[] indifferen[ce]" to the misconduct of a subordinate (Count V). *See, e.g.*, *Massey v. Ojanit*, 759 F.3d 343, 354–57 (4th Cir. 2014) (requiring proof that defendant acted deliberately for fabrication of evidence and malicious prosecution claims); *Owens v. Baltimore City State's Att'y's Off.*, 767 F.3d 379, 396 n.6, 401 (4th Cir. 2014) (noting that a *Brady* claim requires proof that the officers suppressed evidence in

bad faith); *Gilliam v. Sealey*, 932 F.3d 219, 240–41 (4th Cir. 2019) (requiring proof of bad faith in connection with due process claim for failure to adequately investigate); *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (describing deliberate indifference standard for supervisory liability claim). For instance, testimony from the BPD that in practice its *Brady* policy required the Officer Defendants to record and log all exculpatory evidence and maintain a record of such evidence in the homicide file would demonstrate that the detectives' failure to do so on multiple occasions in the Dewitt Duckett murder investigation was no coincidence, but, rather, the product of bad faith.

Cases interpreting 18 U.S.C. § 242, "the criminal analog of § 1983," *see Imbler v. Pacthman*, 424 U.S. 409, 429 (1976), are similarly instructive. Section 242 prohibits a person acting "under color of any law" from "willfully subject[ing] any person . . . to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States[.]" 18 U.S.C. § 242. "If, as here, an officer has been trained that officers should not do several things when confronted with tense situations, yet he does those things anyway, the fact that he broke from his training could make it more likely that he acted willfully." *United States v. Proano*, 912 F.3d 431, 439 (7th Cir. 2019); *see also United States v. Rodella*, 804 F.3d 1317, 1338 (10th Cir. 2015) (recognizing that evidence of departmental policies can be relevant to show intent in § 242 cases); *United States v. Dise*, 763 F.2d 586, 588 (3d Cir. 1985) (same). While, ultimately, the Fourth Amendment "sets the constitutional floor" for certain types of police misconduct, "evidence of training that the officer actually received can be relevant to his state of mind." *Proano*, 912 F.3d at 439–40.

Here, the intent Plaintiffs are required to prove by a preponderance of evidence to satisfy their *Brady* claims is similar to the intent required by § 1983's criminal analog in § 242. For the

13

same reasons, the department policies and the training that the Officer Defendants received on those policies, are relevant to showing the Officer Defendants' intent. The Letter Order fails to address the overlapping nature of this evidence, instead viewing it in a binary fashion (i.e., relevant to either the claims against the individuals or to the municipality without considering whether it could be relevant to both) that is contrary to law. *See id.*

Moreover, both BPD and the Court overlooked the fact that Plaintiffs only agreed to bifurcation in this matter if certain conditions were met. *See* Ex. A. The Letter Order cites that Judge Bennett granted BPD's unopposed motion to bifurcate and stay discovery, and BPD in its motion stated that it would "'participate in *non-Monell* fact discovery specific to Plaintiffs' claims regarding the underlying alleged incident.'" ECF No. 135 at 4 (quoting ECF Nos. 47, 46-1 at 2). As explained above, the very policies at issue, and testimony by a BPD corporate designee concerning the same, are precisely those that, while relevant to *Monell*, are nevertheless "non-*Monell* fact discovery" specific to the intent required to prove Plaintiffs' claims against the Officer Defendants. BPD implicitly recognizes this, as it has already produced written policies concerning procedures for arrest warrants and viewing criminal suspect photographs in Topics 11 and 12, respectively. But BPD refuses to produce a corporate designee to discuss how these policies were created, implemented (including related training on those policies), and enforced, and whether there were any "formal or informal" policies other than these that would have been applicable to the Officer Defendants at the time of the Dewitt Duckett murder investigation. By agreeing to bifurcate under these conditions and later producing relevant documents, BPD has waived any objection on the grounds that this discovery is related solely for *Monell* purposes.

BPD also cannot argue that because it has produced its written policies, it need not provide a designee to offer testimony regarding these policies. "A party should not be prevented

from questioning a live witness in a deposition setting just because the topics proposed are similar to other discovery served—to do so would essentially limit a party to the first form of discovery served." *Baxter Int'l, Inc. v. Becton, Dickinson & Co.*, Case No. 17 C 7576, 2019 WL 3408813, at *7 (N.D. Ill. July 26, 2019). Testimony from a BPD representative "may still be useful to testify as to interpretation of papers, and any underlying factual qualifiers of those documents." *Dongguk Univ. v. Yale Univ.*, 270 F.R.D. 70, 74 (D. Conn. 2010). Moreover, because Plaintiffs are entitled to obtain discovery "in any sequence," Fed. R. Civ. P. 26(d)(3), serving a written discovery request for BPD's policies before taking its deposition (and noting BPD's deposition before the depositions of the Officer Defendants) was wholly appropriate.

