**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| ALFRED CHESTNUT, *et al.* | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. LKG 20-2342 |
| | ) | |
| DONALD KINCAID, *et al.* | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**INDIVIDUAL DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Individual Defendants Donald Kincaid and Bryn Joyce, by and through their undersigned

counsel, submit the below memorandum of law in support of their motion for summary judgment.

Dated: September 6, 2022

Respectfully submitted,

_____/s/_____

Avi T. Kamionski (Bar No. 20703)
akamionski@nklawllp.com
Shneur Nathan (Bar No. 20707)
snathan@nklawllp.com
Mayer Engelsberg (Bar No. 21105)
mengelsberg@nklawllp.com
Michael J. Elliker (Bar No. 20810)
melliker@nklawllp.com
Nathan & Kamionski LLP
575 S. Charles Street Suite 402
Baltimore, MD 21201
T: (312) 612-1928

*Attorneys for Individual Defendants*
*Donald Kincaid, Jr. & Bryn Joyce*

## <u>TABLE OF CONTENTS</u>

Introduction………………………………………………………………………………..1

Factual Background…………………………………………………………………………4

Legal Standard……………………………………………………………………...19

Argument………………………………………………………………...............19

    I.     Undisputed Probable Cause Based on the Statements of Caldwell, Thomas, and Other Evidence Defeats Plaintiffs' Malicious Prosecution Claims…………………………...19

    II.    Summary Judgment Should be Granted as to the Fabrication Claim Because Plaintiff Cannot Establish that any Evidence was Knowingly Fabricated……………………23

    III.   Summary Judgment Should be Granted on Plaintiffs' *Brady* Claim Because Plaintiffs Cannot Point to any Qualifying Evidence that was Withheld……………………….24

         A.    The Notes Referenced in Chestnut's Request to the CIU and Witness Statements Were Not Withheld from the State…..……………………………25

         B.    Keyha Alderman's Statement, even if Suppressed, was not Material……....25

         C.    The Accounts of Capers and Bishop—Including that they at First Denied Knowing the Identity of the Shooter—Were Always Known……………...27

         D.    Any Questions About the Circumstances by Which the Statements of Bishop and Capers Were Procured was Available Through the Exercise of Reasonable Diligence……………………………………………………………27

         E.    The Allegations of Misconduct by Detective Kincaid do not Qualify as Actionable *Brady* Evidence………………………………………………..30

    IV.   Plaintiffs' IIED Claim Fails Because their Arrests were Supported by Probable Cause and they Lack Evidence that Kincaid Fabricated Falsified Evidence……………….31

    V.    Summary Judgment for Defendant Joyce and on the Failure to Intervene Claim is Proper Because There is no Evidence that Joyce was Personally Involved in any Alleged Constitutional Deprivation………………………………………………32

    VI.   Alternatively, Detectives Kincaid and Joyce are Entitled to Qualified Immunity……………………………………………………………………..34

Conclusion…………………………………..…………………………………...35

## TABLE OF AUTHORITY

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................. 19

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) ....................................................... 36, 37

*Bailey v. Town of Smithfield, Va.*, 19 F.3d 10 (4th Cir. 1994) ................................. 21

*Barnes v. Thompson*, 58 F.3d 971 (4th Cir. 1995) ............................................. 29

*Borchers v. Hyrchuk*, 126 Md. App. 10 (1999) .................................................. 33

*Bourchart v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514 (4th Cir. 2003) ............. 19

*Brown v. Gilmore*, 278 F.3d 362 (4th Cir. 2002) ................................................ 21

*Buckley v. Fitzsimmons*, 20 F.3d 789 (7th Cir. 1994) .......................................... 24

*Burley v. Balt. Police Dep't*, 422 F. Supp. 3d 986 (D. Md. 2019) ............................ 35

*Cannon v. Polk County*, 68 F.Supp.3d 1267 (D. Or. 2014) ..................................... 25

*Cannon v. Vill. of Bald Head Island*, 891 F.3d 489 (4th Cir. 2018) ......................... 36

*Carvjal v. Dominguez*, 542 F.3d 561 (7th Cir. 2008) .......................................... 25

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................ 19

*Clipper v. Takoma Park*, 876 F.2d 17 (4th Cir. 1989) ......................................... 24

*Durham v. Horner*, 690 F.3d 183 (4th Cir. 2012) .............................................. 37

*Gerstein v. Pugh*, 420 U.S. 103 (1975) ......................................................... 21

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) .................................................... 36

*Harris v. Jones*, 281 Md. 560 (1977) .......................................................... 33

*Hoke v. Netherland*, 92 F.3d 1350 (4th Cir. 1996) .......................................... 29, 31

*Holland v. City of Chicago*. 643 F.3d 248 (7th Cir. 2011) .................................. 30, 31

*Humbert v. O'Malley*, Civil No. WDQ-11-0440, 2014 126673 (D. Md. Mar. 25, 2014) ........... 21

*Johnson v. Scheidler*, No 05-CV-74465, 2007 WL 1119876 (E.D. Mich. Apr. 16, 2007) ........ 32

*Krashes v. White*, 275 Md. 549 (1975) ......................................................... 20

*Lambert v. Williams*, 223 F.3d 257 (4th Cir. 2000) ........................................... 20

*Lovitt v. True*, 403 F.3d 171 (4th Cir. 2005) .................................................. 29

*McDonough v. Smith*, 139 S. Ct. 2149 (2019) ................................................... 20

*Mosley v. City of Chicago*, No. 06 C 6314, 2009 WL 3097211 (N.D. Ill. Sept. 22, 2019) .... 29

*Owens v. Baltimore City State's Att'y's Off.*, 767 F.3d 379 (4th Cir. 2014) ............... 25

*Petty v. City of Chicago*, 754 F.3d 416 (7th Cir. 2014) ...................................... 24

*Randall v. Prince George's Cty.*, 302 F.3d 188 (4th Cir. 2002) ............................. 34

*Thompson v. Clark*, 142 S. Ct. 1332 (2022) ................................................... 20

*U.S. v. Colkley*, 899 F.2d 297 (4th Cir. 1990) ................................................ 21

*U.S. v. Womack*, 285 F.3d App. 87 (4th Cir. 2008) ........................................... 21

*United States v. Augurs*, 427 U.S. 97 (1976) .................................................. 28

*United States v. Bagley*, 473 U.S. 667 (1985) ................................................ 27

*United States v. Bros. Const. Co. of Ohio*, 219 F.3d 300 (4th Cir. 2000) .................. 29

*United States v. Parker*, 790 F.3d 550 (4th Cir. 2015) ...................................... 28

*United States v. Robinson*, 627 F.3d 941 (4th Cir. 2010) ................................. 25, 32

*United States v. Wilson*, 901 F.2d 378 (4th Cir. 1990) ...................................... 29

*Villeda v. Prince George's Cty*, 219 F.Supp.2d 696 (D. Md. 2002) ......................... 24, 33

*Washington v. Wilmore*, 407 F.3d 274 (4th Cir. 2005).................................................................. 37

**Rules**

Fed. R. Civ. P. 56(c) .................................................................................................................. 19

**EXHIBIT LIST**

1. Trial Transcript, May 25, 1984

2. Appellant's Brief, *Chestnut, et al. v. State*, No. 75, Sept. Term 1985 (Md. Ct. Spec. App. 1985)

3. Unreported Opinion, *Chestnut, et al. v. State*, No. 75, Sept. Term 1985 (Md. Ct. Spec. App. Sept. 30, 1985)

4. Office of the State's Attorney for Baltimore City Conviction Integrity Unit Report

5. Expert Report of Robert Milan

6. Grand Jury Transcript, December 1, 1983

7. Trial Transcript, May 22, 1984

8. Trial Transcript, May 3, 1984

9. Excerpts of BPD Homicide File

10. Trial Transcript, May 16, 1984

11. Trial Transcript, May 23, 1984

12. Trial Transcript May 21, 1984

13. Trial Transcript, May 2, 1984

14. Trial Transcript, May 4, 1984

15. Deposition of Shirley Woodard

16. BPD Investigative Reports

17. Plaintiffs' Written Statements

18. Deposition of Sharon Toon

19. Trial Transcript May 7, 1984

20. Trial Transcript May 17, 1984

21. Search Warrant Affidavit

22. Chestnut's Conviction Integrity Program Application

23. Trial Transcript, May 28, 1984

24. CIU Interview Notes

25. Transcripts of CIU Recorded Interviews

26. Deposition of Ron Bishop

27. Trial Transcript, May 15, 1984

28. Deposition of Edward Capers

29. Deposition of John Caldwell and Statement on the Record

30. Matusiak Expert Report

31. Deposition of Yvette Thomas

32. Joint Petition for Writ of Actual Innocence

33. State's Entry of Nolle Prosequi

34. Deposition of Donald Kincaid

35. Deposition of Floueritta Hunter

36. Deposition of Keyha Alderman Royster

37. States Requested Voir Dire

## INTRODUCTION

Dewitt Duckett was shot while being robbed of his jacket at Harlem Park Junior High School ("HPJHS") in the middle of a school day on November 18, 1983. Alfred Chestnut, Ransom Watkins, and Andrew Stewart ("Plaintiffs") were not students at the school but, according to teacher Shirley Woodard, were in the building within minutes of the murder. Although Plaintiffs deny being in the school at the time of the shooting, they admit that they were there earlier that day and were not authorized to be inside. Four student eyewitnesses—Ron Bishop, Edward Capers, John Caldwell, and Yvette Thomas—identified Plaintiffs as the ones who murdered Duckett. In 1984, a Baltimore City jury found Plaintiffs guilty of felony murder after hearing the four student eyewitness' observations relative to the murder and testimony from several teachers that Plaintiffs interrupted their classes just before the murder. The Honorable Robert M. Bell sentenced Plaintiffs to life terms in prison and no evidence undermining Plaintiffs' convictions developed over the next 36 years.

