**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
(Northern Division)

| | |
|---|---|
| ALFRED CHESTNUT, *et al*.<br><br>Plaintiffs,<br><br>v.<br><br>DONALD KINCAID, *et al.*,<br><br>Defendants. | Civil Action No. LKG-20-2342 |

**PLAINTIFFS' OPPOSITION TO**
**<u>INDIVIDUAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

Kobie A. Flowers (Bar No. 16511)
Andrew D. Freeman (Bar No. 03867)
Chelsea J. Crawford (Bar No. 19155)
Neel K. Lalchandani (Bar No. 20291)
Anthony J. May (Bar No. 20301)
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 2500
Baltimore, Maryland 21202
Tel: (410) 962-1030
Fax: (410) 385-0869
kflowers@browngold.com
adf@browngold.com
nlalchandani@browngold.com
ccrawford@browngold.com
amay@browngold.com

Larry A. Nathans (Bar No. 03023)
Booth M. Ripke (Bar No. 25764)
Nathans & Ripke LLP
120 E. Baltimore Street, Suite 1800
Baltimore, Maryland 21202
Tel: (410) 783-0272
Fax: (410) 783-0518
nathans@nathanslaw.com
bripke@nathanslaw.com

*Counsel for Plaintiffs Alfred Chestnut,*
*Andrew Stewart, Jr., and Ransom Watkins*

Dated: October 14, 2022

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................................... iii

EXHIBIT INDEX ................................................................................................................... vii

INTRODUCTION ..................................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................ 4

I.     BPD's Initial Investigation of Dewitt Duckett's Murder Revealed One Perpetrator. ........ 4

II.    For the Next Five Days, Defendants Ignored Evidence Pointing to Viable Suspects and Focused Their Attention on Plaintiffs. ...................................................................... 6

III.   Five Days After the Murder, Defendants Turned to a 13-Year-Old "Witness" Whose Account was Contradicted by Other Teenage Witnesses. ................................................. 8

IV.   On November 23, 1983, Defendants Coerced Juvenile Witnesses Who Had Not Previously Identified Plaintiffs to Falsely Incriminate Them. ............................................ 9

V.    Plaintiffs Were Arrested on Thanksgiving Day and Then Wrongfully Convicted. .......... 13

VI.   Plaintiffs' 36-year Fight for Freedom. ......................................................................... 14

LEGAL STANDARD .............................................................................................................. 15

ARGUMENT .......................................................................................................................... 16

I.     Defendants Misstate the Fabrication Standard and Fail to Challenge the Evidence Supporting Plaintiffs' Claim. ...................................................................................... 16

     A.   A law enforcement officer who deliberately or recklessly fabricates evidence that results in a deprivation of liberty violates a person's due process rights. ....... 17

     B.   Defendants forced Bishop and Capers to falsely implicate Plaintiffs by threatening violence, prosecution, and separation from their families. ................. 17

     C.   Defendants falsified the affidavit in support of Plaintiffs' arrest warrants. .......... 21

II.    Because Plaintiffs' Failure to Investigate Claim is Uncontested, It Must Proceed to Trial. .................................................................................................................... 22

III.   Genuine Disputes of Material Fact Require a Trial on Plaintiffs' Suppression of Exculpatory and Impeachment Evidence Claim. ............................................................ 23

     A.   The record supports that Defendants unconstitutionally concealed evidence from the prosecutor. ................................................................................................. 24

          1.   Defendants concealed Hunter's and Alderman's statements that they did not witness the murder. ...................................................................... 25

          2.   Defendants concealed Bishop's and Capers's November 23, 1983 Oral Statements. ........................................................................................ 27

          3.   Defendants concealed their coercive tactics. ............................................. 28

     B.   Defendants concede the "bad faith" element of the suppression claim. ............... 29

C.  The concealed exculpatory and impeachment evidence was material.................. 30

D.  Defendants' affirmative defense that defense counsel and the prosecutor should have uncovered the depths of their coercion is unsupported and would immunize police misconduct. ............................................................................... 32

IV.  A Jury Should Decide the Malicious Prosecution Claims Because Defendants Lacked Probable Cause to Arrest Plaintiffs................................................................................. 36

A.  Defendants do not address the fabricated statements of Bishop, Capers, and Hunter in their probable cause analysis. ................................................................ 37

B.  Genuine disputes of material fact exist as to whether Caldwell's and Thomas's November 23 statements established probable cause. ........................ 38

1.  A reasonable jury could conclude that Defendants coerced Caldwell to falsely identify Plaintiffs.................................................................... 38

2.  A reasonable jury could find that Thomas was coerced or unreliable. ...... 39

3.  Defendants' knowledge of exculpatory evidence and failure to investigate other leads further undermined probable cause. .................... 41

V.  A Reasonable Jury Could Conclude that Detectives Joyce and Kincaid Failed to Stop—and Actively Participated In—Witness Coercion.................................................... 42

VI.  Defendants' Coercion of Witnesses and Suppression of Evidence, Causing the Imprisonment of Innocent Teenagers, Supports Plaintiffs' IIED Claims........................ 44

VII.  Qualified Immunity Is Not Available to Defendants ........................................................ 45

CONCLUSION........................................................................................................................ 45

CERTIFICATE OF SERVICE ................................................................................................ 47

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ....................................................................................... *passim*

*Arsham v. Mayor & City Council of Balt.*,
   85 F. Supp. 3d 841 (D. Md. 2015) ............................................................................ 44

*Bailey v. Town of Smithfield*,
   19 F.3d 10 (4th Cir. 1994) ..................................................................................... 40

*Bazinet v. Thorpe*,
   190 F. Supp. 3d 229 (D. Mass. 2016) ....................................................................... 44

*Bell v. Vill. of Streamwood*,
   No. 10 C 3263, 2011 WL 4435664 (N.D. Ill. Sept. 6, 2011) .......................................... 44

*Bolden v. City of Chicago*,
   No. 17-CV-417, 2019 WL 3766104 (N.D. Ill. Aug. 9, 2019) ......................................... 25

*Brady v. Maryland*,
   373 U.S. 83 (1963) ....................................................................................... *passim*

*Burgess v. Balt. Police Dep't*,
   300 F. Supp. 3d 696 (D. Md. 2018) ............................................................. 26, 27, 29

*Burgess v. Balt. Police Dep't*,
   No. RDB-15-0834, 2016 WL 795975 (D. Md. Mar. 1, 2016) .................................... 34–35

*Burgess v. Balt. Police Dep't*,
   No. RDB-15-0834, 2017 WL 4947004 (D. Md. Oct. 31, 2017) .................................. *passim*

*Burgess v. Goldstein*,
   997 F.3d 541 (4th Cir. 2021) .................................................................................. 30

*Caldor, Inc. v. Bowden*,
   330 Md. 632 (1993) .............................................................................................. 36

*Campbell v. Hewitt, Coleman & Assocs., Inc.*,
   21 F.3d 52 (4th Cir. 1994) ..................................................................................... 16

*Cavallo v. Star Enter.*,
   100 F.3d 1150 (4th Cir. 1996) ............................................................................ 23, 29

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ................................................................................... 18, 23, 29

*Chestnut v. Kincaid*,
   No. RDB-20-2342, 2021 WL 1662469 (D. Md. Apr. 28, 2021) ................................ *passim*

*Clipper v. Takoma Park, Md.*,
   876 F.2d 17 (4th Cir. 1989) .................................................................................... 42

*Estate of Bryant v. Balt. Police Dep't*,
   No. ELH-19-384, 2020 WL 673571 (D. Md. Feb. 10, 2020) ................................... 31, 37

*Gell v. Town of Aulander*,
 No. 05-CV-00021-FL, 2008 WL 11381403 (E.D.N.C. Sept. 24, 2008) .................................. 18

*Giglio v. United States*,
 405 U.S. 150 (1972)..................................................................................................... 30, 31

*Gilliam v. Sealey*,
 932 F.3d 216 (4th Cir. 2019) .................................................................................... *passim*

*Grayson O Co. v. Agadir Int'l LLC*,
 856 F.3d 307 (4th Cir. 2017) .......................................................................................... 43

*Haley v. City of Bos.*,
 No. 09-10197-RGS, 2013 WL 4936840 (D. Mass. Sept. 12, 2013)...................................... 25

*Harlow v. Fitzgerald*,
 457 U.S. 800 (1982)........................................................................................................ 45

*Harris v. Jones*,
 281 Md. 560 (1977) ........................................................................................................ 44

*Heron v. Strader*,
 361 Md. 258 (2000) ........................................................................................................ 36

*Hicks v. Anne Arundel Cnty.*,
 No. JKB-20-00022, 2021 WL 4804017 (D. Md. Oct. 14, 2021)......................................... 42

*Hoke v. Netherland*,
 92 F.3d 1350 (4th Cir. 1996) .......................................................................................... 33

*Holland v. City of Chi.*,
 643 F.3d 248 (7th Cir. 2011) .......................................................................................... 33

*Howard v. City of Durham*,
 487 F. Supp. 3d 377 (M.D.N.C. 2020) ...................................................................... *passim*

*Howard v. Dowdy*,
 No. 17cv477, 2022 WL 1720156 (M.D.N.C. May 27, 2022)............................................. 21

*HSK v. Provident Life & Accident Ins. Co.*,
 128 F. Supp. 3d 874 (D. Md. 2015)................................................................................. 23

*Humbert v. Mayor & City Council of Balt. City*,
 866 F.3d 546 (4th Cir. 2017) ............................................................................... 36, 37, 40

*Humbert v. O'Malley*,
 No. WDQ-11-0440, 2014 WL 1266673 (D. Md. Mar. 25, 2014) .................................. 40, 41

*Humbert v. O'Malley*,
 No. WDQ-11-0440, 2015 WL 1569182 (D. Md. Apr. 6, 2015)........................................... 42

*Hyatt v. Miller*,
 No. 19-cv-00250-MR-WCM, 2021 WL 535856 (W.D.N.C. Feb. 12, 2021) .......................... 37

*Jackson v. City of Cleveland*,
 925 F.3d 793 (6th Cir. 2019) ..................................................................................... 18–19

*Juniper v. Zook*,
   876 F.3d 551 (4th Cir. 2017) ............................................................... 32

*Kyles v. Whitley*,
   514 U.S. 419 (1995)................................................................... 30, 31

*Love-Lane v. Martin*,
   355 F.3d 766 (4th Cir. 2004) ............................................................... 18

*Magill v. Gulf & W. Indus., Inc.*,
   736 F.2d 976 (4th Cir. 1984) ......................................................... 15–16

*Manning v. Miller*,
   No. 02 C 372, 2005 WL 3078048 (N.D. Ill. Nov. 14, 2005)............................ 38, 40

*Manuel v. City of Joliet*,
   137 S. Ct. 911 (2017)........................................................................ 37

*Massey v. Ojaniit*,
   759 F.3d 343 (4th Cir. 2014) .............................................. 17, 19–20, 22

*McPherson v. Balt. Police Dep't*,
   494 F. Supp. 3d 269 (D. Md. 2020)................................................. 19, 29

*Miller v. Fenton*,
   474 U.S. 104 (1985)........................................................................ 20

*Monroe v. Angelone*,
   323 F.3d 286 (4th Cir. 2003) ......................................................... 31, 32

*Osborne v. Georgiades*,
   No. RDB-14-182, 2015 WL 6447503 (D. Md. Oct. 23, 2015)......................... 18, 19

*Owens v. Balt. City State's Att'ys Office*,
   767 F.3d 379 (4th Cir. 2014) .................................................... *passim*

*Owens v. Balt. City State's Att'ys Office*,
   No. GLR-11-3295, 2016 WL 5452944 (D. Md. Sept. 29, 2016) ..................... 28, 31

*Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.*,
   673 F.3d 294 (4th Cir. 2012) ............................................................... 32

*Robertson v. Elliott*,
   315 F. App'x 473 (4th Cir. 2009) ......................................................... 20

*Robinson v. Miller*,
   802 F. App'x 741 (4th Cir. 2020) ......................................................... 41

*Smith v. Cain*,
   565 U.S. 73 (2012)........................................................................... 30

*Strickler v. Greene*,
   527 U.S. 263 (1999)..................................................................... 31, 33

*Swick v. Wilde*,
   No. 10-CV-303, 2012 WL 3780350 (M.D.N.C. Aug. 31, 2012)................... 17, 21–22

*United States v. Abdallah*,
   911 F.3d 201 (4th Cir. 2018) ................................................................. 23

*United States v. Moore*,
   709 F.3d 287 (4th Cir. 2013) ................................................................. 33

*United States v. Robinson*,
   627 F.3d 941 (4th Cir. 2010) ................................................................. 35

*United States v. Sutton*,
   542 F.2d 1239 (4th Cir. 1976) ............................................................... 31

*Washington v. Wilmore*,
   407 F.3d 274 (4th Cir. 2005) ................................................. 17, 18, 22

*Wearry v. Cain*,
   577 U.S. 385 (2016) ............................................................... 24, 30, 31

*Wolfe v. Clarke*,
   691 F.3d 410 (4th Cir. 2012) ................................................................. 31

**Rules**

Fed. R. Civ. P. 56 ..................................................................................... 15

**Other Authorities**

Wright & Miller, *Federal Practice and Procedure* ...................................... 16

