# EXHIBIT 14

IN THE CIRCUIT COURT FOR BALTIMORE CITY

THE STATE OF MARYLAND

-vs-

ALFRED A. CHESTNUT
RANSOM L. WATKINS
ANDREW L. STEWART, JR.

Indictment Nos. 18335414, 15, 16, 17, 18, 19

---

REPORTER'S OFFICIAL TRANSCRIPT OF PROCEEDINGS

Baltimore, Maryland

May 16, 1984

BEFORE:

THE HONORABLE ROBERT M. BELL, JUDGE, and a Jury

APPEARANCES:

JONATHAN SHOUP, ESQUIRE
On behalf of the Plaintiff

BARRY DIAMOND, ESQUIRE
On behalf of the Defendant,
Alfred A. Chestnut

RICHARD T. CREMIN, ESQUIRE
On behalf of the Defendant,
Ransom L. Watkins

STEPHEN SUSER, ESQUIRE
On behalf of the Defendant,
Andrew L. Stewart, Jr.

Reported by:
Susan D. Ashe, RPR
Official Court Reporter
507 Courthouse West
Baltimore, Maryland 21202

---

III-2

PROCEEDINGS

THE COURT: Good morning, ladies and gentlemen.

THE JURY: Good morning.

THE COURT: As you recall, I advised you that after the opening statements the first thing that would happen would be the witnesses would be called first by the State.

Mr. Shoup is therefore asked to call his first witness.

MR. SHOUP: Thank you, Your Honor.

State would call Saundra Rusk.

Whereupon,

SAUNDRA RUSK

a witness produced on call of the State, having first been duly sworn, was examined and testified as follows:

THE CLERK: Keep your voice up. State your name and address.

THE WITNESS: My name is Saundra Rusk. I live, 604 Queensgate Road.

DIRECT EXAMINATION

BY MR. SHOUP:

Q   Miss Rusk, good morning.

A   Good morning.

Q   Miss Rusk, are you presently employed as a school-teacher in the Baltimore City school system in our community?

A   Yes, I am.

MFM 0000153

Q    Pursuant to your duties did you have an occasion that day to talk with anyone who was not a student at the school?

A    Yes, I did.

Q    Would you look around the courtroom today and see if you can identify any individuals that you saw on November the 18th, 1983, at Harlem Park Junior High School in our City of Baltimore who are not students?

A    Three young men sitting behind the defense lawyers.

MR. SHOUP:  Now, let the record reflect that the witness has identified the three defendants.

BY MR. SHOUP:

Q    Where did you see -- strike that.

Do you know any of these students, or non-students by name?

A    Yes, I do.

Q    Can you identify these non-students that you have just identified and tell me which -- well, excuse me.

Do you recognize a Ransom Watkins?

A    Yes, I do.

Q    Would you pick him out for the ladies and gentlemen of the jury?

A    The young man sitting in the middle.

MR. SHOUP:  Let the record reflect he's identified the Defendant, Ransom Watkins.

BY MR. SHOUP:

Q    Would you identify a person if you see him in the courtroom that you know by the name of Alfred Chestnut?

A    Yes, sir, the young man sitting right next to Ransom Watkins in the burgundy shirt.

MR. SHOUP:  Let the record reflect he has identified the Defendant, Alfred Chestnut.

BY MR. SHOUP:

Q    Do you know a man or a young man by the name of Andrew Stewart?

A    Yes, I do, a young man sitting with the white sports coat and white shirt.

MR. SHOUP:  Let the record reflect he's identified the Defendant, Andrew Stewart.

BY MR. SHOUP:

Q    Where did you see Ransom Watkins on November the 18th, 1983?

A    There was down --

MR. CREMIN:  Objection.

BY MR. SHOUP:

Q    Answer my question very carefully.  Where did you see Ransom Watkins, just Ransom Watkins, on November 18th, 1983?

A    Down at the basketball court.

Q    Where was that located in relationship to the

Harlem Park Junior High School?