Because the Letter Order failed to engage with applicable law, this Court should respectfully set it aside. *See Phillips v. DolgenCorp LLC*, No. CIV.A. 5:10-1016-MBS, 2011 WL 2214754, at *2 (D.S.C. June 7, 2011) (reversing magistrate judge's decision to strike paragraph from plaintiff's complaint due to decision's conflict with controlling authority).

**B.     The Letter Order misapplies this Court's precedent regarding bifurcation.**

Not only does the Letter Order fail to apply relevant case law that directly addresses the legal issue presented to the Court, but it misapplies the law cited in the Letter Order, requiring reversal.

In concluding that Topics 6-15 impermissibly seek *Monell* discovery, the Letter Order relies on generic language regarding the rationale of bifurcation in cases involving claims against individual officers and claims against a municipality. *See* ECF 135 at 3. But simply pointing out that bifurcation serves several interests, including judicial economy and preventing unfair prejudice, and acknowledging that the Court granted BPD's unopposed motion to bifurcate in this case, does not resolve whether the discovery sought through Topics 6–15 may relate to Plaintiffs' claims against *both* the Officer Defendants *and* BPD, thereby making it discoverable.

Indeed, the very excerpt of *Grim v. Baltimore Police Department* cited in the Letter Order explains that bifurcation will stay discovery related only to a *Monell* claim but does "not effect [sic] plaintiff's ability to pursue discovery concerning her claims against the [defendant officer.]" *See* ECF 135 at 3 (citing *Grim v. Balt. Police Dep't*, No. CV-ELH-18-3864, 2020 WL 1063091, at *7 (D. Md. Mar. 5, 2020)). The Letter Order erroneously analyzes this dispute as competing alternatives—as if the topics relate either to the *Monell* claim or to the claims against the Officer Defendants—and never considers the potential overlap. *See* 135 at 4 ("In light of the Bifurcation Order, the question is then whether the discovery requested from BPD is specific to Plaintiffs' claims against the underlying Individual Officer Defendants, and not its *Monell* claims about BPD's policies, practices, or customs."); *but see Johnson*, 500 F. Supp. 3d at 462 ("[F]or plaintiff to prove his *Brady* claims against the officers, he may endeavor to obtain discovery of BPD policies at the relevant time.").

Here, the policies described in Plaintiffs' topics specifically relate to those that governed the Officers Defendants' conduct in this case, i.e., the interviewing and interrogation of witnesses, including minors; the identification, investigation, and elimination of suspects; the investigation of alibi witnesses; procedures for conducting eyewitness identifications, including photo arrays; and the disclosure of exculpatory and impeachment evidence. The fact that these topics relate to "policies" and not other types of information does not limit their relevance to Plaintiffs' *Monell* claim. These policies bear directly on the standard policies and procedures the Officer Defendants were required to follow at the time, any deviation from which would be material evidence that they acted with the requisite level of intent to prove Plaintiffs' claims of unconstitutional misconduct (i.e., the "bad faith" requirement of the *Brady* claim).

Plaintiffs have demonstrated how "the requested topics are specific to the Individual Defendants" and, while not "distinct," overlap with *Monell*-related discovery. *See* ECF No. 135 at 4. The CIU's investigation revealed that exculpatory evidence directly pointing to an alternate perpetrator was withheld from Plaintiffs' criminal defense counsel and that four juvenile witnesses who testified against Plaintiffs and identified Plaintiffs as the perpetrators were coached extensively to give false evidence. Plaintiffs' *Brady* claims arise from, among other things, the Officer Defendants withholding such evidence and deviating from standard BPD practices governing interrogation of minor witnesses and the use of photo arrays. *See generally* Pls.' Am. Compl., ECF No. 59. Evidence of what those BPD policies and practices were and, specifically, testimony from a BPD 30(b)(6) designee as to how they were created and implemented, is directly relevant to whether the Officer Defendants violated these policies and, therefore, whether a jury could find that such deviation is evidence of intent concerning Plaintiffs' constitutional claims. *See, e.g., Johnson*, 500 F. Supp. 3d at 462; *Grim*, 2020 WL 1063091, at *7; *Proano*, 912 F.3d at 439–40.

The bifurcation cases cited discussed in the Letter Order do not address the question before the Court, and the Court's reliance on them to resolve this dispute is contrary to law.