More than three decades after the trial, Chestnut wrote to the Conviction Integrity Unit of the Baltimore City State's Attorney's Office ("CIU") claiming that police reports were withheld from him at his trial and that these reports constituted newly discovered evidence of innocence. But these documents were not new: the reports documented police investigative efforts to follow up on leads unrelated to Plaintiffs and the police disclosed the reports to the prosecutor. The State submitted the reports to the trial court, which sealed them and refused to compel their production to Plaintiffs. *See* Ex. 1, Trial Tr. 8:23-10:13, May 25, 1984. In fact, Chestnut's appellate counsel relied on these sealed documents during Plaintiffs' appeal, and the Court of Special Appeals affirmed the trial court's refusal to compel the State to turn them over. *See* Ex. 2, Appellant's Brief,

NK DEF 006959-61; Ex. 3, *Chestnut, et al. v. State*, No. 75, Sept. Term 1985 (Md. Ct. Spec. App. Sept. 30, 1985), NK DEF 006863-65.

Even though the reports were decidedly not new evidence, the CIU reinvestigated the Duckett murder and the trial that followed. *See* Ex. 4, CIU Report. The deeply flawed "reinvestigation" falsely concluded that there was no indication that the police reports were disclosed to Plaintiffs before 2018 and otherwise turned up no physical or verifiable evidence that exonerated Plaintiffs. *Id.* at 37. The CIU also failed to review or ignored Grand Jury testimony that Ron Bishop, one of Plaintiffs' recanting witnesses, swore during the reinvestigation was 100% true. Ex. 5, Milan Expert Report, p. 71-72; 165. In that testimony, Bishop waffled between having identified Plaintiffs as the boys he saw confronting Duckett and having only seen one boy—Alfred Chestnut. Ex. 6, Grand Jury Tr. 28:2-31:2, Dec. 1, 1983; Ex. 7, Trial Tr. 129:1-20, May 22, 1984. Instead, the CIU made new credibility determinations about nearly forty-year-old testimony and claimed that all the eyewitnesses recanted their identifications. But the CIU's conclusion is unsupported by its own documentation of the reinvestigation. Bishop and Capers have recanted their identifications; Caldwell and Thomas have not. Ultimately, the CIU joined Plaintiffs in a petition for writ of actual innocence and dismissed the indictments against them.[1]

Although the CIU made no findings that BPD officers suppressed or fabricated evidence, Plaintiffs now assert claims against Detectives Donald Kincaid and Bryn Joyce ("Officer Defendants") for malicious prosecution (Counts I and VII); fabrication of evidence (Count II),

---

[1] Many of the CIU's conclusions were unsound at best. *See* Ex. 5 at 198-204. For example, the CIU failed to explore why Bishop lied either to the Grand Jury or at trial about whether he knew or had seen Chestnut before the day of the murder. *Compare* Ex. 6, 29:6-15 *with* Ex. 8, Trial Tr. 33:15-35:5, May 3, 1984. The CIU also adopted Bishop's assertion that Michael Willis was the real killer without challenging Bishop's decades-delayed realization of the gunman's identity or his repeated, consistent assertions that Willis was uninvolved. Ex. 5, p. 176-80.

failure to investigate and disclose exculpatory and impeachment evidence (Count III); failure to intervene (Count IV); and intentional infliction of emotional distress (Count VIII). To this day, however, neither Thomas nor Caldwell claim that they were coerced. Their combined accounts established probable cause for Plaintiffs' prosecutions notwithstanding the nearly 40-year-delayed recantations elicited from Bishop and Capers by the CIU. Because Plaintiffs' prosecutions were supported by probable cause, Officer Defendants are entitled to summary judgment on Plaintiffs' malicious prosecution claims.

Even accepting for purposes of argument that Bishop's and Capers's accounts were procured through police coercion, Plaintiffs developed no evidence that Officer Defendants knew that these statements, which tracked Thomas's and Caldwell's uncoerced accounts, were false. Thus, Plaintiffs' fabrication of evidence claims must be dismissed. Similarly, Plaintiffs have no evidence that Officer Defendants suppressed or that the State was unaware of any exculpatory or impeachment evidence that would constitute a *Brady* claim. And because Plaintiffs' due process claims fail, Officer Defendants are entitled to summary judgment on Plaintiffs' intentional infliction of emotional distress claims.

As for Plaintiffs' claims against Joyce, Plaintiffs developed no evidence that he knew about any wrongful act or omission. Instead, Plaintiffs ask the Court to draw inferences that Joyce must have had the opportunity to stop Kincaid's alleged bad acts based on nearly forty-year-old testimony and Capers's recollection that other detectives were with Kincaid during portions of one of his interviews with police. But even if Joyce were present, Plaintiffs have no evidence that he knew Capers's statement to Kincaid was false. What is more, Plaintiffs have no evidence that Joyce was aware of any communications between Kincaid and the State's Attorney's Office to know what evidence was or was not disclosed to prosecutors. Because Plaintiffs have no evidence

3

inculpating Joyce in malfeasance, all the claims against him and Plaintiffs' failure to intervene claim must be dismissed.

## FACTUAL BACKGROUND

Dewitt Duckett was shot during a robbery in a second-floor hallway of HPJHS at about 1:10 p.m. on November 18, 1983. Ex. 9, Excerpts of BPD Homicide File, AC BPD 000013; 15. The hallway connected the D-Unit and C-Unit of the building ("C/D Hallway"). *See* Ex. 10, Trial Tr. 9:8-10:7, May 16, 1984; *see also* Ex. 11, Trial Tr. 108:12-113:16, May 23, 1984. It had no classrooms on it and was off-limits to students. Ex. 10, 98:22-99:11. Even so, students sometimes used the C/D Hallway as a short-cut to the cafeteria on the first floor. *See* Ex. 12, Trial Tr. 125:2-127:6, May 21, 1984. Duckett managed to make it downstairs to the cafeteria after he was shot, but later succumbed to his injuries at Shock Trauma. Ex. 9, AC BPD 12.

**The Initial Investigation**

According to the responding officer's report, Duckett and three witnesses were on their way to the school cafeteria when "3 or 4 boys approached the victim." Ex. 9, AC BPD 13. The gunman pointed a small black revolver at Duckett and demanded his Georgetown jacket. *Id.* at AC BPD 13; 15. The gunman pulled on the jacket and shot Duckett in the neck when the sleeve caught on Duckett's wrist. *Id.* at AC BPD 13; 12. The gunman took the jacket and ran from the building with the other suspects. Ex. 9, AC BPD 12. The report described these other suspects as "+3 B/M 15-16 yrs N.F.D." *Id.* at AC BPD 15.

John Caldwell, Ron Bishop, and Edward Capers were the three witnesses who were with Duckett. *Id.* at AC BPD 11. According to the report, all the witnesses heard the shot but only Caldwell saw the actual shooting; Bishop and Capers were in the cafeteria. *Id.* at AC BPD 12.

4

Later that day, the three witnesses were interviewed at Homicide. Ex. 13, Trial Tr. 149:3-9, May 2, 1984; Ex. 14, Trial Tr. 126:13-20, May 4, 1984; Ex. 12, 129:11-25. During Capers's initial interview, he said that three guys were in the hallway just before the robbery and that one guy came up to Duckett. Ex. 12, 40:8-43:25.

Bishop claimed he saw two boys peeping around the corner before the murder and that one stayed down the hall as the gunman came up to Duckett. Ex. 7, 95:4-97:7; 98:9-19. Like Capers, Bishop told police that there was only one person involved in the killing but that there was more than one person with the gunman. *Id.* at 45:17-47:11; 98:9-19.

Caldwell said that he was on his way to lunch with the others but had to turn around. Ex. 12, 129:11-131:18. He claimed that as he tried to catch up, he saw a boy who he did not know trying to take Duckett's jacket outside the cafeteria. *Id.* at 131:19-133:23.

But all three witnesses later admitted that their initial statements were untrue—they did not identify the individuals responsible because they were scared or did not want to get involved. Ex. 13, 149:10-17; Ex. 12, 82:23-83:5; Ex. 7, 47:12-48:5; Ex. 12, 115:15-116:17; 120:8-12; 134:1-13.

**Kincaid Receives Information Pointing to Plaintiffs as Suspects**

Hours after the murder, Shirley Woodard, a teacher at HPJHS, told Kincaid that several boys who did not attend the school disrupted her classroom shortly before the murder. Ex. 15, Woodard Dep. 155:6-157:8, Feb. 10, 2022. Kincaid brought her school yearbooks to see if she could identify the young men. Ex. 11, 62:8-19. As a result of the interview, Kincaid identified Plaintiffs and brothers Curtis and Arnold Dow as the boys who Woodard saw just before the shooting. Ex. 16, BPD Investigative Reports, NK DEF 006996.

**Plaintiffs Give Written Statements to Kincaid**

The day after the murder, Kincaid interviewed Chestnut, who provided a signed statement. Ex. 17, Plaintiffs' Written Statements, HP3_LI_MAIP 10056-70. Chestnut admitted he was in the school with Watkins, Stewart, and the Dow brothers but said he left by 12:30 p.m. after a school security guard, Mr. Kelly, asked why they were in the building. Ex. 17, HP3_LI_MAIP 10066-67.

Watkins also gave a statement on the day after the murder. Ex. 17, HP3_LI_MAIP 10055-61. Watkins said he was at HPJHS from around 12:30 p.m. until 1:00 p.m. Ex. 17, HP3_LI_MAIP 10056. Like Chestnut, he claimed that he left when Mr. Kelly told him he did not belong in the school. Ex. 17, HP3_LI_MAIP 10056; 10061.