## EXHIBIT INDEX

| Exhibit No. | Exhibit Description | Confidential? |
|:---:|:---:|:---:|
| 1 | Dewitt Duckett Homicide File (AC BPD 0000001–40) | Partially Redacted |
| 2 | Excerpts from Deposition of Ed Capers (Jan. 18, 2022) | No |
| 3 | Excerpts from Deposition of Ron Bishop (Jan. 24, 2022) | No |
| 4 | Excerpts from Donald Kincaid's Responses to Plaintiffs' Second Set of Requests for Admission (May 12, 2022) | No |
| 5 | Excerpts from Donald Kincaid's Responses to Plaintiffs' First Set of Requests for Admission (Apr. 11, 2022) | No |
| 6 | Excerpts from Bryn Joyce's Responses to Plaintiffs' Second Set of Requests for Admission (Apr. 11, 2022) | No |
| 7 | Excerpts from Deposition of Donald Kincaid (May 4, 2022) | No |
| 8 | Excerpts from May 22, 1984 Trial Transcript State v. Chestnut, et al. | No |
| 9 | Excerpts from May 21, 1984 Trial Transcript State v. Chestnut, et al. | No |
| 10 | Dewitt Duckett Homicide Reports from Nov. 18, 1983 through Nov. 23, 1983 (NK DEF 006994–7004) | Partially Redacted |
| 11 | Newspaper Article, *The Sun*, "City student shot, killed at school" (Nov. 19, 1983) | No |
| 12 | Newspaper Article, *The Evening Sun*, "Police hunting suspect in murder at school" (Nov. 19, 1983) | No |
| 13 | Newspaper Article, *The Star Democrat*, "Murder over jacket probed" (Nov. 21, 1983) | No |
| 14 | Excerpts from May 16, 1984 Trial Transcript State v. Chestnut, et al. | No |
| 15 | Excerpts from Deposition of Sharon Toon (Mar. 21, 2022) | No |
| 16 | Excerpts from Plaintiffs' Answers to Defendant Donald Kincaid's First Set of Interrogatories (July 29, 2021) | No |
| 17 | Conviction Integrity Unit's Notes from Interviews with Arnold Dow (Oct. 24, 2019) and Curtis Dow (Oct. 18, 2019) (NK DEF 011537–38; NK DEF 011812) | No |

| Exhibit No. | Exhibit Description | Confidential? |
|---|---|---|
| 18 | Excerpts from May 4, 1984 Trial Transcript State v. Chestnut, et al. | No |
| 19 | Excerpts from May 17, 1984 Trial Transcript State v. Chestnut, et al. | No |
| 20 | Declaration of Floueritta Hunter (Oct. 8, 2021) | No |
| 21 | Excerpts from 30(b)(6) Deposition of Donald Kincaid (July 8, 2022) | No |
| 22 | Declaration of Keyha Royster (Alderman) (Nov. 29, 2021) | No |
| 23 | Excerpts from Deposition of Keyha Alderman Royster (Feb. 23, 2022) | No |
| 24 | Excerpts from Deposition of John Caldwell (Feb. 10, 2022) | No |
| 25 | Excerpts from May 23, 1984 Trial Transcript State v. Chestnut, et al. | No |
| 26 | Excerpts from Deposition of Alfred Chestnut (Mar. 9, 2022) | No |
| 27 | Application for Search and Seizure Warrant with Affidavit (HILLIARD 0000065–69) | Partially Redacted |
| 28 | Newspaper Article, *The Evening Sun*, "Stylish team jackets instigate allure that can kill the wearer" (Nov. 23, 1983) | No |
| 29 | Excerpts from May 25, 1984 Trial Transcript State v. Chestnut, et al. | No |
| 30 | Excerpts from July 10, 1984 Sentencing Hearing Transcript State v. Chestnut, et al. | No |
| 31 | Conviction Integrity Unit's Notes from Interview with John Caldwell (Sep. 16, 2019) (NK DEF 011570–71) | No |
| 32 | Excerpts from Conviction Integrity Unit Report (Nov. 13, 2019) (BCCC 0000030–31) | No |
| 33 | Conviction Integrity Unit's Notes from Interview with Yvette Thomas (Sep. 9, 2019) (NK DEF 011849–50) | No |
| 34 | Joint Petition for Writ of Actual Innocence and Memorandum of Law in Support of Joint Petition for Writ of Actual Innocence (Nov. 22, 2019) | No |
| 35 | Excerpts from Nov. 25, 2019 Motions Hearing Transcript State v. Chestnut, et al. | No |
| 36 | Excerpts from Deposition of Robert Milan (Aug. 11, 2022) | No |
| 37 | Excerpts from Deposition of Barry Diamond (Apr. 12, 2022) | No |

| Exhibit No. | Exhibit Description | Confidential? |
|:---:|:---:|:---:|
| **38** | Excerpts from May 3, 1984 Trial Transcript State v. Chestnut, et al. | No |
| **39** | Excerpts from Deposition of Bryn Joyce (Apr. 14, 2022) | No |
| **40** | Appellants' Brief (Apr. 26, 1985) Chestnut, et al. v. State | No |
| **41** | Maryland Court of Special Appeals Opinion (Sep. 30, 1985) Chestnut, et al. v. State | No |
| **42** | Excerpts from May 2, 1984 Trial Transcript State v. Chestnut, et al. | No |
| **43** | Expert Report of Richard A. Leo, Ph.D., J.D. (PLAINTIFFS 0001740–1863) | No |
| **44** | Excerpts from Deposition of Yvette Thomas (Feb. 17, 2022) | No |
| **45** | Excerpts from Deposition of Ransom Watkins (Mar. 28, 2022) | No |
| **46** | Excerpts from Deposition of Andrew Stewart (Mar. 30, 2022) | No |
| **47** | Expert Reports of Susan E. Rushing, M.D., J.D. (PLAINTIFFS 0001652–1739) | Yes |
| **48** | Excerpts from May 28, 1984 Trial Transcript State v. Chestnut, et al. | No |

## INTRODUCTION

In the early morning hours of Thanksgiving 1983, Defendants Donald Kincaid, Jr., Bryn Joyce, and other officers of the Baltimore Police Department ("BPD") descended upon the West Baltimore neighborhood of 16-year-old Plaintiffs Alfred Chestnut, Andrew Stewart, and Ransom Watkins. BPD's "raiding party" located the three Black teenagers, pointed guns at their faces, and carted them away from their families in a police van. The three spent the next 36 years wrongfully imprisoned for the murder of their childhood friend, 14-year-old Dewitt Duckett. Not until 2019 were Plaintiffs, now middle-aged men known as the "Harlem Park Three," finally exonerated and set free.

The record demonstrates that Detectives Kincaid and Joyce robbed Messrs. Chestnut, Stewart, and Watkins of the prime of their lives by fabricating incriminating evidence and concealing favorable evidence. Among other acts, Kincaid threatened to "put" 14-year-old eyewitness Ron Bishop's "goddamn head through [a] window" after Bishop told police that Plaintiffs "weren't involved in the murder." During that interrogation, Kincaid repeatedly gestured toward his gun, and Bishop realized: "When I was ambushed, I knew that . . . to get myself out of this alive or not being sent to prison charged as an accessory for murder, . . . I would have to comply with this whole narrative that Alfred Chestnut, Ransom Watkins, [and] Andrew Stewart participated in this crime."

Another teenage eyewitness, Edward Capers, told Dets. Kincaid and Joyce that while he could not identify the murderer, it was a single person—not three people. In response, Kincaid, with Joyce present, yelled and screamed at Capers, called him a liar, and told him that he would be charged as an accessory to murder if he did not incriminate Plaintiffs. After using fabricated witness statements to arrest Plaintiffs, Kincaid told a handcuffed Ransom Watkins: "I'm white, you black, and I have a badge. Who do you think they going to believe at the end of the day?"

The evidence of Defendants' misconduct is staggering. As their own expert opined, if Plaintiffs' evidence is credited (as required at this stage), Defendants' threats against juvenile witnesses would not only support civil liability—they would be "criminal acts." On this record, summary judgment is inappropriate.

Plaintiffs' claim that Defendants fabricated evidence (Count II), including coercing multiple juvenile witnesses to falsely incriminate Plaintiffs, is the heart of this case. Defendants offer almost no argument on this claim. *See* ECF 196-1 ("Defs.' Mem.") 23–24. Nor could they, given Bishop's and Capers's testimony that Defendants forced them to falsely identify Plaintiffs in statements and at trial. Defendants' sole response is that it was acceptable for them to threaten juvenile witnesses with violence and false criminal charges because they did not know the resulting witness statements were false. This dubious argument relies upon a standard that is not the law of the Fourth Circuit and is belied by the facts. *See infra* Arg. § I.

Defendants did not even move for summary judgment on Plaintiffs' failure-to-investigate claim (an independent claim under Count III), leaving that claim for a jury. *See infra* Arg. § II. Significant evidence supports Plaintiffs' separate due process claim that Defendants failed to disclose exculpatory and impeachment evidence to the prosecutor and criminal defense counsel (Count III). *See infra* Arg. § III. Defendants concealed the coercive tactics they used against the juveniles and four key witness statements, including the exculpatory accounts Bishop and Capers gave shortly before Defendants coerced them into adopting their false narrative. Defendants fail to address each element of this claim, instead arguing that defense counsel and the prosecutor should have uncovered Defendants' suppression of evidence through "reasonable diligence"—a far-fetched affirmative defense that is unsupported in law or fact.

Based on Defendants' extensive misconduct, a reasonable jury could further conclude that they lacked probable cause to arrest Plaintiffs, supporting Plaintiffs' malicious prosecution claims (Counts I & VII). *See infra* Arg. § IV. A reasonable jury could find that Defendants fabricated each of the witness statements they used in seeking warrants to arrest Plaintiffs, including the falsehood in the probable cause affidavit that a student had witnessed the murder when she told police the opposite. Prior to Plaintiffs' arrest, Defendants also had reason to know that witness statements were unreliable, possessed exculpatory evidence, and failed to investigate the likely perpetrator. Taken together, this evidence casts serious doubt on whether probable cause existed, requiring a jury to resolve the fact-intensive issue.

Defendants also failed to intervene to stop each other's unconstitutional misconduct (Count IV). *See infra* Arg. § V. This misconduct, including threatening multiple teenage witnesses to testify falsely against other teenagers, would allow a reasonable jury to find Defendants liable for Intentional Infliction of Emotional Distress (Count VIII). *See infra* Arg. § VI. Defendants' last-ditch attempt to excuse their actions with a qualified immunity defense is foreclosed by precedent. *See infra* Arg. § VII.

Nearly 40 years ago, Kincaid and Joyce deprived three innocent Black teenagers of their constitutional rights, including the right to a fair trial. As a result, Alfred Chestnut, Andrew Stewart, and Ransom Watkins each wrongly spent 36 years—a combined 108 years—in prison. That is the longest combined wrongful conviction term in American history. Now, as three free men, Plaintiffs have uncovered evidence of Defendants' unconstitutional misconduct and should be permitted to present their claims to a jury. To grant summary judgment despite the myriad of material factual disputes as to each claim would be to deny Plaintiffs the opportunity for a fair trial for the second time. Defendants' Motion should be denied in full.

## STATEMENT OF FACTS

I. **BPD's Initial Investigation of Dewitt Duckett's Murder Revealed One Perpetrator.**

On November 18, 1983, at approximately 1:15 p.m., 14-year-old Dewitt Duckett was walking down a second-floor hallway in Harlem Park Junior High School ("HPJHS") with Ron Bishop and Edward Capers. Ex. 1, BPD Duckett Homicide File at AC BPD 14–15; Ex. 2, Capers Dep. 32:6–33:16; Ex. 3, Bishop Dep. 26:20–27:11. A single assailant approached the trio from behind, brandished a gun, and demanded Duckett's Georgetown Starter jacket. Ex. 3, Bishop Dep. at 26:20–27:11, 29:10–30:5; Ex. 2, Capers Dep. 32:6–33:16; Ex. 1, AC BPD 15. Bishop and Capers were the two eyewitnesses standing closest to Duckett at the time he was attacked. Ex. 4, Kincaid May 12, 2022 Ans. Req. Admis. ¶ 4. Bishop and Capers ran to the cafeteria for help. Ex. 2, Capers Dep. 33:10–19. Moments later, Duckett entered the cafeteria with a gunshot wound and collapsed on the floor. *Id.* at 33:14–19; Ex. 3, Bishop Dep. 35:2–9. Duckett died later that day. Ex. 1 at AC BPD 12.

Det. Kincaid was the primary homicide detective assigned to the Duckett homicide. Ex. 5, Kincaid April 11, 2022 Ans. Req. Adm. ¶ 1. Joyce assisted with the investigation. Ex. 6, Joyce April 11, 2022 Ans. Req. Adm. ¶¶ 1, 3; *see also* Ex. 7, Kincaid Dep. 195:19–196:3. Det. Kincaid responded to the scene and reviewed the report of the initial responding officer who identified several potential witnesses, including Bishop, Capers, and another student, John Caldwell. Ex. 1 at AC BPD 12; *see also* Ex. 5, ¶ 3.

Approximately an hour-and-a-half after the murder, Det. Kincaid interviewed witnesses at BPD's homicide unit.[1] *See, e.g.*, Ex. 9, May 21, 1984 Tr. at MFM 394 (44:7–11). Bishop and

---

[1] The version of the BPD homicide file from the time of Plaintiffs' trial no longer exists. The portion of the file BPD produced in this litigation does not contain any written statements of third-party witnesses, *see* Ex. 1, AC BPD 1–40, though some of those statements were referenced and quoted at Plaintiffs' criminal trial, s*ee, e.g.* Ex. 8, May 22, 1984 Trial Tr. at MFM 605 (111:4–25).

Capers told Kincaid that, while one or more individuals were peeping around the corner further down the hall, a single person approached and shot Duckett.[2] *See* Ex. 3, Bishop Dep. 37:8–11, 45:4–46:7; *see also* Ex. 8, at MFM 572–73 (45:17–47:11), MFM 597–98 (95:24–97:7), MFM 600 (100:19–101:2); Ex. 2, Capers Dep. 51:18–52:5, 62:14–63:12; Ex. 9, at MFM 392–394 (40:8–44:18). On the day of the murder, Det. Kincaid authored an investigative report that described how a single suspect "pull[ed] the coat off of" Duckett, a struggle ensued, and "[t]he suspect then fired one time striking the victim in the right side of the neck." Ex. 10, Nov. 18, 1983 Kincaid Report at NK DEF 6995. While Bishop and Capers did not see Caldwell at the scene, he purportedly was at the end of the hall looking around the corner. Ex. 3, Bishop Dep. 350:17–352:2; Ex. 2, Capers Dep. 87:17–88:4, 280:6–15.

The tragic murder of Duckett was "the first time that a student ha[d] been murdered inside a Baltimore public school." Ex. 11, *The Sun* (Nov. 19, 1983), at 1. The day after the murder, based on information relayed by Kincaid, the front page of *The Sun* reported that a single "teenage boy came up from behind, grabbed the collar of the Duckett youth's coat, waved a gun and said, 'Give me your jacket.'" *Id.* Other than the "victim's two companions" (Bishop and Capers), "[t]here were no other students nearby when the shooting occurred, police said." *Id*. That same day, *The Evening Sun* reported that "Homicide Det. Bryn Joyce said this morning police aren't sure whether DeWitt resisted handing the jacket over to his assailant." Ex. 12, *The*

---

[2] There is a dispute as to whether the shooter may have been accompanied by anyone, and if so, where they were standing. Bishop and Capers, undisputedly the two eyewitnesses closest to Duckett when he was shot, told police on the day of the murder (and re-affirmed at their depositions) that only one assailant approached him, though one or more people may have been peeping around the corner at the end of the hallway. Kincaid's and the responding officer's reports from the day of the murder reflect that other "suspects," who did not participate in the crime, may have accompanied the shooter in the hallway. At this stage, any dispute of fact must be resolved in Plaintiffs' favor. Regardless, both the eyewitness accounts and the police reports reflected only one active perpetrator of the robbery and murder.