A    Adjoining right next to the school.

Q    Did you see anyone with him or in the proximity of him?

A    Yes, I did.

Q    Who did you see in his proximity?

A    Alfred Chestnut and Andrew Stewart, Arnold and Curtis Dowell.

Q    Arnold and Curtis Dowell.

What time of the day did you see them?

A    Twelve-forty-five.

Q    Is the basketball court adjacent to Harlem Park Junior High School part of the school property?

A    Yes, it is.

Q    When you saw Alfred Chestnut, Ransom Watkins, Andrew Stewart and two other individuals, did you say anything to them?

A    Yes, sir. I approached them, gave them a warning and told them to leave the premises of the school and they're not to return.

Q    Why did you tell Ransom Watkins, Andrew Stewart and Alfred Chestnut to leave the school?

MR. DIAMOND: Objection.

THE COURT: Overruled.

THE WITNESS: They were non-students at the school

and they had no reason to be on the school property.

MR. CREMIN: Move to strike.

THE COURT: Overruled.

BY MR. SHOUP:

Q    Since you are a security officer, what statutes -- were they in, of course, school property during the school day?

MR. DIAMOND: Objection.

THE WITNESS: Tresspassing.

THE COURT: Was there an objection?

MR. DIAMOND: I objected, Your Honor.

THE COURT: Overruled.

MR. DIAMOND: I withdraw it.

THE COURT: Proceed.

BY MR. SHOUP:

Q    And I couldn't hear the answer. What was your answer?

MR. DIAMOND: Objection.

THE WITNESS: Oh, tresspassing.

THE COURT: Overruled.

BY MR. SHOUP:

Q    You told Andrew Stewart, Ransom Watkins and Alfred Chestnut to leave the property because they were tresspassing. Did they in fact leave?

A    Yes, they did.

MFM 0000192

III-81

Q   What did you do after they left the school property?

A   After they fled the premises and the area between the school, I then proceeded back into the building.

Q   Did you go back in the building immediately?

A   No. I stayed outside for about a couple minutes.

Q   After you went inside the building, what area of the school did you proceed to?

A   Down towards Unit D wing.

Q   Was that on the first or second floor?

A   First floor.

Q   Did there come a time during the course of that day that you saw an individual by the name of Dewitt Duckett? In the course of the whole day -- listen to my question -- did you see an individual by the name of Dewitt Duckett?

A   Yes, sir.

Q   All right. Where did you see him?

A   He was being carried in Unit Principal, Mr. English, arms.

Q   What was his physical condition when you saw him?

A   He had a small, small gunshot wound on the right side of his neck.

MR. CREMIN: Objection.

THE COURT: I'll sustain the objection.

BY MR. SHOUP:

Q   Just say physically what you observed of Mr. Duckett.

III-82

Tell us what you saw.

A   He was semi-unconscious.

Q   Why do you say he's semi-unconscious? Tell the ladies and gentlemen of the jury what you saw with your eyes, not a conclusion, what you saw with his eyes.

A   Okay. He was --

Q   Let me rephrase the question for you.

A   Yes.

Q   When you observed Dewitt Duckett were you able to observe his face?

A   Yes, I did.

Q   Were you able to observe his facial expression and his eyes?

A   Yes, I did.

Q   Were his eyes open or closed?

A   They were open.

Q   When you said that he was being carried by a Mr. English, were you able to observe his limbs, his arms and legs?

A   Yes, sir. They was just hanging off. They was just weak in the knees and arms.

Q   When you saw Dewitt Duckett, what time was it?

A   About 1:20.

Q   Now, when you saw him did you observe whether he had any kind of a jacket on?

III-113

A  Yes, sir.

Q  Now, that's up a hill; isn't that so, sir, a slight incline?

A  Yes, sir.

Q  Were you all running or walking fast?

A  No, sir.

Q  So, you were all taking your time, would you say, walking average?

A  Yes.

Q  And did there come a time when you stopped and the boys continued to walk?