**II.     The Letter Order reaches factual findings regarding Topic 5 of the deposition notice that are unsupported by the record evidence and disregards law regarding the obligations of a corporate deponent.**

Rule 72(a) of the Federal Rules of Civil Procedure also permits the district court to set aside an order of a magistrate judge that is "clearly erroneous." The factual findings reached in the Letter Order regarding Topic 5 are unsupported by the record evidence and are contrary to law that imposes an obligation on corporate deponents to seek out information and prepare designees to testify on matters known to the corporation as a whole. This confluence of error—both in fact and law—warrants reversal.

17

The Letter Order accepts BPD's factually unsupported argument regarding the alleged "significant barriers" BPD would face if ordered to produce a designee to testify on Topic 5. However, the barriers that BPD claims are not barriers at all; rather, they are typical obligations imposed on a corporate deponent when ordered to testify. BPD offered no evidence—by affidavits or otherwise—to support its self-serving and conclusory position that producing a designee to testify on its own methodology would pose an undue burden. As Plaintiffs explained in their position statement, a corporate deponent such as BPD must be prepared to testify "beyond [the designee's] own personal knowledge to matters *known to the corporation as a whole*." *Power Home Solar, LLC v. Sigora Solar, LLC*, 339 F.R.D. 64, 76 (W.D. Va. 2021) (emphasis added). BPD must prepare its designee through "document review, interviews, and other forms of investigation to reasonably identify the corporation's relevant knowledge and positions." *Id.* As other courts have recognized, "Although it may require extensive preparation to educate a witness about matters spanning such a lengthy time period, that burden does not outweigh the benefit of permitting discovery regarding [defendant's] conduct, training, and supervision as [a BPD] member." *Buie v. D.C.*, 327 F.R.D. 1, 8 (D.D.C. 2018).

BPD alone is uniquely positioned to testify as to its own policies, procedures, and methodology for calculating its clearance and closure rates. It cannot claim a lack of memory in order to shield itself from discovery. "[I]t is not uncommon to find that a corporation no longer employs individuals who have memory of distant events, or to find that individuals with knowledge are deceased . . . These problems do not relieve a corporation from preparing its Rule 30(b)(6) designee to the extent matters are reasonably available, whether from documents, past employees, or other sources." *Great Am. Ins. Co. of New York v. Vegas Const. Co.*, 251 F.R.D. 534, 541 (D. Nev. 2008) (internal quotation marks omitted). Indeed, in *Johnson*, BPD provided

two 30(b)(6) witnesses—Col. Richard Worley and Robert Stanton—to testify, in part, about BPD policies similar to those at issue here in effect in 1988.[2] *See Johnson v. Balt. Police Dep't*, Case No. ELH-19-0698, Pl.'s Resp. in Opp'n. to Defs.' Mot. Summ. J. 18, ECF No. 151 (regarding Col. Worley's 30(b)(6) deposition testimony).

The Letter Order erroneously accepts as true BPD's assertions regarding burdensomeness without regard to the legal requirement that a corporate deponent testify—not on personal knowledge—but on all facts known to the corporation and its counsel. Accordingly, reversal is warranted.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that this Court overrule Magistrate Copperthite's February 28, 2022, Letter Order and enter an Order requiring the BPD to produce one or more designees to testify on all matters of examination for all topics provided in Plaintiffs' 30(b)(6) deposition notice.

Respectfully submitted,

/s/
Kobie A. Flowers (Bar No. 16511)
kflowers@browngold.com
Andrew D. Freeman (Bar No. 03867)
adf@browngold.com
Neel K. Lalchandani (Bar No. 20291)
nlalchandani@browngold.com
Chelsea J. Crawford (Bar No. 19155)
ccrawford@browngold.com
Anthony J. May (Bar No. 20301)
amay@browngold.com

---

[2] Because BPD recently prepared and produced these two designees to testify regarding applicable BPD policies in the *Johnson* litigation, any argument that doing so here would be unduly burdensome is likely an exaggeration. There is no reason to believe that BPD is unable to adequately prepare a designee to testify regarding the policies that were in effect in 1983 if it successfully did so for the *Johnson* litigation regarding similar policies in effect in 1988.

                      Brown, Goldstein & Levy, LLP
                      120 E. Baltimore Street, Suite 1700
                      Baltimore, Maryland 21201
                      Tel: (410) 962-1030
                      Fax: (410) 385-0869

                      _____/s/_____
                      Larry A. Nathans (Bar No. 03023)
                      nathans@nathanslaw.com
                      Booth M. Ripke (Bar No. 25764)
                      bripke@nathanslaw.com
                      Nathans & Biddle LLP
                      120 E. Baltimore Street, Suite 1800
                      Baltimore, Maryland 21201
                      Tel: (410) 783-0272
                      Fax: (410) 783-0518

                      *Attorneys for Plaintiffs Alfred Chestnut,*
                      *Andrew Stewart, Jr., and Ransom Watkins*

Dated: March 14, 2022