Kincaid directed another detective, James Blose, to take Polaroid photos of Chestnut, Watkins, and two other boys who were with them at the Homicide office so that Kincaid would have photographs to show to witnesses. Ex. 14, 178:22-25; Ex. 11, 137:7-138:17.

Two days later, Stewart gave Kincaid a signed statement. Ex. 17, HP3_LI_MAIP 9930-34. Stewart explained that he was at the school for about 15-20 minutes but also said that he arrived around 12:00 p.m. and left around 1:00 p.m. Ex. 17, HP3_LI_MAIP 9930.

**Kincaid Shows Photo Arrays to Eyewitnesses**

Kincaid placed a Polaroid photo of Stewart with six other Polaroid photos and the photos taken by Detective Blose, including those of Chestnut and Watkins, to form a group of 11 Polaroid photos ("Polaroid Array"). Ex. 14, 22:6-24; 141:2-17; 177:24-179:15. On the same day that Stewart gave his statement, Kincaid and his partner, Detective William Lansey, showed Bishop and Caldwell the Polaroid Array. Ex. 14, 87:14-89:8; 127:1-23. Neither identified anyone. *Id.*

Kincaid later received information through an anonymous phone call that Michael Willis shot Duckett. Ex. 16, NK DEF 6999. Based on this information, Kincaid created a six-photo array that included a photo of Willis ("Willis Array"). *Id.* Kincaid and Lansey showed this array to

Bishop and Caldwell. *Id.* When Caldwell viewed the array, he identified Willis as someone he had

seen around. Ex. 14, 39:4-13; 95:1-96:25. When Bishop viewed the array, he told Kincaid that he

knew Willis and that Willis was not involved in the murder. Ex. 8, 173:2-10; Ex. 16, NK DEF

6999.

Sergeant Jay Landsman and Detective John Tewey received another anonymous call

identifying Willis as the shooter. Ex. 16, NK DEF 6999. Tewey interviewed the caller who stated

that a girl told his sister that Willis killed Duckett, took his jacket, and wore it to the Shake and

Bake skating rink hours after the murder. *Id.* at NK DEF 6999-7000. Kincaid and Lansey later

interviewed the caller's sister, Theresa Moody, who denied being told that Willis killed Duckett

but admitted telling her brother that her friend said she was at HPJHS with Willis and that he threw

down a gun and ran when police responded. *Id.* at NK DEF 7000. According to Kincaid's report,

on the same day that Bishop and Caldwell cleared Willis as a suspect, he set an appointment to

interview Moody's friend, Sharon Toon.[2] *Id.*

When a phone call relaying third or fourth-hand information suggested Michael

Washington was a possible suspect, Kincaid created an array of five photos that included one of

Washington ("Washington Array") and again visited Caldwell and Bishop with Lansey. *Id.*

Caldwell identified no one. Ex. 14, 103:5-106:2. Kincaid's report reflected that Bishop said he

knew Washington and that he was not involved, though Kincaid later testified that Bishop

identified no one. Ex. 16, NK DEF 7000; Ex. 14, 133:22-136:16.

**Eyewitness Yvette Thomas Identifies Plaintiffs**

---

[2] It is unclear whether this meeting took place, but when Toon was deposed in 2022, she denied
being at HPJHS on the day of the murder or seeing Willis throw down a gun and run. Ex. 18,
Toon Dep. 15:15-16:8; 18:8-21, March 21, 2022. She also denied ever telling Moody that she
had. Ex. 18, 22:9-23:14.

On November 23, five days after the murder, Kincaid learned of two more possible witnesses. Ex. 16, NK DEF 7004. Kincaid and Lansey responded to HPJHS and interviewed these students, Yvette Thomas and Floueritta Hunter. *Id.* Though Hunter could not identify any photos of suspects, she provided a formal statement. *Id.* She later represented to ASA Jonathan Shoup, the trial prosecutor, that she would have to see the individuals in person to identify them. Ex. 8, 21:7-22:1; 119:13-120:4; Ex. 19, Trial Tr. 34:25-35:12, May 7, 1984.

Thomas provided a statement before identifying Plaintiffs in the Polaroid Array. Ex. 16, NK DEF 7004; Ex. 14, 114:11-116:23. Thomas explained that she was walking to a typing classroom on the second floor before heading to the cafeteria. Ex. 20, Trial Tr. 187:23-188:12, May 17, 1984. She believed she saw four boys and thought that there were two guns. *Id.* She also recounted seeing a gun held to Duckett's neck and trigger being pulled. *Id.* When asked if she recognized any of the suspects, she named Chestnut, Watkins, and Stewart. *Id.* at 188:13-20.

**Ron Bishop, Edward Capers, and John Caldwell Also Identify Plaintiffs**

That afternoon, Kincaid separately showed the Polaroid Array to Bishop, Capers, and Caldwell. Ex. 14, 109:3-17; 122:1-10; 141:2-17. Before doing so, Kincaid explained to each witness that he had developed other information and through that information he knew that each of them knew who was there at the time of the murder. *Id.* at 148:4-17. Kincaid did not tell the witnesses the names of whom he expected them to select or that an identification had been made. *Id.* at 148:18-149:6. Each of the witnesses then identified Plaintiffs in the Polaroid Array. Ex. 13, 118:15-122:9; Ex. 8, 70:3-78:21; Ex. 14, 107:14-111:12.

**Police Recover a Georgetown Jacket from Chestnut's House**

In the pre-dawn hours of the day following the eyewitness identifications, Kincaid executed a search warrant at Chestnut's house. Ex. 9, AC BPD 18. During the raid, police seized a

Georgetown jacket. *Id.* Forensic analysis later detected no blood, hairs, or fibers on the jacket. *Id.* at AC BPD 34.

**Eyewitnesses Implicate Plaintiffs in the Duckett Murder for the Grand Jury**

Capers, Caldwell, Bishop, and Thomas each appeared before the Grand Jury a week after they identified Plaintiffs.

Caldwell testified that he saw Plaintiffs accost Duckett for his jacket and that Chestnut shot him. Ex. 6, 7:9-8:15; 9:2-12:25. Caldwell also testified that as he ran to the cafeteria, he crossed paths with Plaintiffs and that Chestnut threatened to shoot Caldwell, "just like they shot [Duckett]" if Caldwell said anything. *Id.* at 13:1-14:7.

Capers, like Caldwell, testified that Plaintiffs accosted Duckett and that Chestnut had a gun. *Id.* at 18:17-22:18. Capers said he was running down the stairs with Bishop when Duckett was shot and did not actually see the shooting. *Id.* at 22:23-23:9.

Bishop testified next and at first stated that there were no other boys around when Duckett was shot. *Id.* at 28:2-14. He later said that he was not sure if he recognized any of the boys that tried to rob Duckett. *Id.* at 28:21-23. When asked whom the boy with the gun in his hand looked like, Bishop stated, "I think it was Alfred Chestnut." *Id.* at 29:2-5. But he said that he did not know Chestnut. *Id.* at 29:6-15. When asked if he picked out the suspects photographs because they did it, Bishop's answered, "Yes." *Id.* at 29:16-24. Ultimately, Bishop stated that he saw only one boy come up to Duckett and that it was Chestnut. *Id.* at 29:25-31:2.

Yvette Thomas testified last. She explained that she saw Duckett through a hallway that intersected the C/D Hallway. *Id.* at 35:14-25. She saw him with four boys and recognized Plaintiffs. *Id.* at 36:1-6. She explained that although she told police that she may have seen two guns, she was only sure that she saw one. *Id.* at 38:5-39:1. She also testified that she saw the group

forcing Duckett to give up his jacket and heard a gunshot but could not see whether anyone was grabbing Duckett. *Id.* at 37:16-24; 39:2-4. And she conceded that as the group of boys moved around, they may have moved out of her view. *Id.* at 39:6-17.

**Judge Bell Refuses to Suppress the Search of Chestnut's House**

Before trial, the State disclosed the probable cause document for the search of Chestnut's home. Ex. 13, 9:24-11:10. The affidavit identified Bishop, Caldwell, Capers, Thomas, and Hunter as eyewitnesses present at the time of the shooting and that "[s]tatements were taken from each witness and each witness was present in or near the hallway on the second floor where Dewitt Duckett was shot[.]" Ex. 21, HILLIARD 0000067-68. According to the affidavit, all the witnesses stated that Chestnut produced a handgun and demanded that the victim give him and two other suspects his jacket or be shot. *Id.* at HILLIARD 68. The Affidavit then stated that the witnesses identified Plaintiffs in the Polaroid Array as those involved in the Duckett murder. *Id.*

Chestnut's attorney tried to suppress the search of Chestnut's house by arguing that the warrant failed to establish a nexus between Chestnut's home and the murder. Ex. 13, 20:20-28:5. But after reviewing the parties' arguments, Judge Bell found that there was a basis for a magistrate to find probable cause to issue the warrant. *Id.* at 30:22-31:18.

The next morning, Chestnut's criminal counsel argued that he was hearing for the first time that Hunter did not make an identification. Ex. 8, 11:17-13:12. Prosecutor Shoup made proffers throughout the day about conversations he had with Hunter including that she could not make a photo identification. *Id.* at 21:23-22:1; 119:13-120:4; 124:21-125:2. In response to Chestnut's counsel's concerns, Judge Bell ordered Shoup to provide criminal defense counsel with Hunter's statement or produce her for their examination. *Id.* at 13:13-23:6. But the court did not disturb its decision not to suppress the search warrant.