*Evening Sun* (Nov. 19, 1983), at 1. Joyce gave additional statements to the press. *See* Ex. 13, *The Star Democrat* (Nov. 21, 1983).

II.     **For the Next Five Days, Defendants Ignored Evidence Pointing to Viable Suspects and Focused Their Attention on Plaintiffs.**

Defendants Kincaid and Joyce spent the five days after the murder focused on Plaintiffs, despite information pointing to other potential suspects. In the days immediately following Duckett's murder, Kincaid learned that an anonymous caller identified Michael Willis as the shooter. Ex. 5, ¶ 23; *see also* Ex. 10, Nov. 23, 1983 Kincaid Report at NK DEF 6999. HPJHS school security guard James Kelly testified that Willis, who was not an HPJHS student, was at the park in front of the school shortly after Duckett was shot. Ex. 14, May 16, 1984 Tr. at MFM 214–15 (124:19–126:25). A second caller, Brian Moody, told BPD officers that Willis was the person who shot Duckett. Ex. 10 at NK DEF 6999. Moody said his sister Theresa Moody's friend, Sharon Toon, told Theresa that Willis killed Duckett and wore the Georgetown jacket at a skating rink on the night of the murder. *Id.* at NK DEF 7000.

Det. Kincaid met with Theresa Moody, who said Toon had told her (Toon) was with Willis at HPJHS on the day of the murder and that, when police responded to the shooting, Willis "had a gun and threw the gun down and ran away with some other boys." *Id.*; *see also* Ex. 5, ¶ 24. No one from BPD met with Toon. Ex. 15, Toon Dep. 26:13–27:16. Without questioning Willis or Toon, and notwithstanding the information regarding Willis's involvement, Kincaid "cleared" Willis. Ex. 7, Kincaid Dep. 212:8–213:10.

Kincaid also received information that another suspect, Irroll Glascoe, told a BPD officer that he had been in HPJHS the day of the murder despite not being a student there. Ex. 5, ¶ 28; Ex. 1, at AC BPD 21; Ex. 10 at NK DEF 7001. Glascoe later changed his story and told Kincaid he was with a friend. Ex. 10 at NK DEF 7001. Although Kincaid's report says that he would

"corroborate" this alibi, *id.*, there is no record of him doing so. Kincaid's November 23 report also lists at least four other suspects, *see id.* at NK DEF 7001–02, but Defendants arrested Plaintiffs by 1:00 a.m. the next morning with no record of additional investigation of those leads.

Before the murder on November 18, Mr. Chestnut, Mr. Stewart, and Mr. Watkins, along with two friends (brothers Arnold and Curtis Dow), had visited the HPJHS campus, where they previously had been students. *See* Defs.' Ex. 17, at HP3_LI_MAIP 9930, 10056–57, 10067; Ex. 16, Pls.' Answer to Def. Kincaid's First Interrog. 2. On the day after the murder (November 19), Det. Kincaid questioned Mr. Chestnut and Mr. Watkins, and two days later, he met with Mr. Stewart. *See id.* at HP3_LI_MAIP 10054–55, 10062–3, 9929. Each Plaintiff told police that they had been with the Dow brothers, saw the school security guard (James Kelly) prior to leaving the school before 1:00 p.m., and later went to Calverton Junior High School. *Id.* at HP3_LI_MAIP 10059, 10061, 10066–67, 9930. Arnold and Curtis Dow similarly reported to the Conviction Integrity Unit ("CIU") of the Baltimore City State's Attorney's Office that they were with Plaintiffs, that they saw the school security guard, and that none of the five boys had anything to do with the shooting. *See* Ex. 17, CIU Notes of Interviews of Arnold and Curtis Dow at NK DEF 11537–38, 11812. Kelly, the school security guard, recalled seeing the five boys on the basketball court outside the school before 1:00 p.m., speaking with them, and watching them walk away from HPJHS, after which Kelly confirmed the closest doors leading back in were locked. Ex. 14, at MFM 191–92 (78:21–79:20), MFM 209–210 (113:24–115:16).

Yet, Defendants stayed focused on the three Plaintiffs.[3] Kincaid prepared an array of 11 Polaroid photographs that included a photograph of each Plaintiff. Ex. 5, ¶ 5. Bishop and

---

[3] Kincaid had no explanation why Arnold and Curtis Dow, who were with Plaintiffs at the relevant times on the day of the murder, were not suspects. Ex. 7, Kincaid Dep. 251:10–22.

Caldwell were each shown that array two days after the murder, and neither identified Plaintiffs. Ex. 18, May 4, 1984 Tr. at MFM 1061–63 (88:13–91:6), MFM 1081 (127:1–23). Kincaid went to Bishop's and Caldwell's homes the next day (November 22) and showed them two more photo arrays that did not include Plaintiffs. *Id*. at MFM 1065 (95:1–25), MFM 1082 (130:7–23). Bishop and Caldwell did not identify any suspects, but Bishop identified Michael Willis as someone he recognized. *Id.* at MFM 1082 (130:7–131:17). Kincaid did not show Capers an array during this time, despite him being one of the two closest eyewitnesses. Ex. 4, ¶¶ 15, 4.

### III. Five Days After the Murder, Defendants Turned to a 13-Year-Old "Witness" Whose Account was Contradicted by Other Teenage Witnesses.

In the afternoon of November 23, 1983, Det. Kincaid went to HPJHS and met with 13-year-old Yvette Thomas. Thomas purportedly said that on the day of the murder she was with two friends, Floueritta Hunter and Keyha Alderman, when they all allegedly saw the murder. Ex. 19, May 17, 1984 Tr. at MFM 320–21 (128:17–129:5), MFM 332 (152:19–25), MFM 346 (180:9–13), MFM 349–350 (187:23–188:11). Thomas claimed "we saw four boys and two of them had guns." *Id.* at MFM 350 (188:4–5). According to Thomas, "The tallest one with the gun told Dewitt to give him his jacket . . . and pulled the trigger. . . The shortest one shot his gun, too. . . Then I couldn't see anymore because they got behind the wall." *Id.* at MFM 350 (188:5–10).

Det. Kincaid interviewed Hunter, also age 13, the same day as Thomas. Ex. 5, ¶ 20. Contrary to Thomas, Hunter told Kincaid she "did not see the shooting take place and did not know who was involved in the shooting." Ex. 20, Hunter Decl. ¶ 3. According to Kincaid's November 23 report, Hunter "was not able to identify in the group of photographs any of the suspects," including Plaintiffs. Ex. 10, Nov. 23, 1983 Second Kincaid Report at NK DEF 7004; *accord* Ex. 20, Hunter Decl. ¶ 7. Hunter later explained that when she met with Kincaid, "the police detectives mentioned Alfred Chestnut's name to [her] multiple times. They tried to get

[her] to admit that someone specific had committed the crime, even though [she] told them that [she] did not witness the shooting." Ex. 20, Hunter Decl. ¶ 5. Ms. Hunter's impression "was that the police had already made up their minds about who committed the crime." *Id.* Kincaid is not sure whether Hunter's statement was written down. Ex. 21, Kincaid 30(b)(6) Dep. 69:6–12.

Keyha Alderman also contradicted Thomas's account. Alderman (now Royster) explained that she did not see the murder and did not identify Plaintiffs as being involved. Ex. 22, Royster (Alderman) Decl. ("Alderman Decl.") ¶¶ 1–5; *see also* Ex. 23, Alderman Dep. 219:2–19, 228:2–229:6, 232:20–233:18.[4] She met with BPD detectives and provided a written statement reflecting that she did not witness the murder. Ex. 22 Alderman Decl. ¶ 5.

Kincaid admitted that he did not corroborate the veracity of Thomas's statement. Ex. 7, Kincaid Dep. 323:21–324:3. Nevertheless, and notwithstanding the statements provided by several witnesses to the murder that Plaintiffs were not involved as well as Hunter's and Alderman's statements that they did not witness the murder as Thomas had claimed, Kincaid deemed Thomas "more credible" than the other witnesses. *See id.* at 164:6–165:6.

### IV. On November 23, 1983, Defendants Coerced Juvenile Witnesses Who Had Not Previously Identified Plaintiffs to Falsely Incriminate Them.

On the evening of November 23, 1983, after meeting with Thomas that afternoon, Kincaid again brought Bishop, Capers, and Caldwell to BPD's homicide unit at the same time. *See* Ex. 5, ¶¶ 13, 15; *see also* Ex. 4, ¶ 20; Ex. 8, at MFM 562 (25:15–18). During the many meetings on the day of the murder and the four days that followed (November 18 to 22), Bishop, Capers, and Caldwell never identified Plaintiffs as being involved. Ex. 5, ¶ 11. Yet those accounts drastically changed after Kincaid and Joyce met with them on November 23.

---

[4] Both Alderman and Hunter stated they were with Thomas and that Thomas could not have seen the murder, but they differ as to where they were located at the time. *Compare* Ex. 23, Alderman Dep. 225:16–22 *with* Ex. 20, Hunter Decl. ¶¶ 2–3.

9

According to Bishop, Kincaid's "tone was much different. He was . . . more serious. And he had a more direct tone. And then he started finger-pointing and [getting] kind of close up in my personal space." Ex. 3, Bishop Dep. 80:17–20. Kincaid accused Bishop of lying, repeatedly gestured toward his gun, and cursed at Bishop. *Id.* at 87:9–89:10. Kincaid fed Bishop information about how the murder supposedly occurred, information that, according to Kincaid, "will prove that [Bishop's] witness account was wrong or [Bishop] was just lying." *Id.* at 87:17–18. When Bishop responded that he had no idea what Kincaid was talking about, Kincaid left the room. *Id.* 88:3–10. When Kincaid returned,

> [Kincaid] was more angry face, flushed. Then I noticed he was gesturing to his side. And that's when I realized he was gesturing to me he has a gun. *And I took that as a threat.* And I took that as basically, *if I don't do what he says, then my life can be in danger.*

*Id.* at 88:9–15 (emphasis added).

Det. Kincaid then said, "'Well, I'll put your goddamn head through that window.'" *Id.* at 91:17–18. Bishop, only 14, pleaded with Kincaid, emphasizing that he "would never lie to you about someone killing my friend." *Id.* at 91:20–22. But Kincaid refused to accept the truth, and Bishop realized that "if I do not give this man what he wants I'm either going to be framed as an accessory . . . to the murder or somehow my life is going to be in jeopardy." *Id.* at 93:19–94:1.

Det. Kincaid provided Bishop "the narrative" he was to follow. *Id.* at 99:4–5. Kincaid showed Bishop the same photo array he had previously, which included Plaintiffs, and stated, "You're going to pick out who was involved in the murder." *Id.* at 97:2–3; *see also* Ex. 18, MFM 1088 (141:2–8). In response, Bishop "told him, any of these guys here, *they weren't involved* in the murder." Ex. 3, Bishop Dep. at 97:5–6 (emphasis added) **[Plaintiffs hereinafter refer to this statement as "Bishop's Nov. 23 Oral Statement"]**.

Ignoring Bishop's resistance to the false narrative, Kincaid walked Bishop through each photo and described how each Plaintiff was supposedly involved. *See id.* at 96:4–101:14. Kincaid laid out the photos, pointed to Plaintiffs, and said, "he [Chestnut] had the gun, right?", "He [Watkins] was pulling on the jacket, right?", and "He [Stewart] was also assisting in the crime, right?". *Id.* at 97:16–17, 99:9–10, 100:15–17. Kincaid then wrote a statement adopting the "lie that Alfred Chestnut, Ransom Watkins, and Andrew Stewart participated in the killing of [] Duckett," *id.* at 104:4–105:7, which Bishop felt "forced" to sign, *id.* at 112:19; *see also id.* at 103:8–104:17, 112:18–113:1 **[Plaintiffs hereinafter refer to this statement as "Bishop's Nov. 23 Written Statement"]**. At the end of the meeting, Kincaid had "accomplished his mission." *Id.* at 114:17–20; *see also id.* at 118:6–8 ("[Kincaid] didn't care about [Plaintiffs'] lives and he didn't care about me either. He just wanted to get this case solved, even by telling lies.").

Joyce and Kincaid similarly forced Capers to adopt their false narrative, based on what Thomas had purportedly told them. Ex. 2, Capers Dep. 74:13–75:8, 80:2–81:3, 81:17–82:14. Capers met with both detectives on November 23. *See* Ex. 18, at MFM 1078–79 (122:1-123:22); Ex. 6, ¶ 3. Capers was emphatic that Thomas's story was false, even drawing a diagram of the hallway where the shooting occurred to show how Thomas could not have seen the murder from where she claimed to have been. Ex. 2, Capers Dep. 48:10–49:3, 80:5–82:1, 84:10–86:22, 87:19–88:4, 89:4–6. Capers further said to Defendants, "I told you from the beginning that *it was only one individual, and he had a hood on. I could not identify him.*" *Id.* at 100:19–22 (emphasis added) **[Plaintiffs hereinafter refer to this statement as "Capers's Nov. 23 Oral Statement"]**.

Dets. Kincaid and Joyce refused to listen. "They balled [the diagram] up," threw it away. *Id.* at 86:6–8. Kincaid then threatened to charge Capers:

> He told me that he would charge me, had me put in prison, separated from my family. He became -- *he became a god right there*. And then he said -- and then he

> said what -- it was law there. This is a detective in a police department. I ain't had
> no power. . . . I don't have nothin'. I'm just sittin' there quiet, following directions.