A  Yes, sir. I stopped right there at the end of the school property and watched them leave the area.

Q  So, that would have been sometime about 1 o'clock; is that so?

MR. SHOUP: Objection.

THE WITNESS: No, sir.

THE COURT: Overruled.

BY MR. SUSER:

Q  Pardon me?

A  No, sir.

Q  No?

A  I don't know.

Q  Oh, you don't know. I see. Well, now, you stopped at the end of the school. Can you tell us where you saw the

III-114

five boys walking as you stopped at the end of the school?

A  Walking north in the 700 block of Gilmor Street.

Q  That would be in the direction away from the school; is that correct?

A  Yes, sir.

Q  I believe you testified on direct examination that for a few minutes you stood there and watched them; is that correct?

MR. SHOUP: Objection.

THE WITNESS: Yes, sir.

THE COURT: Overruled.

BY MR. SUSER:

Q  About how many minutes, would you say, Mr. Kelly?

A  I don't know.

Q  But a few minutes?

A  I don't know. I didn't have a watch.

THE COURT: Now, Mr. Kelly, you're going to have to keep your voice up a little bit, please.

THE WITNESS: Oh, okay.

BY MR. SUSER:

Q  Now, at that point when you went back into the school you were satisfied in your own mind, were you not, that the boys were off the school premises; is that correct?

A  Yes, sir.

| | |
|---|---|
| Q | Now, isn't it true at that point that you went back to A and B Unit to check and make sure that the doors were secure? |
| A | Yes, sir. |
| Q | Now, A and B Units are the units of the junior high school that are closest to what street, sir? |
| A | Gilmor Street. |
| Q | So, they would have been the units contained in the section of the building that was closest to you when you saw the boys walking away from the school; is that correct? |
| A | Yes, sir. |
| Q | Why did you go in there, to check those doors or to check and make sure the units were secure? |
| A | Just a curiousity, that's all. |
| Q | And were the doors secure? |
| A | Yes, they were. |
| Q | Now, we're both using the word, secure. Can you explain to me what you mean by secure? |
| A | The doors were locked at that time when I checked them. |
| Q | Now, can you describe specifically what doors we're talking about? |
| A | Talking about doors leading into the courtyard facing Gilmor Street side. |
| Q | And these are also the doors closest to the parking lot on the Gilmor Street side, also; is that correct? |
| A | Yes, sir. |
| Q | So, all of those doors were secure, correct? |
| A | Yes, sir. |
| Q | So, is it your opinion, then, that no one could have gotten back into the school through those doors? |
| | MR. SHOUP: Objection. |
| | BY MR. SUSER: |
| Q | Through those doors of A and B Unit? |
| | THE COURT: Sustained. |
| | BY MR. SUSER: |
| Q | Between 1 and 1:15? |
| | MR. SHOUP: Objection. |
| | THE COURT: Sustained. |
| | BY MR. SUSER: |
| Q | Mr. Kelly, I want to refer you now to the area of the school that is the north side of the school on Lanvale Street. Are you familiar with that area of the school? |
| A | Yes, I am. |
| Q | Now, correct me if I'm wrong, sir; but doesn't Lanvale Street dead-end right at the school where the junior high school and the elementary school join? |
| A | Yes, sir. |
| Q | Now, the length of the building-- that is, from Lanvale and Gilmor Street down Lanvale Street, which is the |

THE COURT: You missed the point. The question has to be resolved by the finders of the fact, Mr. Shoup; and obviously I'm not going to limit defenses that might be raised if they are in any way relevant. It was indeed, and there's been an answer to the question that he did see him on that day. It has also been mentioned during the investigation, and they should be allowed to explore any connection he might have. That's doesn't change the testimony that's going to be given.

MR. SHOUP: What I am saying is the State feels that if you are going to say that as the defense explains the reason that is relevant because probability is that he committed the murder, which is what the defense seems to be saying; and the only evidence they're showing to show that he probably committed the murder is State's witness, is that, say he definitely did not commit the murder.