**Hunter Refuses to Discuss What She saw With Criminal Defense Counsel**

Following Judge Bell's ruling, Hunter met with Shoup and Plaintiffs' criminal defense counsel.[3] Ex. 8, 101:20-102:15. Hunter was asked if she were present on November 18 and if she could speak to defense counsel about it. *Id.* at 102:25-103:5. Hunter stated that she was there and knew something about it but was quickly interrupted by Shoup, who told her she did not have to say anything. *Id.* at 103:7-15; 105:5-14. Hunter then declined to speak with Plaintiffs' criminal defense counsel. *Id.* at 103:15-22. When criminal defense counsel accused Shoup of prosecutorial misconduct, they again highlighted for the Court that the affidavit for the search warrant included the assertion that Hunter was an eyewitness. *Id.* at 111:2-112:10; 113:9-15.

**Caldwell, Thomas, Bishop and Capers Implicate Plaintiffs During Motion to Suppress**

Plaintiff's criminal defense counsel also moved to suppress the Polaroid Array identifications. During the suppression hearing, the court heard testimony from Caldwell, Bishop, Capers, Thomas, and Kincaid.

Consistent with his Grand Jury testimony, Caldwell testified that as he turned the corner to the C/D Hallway, he saw Duckett with Plaintiffs and that Chestnut had a gun. Ex. 14, 6:7-7:18. He also testified that he ran to the first floor after Chestnut shot Duckett and that Chestnut shoved him against a locker and threatened him. *Id.* at 8:15-10:7; 17:15-18:25; 69:18-70:5. Caldwell identified all three Plaintiffs in open court and described what each did. *Id.* at 10:8-17:14. And he explained that on November 23, detectives encouraged him to tell the truth before he identified Plaintiffs. *Id.* at 32:25-35:19.

---

[3] Plaintiffs' criminal defense counsel asserted that Hunter's testimony constituted *Brady* material and accused prosecutor Shoup of misconduct during their meeting with Hunter. Plaintiffs' criminal counsel called a law clerk who worked for the Office of the Public Defender to testify about what she observed during the meeting. Ex. 8, 96:8-105:20. Shoup called his own witness who testified about what she observed before the meeting. Ex. 8, 106:12-109:4.

Thomas testified that she was walking with her friends Floueritta [Hunter] and Keyha [Alderman] when she saw Plaintiffs talking to Duckett. Ex. 13, 36:12-25. She described that she hid behind a wall and looked down a hallway connected to the C/D Hallway as the events played out. *Id.* at 84:9-85:25. She also described what each Plaintiff did as Chestnut held a gun to Duckett's neck and pulled the trigger. *Id.* at 37:1-19. According to Thomas, Kincaid never mentioned any suspects' names before she viewed the array during which she selected Plaintiffs' photos. *Id.* at 45:3-50:10; 69:6-72:3.

Bishop and Capers both testified during the motion to suppress about what they observed. Ex. 8, 24:13-33:2; Ex. 13, 99:12-110:8 Each explained that they lied when interviewed on the day of the murder and truthfully identified Plaintiffs as the individuals they saw confront Duckett. Ex. 8, 24:13-35:13; Ex. 13, 100:20-108:18. Bishop also testified about identifying Willis in an array and that he told Kincaid that Willis was not involved. Ex. 8, 160:20-162:17; 173:2-10.

**Judge Bell Refuses to Suppress Eyewitness Identifications and Finds that Prior Efforts to Identify Plaintiffs were not Exculpatory**

The court also heard testimony that Kincaid was stern with Caldwell and voiced frustration that the boys had lied to him on the day of the murder and that Kincaid accused them of knowing more than they were telling him. Ex. 14, 107:25-108:18; Ex. 8, 163:21-165:17. Even so, the court denied Plaintiffs' motion to suppress and found that Hunter's, Bishop's, and Caldwell's "non-identifications" of Plaintiffs were not exculpatory. Ex. 19, 39:22-40:3. The court again did not disturb its prior ruling concerning the sufficiency of the search warrant affidavit.

**Plaintiffs' Criminal Trial Results in Their Convictions**

The State began its case with testimony from several teachers and security guard Kelly recounting Plaintiffs' presence at and in HPJHS leading up to the murder. Ex. 10, 2:13- 196:16;

Ex. 20, 78:3-92:18; 94:11-126:9. The State then called the eyewitnesses, each of whom implicated Plaintiffs.

Thomas testified consistently with her prior testimony. Ex. 20, 127:21-128:10. She identified all three Plaintiffs and described what each did and that she ran when she saw Chestnut pull the trigger. *Id.* at 128:24-131:2; 131:17-133:20; 136:21-138:20; 139:24-140:5; Ex. 12, 3:20-6:20. She also testified that she did not come forward at first because she was afraid. Ex. 20, 183:10-13. Instead, she explained, she came forward because Hunter told someone that she (Thomas) saw the incident. *Id.* at 183:17-184:3.

Caldwell similarly testified consistently with his prior testimony. Ex. 12, 102:10-111:21. He identified Plaintiffs and described what they did. *Id.* at 103:21-110:25; 122:4-123:8. He also described being grabbed and threatened by Chestnut immediately after the shooting. *Id.* at 110:24-112:12.

Capers's testimony also mirrored his earlier testimony. *Id.* at 23:7-31:10. He too identified Plaintiffs and their roles in the murder. *Id.* at 32:8-35:17. He also denied that he gave a statement because he was pressured or that Kincaid threatened him. *Id.* at 64:2-15.

The State called Bishop as the final eyewitness. He testified he saw Plaintiffs rob Duckett and identified them in court. Ex. 7, 38:19-42:16. He also explained that he told the police that only one person was involved and did not at first identify Plaintiffs in the Polaroid Array because he was scared someone would shoot him and he did not want to be part of the case. *Id.* at 47:12-48:5; 51:7-24. He also testified about identifying Willis as someone he knew but not as one of the offenders. *Id.* at 57:21-58:23. Bishop later reiterated that Willis had nothing to do with the murder and that he was not scared of Willis. *Id.* at 137:13-21.

13

When confronted with his Grand Jury testimony, Bishop stated that he lied about not really being sure if he recognized any of the boys. *Id.* at 63:18-70:21. He later denied recalling that he told the Grand Jury he saw only one boy in the hallway and agreed with his Grand Jury testimony that he picked out the photographs because they were the boys that he saw in the hallway. *Id.* at 71:6-12; 73:23-74:6.

Following closing arguments, the jury returned guilty verdicts for the Plaintiffs after fewer than 20 minutes of deliberation. Ex. 23, Trial Tr. 208:11-212:16, May 28, 1984.

**CIU Reinvestigates Duckett Murder Trial and Joins Writ for Actual Innocence**

On May 16, 2019, Chestnut contacted the CIU to seek a review of his case based on police reports he claimed to have never seen. Ex. 22, Chestnut's Conviction Integrity Program Application, NK DEF 11321-84. The CIU later interviewed Plaintiffs as well as the Dow brothers, Toon, Hunter, Capers, Caldwell, Bishop, and Thomas. Ex. 24, CIU Reinvestigation Documents.

The CIU's documentation of their interview with Bishop consisted of notes and an audio recording. Ex. 24, NK DEF 11836-38; Ex. 25, Transcripts of CIU Recorded Interviews, NK DEF 20560-91. Bishop told the CIU that everything he told the Grand Jury was 100% correct and that he was not truthful at trial. Ex. 24, NK DEF 11836; Ex. 25, NK DEF 20568. This was because he felt pressured due to friends dying and because his brother was killed a month earlier; Bishop was "done." Ex. 25, NK DEF 20570. Bishop said that he planned to stick with his Grand Jury testimony until Capers told him that Plaintiffs were laughing about Duckett's death. *Id.* at NK DEF 20571. Bishop explained that although he knew Plaintiffs did not do it, he testified as he did because the prosecutor told him that he may be charged as an accessory. *Id.* at NK DEF 20571- 72. He also stated that if he deviated from his Grand Jury testimony, it would have made him look like he was lying for Plaintiffs and he would have been made to look "pretty bad, like a stupid idiot," or that

he had committed perjury. *Id.* at NK DEF 20578-79. Bishop recalled that he told police that Willis was not involved in the murder, but he later told CIU that Willis did it. *Id.* at NK DEF 20576. Bishop also stated that he was not claiming the detectives pressured him to identify Plaintiffs or that they framed or set up the Plaintiffs. *Id.* at NK DEF 20569; NK DEF 020581. And Bishop recounted that in 1992, he asked Capers, "Between you and I, who did it?" Capers responded that it was Alfred Chestnut. *Id.* at NK DEF 20582; NK DEF 20589. None of the CIU notes reflect that Bishop stated he was not pressured by detectives, that he did not believe Plaintiffs were framed, or that Capers told him that Chestnut shot Duckett. Ex. 24, NK DEF 11836-38.

During Bishop's deposition two years later, he testified that one person approached and held a gun to Duckett's neck and demanded the jacket. Ex. 26, Bishop Dep. 27:1-30:5, Jan. 24, 2022. He also recalled selecting Willis in a photo array because he recognized him from the neighborhood, not because he was part of the murder. *Id.* at 62:9-63:3. Unlike his CIU interview, Bishop stated that Kincaid had forced him to identify Plaintiffs by gesturing to his gun, accusing Bishop of having lied, and threatening him. *Id.* at 79:10-97:9. Bishop testified that no other detective was present when Kincaid threatened him. *Id.* at 82:6-102:6.