*Id.* at 83:4–11 (emphasis added); *see also id.* at 79:1–5. Capers described how Dets. Kincaid and

Joyce did not allow his mother to participate in the interview, *id.* at 75:20–76:14, 85:7–11,

threatened to charge him and Bishop as accessories and take them from their families if he did

not adopt their version of what happened, *id.* at 79:16–21, 81:21–82:5, 83:4–11, and called

Capers a "liar," "fake friend," and "belittle[d]" him, until 16-year-old Capers was "terrified" that

he would be sent to a prison with grown men, *see id.* at 84:4–7, 84:15–85:3, 85:13.

At that point, Kincaid and Joyce laid out three photographs of Plaintiffs and told Capers

"they [are] the individuals that [Thomas] identified." *Id.* at 95:9–10; *see also id.* at 94:14–22,

97:7–97:21, 101:1–13. Capers's efforts to convince Kincaid and Joyce of the truth were futile:

"[H]e [Kincaid] just got infuriated, started yellin' and screamin'. I was like – there was nothin' –

and the more I said – the more I said about – the more truth I bring out, the worse it got, I just

shut down." *Id.* at 84:21–85:3. Capers testified that multiple detectives were present during the

coercion. *Id.* at 75:5-12, 83:12-21, 94:17-22, 95:7-12; *see also* Ex. 18, at MFM 1078–79 (122:1-

123:22). Kincaid forced Capers to write out and sign a statement that reflected the false narrative

he learned from Kincaid. Ex. 2, Capers Dep. 90:2–93:12. **[Plaintiffs hereinafter refer to this**

**statement as "Capers's Nov. 23 Written Statement"]**. As Capers now explains, "I couldn't

disagree with 'em. I had to accept it. . . ." *Id.* at 100:5–6. As Capers describes, in his interactions

with Kincaid after November 23 he "always felt threatened around [Kincaid] because [he]

realize[d] how dangerous he is. . . . He already had destroyed my life." *Id.* at 114:16–20.

Detective Kincaid also interviewed John Caldwell that same night. Ex. 8, at MFM 562

(25:15–18). Due to his current health, Caldwell was unable to provide deposition testimony in

this matter. *See* Ex. 24, Caldwell Dep. 11:19–12:4. It is undisputed that Kincaid met with

Caldwell on at least four occasions before November 23, 1983 (once each on November 18 and 21, and twice on November 22), and that Caldwell never identified Plaintiffs as being involved in the murder during those meetings. *See* Ex. 5, ¶ 11; Ex. 18, at MFM 1061–63 (88:13-91:6), MFM 1065 (95:1–95:9), MFM 1068–70 (101:22-101:23). However, on November 23, Kincaid admitted that he became "stern" with Caldwell because he felt like Caldwell was "jerking us around." Ex. 7, Kincaid Dep. 281:18–19, 261:16–22. Kincaid told Caldwell that he had heard from other witnesses that Caldwell knew who had murdered Duckett, Ex. 9, at MFM 468 (191:21–192:15), and said "we are not going to play around any longer," Ex. 7, Kincaid Dep. 260:15–19. Kincaid showed the same photos containing Plaintiffs that he had shown to Caldwell two days earlier. Ex. 9, MFM 469 (103:9:13). This time, in the "small interview room," Kincaid admitted to standing "right on top" of a seated Caldwell, "within a matter of inches." Ex. 25, May 23, 1984 Tr. at MFM 681 (92:2–18). For the first time, Caldwell implicated Plaintiffs.

**V.     Plaintiffs Were Arrested on Thanksgiving Day and Then Wrongfully Convicted.**

Mere hours after interrogating the juveniles, and shortly after 1:00 a.m. on Thanksgiving Day 1983, Dets. Kincaid and Joyce, along with the other members of BPD's "raiding party," executed a search of Mr. Chestnut's home. Ex. 1, at AC BPD 16, 17–19. While pointing guns at the teenagers' heads, Defendants arrested the Plaintiffs. *See, e.g.*, *id.* at AC BPD 18; Ex. 26, Chestnut Dep. 228:8–17. After their arrest, Joyce completed a Supplement Report that was signed by Kincaid, which marked the case as "CLEARED." Ex. 1, at AC BPD 19.

Kincaid obtained the warrant on November 23 based on the statements he secured hours before from Thomas, Bishop, Capers, and Caldwell. He submitted an application and affidavit in support of the warrant. *See* Ex. 27, Nov. 23, 1983 Application for Arrest Warrant and Affidavit at HILLIARD 65–69. Kincaid admitted during his deposition that the affidavit contained two "mistake[s]." Ex. 7, Kincaid Dep. 49:6–51:3. The affidavit included the representations that

Hunter witnessed the murder and identified Plaintiffs in a photo array. *See* Ex. 27, at HILLIARD 67–68. Both statements were false. *See* Ex. 20, Hunter Decl. ¶¶ 1–7 (stating that she told police she did not witness the murder), Ex. 10, at NK DEF 7004 (Kincaid's report stating that Hunter did not identify suspects, including Plaintiffs, in photo array).

Defendants had no physical evidence implicating Plaintiffs. Their search did not recover a murder weapon. Ex. 4, ¶ 1. While they recovered a Georgetown jacket from Chestnut's home, Chestnut's mother produced a receipt showing she had purchased the jacket from Cavalier's Men Shop more than two weeks before the murder.[5] *See* Ex. 29, May 25, 1984 Tr. at MFM 809–810 (141:7–142:5), MFM 806–07 (134:24–136:11). Testing of the jacket "exhibited no signs of damage" and was negative for blood, hairs, or fibers. Ex. 1, AC BPD 34. Nevertheless, Defendants pressed forward against the 16-year-old Plaintiffs.

Plaintiffs' criminal trial began on May 14, 1984, and lasted approximately 11 days. Without any physical evidence, the evidence against Plaintiffs consisted of the testimony of the juvenile witnesses, which resulted in Plaintiffs' subsequent convictions and life sentences. *See* Ex. 30, July 10, 1984 Sentencing Hearing Tr. at OAG 2129 (7:16–25), OAG 2152 (30:2–17). Right before being sentenced, 16-year-old Stewart said, "I knew Dewitt almost all my life . . . I'm saying we know we didn't do it." *Id.* at OAG 2151 (29:9–14).

## VI. Plaintiffs' 36-year Fight for Freedom.

Plaintiffs have never wavered in asserting their innocence. In 2019, Mr. Chestnut contacted the CIU, which conducted a comprehensive re-investigation of the case.[6] Bishop told

---

[5] "Starter jackets" were popular at the time, with one HPJHS student saying that "everybody had them," and Georgetown jackets being "among the most popular." Ex. 28, *The Evening Sun* (Nov. 23, 1983), at 2.

[6] Defendants expend significant effort criticizing the CIU. *See, e.g.*, Defs.' Mem. 2. These attacks are a red herring. This case is not about the CIU's actions in 2019; it is about Defendants' violations

the CIU that Plaintiffs were innocent and that Willis killed Duckett. Ex. 3, Bishop Dep. 162:20–

163:19, 152:16–20, 297:10. In his interview, Capers independently told the CIU that Plaintiffs

did not commit the murder and that only one individual shot and killed Duckett. Ex. 2, Capers

Dep: 140:6–13. The CIU's notes from an interview with Caldwell reflect that he saw one person

confront the victim for his jacket, could not see faces clearly from a distance, and was coached

before the trial on what to say. Ex. 31, CIU Notes of Interview of John Caldwell at NK DEF

11570–71. Thomas admitted to the CIU that she did not see the victim until he came into the

cafeteria, nor did she hear a gunshot or see anyone shoot a gun. Ex. 32, CIU Rpt., at BCCC 30–

31; Ex. 33, CIU Notes of Interview of Yvette Thomas at NK DEF 11849–50.

Following the reinvestigation, the State of Maryland and Plaintiffs filed a Joint Petition

for Writ of Actual Innocence. Ex. 34, Joint Petition. The Circuit Court for Baltimore City

granted the Petition, Ex. 35, Nov. 25, 2019 Tr. at MFM 2822–23 (9:23–10:7), which vacated the

convictions, and the State *nol prossed* all charges against Plaintiffs, *id.* at MFM 2837 (24:11–20).

On November 25, 2019—just days before Thanksgiving—Mr. Chestnut, Mr. Stewart, and Mr.

Watkins were finally released from prison as free men.

## <u>LEGAL STANDARD</u>

To prevail on their Motion for Summary Judgment, Defendants must establish that there

is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a). The "evidence of the non-

movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Credibility determinations, the weighing of the

evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of

---

of Plaintiffs' constitutional rights in 1983 and 1984. As Defendants' "CIU expert" conceded at his
deposition, he has no opinion on whether Defendants violated Plaintiffs' rights. Ex. 36, Milan Dep.
10:8–20. To the extent Defendants are perniciously trying to suggest that Plaintiffs should not have
been exonerated, the overwhelming evidence of Plaintiffs' innocence must be credited at this stage.

a judge . . . ruling on a motion for summary judgment." *Id.* "Even if there is no dispute as to the evidentiary facts, summary judgment is inappropriate if there is a dispute as to the conclusions to be drawn from such facts." *Magill v. Gulf & W. Indus., Inc.*, 736 F.2d 976, 979 (4th Cir. 1984) (citation omitted). Moreover, "courts are not necessarily bound by the formal issues framed in the pleadings when ruling upon a motion for summary judgment." *Campbell v. Hewitt, Coleman & Assocs., Inc.*, 21 F.3d 52, 56 (4th Cir. 1994) (citing 10A Wright & Miller, *Federal Practice and Procedure* § 2721 (stating that court should ascertain issues of fact contained in pleadings and then consider any other triable issues of fact suggested by post-pleading material)).

## ARGUMENT

### I.   Defendants Misstate the Fabrication Standard and Fail to Challenge the Evidence Supporting Plaintiffs' Claim.

Defendants' fabrication of false witness statements is at the heart of Plaintiffs' case. As described by Ron Bishop:

> I told the truth in the beginning and I told the truth on [November] 18th. I told the truth during those meetings that -- where Detective Kincaid brought the photo array to my house. And then when -- on [November] 23rd when I was ambushed, I knew that I was in some type of serious situation, that in order to get myself of this alive or not being sent to prison charged as an accessory for murder, that I would have to comply with the whole narrative that Alfred Chestnut, Ransom Watkins, Andrew Stewart participated in this crime.
>
> So being 14, just turning 14 that year, I realized that I could be sent to the Maryland State Penitentiary. And given the neighborhood I grew up in, I heard some of the worst things what men would do to men, grown men . . . . I knew I would be a victim at all times.

Ex. 3, Bishop Dep. 138:7–139:7 (cleaned up).

Plaintiffs have amassed direct evidence that Defendants fabricated the following evidence: (1) Bishop's Nov. 23 Written Statement and testimony incriminating Plaintiffs; (2) Capers's Nov. 23 Written Statement and testimony incriminating Plaintiffs; and (3) the conceded "mistake[n]" statements in the search and seizure affidavit regarding Hunter.

16

**A.      A law enforcement officer who deliberately or recklessly fabricates evidence that results in a deprivation of liberty violates a person's due process rights.**

The Fourth Circuit has recognized a due process right to not be deprived of liberty by an officer's fabrication of evidence. *See Washington v. Wilmore*, 407 F.3d 274, 282–83 (4th Cir. 2005). "For a plaintiff to prevail on a claim of evidence fabrication . . . he must demonstrate proof that Defendants fabricated evidence and that the fabrication resulted in a deprivation of his liberty." *Swick v. Wilde*, No. 10-CV-303, 2012 WL 3780350, at *21 (M.D.N.C. Aug. 31, 2012) (citing *Washington*, 407 F.3d at 282). A plaintiff may prove the claim by showing that the officer fabricated evidence "deliberately or with *reckless disregard for the truth.*" *Howard v. City of Durham*, 487 F. Supp. 3d 377, 404–05 (M.D.N.C. 2020) (emphasis added) (quoting *Massey v. Ojaniit*, 759 F.3d 343, 357 (4th Cir. 2014)). As Judge Bennett noted in this case, "[t]he Fourth Circuit has recognized a due process claim for fabrication of evidence on the basis of coercing a witness into providing false testimony." *Chestnut v. Kincaid*, No. RDB-20-2342, 2021 WL 1662469, at *10 (D. Md. Apr. 28, 2021) (citing *Gilliam v. Sealey*, 932 F.3d 216, 220 (4th Cir. 2019)). False statements in police reports or warrant affidavits also give rise to a claim of fabrication of evidence. *See Washington*, 407 F.3d at 282; *Swick*, 2012 WL 3780350, at *21.

**B.      Defendants forced Bishop and Capers to falsely implicate Plaintiffs by threatening violence, prosecution, and separation from their families.**

Defendants do not challenge the overwhelming direct evidence (which must be credited) that (1) they coerced Bishop and Capers into giving false statements and testimony and (2) Plaintiffs' convictions were a reasonably foreseeable result of those fabrications. *See* Defs.' Mem. 23–24. Nor could they.

As Bishop and Capers testified, the detectives refused to accept their truthful Nov. 23 Oral Statements, became irate, accused them of lying, threatened prosecution, and in the case of Bishop, gestured towards the detective's gun and threatened physical violence, all to force the

17

juveniles to falsely incriminate Plaintiffs. *See, e.g.,* Ex. 3, Bishop Dep. 80:19–20, 87:11–18, 88:9–15, 89:6–22, 92:10–94:1, 104:12–105:5; Ex. 2, Capers Dep. 75:20–76:14, 79:1–5, 79:16–21, 81:21–82:5, 83:4–11, 84:4–7, 84:15–85:3, 85:7–15, 89:4–6, 93:14–16, 100:5–8. Bishop and Capers later testified at trial in conformance with those false statements. *See* Ex. 2, Capers Dep. 128:7–13, 340:21–341:10; Ex. 3, Bishop Dep. 131:4–10, 160:13–161:9; *see generally* Defs.' Ex. 7 at MFM 568–624; Defs.' Ex. 12 at MFM 382–422. Defendants do not engage with any of this evidence, which more than suffices to survive summary judgment.