THE COURT: I understand the point, Mr. Shoup.

MR. SHOUP: I don't see how through this witness that they might be able to call him as a witness when it was not covered on direct examination.

If that is their defense to have them call and bring up that area in a defense posture, but it's not part of cross-examination as to what he saw, as to what Dewitt Duckett and the three individuals. It also has nothing to do with -- there's no evidence to indicate

that there is -- that he conducted an investigation or that is relevant if they can somehow tie in the State feels, in a defense posture to say that he saw him up there, and they will present it at the time of defense, then I think that is proper; but at this point to just start, mention a name, continue that stream all the way through the State's case with no foundation to indicate that he in any way perpetrated the murder, I think the State feels it's incorrect. If the defense puts it on, then I think they can call Mr. Kelly as a defense witness to put him at the premises.

THE COURT: Any comments from anybody else?

MR. CREMIN: No, sir.

THE COURT: Objection will be overruled.

MR. DIAMOND: Thanks, Your Honor.

(Counsel and the defendants returned to trial tables and the following ensued:)

THE COURT: Overruled.

BY MR. SUBER:

Q Now, Mr. Kelly, I believe I asked you if you could, sir, please try and recall about what time it was that you saw Michael Willis at the school that day.

A Sir, I can't recall.

Q Well, can you give us some idea of whether it was in the morning or possibly the early afternoon?

A It's about late afternoon.

Q  Do you recall seeing Mr. Willis at or around the time that the ambulance came to the school to pick up Mr. Duckett?

A  Yes, sir.

Q  Yes. So, that would have been around what time?

A  I don't know.

Q  Do you know what time the ambulance came to school?

A  No, sir.

Q  Well, can you give us an estimate, sir? I know you called, you say you called at 1:20; is that correct?

A  Yes.

Q  And about how long did it take for it to respond?

A  Around seven, around eight, around about five minutes.

Q  So, around 1:25, then, you're saying, it's very possible that you saw Michael Willis, likewise, on the school grounds?

   MR. SHOUP:  Objection.

   THE COURT:  Overruled.

   THE WITNESS:  No, sir. He was not on the school grounds.

   BY MR. SUSER:

Q  Where did you see him, then, sir?

A  He was in the park which is next -- which is in

front of the school but it's not part of the school.

Q  So, that is right next to the school; is that correct?

A  Yes, sir.

Q  Where he was in the park, how far would you say that was from the front entrance to the school?

A  I don't know.

Q  Would it be less than fifty feet?

A  I don't know.

Q  It wasn't very far, was it, sir?

A  I don't know.

Q  Did you see him there?

A  He was there.

Q  You saw him there?

A  Yes, sir.

Q  Okay. Can't you give us any idea of how far he was from the school?

A  He was -- let's say he was in the middle of the park near the statue.

Q  And who was he with?

A  I don't know.

Q  Well, but, he was with someone?

A  I don't know. He just hollered at me.

Q  What did he holler at you?

A  Nothing, just hollered out my name.

Case 1:20-cv-02342-LKG   Document 202-14   Filed 10/14/22   Page 10 of 10
III-207

REPORTER'S CERTIFICATE

I, SUSAN D. ASHE, an Official Court Reporter for the Circuit Court for Baltimore City, do hereby certify that I stenographically recorded the proceedings in the matter of State of Maryland versus Alfred A. Chestnut, Ransom L. Watkins and Andrew L. Stewart, Jr., Indictment Nos. 18335414, 15, 16, 17, 18 and 19, in the Circuit Court for Baltimore City on Wednesday, May 16, 1984, before the Honorable Robert M. Bell, Judge, and a Jury.

Further, I certify that the page numbers III-2 through III-205 constitute the official record of proceedings as transcribed by me from my stenographic notes to the within typewritten matter in a complete and accurate manner.

In Witness Whereof, I have affixed my signature this 21st day of December, 1984.

_____
SUSAN D. ASHE
Official Court Reporter

MFM 0000256