Bishop later explained that his testimony in front of the Grand Jury was because his conscience was getting to him. *Id.* at 123:15-126:22. He felt "no pressure at all" when he gave his Grand Jury testimony and "felt like [he] was doing the right thing." *Id.* at 127:9-18. He said that he thought about Kincaid's threats, but that lying to the Grand Jury did not sit well with him. Ex. *Id.* at 127:19-128:11. He also stated that his pretrial preparation meetings before the Grand Jury were with Kincaid, Shoup, Thomas, Caldwell, and Capers and that the witnesses' parents were present, including his own mother. *Id.* at 128:15-134:3. Bishop did not recall any similar meetings after he gave his Grand Jury testimony. *Id.* at 133:22-124:3. Bishop admitted that he told the CIU

that the police did not pressure him, but this was because he had not gathered his thoughts and he later remembered he was pressured. *Id.* at 153:8-157:2. This despite testimony that his interaction with Kincaid was "something that traumatized [Bishop] for all [his] life." *Id.* at 117:3-118:3. Bishop also recounted interviews he gave to a writer from *The New Yorker* for an article about witnesses who were coerced or threatened to give false testimony. *Id.* at 170:19-173:2. Yet Bishop did not recall talking about his more outrageous claims of coercion including Kincaid's supposed gesturing towards his gun and his threat to throw Bishop out of a window. *Id.* at 203:21-206:16.

The documentation of the CIU's interview with Capers consisted of notes and a video without audio. Ex. 24, NK DEF 11572-73. According to the notes, Capers felt pressured to make a statement that matched a female witness's statement. *Id.* Capers explained that three guys came from behind and pulled the jacket but that he did not see their faces. *Id.* at NK DEF 11572. At the end of the interview, Capers told the CIU to let him know if there was anything he could do to help "[i]f they did not do it[.]" *Id.* at NK DEF 11573.

At Capers's deposition two years later, he claimed that he saw only one suspect and that another person peeped around a wall from the D Unit. Ex. 28, Capers Dep. 33:20-35:13, Jan. 18, 2022. Capers also explained that during trial prep meetings, the prosecutor was always present and that Thomas and Caldwell were not. *Id.* at 227:13-238:15. Capers admitted that nearly two years after the CIU interview, he told his sister during a conversation about the reasons for Plaintiffs' release, he said, "I ain't saying they didn't do it, I ain't saying they did do it. I'm just saying[.]" *Id.* at 214:10-216:22. He also denied telling Bishop that Plaintiffs murdered Duckett, despite Bishop's assertion to the contrary. *Id.* at 220:10-20.

The CIU's interview of Caldwell consisted of at least three interactions. The recording of the second interview reveals that the day before that interview, the CIU's investigator had

suggested to Caldwell that Willis shot Duckett. Ex. 25, NK DEF 20603-04. Caldwell told the CIU he was disillusioned by this representation. *Id.* at. Even so, Caldwell's statement did not stray from his testimony from nearly 40 years earlier. He maintained that the guys he identified at trial were the ones he saw during the crime. *Id.* at NK DEF 20606-07.

Twenty-six days later, the CIU reinterviewed Caldwell. Ex. 24, NK DEF 11570-71. According to the CIU's notes, Caldwell gave permission to record the interview but the CIU only produced notes from the interview. *Id.* at NK DEF 11570. According to these notes, Caldwell witnessed the shooting and saw the shooter with two other individuals but could not see faces clearly—he could see the form of a face but no details. *Id.* Caldwell told the CIU that he picked a guy that resembled the shooter and pictures he recognized. *Id.* The notes provide no indication about why the CIU interviewed Caldwell again or what questions they asked. *Id.* at NK DEF 11570-71. The notes and the CIU report similarly shed no light on why Caldwell's version changed between his second and third interviews. *Id.*; Ex. 4. And the notes provide no indication that Caldwell recanted his testimony about Plaintiffs confronting him right after the murder. Ex. 24, NK DEF 11570-71.[4]

The CIU's interview of Yvette Thomas was documented by notes and audio recorded, though the recording was abruptly stopped and about twelve minutes passed before it began again. *See* Ex. 30, Matusiak Expert Report p. 3. During the interview, she recalled three young men talking to the victim, but she could no longer recall who had the gun or the victim's name. Ex. 25, NK DEF 20675-76. After the recording resumed, Thomas could not recall whether she was shown a lineup and asked whether there was one and if it was black and white, to which the CIU's

---

[4] Mr. Caldwell appeared only briefly for his deposition and failed to appear when the deposition was continued to the following day. Ex. 29, Caldwell Depos.

investigator misleadingly stated "yes"—the lineup that Ms. Thomas testified in 1984 about having viewed was an array of color photos, the Polaroid Array. *Id.* at NK DEF 20683-84. Still, Thomas rejected the CIU's suggestion that she may have gotten the detailed information that she testified to in 1984 from someone else. *Id.* at NK DEF 20691. And following additional pushback from the CIU investigator, Ms. Thomas adamantly stated that she knew one of the people in the hallway. *Id.* at NK DEF 20691-92. Thomas similarly denied the CIU investigator's suggestion that she may have made up her testimony because she feared getting in trouble for cutting class. *Id.* at NK DEF 20694-95.

Even so, the CIU ignored Thomas's recollection of the individuals she identified being in the hallway with Duckett and focused on her unrefreshed recollection nearly 40 years later in which she could not recall hearing a shot fired or seeing a person shooting gun. *See* Ex. 4 at NK DEF 19809.

During Thomas's deposition, she testified that she never questioned whether she gave false testimony before the CIU spoke with her. Ex. 31, Thomas Depo. 21:7-22:9, Feb. 17, 2022. And after reviewing portions of her testimony, she agreed that it was the truth and that she was not coerced by anyone to testify against Plaintiffs. *Id.* at 38:16-42:20; 46:14-105:5; 107:6-177:2. She also confirmed that her deposition was the first time she had gone through her 1984 testimony. *Id.* at 106:17-107:4. And she confirmed that no police officer or detective pressured her to testify against or identify Plaintiffs. *Id.* at 177:3-178:16.

Despite Caldwell's and Thomas's statements, the CIU concluded that: (1) Plaintiffs were not present in HPJHS when the murder occurred; (2) the eyewitnesses recanted and their identifications of Plaintiffs were nullified; (3) Willis killed Duckett; (4) the State's witnesses were

coerced and coached; (5) critical exculpatory evidence was not disclosed to the defense before or during the trial; and (6) Plaintiffs are innocent. Ex. 4, NK DEF 19809-10.

Based on the CIU's determinations, the State's Attorney's Office and Plaintiffs filed a Joint Petition for Writ of Actual innocence and dismissed Plaintiffs' indictments. *See* Ex. 32, Joint Petition for Writ of Actual Innocence; Ex. 33, SAO's Entry of nolle prosequi. This lawsuit followed.

## LEGAL STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). To determine whether there is a genuine issue of material fact, courts construe the record in the light most favorable to the non-movant and draw all reasonable and justifiable inferences in that party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not assertions in the pleadings. *Bourchart v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). Neither "[u]nsupported speculation, nor evidence that is merely colorable or not significantly probative, will suffice to defeat a motion for summary judgment[.]" *Id.*

## ARGUMENT

I.      **Undisputed Probable Cause Based on the Statements of Caldwell, Thomas, and Other Evidence Defeats Plaintiffs' Malicious Prosecution Claims.**

"Common-law malicious prosecution requires showing, in part, that a defendant instigated a criminal proceeding with improper purpose and without probable cause." *McDonough v. Smith*, 139 S. Ct. 2149, 2156 (2019) (citation omitted); *see also Thompson v. Clark*, 142 S. Ct. 1332, 1337-38 (2022) ("the gravamen of the Fourth Amendment claim for malicious prosecution . . . is

19

the wrongful initiation of charges without probable cause. And the wrongful initiation of charges without probable cause is likewise the gravamen of the tort of malicious prosecution"). In defining the elements of a malicious prosecution claim under 42 U.S.C. §1983, the Fourth Circuit incorporates the common law elements into the constitutional tort. *See Lambert v. Williams*, 223 F.3d 257, 262 (4th Cir. 2000).[5] To succeed on a claim of malicious prosecution under the common law of Maryland and on Federal constitutional grounds, Plaintiffs must show that Officer Defendants prosecuted them without probable cause.

Probable cause is "defined in terms of facts and circumstances sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (alterations omitted). "For probable cause to exist, there need only be enough evidence to warrant the belief of a reasonable officer that an offense has been or is being committed; evidence sufficient to convict is not required." *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002). Indeed, the testimony of a single eyewitness can establish probable cause. *See Bailey v. Town of Smithfield, Va.*, 19 F.3d 10, at *3, *6 (4th Cir. 1994) (finding a single positive identification of the defendant from a photo array established probable cause for arrest); *Humbert v. O'Malley*, Civil No. WDQ-11-0440, 2014 WL 126673 *9 (D. Md. Mar. 25, 2014) ("[T]he positive identification of a suspect by a witness is generally sufficient to establish probable cause for an arrest, unless officers have reason to believe the witness is unreliable or have other exculpatory evidence"). Conflicting information from eyewitnesses does not inherently negate

---

[5] Under Maryland common law, "[t]he necessary elements of a case for malicious prosecution of a criminal charge are well established. There must be: (a) a criminal proceeding instituted or continued by the defendant against the plaintiff, (b) termination of the proceeding in favor of the accused, (c) absence of probable cause for the proceeding, and (d) malice, or a primary purpose in instituting the proceeding other than that of bringing an offender to justice." *Krashes v. White*, 275 Md. 549, 554 (1975) (quotation omitted).

probable cause established by other witnesses. *See, e.g.*, *U.S. v. Womack*, 285 F.3d App. 87, 89 (4th Cir. 2008); *U.S. v. Colkley*, 899 F.2d 297, 302 (4th Cir. 1990).