Defendants do not dispute, and thus concede, that Plaintiffs' convictions were "a reasonably foreseeable result of" Defendants' fabrication. *Washington*, 407 F.3d at 283; *cf. Gell v. Town of Aulander*, No. 05-CV-00021-FL, 2008 WL 11381403, at *13 (E.D.N.C. Sept. 24, 2008) ("Causation . . . can be decided on summary judgment only in those instances when there are no causal facts in dispute." (quoting *Love-Lane v. Martin*, 355 F.3d 766, 776 (4th Cir. 2004))). Defendants have thus failed to meet their initial summary judgment burden. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Nor could they have offered a credible challenge. For one, that prosecutors declined to pursue a new trial against Plaintiffs once Bishop's and Capers's statements were deemed false underscores that absent the fabrication, Plaintiffs would not have been prosecuted, let alone convicted. Bishop's and Capers's statements were used in the affidavit as a basis for criminal charges, which alone resolves the causation inquiry. *See Washington*, 407 F.3d at 283 (recognizing inquiry as whether false statement "influenced the decision to bring charges"); *Howard*, 487 F. Supp. 3d at 410 (same); *Osborne v. Georgiades*, No. RDB-14-182, 2015 WL 6447503, *4 (D. Md. Oct. 23, 2015) (same). As cited above, Bishop and Capers each testified at trial consistent with the false narratives that Defendants forced them to adopt on November 23. This provides a separate avenue for causation. *See Jackson v. City of Cleveland*,

925 F.3d 793, 817 (6th Cir. 2019) (jury could find "falsified statement caused the criminal

verdicts because the statement coerced [juvenile witness] to testify in conformance with it").

There is no justification for Defendants' conduct, which at this stage must be assumed to

have occurred as described by Bishop and Capers. The evidence here more than suffices to take

Plaintiffs' fabrication claim to a jury—it is direct, powerful, and more egregious than the facts in

other similar cases involving strong fabrication claims. *See, e.g.*, *Gilliam*, 932 F.3d at 240

(Fourth Circuit decision affirming denial of summary judgment where police coerced 16-year-

old witness "to testify falsely, which [the witness] agreed to do only after" officers accused him

of being involved in crime); *McPherson v. Balt. Police Dep't*, 494 F. Supp. 3d 269, 282 (D. Md.

2020) (allowing fabrication claim to proceed, at motion to dismiss stage, where police told 13-

year-old, who initially said that suspects had "no involvement in the murder," that "he was

wrong and insisted he give a different answer, after feeding him information they wanted him to

say," and held him for more than 13 hours); *Jackson*, 925 F.3d at 804 (finding fabrication claim

survived summary judgment where officers accused 12 year-old of lying in original statement,

called him slurs, and forced him to sign statement saying he initially failed to identify suspects

because he feared retaliation); *see also Osborne*, 2015 WL 6447503 at *4.

Relying on Seventh Circuit decisions, Defendants dedicate only two paragraphs to the

erroneous proposition that their conduct should be immunized because they purportedly did not

know Bishop's and Capers's statements were false. Defs.' Mem. 23–24. Defendants are wrong

on the law. The heightened "knowledge" standard used by the Seventh Circuit is not the law of

the Fourth Circuit, where a claim can be based on recklessness without proof of knowledge. *See*

*Howard*, 487 F. Supp. at 404–05 (explaining the standard is "deliberately *or with reckless*

*disregard for the truth*" (emphasis added) (citation omitted); *accord Massey*, 759 F.3d at 357

(liability attaches by showing officer "entertained serious doubts as to the truth of statements or had obvious reasons to doubt the accuracy of the information"); *Robertson v. Elliott*, 315 F. App'x 473, 477 (4th Cir. 2009) (explaining that officer's "recklessness" or even "gross negligence" may suffice to sustain due process claim of false or fabricated evidence (citation omitted)). Defendants do not, and cannot, refute the strength of Plaintiffs' evidence cited above under this proper standard, and thus their argument for summary judgment on this claim fails.[7]

Even under the "knowledge" standard, Defendants are wrong on the facts. Defendants' blanket assertion that there is "no evidence, circumstantial or otherwise" that they knew the witness statements were false, Defs.' Mem. 24, is wrong. Immediately prior to being coerced, Bishop told Kincaid that Plaintiffs "weren't involved in the murder." Ex. 3, Bishop Dep. 97:4–6. Similarly, immediately before Kincaid and Joyce threatened him, Capers informed them that "it was only one individual" with "a hood on"—someone he could *not* identify—who committed the offense. Ex. 2, Capers Dep. 100:19–22. Both Bishop and Capers had also told police on the day of the murder that only one person killed their friend. *See, e.g., id.* at 62:14–63:12; Ex. 3, Bishop Dep. 46:6–8. The witnesses' repeated statements to Defendants that Plaintiffs were not involved in the murder is evidence that Defendants knew that the incriminating statements they obtained after threatening physical harm and prosecution were, indeed, false.

Though that evidence alone is sufficient to survive summary judgment, there is more evidence from which a jury could conclude that Defendants knew that Bishop's and Capers's statements were false. As Bishop and Capers testified, they did not voluntarily provide Plaintiffs'

---

[7] Defendants do not dispute that threatening juveniles with violence, false charges, and separation from their families was (at a minimum) reckless. As the Supreme Court has explained, "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular [witness], are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment." *Miller v. Fenton*, 474 U.S. 104, 109 (1985).

names; rather, Defendants directed Bishop and Capers to select Plaintiffs as the perpetrators. Bishop and Capers testified that, despite saying Plaintiffs were not involved, Kincaid explicitly directed them to select Plaintiffs' photographs, parrot a false narrative of their involvement, and adopt a statement to that effect. Ex. 3, Bishop Dep. 96:4–101:14, 103:8–104:17, 112:18–113:1, 138:7–139:7; Ex. 2, Capers Dep. 90:9–91:21, 94:14–22, 95:9–10, 97:2–100:8, 101:1–13.

Defendants further claim (under the wrong standard) that they could not have known that Bishop's and Capers's statements were false because another witness, Thomas, purportedly had identified Plaintiffs. This argument is unsupported by law. Indeed, Defendants cite no authority to support the proposition that, where an officer believes the statement of one witness, that officer has license to threaten others with violence and prosecution if they do not fall in line with the statement the officer has chosen to credit. Even where officers have inculpatory witness accounts, that does not allow them to fabricate other witness statements. *See Howard v. Dowdy*, No. 17cv477, 2022 WL 1720156, at *4–6 (M.D.N.C. May 27, 2022) (finding that fabricated statement of a single witness supported fabrication claim even where other witnesses provided inculpatory statements). Defendants inappropriately ask the Court to ignore Bishop's and Capers's direct testimony that they told Defendants that Plaintiffs were not involved and to make credibility determinations about these witnesses. *But see Anderson*, 477 U.S. at 255 (explaining that at summary judgment stage credibility determinations are left for jury). Moreover, even assuming that Thomas provided an uncoerced and reliable statement—which is disputed for multiple reasons as described below, *see infra* Arg § IV.B.2—and, even under the wrong legal standard, that would at best create disputes of material fact that preclude summary judgment.

**C.      Defendants falsified the affidavit in support of Plaintiffs' arrest warrants.**

Det. Kincaid's falsification of the arrest warrant affidavit supplies the basis for an independent fabrication claim that Defendants do not address. *See Swick*, 2012 WL 3780350, at

*21–22 (finding "genuine dispute of material fact exists whether [defendant] mischaracterized the . . . incident in seeking a warrant for [plaintiff's] arrest by misstating facts"); *Washington,* 407 F.3d at 282 (finding officer's report containing "unclear" statement falsely stating that defendant gave pertinent information about crime was "fabrication" of evidence). Det. Kincaid's affidavit falsely stated that: 1) Hunter witnessed the murder and 2) she identified Plaintiffs as the murderers. *Compare* Ex. 27 at HILLIARD 67–68 *with* Ex. 20, Hunter Decl. ¶¶ 1–7 (Hunter told police she did not witness murder) and Ex. 10, at NK DEF 7004 (Kincaid's report stating that Hunter did *not* identify any suspects). Kincaid admitted that he should not have included Hunter in his affidavit for the Thanksgiving Day arrest of Plaintiffs. Ex. 7, Kincaid Dep. 49:6–51:3.

At the very least, Kincaid's actions were reckless, which is sufficient for a fabrication claim in the Fourth Circuit. Given that Kincaid wrote the false affidavit statements on the night of November 23, mere hours after Hunter told him she did not witness the murder and he wrote a report that she did not identify Plaintiffs, a reasonable jury could even conclude that Kincaid intentionally falsified his affidavit. *Cf. Owens v. Balt. City State's Att'ys Office,* 767 F.3d 379, 398 (4th Cir. 2014) (finding "temporal proximity" between witness statements and officer's report omitting reference to those statements supported finding that actions "were not accidental, but intentional and malicious"). In addition, the falsification of Hunter's account foreseeably led to Plaintiffs' convictions because they were used to charge them. *Massey,* 759 F.3d at 356; *see also Howard,* 487 F. Supp. 3d at 410. The false statements were especially significant because they falsely corroborated Thomas's statement that she and Hunter saw the murder together.

## II.   Because Plaintiffs' Failure to Investigate Claim is Uncontested, It Must Proceed to Trial.

Defendants do not address Plaintiffs' first *Brady*-based due process claim that Defendants acted in bad faith by failing to conduct an adequate investigation of the Duckett homicide to

shield their wrongful acts (Count III). *See* Compl., ECF 1 at 29; *see also* Am. Compl., ECF 59 at

30. This is a well-recognized claim. *Gilliam*, 932 F.3d at 240–41 (affirming denial of summary

judgment on claim that officers' failure to investigate was "done in bad faith in order to shield"

their "wrongful acts"); *Howard*, 487 F. Supp. 3d at 426 (M.D.N.C. 2020) (denying summary

judgment on "due process claim for failure to perform an adequate investigation").

Here, there is significant evidence of Defendants' failures during their investigation. *See*

*supra* pp. 6–7. Because Defendants have elected not to move for summary judgment on this

theory, they have failed to meet their summary judgment burden. *Celotex*, 477 U.S. at 323; *see*

*also Cavallo v. Star Enter.*, 100 F.3d 1150, 1152 n.2 (4th Cir. 1996) (noting that "omission of the

issue from [the] initial brief denied [the other side] an opportunity to respond, so considering it

now would be unfair [] and would risk an improvident or ill-advised opinion on the legal issues

raised"); *accord HSK v. Provident Life & Accident Ins. Co.*, 128 F. Supp. 3d 874, 884 (D. Md.

2015). As a result, this claim remains for a jury to resolve.

## III.    Genuine Disputes of Material Fact Require a Trial on Plaintiffs' Suppression of Exculpatory and Impeachment Evidence Claim.

Plaintiffs' additional claim under Count III that Defendants failed to disclose exculpatory

and impeachment evidence should also proceed to trial. Plaintiffs must establish "that (1) the

evidence at issue was favorable to [them]; (2) the Officers suppressed the evidence in bad faith;

and (3) prejudice ensued." *Owens*, 767 F.3d at 396–97. Police officers violate a defendant's

constitutional rights by withholding favorable evidence from the prosecutor. *Id.* at 396.

Favorable evidence includes both exculpatory and impeachment evidence. *Id.* at 397 (citation

omitted); *see also United States v. Abdallah*, 911 F.3d 201, 217 (4th Cir. 2018) ("Evidence is

favorable not only when it tends substantively to negate guilt but also when it tends to impeach

the credibility of a key witness for the prosecution." (citation omitted)).

Defendants mistakenly contend that Plaintiffs' suppression of evidence claim is based only on unspecified police notes and Bishop's and Capers's initial statements and photographic identifications. Defs.' Mem. 25, 27. Not so. Plaintiffs' claim is premised on the withholding of: (1) Floueritta Hunter's statement to police that she did not witness the murder; (2) Keyha Alderman's written statement to police that she did not witness the murder; (3) Ron Bishop's Nov. 23 Oral Statement that Plaintiffs were not involved in the murder; (4) Edward Capers's Nov. 23 Oral Statement that only one person was involved in the murder and he could not identify that person; and (5) the coercive tactics Defendants used to get the juvenile witnesses to provide their false Nov. 23 written statements and trial testimony.

Defendants ignore facts supporting a finding that they concealed this favorable evidence. They present no arguments regarding the "bad faith" portion of the second element. And their sole argument regarding prejudice (*i.e.*, "materiality") misconstrues the facts and ignores the Supreme Court's requirement that materiality be analyzed collectively, not in isolation. *See Wearry v. Cain*, 577 U.S. 385, 394 (2016).

**A.    The record supports that Defendants unconstitutionally concealed evidence from the prosecutor.**

Defendants do not point to any record evidence establishing that they disclosed the five pieces of evidence listed above to the prosecutors. Nevertheless, they ask the Court to conclude as a matter of law that they did so. Because the record contains ample evidence from which a reasonable jury could conclude otherwise, summary judgment must be denied. *See Burgess v. Balt. Police Dep't*, No. RDB-15-0834, 2017 WL 4947004, at *11 (D. Md. Oct. 31, 2017) (relying on "circumstantial evidence [that] Defendants failed to disclose" evidence, in case where original attorneys' files no longer exist, in denying summary judgment on suppression claim).

24

1. **Defendants concealed Hunter's and Alderman's statements that they did not witness the murder.**

Hunter and Alderman each gave statements to police that they did not witness the murder. *See* Ex. 10, at NK DEF 7004–06; Ex. 20, Hunter Decl. ¶¶ 1–7; Ex. 22, Alderman Decl. ¶¶ 1–5. None of the three criminal defense lawyers used the statements when cross-examining Thomas, even though the statements would have powerfully contradicted her claim that she was with both classmates when she allegedly saw the murder. *See, e.g.*, Ex. 19, at MFM 320 (128:17–129:5). Mr. Chestnut's counsel, Barry Diamond, testified that he does not recall receiving any exculpatory material that undermined Thomas's credibility. Ex. 37, Diamond Dep. 87:3–6. Mr. Diamond further testified that had he received such material, he would have used it at trial. *Id.* at 86:20–87:2. Defendants do not respond to this ample evidence from which a jury could conclude that they concealed those statements. *See* Defs.' Mem. 25.

Criminal defense counsel's failure to use Hunter's or Alderman's statements at trial and Mr. Diamond's testimony that he would have used such material if he had it creates a dispute about whether Defendants concealed those statements. *See Burgess*, 2017 WL 4947004, at *11 (relying on circumstantial evidence, including testimony from attorneys from criminal trial, in denying summary judgment); *Bolden v. City of Chicago*, No. 17-CV-417, 2019 WL 3766104, at *17 (N.D. Ill. Aug. 9, 2019) (concluding that criminal defense counsel's "denied knowledge" of police reports gave "rise to an inference that it was not disclosed to the prosecution and not disclosed to the defense"); *Haley v. City of Bos.*, No. 09-10197-RGS, 2013 WL 4936840, at *4 (D. Mass. Sept. 12, 2013) (finding that suppression claim "cannot be decided on summary judgment record" in part because defense counsel used "less-probative inconsistencies" to impeach witness and thus would have used more probative statement if he had it).