Kincaid knew through Plaintiffs' own statements that they were in HPJHS shortly before the murder and that they were not authorized to be there. *See* Ex. 17. He also knew, through Ms. Woodard, that Plaintiffs were in the building after they claimed to have left and within minutes of the murder. Ex. 20, 4:12-22. And Kincaid knew that Mr. Kelly never saw Plaintiffs inside the school, further cutting against the reliability of Plaintiffs' self-serving denials. *See* Ex. 10, 102:20-23. At minimum, Kincaid knew that Caldwell and Thomas, who never claimed to have been coerced, identified Plaintiffs in the Polaroid Array. Just as damning, Kincaid knew that Plaintiffs had threatened Caldwell as they fled the crime scene right after the murder.

After nearly forty years, Bishop and Capers changed their explanations about why they identified Plaintiffs, now claiming that they only did so because of Kincaid. *See* Ex. 26, 79:10-97:9; Ex. 28, 22:2-12. Kincaid adamantly denies any impropriety during his interviews with them. Ex. 34, Kincaid Dep. 278:2-22; 280:22-281:7; 307:9-308:15, May 4, 2022. But accepting Bishop's and Capers's allegations without conceding them, Officer Defendants still had probable cause to arrest Plaintiffs as neither Plaintiffs nor the CIU generated evidence that Officer Defendants coerced Thomas or Caldwell during the investigation or before they testified.

Thomas maintains that she told the truth to detectives and at trial—she saw Plaintiffs confront Duckett right before he was shot. Ex. 31, 47:6-48:9. And even if Caldwell had only seen the forms of faces and saw one individual "beefing" with Duckett and saw two other individuals in the C/D hallway, as he purportedly told the CIU (*see* NK DEF 11570), the other incriminating portions of Caldwell's testimony—that Plaintiffs threatened him as their paths crossed while they fled the school after the murder—supported probable cause. *See* Ex. 14, 17:15-18:25; 69:18-70:5;

Ex. 12, 110:24-111:21. And as Plaintiffs developed no evidence that Officer Defendants coerced Thomas or Caldwell to put Plaintiffs in the C/D Hallway, the accounts that they gave during the investigation that inculpated Plaintiffs, and on which Kincaid relied, stand unchallenged.

What is more, Bishop, who even now says that he felt "no pressure at all" and was "doing the right thing" in front of the Grand Jury, (Ex. 26, 127:9-18), testified that he thought the gunman was Chestnut and that he identified the photos in the Polaroid Array because they were the ones involved in the murder. Ex. 6, 29:2-5; 29:18-24.

The testimony and statements of Thomas and Caldwell established probable cause that Plaintiffs confronted Duckett right before he was shot, that Chestnut shot him, and that Plaintiffs fled the school immediately afterward. These inculpatory accounts were corroborated and strengthened by Plaintiff's undisputed admissions that they were in the school that day without authority. *See* Ex. 17. Probable cause is further strengthened by the testimony of Ms. Woodard that Plaintiffs were interrupting her classroom minutes before the shooting. *See* Ex. 20, 4:12-22; 5:23-6:4; 15:4-6; 18:11-19; 104:2-5; 108:17-111:19. And although the CIU claims, based on their notes, that Caldwell recanted and now says he could not have seen faces in the hallway, Caldwell never recanted his assertion that he was threatened by Plaintiffs in the first-floor hallway right after the shooting. *See* Ex. 24, NK DEF 11570-71. Caldwell's account of the first-floor confrontation after Duckett was shot at the very least circumstantially implicated Plaintiffs in the murder. Despite Capers's and Bishop's claims of coercion, Plaintiffs' prosecutions were supported by probable cause from Thomas's and Caldwell's statements and the identifications that they made and based on Bishop's maintained assertion that he told the truth in front of the Grand Jury. Because Plaintiffs' prosecutions were supported by probable cause, Officer Defendants are entitled to summary judgment on Plaintiffs malicious prosecution claims.

## II.   Summary Judgment Should be Granted as to the Fabrication Claim Because Plaintiff Cannot Establish that any Evidence was Knowingly Fabricated.

Even if the statements of Capers and Bishop were procured through aggressive questioning, this allegation does not amount to an actionable fabrication claim under the 14th Amendment because there is no evidence that Detective Kincaid knew that their statements were false. As explained by the Seventh Circuit, "[c]oercing witnesses to speak . . . is a genuine constitutional wrong, but the persons aggrieved [are the witnesses] rather than [the arrestee]." *Buckley v. Fitzsimmons*, 20 F.3d 789, 794 (7th Cir. 1994). "Coercively interrogating witnesses, paying witnesses for testimony, and witness-shopping may be deplorable, and these tactics may contribute to wrongful convictions, but they do not necessarily add up to a constitutional violation even when their fruits are introduced at trial," because "[e]vidence collected with these kinds of suspect techniques, unlike falsified evidence and perjured testimony, may turn out to be true." *Petty v. City of Chicago*, 754 F.3d 416, 422 (7th Cir. 2014) (internal quotation omitted). To sustain a fabrication claim under the 14th Amendment, a plaintiff must prove that the defendants affirmatively knew that the evidence was false. *Id.* (dismissing fabrication claim based on coerced witness statement because allegations did not establish that officers knew the account was false).

Thomas was the first eyewitness to identify Plaintiffs. And Plaintiffs can point to no evidence that Kincaid knew on the day Thomas provided her identification that it was untrue.[6]

---

[6] Although Hunter now claims she did not witness the murder, during her deposition, Hunter testified that she told detectives in 1983 that she saw Plaintiffs in a park connected to the school just after she ran outside following the murder and that no detective threatened her. Ex. 35, Hunter Dep. 126:17-128:8; 167:8-168:4; 168:15-23, Feb. 22, 2022. Additionally, Shoup's proffers concerning Hunter's ability to identify Plaintiffs if she saw them in person create the unavoidable conclusion that in 1983 and 1984, Hunter provided information to the State that implicated Plaintiffs in the murder. Regardless, "the failure to pursue potentially exculpatory leads, in itself, is not sufficient to negate probable cause." *Villeda v. Prince George's Cty*, 219 F.Supp.2d 696, 701 (D. Md. 2002) (citing *Clipper v. Takoma Park*, 876 F.2d 17, 20 (4th Cir. 1989)).

Indeed, to this day Thomas believes she was truthful when identifying Plaintiffs. Ex. 31, 47:6-48:9; 49:7-54:15. Thus, even accepting Bishop's and Capers's assertions that Kincaid coerced them into identifying Plaintiffs later that day, Plaintiffs have no evidence, circumstantial or otherwise, that Kincaid knew that their identifications were false. Considering Thomas's identification of Plaintiffs, corroborated by Caldwell's statement and identification, at most Plaintiffs can point to an inference that Kincaid used suspect techniques to encourage Bishop and Capers to tell Kincaid what he believed was the truth, not that he fabricated falsified evidence. Therefore, summary judgment should be granted as to Plaintiffs' fabrication of evidence claim.

### III.   Summary Judgment Should be Granted on Plaintiffs' *Brady* Claim Because Plaintiffs Cannot Point to any Qualifying Evidence that was Withheld.

Plaintiffs claim that Officer Defendants suppressed exculpatory and impeachment evidence of officer misconduct and their documentation of the Duckett murder investigation including the photo arrays and their interactions with and statements from witnesses Hunter, Alderman, Bishop, and Capers. To prove a *Brady* claim against Officer Defendants, Plaintiffs must establish "(1) that the evidence at issue was favorable to him; (2) the Officers suppressed the evidence in bad faith; and (3) prejudice ensued." *Owens v. Baltimore City State's Att'y's Off.*, 767 F.3d 379, 396-97 (4th Cir. 2014). A police officers' *Brady* duty is satisfied through disclosure to prosecutors. *See United States v. Robinson*, 627 F.3d 941, 952 (4th Cir. 2010); *Carvjal v. Dominguez*, 542 F.3d 561, 566 (7th Cir. 2008); *Cannon v. Polk County*, 68 F.Supp.3d 1267, 1279 (D. Or. 2014) (police officer fulfills *Brady* obligation through disclosure of evidence to the prosecutor even if the defense never receives it).

Plaintiffs' *Brady* claims fail for many reasons including that Officer Defendants disclosed purported *Brady* evidence to the State; that Plaintiffs were aware of the information that they claim was suppressed; that Plaintiffs could have discovered purportedly suppressed information through

a reasonably diligent investigation; that evidence, even if suppressed, was not material; and that the remaining purported *Brady* evidence is not actionable under § 1983.

### A. The Notes Referenced in Chestnut's Request to the CIU and Witness Statements Were Not Withheld from the State

According to Plaintiffs' Amended Complaint, the basis for Chestnut's request to the CIU for a re-investigation was exculpatory documents he received in response to a public records request. ECF 59 ¶¶ 123-124. Plaintiffs also assert that Officer Defendants suppressed Hunter's non-identification of Plaintiffs during a photo array and statements from Alderman and Hunter. But the undisputed evidence establishes that the State was aware of this information.

From the start of the suppression hearing, the State opposed the disclosure of witness statements and the documents that Chestnut claimed to have received in response to his public information request. Ex. 13, 9:24-18:21. And the State made no representations that it was missing any statements from possible witnesses it identified in discovery. Prosecutor Shoup also made proffers during the suppression hearing that Hunter told him she could not make a photo identification and would need to see the individuals to identify them. Ex. 8, 21:23-22:1; 119:13-120:4; 124:21-125:2. Indeed, Hunter began to tell Plaintiffs' defense counsel that she was present and saw something about the murder before Shoup interrupted her. *Id.* at 103:7-22; 105:5-14. At the State's request, the trial court sealed the investigative documents that Chestnut told the CIU were withheld. *See* Ex. 1, 8:23-10:13. The Court retained these documents as part of its file. *Id.*

Because an officer's duty to disclose *Brady* material is satisfied when he or she provides it to the State, and because the record shows that the State was aware of and resisted disclosing the information Plaintiffs now claim was favorable, summary judgment on Plaintiffs' *Brady* claims related to this information should be granted.