Additional evidence supports a finding that the police, not the prosecutor, suppressed the statements. Defendants cite proffers that the prosecutor, Shoup, made during the trial, *see, e.g.*, Defs.' Mem. 25 (citing Defs.' Ex. 8, 21:23–22:1, 119:13–120:4, and 124:21–125:2), but ignore that Shoup's proffer was *inculpatory* and the very *opposite* of what Hunter and Alderman told the police. At trial, Shoup proffered that Hunter was an eyewitness to the homicide who might be called as a witness, and he affirmatively stated that Alderman had identified Plaintiffs. *See* Ex. 38, May 3, 1984 Tr. at MFM 936 (14:16–15:7), MFM 989 (119:13–17). Shoup's proffer is contrary to what Hunter and Alderman told the police. *See* Ex. 20, Hunter Decl. ¶ 5 (stating that she told police that she "did not witness the shooting"); Ex. 23, Alderman Dep. 219:2–19 (testifying that she did not identify Plaintiffs as being involved in the murder). From these disputes of fact, a reasonable jury could infer that Defendants never provided Shoup (and thus defense counsel) with Hunter's and Alderman's statements that they had *not* witnessed the murder. *See Burgess v. Balt. Police Dep't*, 300 F. Supp. 3d 696, 705 (D. Md. 2018) (denying Rule 50 motion on suppression claim where prosecutor wrote note reflecting an "inculpatory" eyewitness account, suggesting that police "withheld the true [exculpatory] account of [the] eyewitness account from both" the prosecutor and defense counsel); *see also Anderson*, 477 U.S. at 250–51 (summary judgment standard mirrors Rule 50 standard).

Further, Dets. Joyce and Kincaid each testified that they provided only a subset of documents from their case files to the State in their "prosecution folders." Ex. 39, Joyce Dep. 195:5–17; 196:4–19 (testifying that he provided only a "Reader's Digest of the case" to prosecutors and that if a witness in his judgment was not "germane to the case," he would not include information in prosecution folder); Ex. 21, Kincaid 30(b)(6) Dep. 41:9–42:10 (adopting Joyce's testimony and adding that prosecution folders were "nowhere[] near the size" of

detectives' case folders). Kincaid could neither recall which documents he did or did not provide to the prosecutors in this case, *id.* at 46:12–14, nor whether he memorialized Hunter's statement in writing, *id.* at 69:10–12. This further supports denial of Defendants' Motion. *See Burgess*, 300 F. Supp. 3d at 710 (upholding verdict against officer for suppression of evidence based in part on officer's testimony that he could not say for sure if he provided notes to prosecutor).

Defendants suggest that they disclosed the Hunter and Alderman statements to the prosecutor because he had them in his possession and asked the Court to seal them. Defs.' Mem. 25. That is wrong: the sealed documents consisted of police reports and notes—*not* witness statements. *See, e.g.*, Ex. 40, OAG 2506 (appellant's brief describing records as "[r]eports of the principal investigating officer"). The appellate court ruled that the sealed documents did not have to be produced because they were *not* "written statement[s] of a witness," which have to be produced. Ex. 41, OAG 2410 (citation omitted). Defendants' speculation that the sealed documents contained *witness statements* and further leap that they included Hunter's and Alderman's statements, is contradicted by the record and ignores all the evidence cited above that Defendants concealed those statements. Defendants' request for an unreasonable inference in their favor should be rejected. *Anderson*, 477 U.S. at 255.

### 2. Defendants concealed Bishop's and Capers's November 23, 1983 Oral Statements.

Defendants also concealed both Bishop's Nov. 23 Oral Statement that Plaintiffs were not involved and Capers's Nov. 23 Oral Statement that one person, whom he could not identify, committed the crime. As with Hunter's and Alderman's statements, none of the Plaintiffs' defense attorneys referenced the Nov. 23 Oral Statements at trial—which they could have used to help establish Plaintiffs' innocence and impeach the juvenile witnesses. That the prosecutor turned over Bishop's and Capers's other written statements to criminal defense counsel

27

(including prior exculpatory statements), *see*, *e.g.*, Ex. 8, at MFM 572–73 (45:17–46:12), MFM 575–76 (51:25–52:24); Ex. 9, at MFM 393 (42:8–16), supports the reasonable inference that he did not provide their Nov. 23 Oral Statements to defense counsel because he never received them from Defendants. *See Burgess*, 2017 WL 4947004, at *11 (citing prosecutor's statement "that she did not withhold . . . documents" from defendant in finding "genuine issue of fact to be addressed at trial" on whether officers concealed statement from prosecutor).

Defendants flout the summary judgment standard and ask the Court for *unreasonable* inferences in *their* favor that prosecutors not only received witness statements (including those of Hunter and Alderman) from police but then violated their ethical duties to disclose them to criminal defense counsel. *See Anderson*, 477 U.S. at 255. Defendants do not even address Bishop's or Capers's November 23, 1983 Oral Statements, let alone point to any evidence that they disclosed the statements to the prosecutor. Instead, Defendants note that criminal defense counsel sought to impeach the witnesses. Defs.' Mem. 27. The generic point that criminal defense counsel sought to impeach Bishop and Capers with weaker statements does not refute Plaintiffs' claim that Defendants concealed Bishop's and Capers's oral exculpatory statements, given just before Defendants pressured them to adopt a false story. *See Owens v. Balt. City State's Att'ys Office*, No. GLR-11-3295, 2016 WL 5452944, at *4–5 (D. Md. Sept. 29, 2016) (finding suppression where defense had other inconsistent statements from witness).

### 3.   Defendants concealed their coercive tactics.

Finally, Defendants' Motion ignores their failure to disclose in 1983 or 1984 the coercive tactics they had used against the juvenile witnesses.[8] *See Chestnut*, 2021 WL 1662469, at *11

---

[8] Defendants offer no argument on any of the substantive elements, *i.e.*, they do not dispute that evidence of their coercive tactics (which must be assumed to have occurred) was concealed from the prosecutor, in bad faith, and caused prejudice in violation of *Brady*. Rather, they assert a feeble

(acknowledging theory that "Officer Defendants did not disclose the fact that several witness statements were coerced and fabricated"). Because Dets. Kincaid and Joyce participated in meetings where they forced witnesses to adopt a false story of Plaintiffs' guilt, they had direct knowledge of their own tactics. *See* Ex. 3, Bishop Dep. 96:4–101:14, 103:8–104:17, 112:18– 113:1; Ex. 2, Capers Dep. 92:18–93:1; Ex. 18, at MFM 1078–79 (122:1–123:22). As such, a jury may find both of them liable. *See Owens*, 767 F.3d at 397–98 (holding police officers possessing same exculpatory evidence could be held liable for failing to disclose to prosecutors).

### B.   Defendants concede the "bad faith" element of the suppression claim.

Defendants do not address the bad faith element of the suppression claim, failing again to meet their burden and waiving this argument. *Celotex*, 477 U.S. at 323; *Cavallo*, 100 F.3d at 1152 n.2. Even if Defendants belatedly address this element, there is overwhelming evidence from which a jury could find bad faith, which at a minimum creates a dispute of material fact. This evidence includes: threats of violence and prosecution against juvenile witnesses to get them to change their accounts, the inclusion of false statements in the affidavit in support of Plaintiffs' arrest warrant, and the failure to investigate other suspects. *See Burgess*, 300 F. Supp. 3d at 705–06 (discussing bad faith and finding that defendant's "failure to investigate" alternate suspect evidenced bad faith); *McPherson*, 494 F. Supp. 3d at 282 (explaining that bad faith can be "inferred through gross deviations from routine police conduct" and specifically "when police officers fabricate evidence and fail to disclose especially pertinent exculpatory evidence" (citation omitted)). Forcing juvenile witnesses to adopt false statements is unmistakable evidence of bad faith, and in fact, Defendants have no police practices expert in this case because no credible expert would defend such behavior. In addition, the significance of the suppressed

---

affirmative defense that "reasonable diligence" would have led Plaintiffs' trial attorneys to discover Defendants' conduct. *See* Defs.' Mem. 28–30, which is addressed *infra* Arg. § III.D.

statements, including Bishop's affirmative exculpatory statement that Plaintiffs "weren't involved in the murder," by itself "negate[s] any innocent explanation for . . . Defendant[s'] withholding." *Burgess v. Goldstein*, 997 F.3d 541, 552 n.4 (4th Cir. 2021) (citation omitted).

### C.     The concealed exculpatory and impeachment evidence was material.

"Evidence qualifies as material when there is 'any reasonable likelihood' it could have 'affected the judgment of the jury.'" *Wearry*, 577 U.S. at 392 (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)). To show materiality, Plaintiffs need *not* show that they "more likely than not would have been acquitted," *id.*, or even that "disclosure *probably* would have modified a trial's result," *Owens*, 767 F.3d at 398. Instead, Plaintiffs need "show only that the new evidence is sufficient to 'undermine confidence' in the verdict." *Wearry*, 577 U.S. at 392 (quoting *Smith v. Cain*, 565 U.S. 73, 76 (2012)). *Brady* requires a holistic analysis in which all suppressed evidence is "considered collectively, not item by item." *Kyles v. Whitley*, 514 U.S. 419, 436 (1995) (citation omitted); *see also Burgess*, 2017 WL 4947004, at *11 n.8.

Defendants do not address, and thus concede, the materiality of four pieces of evidence: their coercive tactics, Bishop's Nov. 23 Oral Statement, Capers's Nov. 23 Oral Statement, and Hunter's statement that she did not witness the murder. Defendants' improper analysis of one piece of evidence (Alderman's statement) in isolation is reason enough to reject their arguments. *See Kyles*, 514 U.S. at 436; *Burgess*, 2017 WL 4947004, at *11 n.8.

Given the lack of physical or forensic evidence, the criminal trial against Plaintiffs rose and fell on witness testimony and the propriety of the investigation. Yet, Plaintiffs' criminal defense counsel were deprived of evidence that: Defendants had threatened juvenile witnesses with violence and prosecution; Bishop and Capers had told Defendants that Plaintiffs were not involved in the murder right before being coerced; and Hunter and Alderman had told police that they did not witness the murder (contradicting Thomas). Taken together, this evidence would

have exculpated Plaintiffs, offered powerful impeachment of multiple witnesses (including

Kincaid), and exposed the lack of integrity at the core of Defendants' investigation. A reasonable

jury could conclude that, if disclosed, this concealed evidence collectively could have "affected

the judgment of the jury." *Wearry*, 577 U.S. at 392 (citation omitted).

Even if the concealed evidence were viewed in isolation, it is material under established

law. Undisclosed threats of violence and prosecution against juveniles are material. *See Kyles*,

514 U.S. at 445 (concluding that evidence that "would have raised opportunities to attack . . . the

thoroughness and even the good faith of the investigation" was material); *see also United States

v. Sutton*, 542 F.2d 1239, 1240, 1243 (4th Cir. 1976) (granting new trial where FBI agent's

threats to prosecute witness who later provided inculpatory testimony were not disclosed) (citing

*Giglio*, 405 U.S. 105); *Estate of Bryant v. Balt. Police Dep't*, No. ELH-19-384, 2020 WL

673571, at *22 (D. Md. Feb. 10, 2020) (describing detective's undisclosed "use of suggestive

tactics" as "material"). Bishop's and Capers's Nov. 23 Oral Statements—both provided to police

right before they were coerced—offered "compelling[] exculpatory information [that] could have

affected the judgment of the jury." *Burgess*, 2017 WL 4947004, at *13 (citation omitted). At a

minimum, the Oral Statements were material because they "would have significantly impaired

the credibility of . . . key prosecution witness[es]." *Monroe v. Angelone*, 323 F.3d 286, 317 (4th

Cir. 2003); *Owens*, 767 F.3d at 398 (citing *Strickler v. Greene*, 527 U.S. 263, 289–90 (1999)).

This is true even where defense counsel had other information to impeach witnesses. *See Wolfe

v. Clarke*, 691 F.3d 410, 414–25 & n.8 (4th Cir. 2012); *Owens*, 2016 WL 5452944, at *4–5

(ruling impeachment evidence that would have discredited key witness was material even if

defense counsel already knew witness had changed his story).

Defendants only contest (improperly in isolation) the materiality of Alderman's statement, which they claim was insignificant because the State "did not use any of Alderman's evidence against Plaintiffs," as she was not called as a witness. Defs.' Mem. 26. This misses the point: If the *defense* had access to Alderman's statement that she had not witnessed the murder with Thomas, defense counsel could have used it to great effect by calling Alderman as a witness and impeaching Thomas's "eyewitness" testimony. *See Monroe*, 323 F.3d at 317; *Owens*, 767 F.3d at 398. While Defendants claim that Plaintiffs had "ample impeachment material to cross-examine Thomas," Defs.' Mem. 27, criminal defense counsel had no witness statements undermining that Thomas *even saw the murder*. Thus, Alderman's statement was material (and "not cumulative of other evidence") because it would have "provided new avenues for impeaching" Thomas that "directly undermined" her testimony. *Juniper v. Zook*, 876 F.3d 551, 571 (4th Cir. 2017). Defendants' half-hearted argument regarding Alderman's statement rings hollow, even when viewed in isolation, and especially when properly considered collectively with the other concealed evidence.

> **D.    Defendants' affirmative defense that defense counsel and the prosecutor should have uncovered the depths of their coercion is unsupported and would immunize police misconduct.**

Defendants seek an affirmative defense riddled with factual disputes, unreasonable inferences, and legal flaws. They offer the fanciful argument that, even if they concealed their coercive tactics, Plaintiffs' criminal defense counsel and the State should have uncovered those tactics using "reasonable diligence." *See* Defs.' Mem. 28–30. This is an affirmative defense, *Burgess*, 2017 WL 4947004, at *11 n.9, for which Defendants bear the burden, *see Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.*, 673 F.3d 294, 299–300 (4th Cir. 2012). Defendants argue that criminal defense counsel (and their investigator) should have interviewed Bishop, done a better job interviewing Capers, and, through those interviews, uncovered

Defendants' threats. This argument fails for at least three reasons.