### B. Keyha Alderman's Statement, even if Suppressed, was not Material

25

At Alderman's deposition, she testified that she may have identified Watkins in a photo book and that she may have told detectives that she had once seen Ransom with a gun but that she did not witness the murder at HPJHS. Ex. 36, Alderman Depo. 149:3-14; 171:22-172:18. Even if Officer Defendants suppressed Alderman's statement, it does not support Plaintiffs' *Brady* claim because her statement did not help Plaintiffs and it was otherwise immaterial. Plaintiffs can only speculate about why the State would have called Alderman as a witness. Before Plaintiffs' criminal trial, the State identified her in discovery as a witness who identified Ransom in a photo. Ex. 37, State's Requested Voir Dire, HP3_LI_MAIP 13394-95. Even so, the State did not use any of Alderman's evidence against Plaintiffs. Shoup represented to the Court that he decided not to call her as a witness because her mother thought it would be too terrifying for her even though she made an identification. Ex. 8, 15:2-7. The Court then refused to allow Plaintiffs to examine Alderman once the State announced it would not call her as a witness. *Id.* at 11:6-16:20.

Undisclosed *Brady* evidence "is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome" *United States v. Bagley*, 473 U.S. 667, 682 (1985). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Augurs*, 427 U.S. 97, 109-110 (1976). Impeachment evidence may be material if it was the "only significant impeachment material," or if the witness to be impeached "supplied the only evidence of an essential element of the offense." *United States v. Parker*, 790 F.3d 550, 558 (4th Cir. 2015).

Alderman's statement did not help Plaintiffs and therefore it cannot serve as the basis for a *Brady* claim. Although Plaintiffs may argue that Alderman's statement could have called

26

Thomas's account into question, Plaintiffs had ample impeachment material to cross-examine Thomas. On cross-examination, Plaintiffs explored Thomas's written statement, her Grand Jury testimony, and her suppression hearing testimony extensively and argued they impeached her trial testimony. And Caldwell also testified that Plaintiffs were the ones who robbed and shot Duckett. Although Plaintiffs assert that they could have impeached Thomas with Alderman's statement that she (Alderman) did not witness the murder, Alderman's statement was not material because it did not exclude the possibility that Thomas saw it. Additionally, Alderman's statement would have been cumulative as it relates to the potential impeachment of Thomas considering Thomas's robust cross-examination. Because Alderman's statement was not material exculpatory or impeachment evidence, it cannot support Plaintiffs' *Brady* claim.

### C. The Accounts of Capers and Bishop—Including that they at First Denied Knowing the Identity of the Shooter—Were Always Known.

As discussed above, the State disclosed witness statements and Grand Jury testimony before the trial. Ex. 27, Trial Tr., 29:15-21, May 15, 1984. And during the motion to suppress hearing, Plaintiffs learned about Bishop's and Capers's early lack of cooperation and their hesitation to identify Plaintiffs in the Polaroid Array on November 23. Ex. 8, 147:13-148:13; 158:14-159:6; Ex. 13, 140:21-141:3; 149:10-17. Plaintiffs cross-examined and impeached them extensively with these points and their suppression hearing testimony. Ex. 12, 41:14-95:2; Ex. 7, 60:18-132:16. Because Officer Defendants did not suppress the fact that Bishop and Capers did not identify Plaintiffs on the day of the murder and hesitated to identify them on November 23, Plaintiffs have no *Brady* claim based on this information.

### D. Any Questions About the Circumstances by Which the Statements of Bishop and Capers Were Procured was Available Through the Exercise of Reasonable Diligence.

The Fourth Circuit has firmly established that where evidence is both available to the defendant and in a source where a reasonable defendant would look that evidence is not considered suppressed for purpose of the *Brady* rules. *Lovitt v. True*, 403 F.3d 171, 184 (4th Cir. 2005); *United States v. Bros. Const. Co. of Ohio*, 219 F.3d 300, 316 (4th Cir. 2000); *United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990). This includes evidence that could have been obtained by the defendant through "reasonable and diligent investigation." *Barnes v. Thompson*, 58 F.3d 971, 976 (4th Cir. 1995); *Hoke v. Netherland*, 92 F.3d 1350, 1355 (4th Cir. 1996); *see also Mosley v. City of Chicago*, No. 06 C 6314, 2009 WL 3097211, at *6-7 (N.D. Ill. Sept. 22, 2019) (finding no suppression about the circumstances of a lineup identification where plaintiff could have interviewed witness about his lineup identification).

During Plaintiffs' criminal trial, Plaintiffs' investigator, Gregory Perry, testified that he spoke with Capers and Caldwell together, one time, about two months before the trial. Ex. 23, 5:12-7:15. Perry did not testify about trying to interview Bishop, Alderman, or Hunter. *Id*. According to Perry, Capers adopted Caldwell's recitation of the events including that they identified but did not implicate Chestnut in the murder. *Id.* at 8:8-10:25. But Perry's trial testimony does not suggest that he asked Capers or Caldwell about threats or coercion during any of their interactions with police. Instead, Perry focused on whether Kincaid provided them with Chestnut's name before they gave statements. Ex. 12, 83:17-85:10. Perry's single interview of two witnesses together can hardly be considered a reasonably diligent effort, particularly when he claims the witnesses he briefly interviewed exonerated Plaintiffs.

The inescapable fact that any reasonably diligent criminal defense attorney would have interviewed Capers and Bishop about the circumstances of their identifications is underscored by the Seventh Circuit's ruling in *Holland v. City of Chicago*. 643 F.3d 248, 255 (7th Cir. 2011). In

*Holland*, the plaintiff's rape charges were vacated based on DNA evidence. *Id*. The plaintiff was

identified by the victim at a show-up at a hospital and plaintiff alleged that the police coerced and

unduly influenced the victim's identification through highly suggestive identification procedures.

*Id*. The court explained that there was no *Brady* violation because the details of the police interview

and the victim's identification were always available to the plaintiff through a reasonably diligent

interview. *Id*. at 256.

The Fourth Circuit earlier reached a similar conclusion in *Hoke v. Netherland*. 92 F.3d at

1355-56. In that case, a defendant who was convicted of rape, argued that the State committed a

*Brady* violation by not disclosing interviews with three men who admitted to having had sexual

contact with the victim. *Id.* at 1354. The Fourth Circuit reversed the grant of a writ of *habeas*

*corpus*, holding that had the defendant undertaken a reasonable and diligent investigation, he

would have learned of the witnesses and their relationships with the victim. *Id.* at 1355.

The same is true here. During Plaintiffs' suppression hearing, they were unquestionably

aware that Capers and Bishop did not identify Plaintiffs on the day of the murder and still hesitated

before identifying Plaintiffs on November 23. Ex. 13, 118:15-120:7; 140:21-141:3; 149:3-17; Ex.

8 163:21-165:13. Still, unlike with Hunter, Plaintiffs' counsel made no requests of the court to

help them secure an interview with Capers or Bishop. Instead, they asked Capers whether he had

been threatened to come to the Homicide office on November 23 or if he had been told that he was

a suspect along with everybody else in the hall. Ex. 13, 145:3-25. They asked Bishop none of these

questions. Ex. 8, 70:3-94:5; 145:18-151:1; 153:8-154:19; 165:21-171:1. The circumstances of

Capers's and Bishop's statements that implicated Plaintiffs were available to Plaintiffs had they

exercised reasonable diligence by interviewing Bishop and Capers (rather than allowing Capers to

adopt Caldwell's story). In that same vein, if Hunter's and Alderman's accounts were material

*Brady* evidence that Officer Defendants withheld from the State, their statements were available to criminal defense counsel had they exercised reasonable diligence. Thus, the allegations about Capers, Bishop, Hunter, and Alderman do not amount to an actionable *Brady* claim.

### E.  The Allegations of Misconduct by Detective Kincaid do not Qualify as Actionable *Brady* Evidence.

Since it is the prosecutor's duty to disclose *Brady* material to the defense, police officers cannot be liable for a *Brady* violation where the prosecutor is aware of the allegedly withheld *Brady* material. *See*, *e.g.*, *Johnson v. Scheidler*, No 05-CV-74465, 2007 WL 1119876, at *10 (E.D. Mich. Apr. 16, 2007) (*Brady* due process claim could not be maintained against police officer who omitted information from his police report, since the prosecutor learned of the omitted information before trial). The Fourth Circuit has recognized that there is an outer limit to *Brady* obligations of police misconduct and how much knowledge of such misconduct is imputed to the prosecutor, triggering an obligation to disclose it. *See Robinson*, 627 F.3d at 952 ("We draw no hard and fast lines here about the scope of *Brady* imputation, and we reiterate that prosecutors have a duty to learn of exculpatory evidence gathered by those acting on the government's behalf"). Thus, if police misconduct existed and should have been known to the prosecutors, the obligation is upon the prosecutor to disclose it to the defense. *Id.*

Bishop asserts that he told prosecutor Shoup that things did not occur as he was being instructed to testify during Shoup's trial preparation meetings. Ex. 26, 245:18-246:15. Yet Shoup ignored Bishop and presented the case to the jury with criminal defense counsel accusing him of misconduct at nearly every step along the way. And Shoup, knew through the eyewitnesses' Grand Jury testimony that Bishop, Capers, and Caldwell identified Plaintiffs on November 23 after earlier signing statements in which they did not identify anyone. Ex. 27, 29:15-21; Ex. 12, 40:8-43:25; 129:11-133:23; Ex. 7, 95:4-99:11. As much as the change in Capers's and Bishop's accounts

between the murder and their November 23 identifications could support an inference of police misconduct, Shoup was aware of it. Because Shoup did or should have known about any alleged misconduct, Officer Defendants did not suppress it. Bishop and Capers were not under the control of Officer Defendants and their accounts of purported misconduct were fully available to the State and Plaintiffs' criminal defense counsel. Thus, the nondisclosure of the alleged witness coercion is not actionable as a *Brady* claim.