First, Defendants incorrectly assume the affirmative defense is available to them. Because Defendants concealed the evidence of their coercive tactics, defense counsel (and the prosecutors) had no reason to believe that the detectives had levied physical and psychological threats against juveniles to procure their written November 23 inculpatory statements. *See Strickler*, 527 U.S. at 284–85 (where defense counsel would have no reason to believe that *Brady* material existed, due diligence does not require they seek out such material); *accord United States v. Moore*, 709 F.3d 287, 293 (4th Cir. 2013).

Second, the affirmative defense is legally unsupported. Defendants rely on *Hoke v. Netherland*, a case so far afield from this case that it does not warrant consideration. *See* 92 F.3d 1350, 1355–56 (4th Cir. 1996) (faulting defense attorney in habeas case with no police misconduct for not investigating client's prior consensual sexual relationships). Defendants' reliance on *Holland v. City of Chi.* is similarly misguided. *See* 643 F.3d 248, 256 (7th Cir. 2011). Contrary to Defendants' description of the case, the Seventh Circuit there found "no evidence" that the "officers "coerced [witness] to lie or were otherwise withholding exculpatory evidence." *Id.* at 256. Neither of these cases speak to the fear and trauma Defendants inflicted on Bishop and Capers to coerce their false statements and cause them to conceal their lies.

Third, even if the defense were available, it rests on conjecture that is contradicted, or at least disputed, by the record. Relying on investigator Gregory Perry's trial testimony, Defs.' Mem. 29, Defendants assume that defense counsel did not try to contact the juvenile witnesses *and* that they could have spoken to them if they had. But Plaintiffs' criminal defense counsel made repeated attempts to contact witnesses but were stymied. For instance, Mr. Stewart's criminal defense attorney tried to contact the State's witnesses well before trial and received no

response. Ex. 42, May 2, 1984 Tr. at MFM 476 (7:12–16). He followed up with each witness again before trial but received no response other than that two witnesses affirmatively said they would *not* speak with the defense. *Id.* at MFM 476 (7:22–8:2). Perry tried to interview Capers four times before he finally reached him. Ex. 48, May 28, 1984 Tr. at MFM 827 (13:20–23).

Defendants further assume that teenage Bishop and Capers—whose lives had been threatened—would have been forthcoming about Defendants' misconduct. Defs.' Mem. 29. That speculation is both disputed and asks for an unreasonable inference in their favor. As reflected in the testimony cited by Defendants (Defs.' Ex. 12, 83:17-85:10), when the investigator asked Capers whether Kincaid had improperly suggested Plaintiffs' name, Capers did *not* mention the abuse he endured. This reflects both the investigator's diligence and Capers's fear of Defendants that kept him from telling the truth. Capers explained that he "felt ashamed of [him]self" and "couldn't even talk to [his] mother about it." Ex. 2, Capers Dep. 92:16–93:8. Bishop similarly testified that he "told no one" about what happened because he was worried "that something could happen to them. Ex. 3, Bishop Dep. 116:3–10. Given that the police threatened both juvenile witnesses with prosecution, *id.* at 111:22–112:2, Ex. 2, Capers Dep. 79:9–21, a reasonable jury could conclude that defense counsel's efforts were both reasonable and futile.

In a single sentence with no citations, Defendants refer to Hunter and Alderman, suggesting that their undisclosed statements could have been discovered by criminal defense counsel. Defs.' Mem. 29–30. This argument suffers from the same legal flaws and unreasonable inferences outlined above. In addition, because the prosecutor and criminal defense counsel were led to believe that Hunter had witnessed the murder and Alderman had identified Plaintiffs, criminal defense counsel could not have been reasonably expected to pursue the witnesses. *Burgess v. Balt. Police Dep't*, No. RDB-15-0834, 2016 WL 795975, at *9 (D. Md. Mar. 1, 2016)

(finding that where "the [criminal] defendant alleges that he did not know the importance of the unavailable witness due to the alleged misconduct of another party, he cannot reasonably be expected to pursue the witness"). Defendants' argument also fails on the facts. Neither witness was actually available. As Defendants acknowledge, criminal defense counsel tried to speak with Hunter but she "declined," Defs.' Mem. 11 (citing Defs.' Ex. 8, 103:15–22); *see also* Ex. 38, at MFM 938 (18:22–24), and Alderman's mother thought testifying would be "too terrifying an experience" for her daughter, Ex. 38, at MFM 937 (15:2–7).

Finally, Defendants offer a related and equally dubious defense: the prosecutor should have discovered Defendants' coercion of Bishop and Capers. Defs.' Mem. 30–31. Again, Defendants do not contest that they concealed their coercive tactics from the prosecutor. Instead, according to Defendants, based on a single vague statement from Bishop to the prosecutor (that "things didn't go the way – the exact way as we're going over them") and because witness accounts had changed, they posit that the prosecutor should have uncovered Defendants' misconduct. Defendants cite no case law applying their proposed defense based on a prosecutor's supposed lack of reasonable diligence to a § 1983 suppression claim. And the case they do cite supports Plaintiffs' position, not Defendants'. *See* Defs.' Mem. 30 (citing *United States v. Robinson*, 627 F.3d 941, 952 (4th Cir. 2010) (explaining that prosecutors are *not* required to "conduct disciplinary inquiries into the general conduct of every officer working the case" where "no one other than the officers themselves had any idea of any impropriety")).

Taken to its logical conclusion, Defendants' affirmative defense would permit law enforcement to conceal their heinous threats against innocent children and then, even when discovered, escape liability by claiming others should have figured it out. Such a perverse outcome would swallow the rule of *Brady* and its progeny. *See Brady v. Maryland*, 373 U.S. 83,

87 (1963) ("Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly.").

## IV.    A Jury Should Decide the Malicious Prosecution Claims Because Defendants Lacked Probable Cause to Arrest Plaintiffs.

For the state and federal malicious prosecution claims (Counts I & VII), Plaintiffs must show that Defendants "(1) caused (2) a seizure of [Plaintiffs] pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in [their] favor." *Humbert v. Mayor & City Council of Balt. City*, 866 F.3d 546, 555 (4th Cir. 2017), *as amended* (Aug. 22, 2017) (citation omitted); *see also Heron v. Strader*, 361 Md. 258, 265 (2000). Defendants only address the second element, claiming that they had probable cause to arrest Plaintiffs.[9] The relevant inquiry is whether, under "a totality of the circumstances," the information available to Defendants would "warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect[s] ha[d] committed . . . an offense." *Humbert*, 866 F.3d at 555 (alteration in original) (citation omitted). Probable cause can "only [be based on] the information the officers had at the time of the arrest." *Gilliam*, 932 F.3d at 234 (citation omitted).

Defendants' misconduct infects the entire analysis. At least three of the witness statements on which the Defendants relied in their affidavit (from Bishop, Capers, and Hunter) were fabricated. A reasonable jury could find that the remaining two statements (from Caldwell

---

[9] At various points in their Motion, Defendants reference the pre-trial decisions of the Honorable Robert M. Bell, including with respect to probable cause. *See, e.g.*, Defs.' Mem. 10. If Defendants seek to imply that those prior rulings have any force of law, they forget that Plaintiffs' convictions were *vacated* and thus cannot be used as a basis for collateral estoppel. *See Gilliam*, 932 F.3d at 232 ("[Plaintiffs] have sufficiently alleged that their now-vacated state court convictions were obtained improperly. Accordingly, collateral estoppel does not preclude [plaintiffs] from challenging the probable cause of their arrests."); *see also Caldor, Inc. v. Bowden*, 330 Md. 632, 658 (1993) (explaining party is not entitled to preclusive effect absent a valid, final judgment).

and Thomas) were likewise coerced or, at a minimum, unreliable. Regardless, Caldwell's and Thomas's purported statements cannot be viewed in a vacuum, and Defendants' knowledge of and failure to pursue exculpatory evidence undermines probable cause. Given the numerous factual disputes, summary judgment is inappropriate. *See Hyatt v. Miller*, No. 19-cv-00250-MR-WCM, 2021 WL 535856, at *7 (W.D.N.C. Feb. 12, 2021) ("In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." (citation and quotation omitted)).

### A.   Defendants do not address the fabricated statements of Bishop, Capers, and Hunter in their probable cause analysis.

In his application and supporting affidavit for Plaintiffs' arrest warrant (*i.e.*, Defendants' original purported statement of probable cause, *see Humbert*, 866 F.3d at 555–56), Kincaid relied on statements from five witnesses: Bishop, Capers, Hunter, Caldwell, and Thomas. *See* Ex. 27, at HILLIARD 67. Defendants do not address the statements of Bishop, Capers, and Hunter.[10] And for good reason: it is well-established that "fabricated evidence cannot serve as the basis for probable cause." *Estate of Bryant*, 2020 WL 673571, at *25 (citing *Manuel v. City of Joliet*, 137 S. Ct. 911, 918 (2017)). As detailed above, the evidence supports that Defendants coerced Bishop and Capers to abandon their exculpatory Nov. 23 Oral Statements and falsely implicate Plaintiffs in their Nov. 23 Written Statements. Similarly, Kincaid's probable cause

---

[10] Defendants assert that Bishop's present-day recollections about his December 1, 1983, grand jury testimony somehow support probable cause. *See* Defs.' Mem. 22 (citation omitted). This fails as a matter of law because it (and Bishop's current recollections of it) occurred *after* Plaintiffs' arrest. *See Gilliam*, 932 F.3d at 234. Moreover, Defendants splice together quotes from Bishop's current recollections with his grand jury transcript from 38 years ago, which the parties obtained *after* Bishop's deposition, to misrepresent that Bishop believes that Mr. Chestnut was involved in the murder. *See* Defs.' Mem. 22 (citing Defs.' Ex. 26, 127:9–19 & Defs.' Ex. 6, 29:2–5, 29:18–24). Yet Bishop testified to the opposite: that Kincaid fed him the "lie that Alfred Chestnut, Ransom Watkins, and Andrew Stewart participated in the killing of Dewitt Duckett," Ex. 3, Bishop Dep. 105:2–7, and "Michael Willis shot Dewitt Duckett," *id.* at 297:3–11.

affidavit included two other false statements, *i.e.*, that Hunter both witnessed the murder and identified Plaintiffs. *See supra* Arg. § III.A.1.

**B.      Genuine disputes of material fact exist as to whether Caldwell's and Thomas's November 23 statements established probable cause.**

Defendants claim that even if they threatened Bishop and Capers and fabricated their statements, the statements of Caldwell and Thomas independently supplied probable cause. *See* Defs.' Mem 19–22. That claim ignores the evidence from which a jury could reasonably conclude that Defendants also fabricated Caldwell's and Thomas's statements (or at least had reason to know they were unreliable); it also ignores that Defendants possessed and failed to pursue exculpatory evidence that undermined their supposed basis for probable cause.

**1.      A reasonable jury could conclude that Defendants coerced Caldwell to falsely identify Plaintiffs.**

A reasonable jury could find that Defendants coerced Caldwell to abruptly change his story on November 23, 1983. *See Gilliam*, 932 F.3d at 240 (explaining, in affirming denial of summary judgment, that circumstantial evidence, including witness's age (16), change in story, and evidence of bad faith "suggest that [the witness's] statements were coerced or fabricated"); *Manning v. Miller*, No. 02 C 372, 2005 WL 3078048, at *5–9 (N.D. Ill. Nov. 14, 2005) (a jury could infer officers induced false statements based on circumstantial evidence and noting that "[w]ere direct evidence required, it would be tantamount to a death knell for cases of this type").

Caldwell's statements mirror the pattern of Bishop's and Capers's. As with those two witnesses, police interviewed Caldwell several times before November 23, and he never identified Plaintiffs. *See* Ex. 5, ¶ 11. On November 21, Caldwell was also shown an array that included Plaintiffs, yet did not identify Plaintiffs. *See* Ex. 18, at MFM 1061–63 (88:13–91:6). On November 23 at the homicide unit, on the same evening at the same place that Defendants coerced Bishop and Capers, Caldwell's story suddenly changed. Kincaid admitted that he was

"stern" with Caldwell and told Caldwell "we are not going to play around any longer." *See* Ex. 7, Kincaid Dep. 257:15–261:22. Kincaid stood "right on top," within inches of Caldwell when he displayed the same array from two days prior. Ex. 25, at MFM 681 (92:14–18). Caldwell also told the CIU that he was not wearing his glasses during the murder, could not make out faces from where he was standing, and was coached on what to say. Ex. 31, at NK DEF 11570–71.

Defendants assert that Caldwell was not forthcoming in his initial meetings with Kincaid because he was purportedly threatened by Plaintiffs. *See* Defs.' Mem. 22. But Bishop explained that it was Kincaid who concocted this lie:

> And we were given a narrative of, if we're questioned about . . . why we didn't initially tell the truth, meaning tell the truth to that lie, that all we have to say when we get to court was "I was scared for my life, so therefore, I did not tell the truth."

Ex. 3, Bishop Dep. 131:4–12.

Viewing the facts in the light most favorable to Plaintiffs, a reasonable jury could find that 15-year-old Caldwell was coerced based on: (1) Bishop's and Capers' accounts of Defendants' coercion; (2) Kincaid's concession regarding his anger during his meeting with Caldwell; (3) Caldwell's statements that he could not make out the faces of those who committed the murder; and (4) Caldwell's sudden adoption of the same false story after originally failing to identify Plaintiffs. *See Gilliam*, 932 F.3d at 240; *see also* Ex. 43, Expert Rep. of Dr. Richard Leo, at PLAINTIFFS 1784–86 (detailing facts surrounding November 23 meeting from which jury could find that Caldwell's change in story to implicate Plaintiffs was "police-induced").

### 2. A reasonable jury could find that Thomas was coerced or unreliable.

This leaves only Thomas's statement, and a jury could similarly conclude that Defendants fed her a false narrative, or, at a minimum, her statement was unreliable. Contrary to Defendants' asserted basis for probable cause, Thomas told the CIU that she did not witness the murder, Ex. 33, at NK DEF 11849–50. She later testified that she has no memory of meetings

with Det. Kincaid or witnessing the murder. Ex. 44, Thomas Dep. 214:1–215:5, 216:20–217:4,

226:10–22, 231:14–233:2. Kincaid confirmed that he failed to confirm any facets of Thomas's

story. Ex. 7, Kincaid Dep. 323:21–324:3. Given Thomas's young age (13 years old), her lack of

memory regarding the murder, and the evidence that Defendants coerced (or attempted to coerce)

multiple juveniles (including Bishop, Capers, Caldwell, and Hunter), *see supra* SOF § IV & Arg.