## IV.    Plaintiffs' IIED Claim Fails Because their Arrests were Supported by Probable Cause and they Lack Evidence that Kincaid Fabricated Falsified Evidence.

Intentional Infliction of Emotional Distress ("IIED") is a recognized tort in Maryland. *Harris v. Jones*, 281 Md. 560 (1977). The tort has four elements. (1) The conduct must be intentional or reckless; (2) [t]he conduct must be extreme and outrageous; (3) [t]here must be a causal connection between the wrongful conduct and the emotional distress; [and] (4) [t]he emotional distress must be severe. *Id.* at 566. The Court of Special Appeals has cautioned that a claim for IIED is "rarely viable, and is to be used sparingly." *Borchers v. Hyrchuk*, 126 Md. App. 10, 19 (1999) (internal citations omitted).

Plaintiffs have not shown that Officer Defendants engaged in "extreme and outrageous" conduct. Kincaid engaged in a good-faith investigation of the Duckett murder and arrested Plaintiffs based on probable cause. Since Detective Kincaid had probable cause to prosecute Plaintiffs based on the statements of Caldwell and Thomas, no IIED claim is viable. *See Villeda,* 219 F.Supp.2d at 702 (granting summary judgment on IIED claim where officer defendant had probable cause to arrest plaintiff). And as discussed, Plaintiffs' alleged fabrication and *Brady* claims do not amount to actionable due process violations and do not support an inference that their actions were motivated by a desire to inflict emotional distress on Plaintiffs or carried out

31

with reckless disregard for their emotional distress. Because Officer Defendants' conduct was not "extreme and outrageous," they are entitled to summary judgment on Plaintiffs' IIED claim.

**V.     Summary Judgment for Defendant Joyce and on the Failure to Intervene Claim is Proper Because There is no Evidence that Joyce was Personally Involved in any Alleged Constitutional Deprivation.**

According to Plaintiffs, Kincaid and Joyce failed to document Capers's statements that exculpated Plaintiffs and their interview with Capers before they showed him a photo array and failed to take notes about the photo identification process. They also allege that Kincaid and Joyce fed Capers a false narrative of the crime and directed him to identify Plaintiffs as the perpetrators of the murder during the Polaroid Array and used verbal and physical threats and intimidated him to inculpate Plaintiffs. Through these allegations, Plaintiffs assert that Kincaid and Joyce failed to intervene to stop one another from violating Plaintiffs' constitutional rights.

In the Fourth Circuit, a failure-to-intervene claim lies where an officer "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Randall v. Prince George's Cty.*, 302 F.3d 188, 204 (4th Cir. 2002). But even assuming Kincaid had violated Plaintiffs' constitutional rights, Plaintiffs lack evidence that Joyce was aware and had a reasonable opportunity to prevent the harm.

Capers's deposition testimony about his November 23, 1983 interview with Kincaid did not inculpate Joyce. Capers testified that there were two other Caucasian male detectives in the interrogation room during the interrogation with Kincaid. Ex. 28, 74:7-19. Yet Capers connected none of the other detectives to his testimony about Kincaid's actions. According to Capers, they sat still and one unnamed detective mentioned the name Yvette. *Id.* at 77:1-82:14. Presumably, Plaintiffs ask this Court to infer that Joyce was one of those detectives based on Kincaid's 1984 trial testimony and his deposition testimony, after being misled following a failed attempt to

32

refresh his recollection with trial testimony. Ex. 14, 123:4-19; Ex. 34, 79:12-80:1; 282:19-283:17; 334:3-10. But Kincaid's former testimony is insufficient circumstantial evidence to warrant submission of the matter to a jury for resolution at trial because Capers testified that multiple detectives were in and out of the room during his interview. *See* Ex. 28, 329:18-22; 74:13-75:19.

At best, Plaintiffs can only establish that Joyce, who was not the secondary detective on the investigation, was in the room during the Polaroid Array on November 23 and that he participated in the execution of the search warrant for Chestnut's house. But none of Plaintiffs' claims against Joyce stem from the execution of the search warrant. And even if Joyce were in the room when Capers viewed the Polaroid Array, Plaintiffs developed no evidence that he recognized and had a chance to intervene in any of Kincaid's purported misconduct. *See Burley v. Balt. Police Dep't*, 422 F. Supp. 3d 986, 1030 (D. Md. 2019) (noting that a failure to intervene claim requires the officer to know that a constitutional deprivation is taking place and to have a realistic opportunity to intervene to prevent it).

As discussed above, Plaintiffs' claims about Capers's identification of Plaintiffs during the Polaroid Array stem from Kincaid's alleged fabrication of the identification and his non-disclosure of purportedly favorable evidence related to the identification. But Plaintiffs developed no evidence that Joyce fabricated or suppressed any evidence or that he (Joyce) knew that Kincaid knew he (Kincaid) was fabricating false evidence. And assuming Kincaid had an obligation to disclose the circumstances of the Polaroid Array to the State, Plaintiffs have no evidence that Joyce knew Kincaid had not made that disclosure. Because of Plaintiffs' lack of evidence of Joyce's involvement beyond perhaps being a fly on the wall while Capers viewed the Polaroid Array on November 23, Joyce is entitled to summary judgment on all of Plaintiffs' claims against him including Plaintiffs' failure to intervene claim.

Additionally, as Plaintiffs have no evidence that Joyce violated their constitutional rights, Kincaid is entitled to summary judgment on Plaintiffs failure to intervene claim against him because there was nothing for Kincaid to prevent.

## VI.   Alternatively, Detectives Kincaid and Joyce are Entitled to Qualified Immunity.

Public officials such as police officers are immune from suit under 42 U.S.C. § 1983 if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In essence, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). "To overcome qualified immunity, a plaintiff must show '(1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct.'" *Cannon v. Vill. of Bald Head Island*, 891 F.3d 489, 497(4th Cir. 2018) (quoting *Ashcroft*, 563 U.S. at 735). For the same reasons discussed above, Plaintiffs cannot meet the first prong with respect to any of the alleged violations.

Plaintiffs seek to hold Officer Defendants liable for their belief during the Duckett murder investigation that Thomas and Caldwell honestly identified Plaintiffs. It is undisputed that Plaintiffs did not belong in the school and teacher Woodard placed the Plaintiffs in the school within minutes of the murder. As established above, Thomas's and Caldwell's accounts combined with Plaintiffs' denials that were inconsistent with teacher Woodard's account provided Officer Defendants with probable cause to arrest and charge Plaintiffs for murdering Duckett. Thus, this Court cannot find Kincaid "plainly incompetent in assessing the probable cause issue." *Durham v. Horner*, 690 F.3d 183, 190 (4th Cir. 2012). If Officer Defendants were mistaken as to whether the accounts created probable cause, their assessments were reasonable under the circumstances and

cloaked them with qualified immunity as to the malicious prosecution claim. *See id.* ("[E]ven if the existence of probable cause were a close question, the qualified immunity standard gives ample room for mistakes in judgments.") (internal quotation omitted).

Officer Defendants are also entitled to qualified immunity from Plaintiffs' fabrication claim. As the Fourth Circuit explained in *Washington v. Wilmore*, at issue in a fabrication claim is the right "not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity." 407 F.3d 274, 282 (4th Cir. 2005) (quotation omitted). The alleged "fabrication evidence" is Capers's and Bishop's November 23 statements and identifications implicating Plaintiffs in the Duckett murder. But as discussed above, Plaintiffs lack evidence that Officer Defendants knew that the statements or identifications were false. And because the facts, viewed in the light most favorable to Plaintiffs, do not establish a violation of Plaintiffs' constitutional right not to be deprived of liberty due to the fabrication of evidence, Plaintiffs cannot overcome Officer Defendants' qualified immunity as to the fabrication claim.

Finally, Officer Defendants are entitled to qualified immunity from Plaintiffs' *Brady* claim. For the reasons discussed above, Plaintiffs failed to establish that the State was unaware of any favorable evidence or that criminal defense counsel could not have through the exercise of due diligence discovered evidence purportedly suppressed in bad faith by Officer Defendants. Thus, because Officer Defendants did not suppress any favorable evidence, they are entitled to qualified immunity from Plaintiff's *Brady* claims.

## <u>CONCLUSION</u>

For these reasons, Officer Defendants Donald Kincaid and Bryn Joyce respectfully request that this Honorable Court grant their motion for summary judgment and dismiss Plaintiffs' claims against them in their entirety.

DATED: September 6, 2022               Respectfully submitted,

                                       _____/s/_____

Avi T. Kamionski (Bar No. 20703)
akamionski@nklawllp.com
Shneur Nathan (Bar No. 20707)
snathan@nklawllp.com
Mayer Engelsberg (Bar No. 21105)
mengelsberg@nklawllp.com
Michael J. Elliker (Bar No. 20810)
melliker@nklawllp.com
Nathan & Kamionski LLP
575 S. Charles Street Suite 402
Baltimore, MD 21201
T: (312) 612-1928

*Attorneys for Individual Defendants*
*Donald Kincaid, Jr. & Bryn Joyce*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 6, 2022, I caused the foregoing document to be electronically filed with the Court's CM/ECF system, which will send an electronic copy of the same to all counsel of record.

*/s/ Michael Elliker*