§ I.B; Ex. 20, Hunter Decl. ¶¶ 5–7, a jury could reasonably conclude that Defendants coerced

Thomas to name Plaintiffs. *See Manning*, 2005 WL 3078048, at \*8; *Gilliam*, 932 F.3d at 240.

   Even if a jury does not conclude that Thomas was coerced, it could reasonably find that

Defendants could not rely on her statement to establish probable cause. Defendants again rely on

authority that bolsters Plaintiffs' position. *See* Defs.' Mem. 20 (citing *Humbert v. O'Malley*, No.

WDQ-11-0440, 2014 WL 1266673 (D. Md. Mar. 25, 2014)).[11] In *Humbert*, the court explained

that "the positive identification of a suspect by a witness is generally sufficient to establish

probable cause for an arrest, *unless officers have reason to believe the witness is unreliable or

have other exculpatory evidence.*" *Id.* at \*9 (emphasis added, footnote omitted). Here,

Defendants had ample reason to believe Thomas was unreliable, given their knowledge of

Hunter's and Alderman's statements contradicting Thomas (and in fact when seeking the arrest

warrant Det. Kincaid himself did not rely on Thomas alone). *See supra* SOF § III; *see also* Ex.

20, Hunter Decl. ¶¶ 2–7; Ex. 22, Alderman Decl. ¶¶ 1–5; Ex. 27. Capers and Bishop also

repeatedly told Defendants that it was impossible for Thomas to have seen the shooting from

where she claimed to have been. *See, e.g.,* Ex. 2, Capers Dep. 48:10–49:3, 80:5–82:1, 84:10–

86:22, 87:19–88:4, 89:4–6; Ex. 3, Bishop Dep. 90:1–5. Additionally, Thomas's age, the

---

[11] Defendants also cite *Bailey v. Town of Smithfield*, 19 F.3d 10 (4th Cir. 1994) (per curiam), but unlike here, that case did not involve coercion or conflicting witness statements.

inconsistencies in her statements, and her inability to relay basic details about the crime gave

Defendants reason to believe her statement was unreliable. *See* Ex. 43, at PLAINTIFFS 1786–87

(detailing facts that jury could credit in finding Thomas's statement was false and unreliable).

Contrary to Defendants' assertion, Caldwell's and Thomas's statements do not "stand

unchallenged." Defs.' Mem. 22. The opposite is true: nearly every material fact is disputed.

Viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could conclude

that Defendants coerced all the witnesses. *See Chestnut*, 2021 WL 1662469, at *9 (finding that if

officers "coerced the four witnesses into [falsely] identifying the Plaintiffs . . . it is hard to see

how such statements could have provided the Officer Defendants with probable cause"). [12]

### 3. Defendants' knowledge of exculpatory evidence and failure to investigate other leads further undermined probable cause.

Even assuming Caldwell's and Thomas's statements were voluntary, Defendants'

knowledge of exculpatory evidence and failure to investigate other suspects further undermine

probable cause. First, Defendants had "other exculpatory evidence" when they sought to arrest

Plaintiffs, including Bishop's and Capers's Nov. 23 Oral Statements. *Humbert*, 2014 WL

1266673, at *9. Because disputes of material fact preclude summary judgment on Plaintiffs'

suppression and fabrication claims, summary judgment should likewise be denied on the

malicious prosecution claims. *See Burgess*, 2017 WL 4947004, at *21 (denying summary

judgment on malicious prosecution where claim was "intricately tied" to officer's knowledge of

---

[12] In an after-the-fact attempt to establish probable cause, Defendants state that HPJHS teacher Shirley Woodard told them that Plaintiffs were in the school minutes before the shooting. Defs.' Mem. 22. This fact is disputed. In discussing his sole interview with Ms. Woodard *before* Plaintiffs' arrests, Kincaid testified that Ms. Woodard did *not* identify anyone "of any importance to the investigation." Ex. 25, at MFM 679 (87:7–16); *see also* Ex. 14, at MFM 191–93 (78:21–79:20, 80:22–81:5) (school security officer testifying he escorted Plaintiffs away from school *before* shooting occurred). Regardless, "[p]resence at a crime scene or accompanying someone who engages in criminal activity does not by itself establish probable cause of involvement in the criminal offense." *Robinson v. Miller*, 802 F. App'x 741, 748 (4th Cir. 2020) (citation omitted).

exculpatory witness statements and "knowledge that he fabricated" evidence).

Second, "evidence that . . . police defendants failed to investigate other suspects is relevant to whether there was probable cause to arrest" Plaintiffs. *Humbert v. O'Malley*, No. WDQ-11-0440, 2015 WL 1569182, at *3 n.9 (D. Md. Apr. 6, 2015); *see also Clipper v. Takoma Park, Md.*, 876 F.2d 17, 20 (4th Cir. 1989) (same and finding evidence was sufficient to negate probable cause). Here, Defendants received multiple reports that Willis committed the murder, including that he wore the Georgetown jacket that night and threw the gun as he ran from the school. *See, e.g.,* Ex. 5, ¶¶ 23–24; Ex. 10, at NK DEF 6999–7000; Ex. 14, at MFM 214–15 (124:19–126:25). Yet Defendants never interviewed Willis, nor met with a witness who reportedly had knowledge about him, nor properly investigated other potential suspects. Ex. 7, Kincaid Dep. 213:13–17; Ex. 15, Toon Dep. 26:13–27:16; Ex. 10, at NK DEF 6999–7000.

Under the "totality of the circumstances," and given the numerous factual disputes that must be viewed in Plaintiffs' favor, the malicious prosecution claims require resolution by a jury. *See Gilliam*, 932 F.3d at 234; *Hicks v. Anne Arundel Cnty.*, No. JKB-20-00022, 2021 WL 4804017, at *4 (D. Md. Oct. 14, 2021); *Burgess*, 2017 WL 4947004, at *21.

## V.     A Reasonable Jury Could Conclude that Detectives Joyce and Kincaid Failed to Stop—and Actively Participated In—Witness Coercion.

For the failure to intervene claim (Count IV), Plaintiff must show that Defendants: (1) knew that a fellow officer was violating an individual's constitutional rights; (2) had a reasonable opportunity to prevent the harm; and (3) chose not to act. *Burgess*, 2017 WL 4947004, at *21.

While Defendants proclaim there is "no evidence" of any wrongdoing by Joyce, Defs.' Mem. 33, they ignore that he was involved in the investigation from at least the day after the murder, gave statements to the press, interviewed Capers, and arrested Plaintiffs. Ex. 7, Kincaid Dep. 195:19–196:3; Ex. 6 ¶¶ 1, 3; Exs. 11, 13. Joyce's failure to stop Kincaid from threatening

Capers on November 23, 1983, alone warrants denial of summary judgment on this claim. *See Chestnut*, 2021 WL 1662469, at*12 (noting presence during coercion suffices for failure to intervene); *Burgess*, 2017 WL 4947004, at *21; *see also* Ex. 18, at MFM 1078–79 (122:1–123:22).[13] When asked whether the other two Caucasian male detectives in the room tried to "intervene and stop Kincaid from saying the things he was saying to you," Capers responded, "No one [did]." Ex. 2, Capers Dep. at 83:18–21; *see also id.* at 75:5–12, 83:12–17.

Based on a strained reading of the record, Defendants ask the Court to infer in their favor that Joyce was not one of those detectives. Defs.' Mem. 32–33. Yet, Kincaid *himself* admitted that Joyce was present for the November 23 meeting with Capers. Ex. 18, at MFM 1078–79 (122:1–123:22); *see also* Ex. 6, ¶ 3. That direct evidence alone creates a dispute of material fact. While Defendants posit that Joyce may not have been present for parts of the meeting (*i.e.*, those where Kincaid coerced Capers), Kincaid's admission and Capers's testimony that the other Caucasian male detectives *were present* for those parts should be considered by a jury. Courts have relied on less to infer that an officer knew of a fellow officers' misconduct. *See Burgess*, 2017 WL 4947004, at *14, 21 (denying summary judgment on failure to intervene claim and inferring that three officers knew of exculpatory witness statement based merely on presence at crime scene where statement was made, even absent direct evidence they spoke to witness).

Finally, in a single sentence, Defendants incorrectly conclude that a claim for failure to intervene cannot lie against Det. Kincaid "because there was nothing to prevent." Defs.' Mem. 34. This argument is undeveloped and waived. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017). There is ample evidence from which a jury could conclude that Kincaid

---

[13] Based on Capers's testimony that "it was pretty much the same people" at the November 23 meeting as his first meeting, Ex. 2, Capers Dep. 74:7–17, a jury could reasonably conclude that Joyce participated in the meeting with Capers on the day of the murder (November 18).

failed to intervene, including Capers's testimony that a detective other than Kincaid showed him photographs of Plaintiffs, Ex. 2, Capers Dep. 94:17–22, 101:6–13, told him that those photographs were the people that Thomas had identified, and accused Capers of protecting Plaintiffs, *id.* at 97:7–17, forcing Capers to adopt a false narrative. Capers testified that Kincaid did not stop that conduct, but promoted it. *Id.* at 100:13–16. Summary judgment on this claim should be denied. *See Chestnut*, 2021 WL 1662469, at*12; *Burgess*, 2017 WL 4947004, at *21.

## VI.    Defendants' Coercion of Witnesses and Suppression of Evidence, Causing the Imprisonment of Innocent Teenagers, Supports Plaintiffs' IIED Claims.

"A claim of IIED [Count VIII] has four elements: (1) intentional or reckless conduct that is (2) extreme and outrageous and is (3) causally connected to the emotional distress, which is (4) severe." *Arsham v. Mayor & City Council of Balt.*, 85 F. Supp. 3d 841, 849 (D. Md. 2015) (citation omitted). A police officer's abuse of power is significant in assessing an IIED claim. *See Bell v. Vill. of Streamwood*, No. 10 C 3263, 2011 WL 4435664, at *5 (N.D. Ill. Sept. 6, 2011); *accord Harris v. Jones*, 281 Md. 560, 569 (1977) ("[W]here the defendant is in a peculiar position to harass the plaintiff, and cause emotional distress, his conduct will be carefully scrutinized[.]" (citation omitted)).

A reasonable jury could view Defendants' threats of violence and prosecution against vulnerable teenagers to coerce them to adopt a false narrative to place three Black 16-year-olds from West Baltimore in prison for a crime they did not commit as "extreme and outrageous." *See, e.g., Howard*, 487 F. Supp. 3d at 429; *Burgess*, 2017 WL 4947004, at *22; *Bazinet v. Thorpe*, 190 F. Supp. 3d 229, 241 (D. Mass. 2016) ("Likewise, the officers' treatment of Lori, which involved coercing her into filing a false APO against her mentally-ill husband, could constitute a claim for IIED."). As Defendants' own expert testified, if a jury credits Bishop's and Capers's testimony, Defendants' threats were "criminal acts." Ex. 36, Milan Dep. 239:4–9.

Plaintiff Ransom Watkins perhaps best captures the outrageous, extreme, and severe misconduct of Defendants when he recounts what Kincaid said to him at age 16:

> When he [Detective Kincaid] came back. I guess because he couldn't get none – he didn't get what he wanted to get out of me, so he came back. He looked me right in my face. I'll never forget it. He told me, he said, '*I'm white, you black and I have a badge. Who do you think they going to believe at the end of the day,*' and that day for the rest of my life, I will never forget it. Never. I will die going to my grave remembering that. *If nothing else happen in life, that's one thing I won't never in my life forget*.

Ex. 45, Watkins Dep. 142:2–15 (emphasis added); *accord id.* 164:18–178:8; Ex. 26, Chestnut Dep. 229:13–230:3, 232:13–22; Ex. 46, Stewart Dep. 109:2–12, 141:11–143:3, 146:20–148:9; *see generally* Ex. 47, Reports of Dr. Susan Rushing (detailing mental health trauma experienced by each Plaintiff during decades-long wrongful incarceration).

## VII.    Qualified Immunity Is Not Available to Defendants

In a last-ditch effort to justify their behavior, Defendants assert, based on a misunderstanding of the law, that they are entitled to qualified immunity. But qualified immunity is only available if they did "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Plaintiffs' constitutional rights were "clearly established" in 1983. *Gilliam*, 932 F.3d at 235, 241. Defendants' qualified immunity argument merely recycles their claims that they did nothing wrong in the first place. Defs.' Mem. 34–35. As with all their other arguments, this, too, fails.

## <u>CONCLUSION</u>

Plaintiffs Alfred Chestnut, Andrew Stewart, and Ransom Watkins have waited almost forty years for justice. They should not have to wait any longer. For the foregoing reasons, the Court should deny Individual Defendants' Motion for Summary Judgment in its entirety and set this case for trial.

Respectfully submitted,


_____/s/_____
Kobie A. Flowers (Bar No. 16511)
Andrew D. Freeman (Bar No. 03867)
Chelsea J. Crawford (Bar No. 19155)
Neel K. Lalchandani (Bar No. 20291)
Anthony J. May (Bar No. 20301)
kflowers@browngold.com
adf@browngold.com
ccrawford@browngold.com
nlalchandani@browngold.com
amay@browngold.com
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 2500
Baltimore, Maryland 21202
Tel: (410) 962-1030
Fax: (410) 385-0869


_____/s/_____
Larry A. Nathans (Bar No. 03023)
Booth M. Ripke (Bar No. 25764)
nathans@nathanslaw.com
bripke@nathanslaw.com
Nathans & Ripke LLP
120 E. Baltimore Street, Suite 1800
Baltimore, Maryland 21202
Tel: (410) 783-0272
Fax: (410) 783-0518

*Attorneys for Plaintiffs Alfred Chestnut,
Andrew Stewart, Jr., and Ransom Watkins*

Dated: October 14, 2022

## **CERTIFICATE OF SERVICE**

I, the undersigned attorney, hereby certify that I have caused true and correct copies of

the above and foregoing to be served on all counsel of record via the Court's CM/ECF system, in

accordance with the rules of electronic filing of documents, on this 14th day of October, 2022.

/s/ Kobie A. Flowers
Kobie A. Flowers